# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALAN ZAMETKIN, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FIDELITY MANAGEMENT & RESEARCH COMPANY, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) 1:08-CV-10960-MLW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Goodwin Procter LLP
   James S. Dittmar (BBO# 126320)
   Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, MA 02109

Milbank, Tweed, Hadley & McCloy LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert R. Miller
   Andrew W. Robertson (*pro hac vice*)
   Jennie Woltz
1 Chase Manhattan Plaza
New York, NY 10005-1413

*Attorneys for Defendants Fidelity Management & Research Co., FMR Corp. (n/k/a FMR LLC), Fidelity Brokerage Services LLC, Edward C. Johnson 3d, Abigail P. Johnson, James C. Curvey, Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas, Kimberley Monasterio, Christine Reynolds, and Robert L. Reynolds*

(Other counsel listed below)

Dechert LLP

    William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036-6797

    - and -

    Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, MA 02116

    - and -

    Thomas C. Bogle
    Robert W. Helm
1775 I Street, NW
Washington, DC 20006-2401

*Attorneys for Defendant Fidelity Income Fund*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND.........................................................................................4

ARGUMENT................................................................................................................14

I.   PLAINTIFF CANNOT BRING AN ACTION FOR MISMANAGEMENT
     UNDER THE FEDERAL SECURITIES LAWS. ...............................................14

     A.   Allegations of Corporate Mismanagement Are Not Actionable Under the
          Federal Securities Laws. .......................................................................15

     B.   Plaintiff's Allegations Challenge Management of the Fund and Its
          Performance. ..........................................................................................16

          1.   Decisions to Invest in Mortgage Securities Are Not Actionable
               Under Federal Securities Law...................................................16

          2.   Alleged Errors in Valuation of Mortgage Securities Do Not
               Support a Disclosure Claim Under the Securities Act..............18

II.  PLAINTIFF FAILS TO ADEQUATELY ALLEGE ANY ACTIONABLE
     MISREPRESENTATIONS OR OMISSIONS. ..................................................18

     A.   Plaintiff Must Plead Facts Supporting Falsity, Materiality, and Duty to
          Disclose, Without Relying on Hindsight. ...............................................19

     B.   Plaintiff's Alleged Misrepresentations and Omissions Are Insufficient
          Under Any Standard. ..............................................................................21

          1.   The Alleged Misrepresentations and Omissions Regarding the
               Fund's Investment Strategy and Risks Are Not Actionable. ......22

          2.   Defendants Openly Disclosed and Discussed the Fund's Exposure
               to Mortgage Securities. ............................................................33

          3.   Plaintiff's Allegations Regarding Pricing Accuracy and Pricing
               Process Deficiencies Cannot Support a Claim...........................34

III. PLAINTIFF'S CLAIMS ARE BARRED BY THE APPLICABLE ONE-YEAR
     STATUTE OF LIMITATIONS. ........................................................................38

     A.   Claims Under the Securities Act Must Be Brought Within One Year After
          Plaintiff Is on Notice of the Claims. ......................................................38

    B.     Plaintiff Was on Notice of His Claims More Than One Year Before the Initial Complaint Was Filed........................................................................39

IV.    PLAINTIFF HAD KNOWLEDGE OF THE ALLEGED MISREPRESENTATIONS AND OMISSIONS AT THE TIME HE PURCHASED SHARES IN THE FUND........................................................................41

V.    PLAINTIFF'S CLAIMED LOSSES WERE NOT CAUSED BY THE ALLEGED MISREPRESENTATIONS OR OMISSIONS. ...............................................................41

VI.    FMR LLC IS NOT A PROPER DEFENDANT FOR PURPOSES OF SECTION 11.........................................................................................................................43

VII.    PLAINTIFF'S CLAIM UNDER SECTION 15 FOR CONTROL PERSON LIABILITY MUST BE DISMISSED. .................................................................45

CONCLUSION .........................................................................................................................45

**Cases**

ACA Fin. Guar. Corp. v. Advest, Inc.,
512 F.3d 46 (1st Cir. 2008) .......................................................................................... 20, 21, 29

Aldridge v. A.T. Cross Corp.,
284 F.3d 72 (1st Cir. 2002) .......................................................................................... 45

Alliance N. Am. Gov't Income Trust,
1996 U.S. Dist. LEXIS 14209 ....................................................................................... 23

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) .................................................................................................. 19

Basic Inc. v. Levinson,
485 U.S. 224 (1988) ...................................................................................................... 20

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ...................................................................................................... 19

Benzon v. Morgan Stanley Distribs., Inc.,
420 F.3d 598 (6th Cir. 2005) ........................................................................................ 21, 25

Brown v. Credit Suisse First Boston LLC,
431 F.3d 36 (1st Cir. 2005) ........................................................................................... 19, 28, 29

Burstein v. Applied Extrusion Techs., Inc.,
150 F.R.D. 433 (D. Mass. 1993) ................................................................................... 16

Cent. Bank, N.A. v. First Interstate Bank, N.A.,
511 U.S. 164 (1994) ...................................................................................................... 20

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002) .......................................................................................... 8

Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,
129 F.3d 222  (1st Cir. 1997) ......................................................................................... 38, 39

Cooperman v. Individual, Inc.,
171 F.3d 43 (1st Cir. 1999) ........................................................................................... 20

Cooperman v. Individual, Inc.,
No. 96-12272-DPW, 1998 U.S. Dist. LEXIS 22126 (D. Mass. May 27, 1998),
aff'd, 171 F.3d 43 (1st Cir. 1999) ................................................................................. 22

Coronel v. Quanta Capital Holdings Ltd.,
  07 Civ. 1405 (RPP), 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 26, 2009) .......................... 19

Curran v. Cousins,
  509 F.3d 36 (1st Cir. 2007) .......................................................................................... 8

Decker v. Massey-Ferguson, Ltd.,
  681 F.2d 111 (2d Cir. 1982) ...................................................................................... 17

Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,
  353 F.3d 1125 (9th Cir. 2004) .................................................................................... 22

Ezra Charitable Trust v. Tyco Int'l, Ltd.,
  466 F.3d 1 (1st Cir. 2006) .......................................................................................... 45

Fitzer v. Sec. Dynamics Techs., Inc.,
  119 F. Supp. 2d 12 (D. Mass. 2000) ........................................................................... 17

In re AES Corp. Sec. Litig.,
  825 F. Supp. 578 (S.D.N.Y. 1993) .............................................................................. 26

In re Alkermes Secs. Litig.,
  No. Civ.A 03-12091, 2005 WL 2848341 (D. Mass. Oct. 6, 2005) ................................ 42

In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.,
  95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 26, 1996) ............ 22

In re Am. Bank Note Holographics, Inv. Sec. Litig.,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) ........................................................................... 44

In re CIT Group, Inc. Sec. Litig.,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) .................................................................... 20, 28

In re Craftmatic Sec. Litig.,
  890 F.2d 628 (3d Cir. 1989) ...................................................................................... 16

In re Donald J. Trump Casino Sec. Litig.,
  7 F.3d 357 (3d Cir. 1993) .......................................................................................... 20

In re Duke Energy Corp. Sec. Litig.,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................................... 18, 37

In re Elscint, Ltd. Sec. Litig.,
  674 F. Supp. 374 (D. Mass. 1987) .............................................................................. 44

In re Hyperion Sec. Litig.,
  No. 93 Civ. 7179 (MBM), 1995 WL 422480 (S.D.N.Y. July 14, 1995) ......................... 23

In re JP Morgan Chase Sec. Litig.,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................. 21

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................. 21

In re Merrill Lynch & Co.,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ................................... 39, 40, 43

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) ................................................. 42

In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,
   No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ................................... 43

In re NAHC, Inc. Sec. Litig.,
   306 F.3d 1314  (3d Cir. 2002) ........................................................... 39

In re Salomon Analyst AT&T Litig.,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ................................................. 29

In re Salomon Analyst Level 3 Litig.,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004) ................................... 22, 30, 35

In re Salomon Smith Barney Mut. Fund Fees Litig.,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................. 43

In re SeaChange Int'l, Inc. Sec. Litig.,
   No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004) ........................... 8

In re Tyco Int'l, Ltd., Sec. Litig.,
   185 F. Supp. 2d 102 (D.N.H. 2002) ................................................... 39

In re USF&G Corp. Sec. Litig.,
   No. B-90-2928, 1993 U.S. Dist. LEXIS 10064 (D. Md. Feb. 11, 1993) ................................. 28

In re Worldcom, Inc. Sec. Litig.,
   308 F. Supp. 2d 338  (S.D.N.Y. 2004) ................................................. 44

Kaplan v. First Hartford Corp.,
   447 F. Supp. 2d 3 (D. Mass. 2006) ..................................................... 20

Kinder v. Acceptance Ins. Cos.,
   423 F.3d 899 (8th Cir. 2005) ............................................................. 21

Krouner v. Am. Heritage Fund, Inc.,
   899 F. Supp. 142 (S.D.N.Y. 1995) ..................................................... 26

Ladmen Partners, Inc. v. Globalstar, Inc.,
07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. Sept. 30, 2008) ................................ 19

LC Capital Partners LP v. Frontier Ins. Group Inc.,
318 F.3d 148 (2d Cir. 2003) ........................................................................................... 39

Lerner v. FNB Rochester Corp.,
841 F. Supp. 97 (W.D.N.Y. 1993) .................................................................................. 17

Luce v. Edelstein,
802 F.2d 49 (2d Cir. 1986) ............................................................................................. 23

Maggio v. Gerard Freezer & Ice Co.,
824 F.2d 123 (1st Cir. 1987) ........................................................................................... 38

Mayer v. Oil Field Sys. Corp.,
803 F.2d 749 (2d Cir. 1986) ........................................................................................... 41

Merrill Lynch Research Reports,
272 F. Supp. 2d at 249 ............................................................................................. 25, 42

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996) ............................................................................................ 21, 26

Panter v. Marshall Field & Co.,
646 F.2d 271 (7th Cir. 1981) .......................................................................................... 16

Panther Partners, Inc. v. Ikanos Commc'ns Inc.,
538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................................ 20

Press v. Quick & Reilly, Inc.,
218 F.3d 121 (2d Cir. 2000) ........................................................................................... 25

Romani v. Shearson Lehman Hutton,
929 F.2d 875 (1st Cir. 1991) ........................................................................................... 23

Santa Fe Indus., Inc. v. Green,
430 U.S. 462 (1977) ........................................................................................ 3, 14, 15, 16

Scritchfield v. Paolo,
274 F. Supp. 2d 163 (D.R.I. 2003) ............................................................................ 16, 22

Shaw v. Digital Equip. Corp.,
82 F.3d 1194 (1st Cir. 1996) ................................................................................ 14, 22, 29

Sheppard v. TCW/DW Term Trust 2000,
938 F. Supp. 171 (S.D.N.Y. 1996) .................................................................................. 26

Shields v. Amoskeag Bank Shares Inc.,
766 F. Supp. 32 (D.N.H. 1991) ................................................................. 17

**Slavin v. Morgan Stanley & Co.,**
**791 F. Supp. 327 (D. Mass. 1992)** ........................................................... 39

Suna v. Bailey Corp.,
107 F.3d 64 (1st Cir. 1997) ...................................................................... 27

Vachon v. BayBanks, Inc.,
780 F. Supp. 79 (D. Mass. 1991) .................................................. 16, 18, 37

Virginia Bankshares, Inc. v. Sandberg,
501 U.S. 1083 (1991) ............................................................................... 19

Warren Freedenfeld Assocs., Inc. v. McTigue,
531 F.3d 38 (1st Cir. 2008) ........................................................................ 8

Wilkes v. Heritage Bancorp, Inc.,
767 F. Supp. 1166 (D. Mass. 1991) ..................................................... 15, 18

**Statutes**

15 U.S.C. § 77k(a) ........................................................................ 19, 41, 44

15 U.S.C. § 77k(e) ................................................................................... 41

15 U.S.C. § 77*l*(b) ................................................................................. 41

15 U.S.C. § 77m ...................................................................................... 38

15 U.S.C. § 77o ....................................................................................... 45

15 U.S.C. § 77z-2 .................................................................................... 22

15 U.S.C. 77*l*(a)(2) .......................................................................... 19, 41

**Rules**

17 C.F.R. 270.22c-1 ............................................................................ 7, 42

Fed. R. Civ. P. 9(b) ................................................................................. 20

**Other Authorities**

Int'l Monetary Fund, Global Financial Stability Report at 7 (Apr. 2007) .................... 30

SEC Release No. 33-7398, Registration Form Used By Open-End Management Investment
Companies, 1997 WL 87357, at *16-*17, *20 (Feb. 27, 1997) ................ 24

SEC Release No. AS-118, 1970 WL 10502, at *4 ...................................... 38

SEC Release No. AS-118, <u>Accounting for Investment Securities by Registered Investment Companies</u>, 1970 WL 10502, at *4-*5 (Dec. 23, 1970) .......................................................... 35

Testimony of Ben S. Bernanke before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007), <u>available at</u> 2007 WL 927663 ......................................................................................... 30

Defendants respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint ("Complaint" or "Compl."), pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff's disappointment with the performance of the Fidelity Ultra-Short Bond Fund (the "Fund") in 2007 and 2008 does not give rise to a cause of action. The Fund's prospectus and shareholder reports complied with SEC rules and disclosed each material risk of which Plaintiff complains. The essence of the Complaint is Plaintiff's hindsight view that the Fund should not have invested in highly rated mortgage securities, which caused the Fund (along with many others in the same market) to experience negative total returns of approximately 15% during the last 12 months of the Class Period. The investments Plaintiff seeks to challenge were within the Fund's investment policies and properly disclosed. Plaintiff's claim is nothing more than an after-the-fact attempt to second-guess the discretionary decisions of fund management, and must be dismissed in full.

**Plaintiff's claims of mismanagement are inactionable.** The federal securities laws govern disclosure, not the discretionary management and investment decision-making of which Plaintiff complains. With the benefit of hindsight, Plaintiff may now contend that the Fund could have invested in better performing securities, but that does not amount to a misrepresentation claim.

**The Fund made no promises of safety.** As required by federal securities laws, the Fund stated an investment objective: it "seeks to obtain a high level of current income consistent with preservation of capital." (Ex. A at 3.)[1] This mandatory forward-looking disclosure is protected

---

[1] Citations in the form "Ex. __" are to the Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss.

by the bespeaks caution doctrine and by plainspoken warnings, such as "the fund may not achieve its objective" and "you could lose money."  (Id. at 3, 8.)

**The Fund disclosed its substantial holdings of mortgage securities and their corresponding risks.**  The Fund disclosed its broad mandate to invest in medium and high quality debt securities "of all types," including "mortgage and asset-backed securities."  (Id.) The Fund had a disclosed policy of "investing more than 25% of total assets in the financial services industries," which included mortgage securities.  (Id. at 3.)  Specific risk disclosure was provided for mortgage securities and other securities in the financial services sector.  (Ex. B at 4, 9.)

More important, the Fund publicly disclosed that its holdings of mortgage securities ranged from 42% to 65% from 2003 through 2008, according to financial statements distributed to shareholders and filed with the SEC twice each year.  The Fund's portfolio manager also commented regularly about the Fund's large stake in mortgage securities.[2]

**The Fund's pricing procedures were properly disclosed and timely reflected the declining market in 2007 and 2008.**  In accordance with SEC requirements, the Fund disclosed its reliance on third-party data and, in some cases, judgment to price portfolio securities:  "The fund's assets are valued primarily on the basis of information furnished by a pricing service or market quotations."  (Ex. A at 10.)  If such third-party data were not available or not considered reliable, "such security will be valued by another method that the Board of Trustees believes

---

[2]     Plaintiff's contention that Defendants should have foreseen the impact of the global financial crisis as early as 2005 is not even credible as a management critique.  Virtually all market participants— including financial institutions, market regulators, and the financial press—simply did not predict the credit crisis that erupted in 2007.  Federal Reserve Chairman Ben Bernanke opined in March 2007 that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  Testimony of Ben S. Bernanke Before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007), available at 2007 WL 927663.  Indeed, it was not until the third quarter of 2007 that major financial institutions began to write down the value of investment-grade mortgage securities.

accurately reflects fair value . . . . " (Id.)  More importantly, the pricing process worked:  the Fund's net asset value per share ("NAV") went down as prices for mortgage securities declined.

Against this backdrop, Plaintiff's hindsight claims must be dismissed as a matter of law:

First, under clear Supreme Court precedent, allegations of corporate mismanagement cannot serve as the basis for a claim under the disclosure provisions of the federal securities laws.  Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977).

Second, even if considered as disclosure claims, Plaintiff's allegations do not identify any actionable misrepresentations or omissions.  Defendants made all of the disclosures required by law, and the alleged omissions are neither material nor necessary to make Defendants' disclosures not misleading.  Further, the majority of Plaintiff's alleged misrepresentations (i) relate to forward-looking statements that are inactionable under the bespeaks caution doctrine or (ii) concern matters of judgment or opinion which are not alleged to have been subjectively or objectively false.

Third, Plaintiff's claims are barred by the statute of limitations because Plaintiff was on notice of the Fund's mortgage securities exposure more than one year before he filed his claims.

Fourth, Plaintiff is precluded from asserting claims under the Securities Act because he purchased Fund shares with knowledge of the alleged misrepresentations and omissions. Specifically, Plaintiff purchased shares of the Fund on August 22, 2007, after Defendants had disclosed that the Fund was experiencing losses on its investments in mortgage securities.

Fifth, the alleged misrepresentations and omissions did not cause Plaintiff's loss. Because the price of Fund shares is set by regulatory formula, Defendants' disclosures could not have caused the price to decrease.  In any event, Plaintiff affirmatively alleges that his loss

resulted from the Fund's investments in mortgage securities, which lost value due to a slump in the housing market, not because of any of the Fund's disclosures.

Finally, Plaintiff fails to allege the necessary facts to hold certain Defendants liable under the relevant provisions of the Securities Act. FMR LLC is not responsible for the registration statement and, therefore, cannot be liable under Section 11. In addition, Plaintiff's claims for control person liability under Section 15 must fail because the Complaint does not allege that FMR LLC or any of the Individual Defendants exercised control over any other Defendant.

## FACTUAL BACKGROUND

### 1. The Parties

Plaintiff Alan Zametkin was a shareholder in the Fund until May 16, 2008. Zametkin purports to sue on behalf of a proposed class (the "Proposed Class") consisting of persons and entities who purchased shares of the Fund between June 6, 2005 and June 5, 2008 (the "Class Period"). (Compl. ¶ 1.) Zametkin made three purchases of Fund shares between January 9, 2007 and August 22, 2007, and liquidated his holdings through a series of five sales between February 6, 2008 and May 16, 2008. (See Docket Entry No. 1 at 18.)

Defendant FMR Corp. (n/k/a FMR LLC[3]) is a private financial services company and the ultimate parent company of Defendants Fidelity Management & Research Company ("FMR") and Fidelity Brokerage Services LLC ("FBS"). FMR is the investment adviser to the Fund. FBS is a multi-service broker-dealer that sells shares of the Fund as well as other securities.

Defendant Fidelity Income Fund is an open-end management investment company that issues shares of the Fund, as well as four other Fidelity mutual funds. The Complaint also names

---

[3]     In October 2007, FMR Corp. was converted into a limited liability company and changed its name to FMR LLC.

as defendants nine individuals (collectively, the "Individual Defendants") who served as trustees or officers of the Fund. (See Compl. ¶¶ 12-20, 23-25, 27.)

### 2. Plaintiff's Allegations

Plaintiff asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, all based on the same set of allegations that the Fund's disclosures misrepresented and/or failed to disclose information regarding the Fund's investments in mortgage securities. Plaintiff seeks as damages losses suffered beginning in mid-2007 when the value of the Fund's holdings of mortgage securities began to decline at the outset of the global credit crisis. While Plaintiff attempts to articulate them in many ways, the alleged misrepresentations and omissions fall into two general categories:

(1) the Fund's investment strategy and risks, specifically relating to mortgage securities (see, e.g., id. ¶¶ 84-97, 106-111). Plaintiff claims that Defendants:

- "represented that the Fund was stable with little to no volatility," which was misleading because the Fund was "a less stable investment than represented" due to its investments in mortgage securities (id. ¶¶ 92-93);[4]

- "directly exposed the Fund to the volatility of the subprime mortgage market at precisely the time when it was publicly reported that defaults of subprime mortgages were skyrocketing, and that numerous subprime lenders were facing insolvency" (id. ¶ 50; see also id. ¶ 112 ("[T]he Fund suffered losses as a direct result of its investments in risky mortgage-related securities."));[5]

- stated "that '80% of the fund's assets' were 'in investment-grade debt securities,'" which allegedly was inaccurate "because the risky mortgage-related securities were

---

[4] Plaintiff similarly claims that Defendants "marketed the Fund as a conservative bond fund" because the stated investment objective was "to obtain a high level of current income consistent with preservation of capital." (Compl. ¶ 37; see also id. ¶ 85 (investment risk was "significantly greater than represented").)

[5] In the same vein, Plaintiff criticizes Defendants for ignoring developments in the real estate and subprime mortgage markets that allegedly were "strong indicator[s] that the problems being experienced by sub-prime lenders would generate huge losses for mortgage-related securities, such as those held by the Fund" (Compl. ¶ 79; see also id. ¶¶ 63-79), including those of certain Fidelity analysts who "expressed concerns about the housing market and sub-prime mortgage market" (id. ¶¶ 80-81).

not investment grade even though they may have had investment grade ratings by the ratings agencies" (id. ¶ 86);

- "failed to inform investors of the interest rate changes risk that the Fund was exposed to, significantly because rising interest rates would increase the risk of default on mortgage-related securities" (id. ¶ 91);[6] and

- "obfuscated, concealed or otherwise understated the Fund's true exposure to high risk mortgage-related securities" (id. ¶ 106).

(2) the Fund's valuation capabilities and procedures, especially with respect to mortgage securities (see, e.g., id. ¶¶ 55-62, 98-101). Plaintiff contends that Defendants:

- should have disclosed that there was a "valuation risk due to the fact that Fidelity was unable to adequately price risky mortgage-related assets and heavily relied upon external pricing sources, including Bear Stearns" (id. ¶ 89);

- "reported inflated values" of the Fund's holdings of mortgage-related securities because Defendants "fail[ed] to properly value and write-down" those securities to reflect "prevailing economic conditions" (id. ¶¶ 95-96);

- should have specifically disclosed their reliance on information provided by Bear Stearns (id. ¶¶ 95, 101); and

- employed an internal valuation group that was "not adequately staffed" and, as a result, "was unable to adequately value risky mortgage-related securities and heavily relied upon external pricing sources" (id. ¶¶ 99, 101).

### 3. The Fund

Like all open-end mutual funds, the Fund pools shareholder money and invests it toward a specific goal. FMR, the Fund's investment manager, "has overall responsibility for directing the fund's investment and handling its business affairs." (Ex. A at 22.)

The Fund issues redeemable securities, which means that it fills purchase orders by issuing new shares to the purchaser, and repurchases or "redeems" the shares of any existing

---

[6]     Similarly, Plaintiff alleges that the prospectus's statement that FMR would manage the Fund to have a similar overall interest rate risk to the Lehman Brothers 6 Month Swap Index was false and misleading because "the Fund was structured differently from, and was much riskier than, the [Index]" and was subject to a rising interest rate risk that would increase the risk of default on mortgage securities. (Compl. ¶ 87.)

shareholder who wishes to sell. The price for all purchases and sales of Fund shares is a function

of the Fund's NAV, which is calculated daily as the sum of the value of all of the securities and

other assets held by the Fund, less expenses and liabilities, divided by the total number of shares

outstanding. See 17 C.F.R. 270.22c-1. There is no trading of the Fund's shares between

investors in the secondary market.

The Fund's prospectus explains the pricing process, including that judgment is sometimes

required to ascertain fair valuation, subject to the supervision of the Fund's Board of Trustees:

> The fund's assets are valued primarily on the basis of information
> provided by a pricing service or market quotations . . . . If market
> quotations or information furnished by a pricing service is not
> readily available or does not accurately reflect fair value for a
> security . . . that security will be valued by another method that the
> [Fund's] Board of Trustees believes accurately reflects fair value
> in accordance with the Board's fair value pricing policies . . . . A
> security's value may differ depending on the method used for
> determining value.

(Ex. A at 10.)

### 4. Mortgage Securities Held by the Fund

Mortgage securities, including mortgage-backed securities ("MBS"), collateralized

mortgage obligations ("CMOs"), and asset-backed securities ("ABS"), are interests in pools of

other assets, which generate cash flows that are distributed to the holders of the mortgage

securities. MBS and CMOs are backed by pools of mortgages. (Ex. B at 9.) ABS frequently

may be backed by pools of mortgages and/or other types of collateral, such as credit card

receivables and other consumer debt. (Id. at 4.)[7]

---

[7] The underlying mortgages are originated by commercial banks and mortgage brokers. Investment banks then purchase the mortgages in bulk and bundle them into pools that serve as the collateral for mortgage-related securities. The investment banks then sell the securities to investors of all types, including other investment banks, hedge funds, mutual funds, pension funds, endowments, and individual investors.

Contrary to Plaintiff's characterizations (see, e.g., Compl. ¶¶ 43, 47, 50), mortgage securities have varying credit ratings depending on a number of factors. Mortgage securities typically are structured into a number of senior, mezzanine, and equity layers (or "tranches") that each bear a different risk profile based on the priority in which the tranche is paid the cash generated by the pool of collateral backing the security. Senior tranches are typically paid first and may be assigned high credit ratings (e.g., AA to AAA).[8] The security might also receive a high credit rating due to credit enhancements, such as bond insurance, over-collateralization or reserve funding. Mezzanine and equity tranches are paid after the senior tranches and are typically rated lower or unrated.

Since its inception in 2002, the Fund held a significant portion of its assets in mortgage securities of various types. At all times during the Class Period, the Fund's holdings of mortgage securities were primarily senior tranches that had high investment-grade, AAA and AA credit ratings. (See, e.g., Ex. J at V (noting portfolio manager's emphasis on subprime mortgage securities rated AAA or AA by the major bond rating agencies).) As disclosed, the Fund held a relatively small position in more junior (but generally still investment-grade) mortgage securities.

### 5. The Fund's Public Disclosures

The Fund filed numerous disclosures with the SEC, all of which are also available on the SEC or Fidelity websites.[9] The Fund's prospectus was updated annually and distributed to

---

[8] Mortgage securities typically are reviewed and rated by one or more of the nationally recognized statistical rating organizations ("NRSROs")—i.e., Moody's, Standard & Poor's, Fitch.

[9] The Court may consider the Fund's disclosures in deciding this motion because (1) Plaintiff incorporated them by reference into the Complaint; (2) Plaintiff relied upon them in drafting the Complaint; and/or (3) they are publicly available reports filed with the SEC. See Warren Freedenfeld Assocs., Inc. v. McTigue, 531 F.3d 38, 44 (1st Cir. 2008); Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007); In re SeaChange Int'l, Inc. Sec. Litig., No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687, at *10 (D. Mass. Feb. 6, 2004); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

shareholders both at the time of purchase and with each annual update.  The prospectus explicitly incorporates by reference the Fund's Statement of Additional Information ("SAI"), and its annual and semi-annual shareholder reports.  The annual and semi-annual reports are also distributed to Fund shareholders and include complete financial statements (independently audited once a year), a complete list of the securities held by the Fund, charts showing the distribution of the Fund's holdings across various types of securities, and commentary by the Fund's portfolio manager.  In addition, the Fund periodically distributes "shareholder updates," which include commentary by the Fund's portfolio manager and other information.

### a.    The Fund Disclosed the Risks of Its Investment Strategy.

Contrary to Plaintiff's allegations, the Fund's prospectus made it clear that the Fund's value could decrease.  As required by SEC Form N-1A, the Fund stated its investment objective, which was to seek a high level of current income consistent with preservation of capital.  (See Ex. A at 3.)  This was a goal rather than a promise.  The prospectus stated that "[w]hen you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money."  (Id.)[10]

The Fund is a short-term bond fund that operates under certain parameters but also provides its manager with considerable discretion.  Its disclosed policies include:

- "Normally investing at least 80% of its assets in investment grade debt securities (those of medium and high quality)";

- "Investing more than 25% of total assets in the financial services industries";

- "Managing the fund to have similar overall interest rate risk to . . . the Lehman Brothers 6 Month Swap Index";

---

[10]    The Fund's shareholder reports reinforce this:  "mutual fund shares are not deposits or obligations of, or guaranteed by, any depository institution.  Shares are not insured by the FDIC, Federal Reserve Board or any other agency, and are subject to investment risks, including possible loss of principal amount invested."  (Ex. C at 2.)

- "Normally maintaining a dollar weighted average maturity of two years or less"; and

- "Allocating assets across different market sectors and maturities." (Id.)

The prospectus went on to describe the risks associated with these policies. In addition to interest rate risk (a broad economic risk), bonds are subject to credit risks and market risks specific to instruments selected by the Fund's manager:

> The fund's yield and share price change daily based on changes in interest rates and market conditions and in response to other political, economic or financial developments. The fund's reaction to these developments will be based on the types and maturities of securities in which the fund invests, the financial condition, industry and economic sector, and geographic location of an issuer, and the fund's level of investment in the securities of that issuer.

(Id. at 8.) The prospectus specifically explained the risk of investing more than 25% of its assets in the financial services industry at all times, and the attendant risk that "economic downturns can have a significant negative effect on issuers in the financial services sector." (Id. at 3, 9.) It also noted that individual securities or certain security types can be more volatile than the overall market. (Id. at 3.) Finally, the prospectus bluntly disclosed that "[i]f FMR's strategies do not work as intended, the fund may not achieve its objective." (Id. at 8.)

**b.** **The Fund's Stated Strategy Included Mortgage Securities.**

The Fund's disclosures during the Class Period provided investors with an abundance of information about the Fund's investments in ABS and mortgage securities. These disclosures identified ABS and mortgage securities as among the principal types of securities in which the Fund invests and discussed the risks associated with these investments:

> Asset-Backed Securities represent interests in pools of mortgages, loans, receivables, or other assets. Payment of interest and repayment of principal may be largely dependent upon the cash flows generated by the assets backing the securities . . . . Asset-backed security values may also be affected by other factors including changes in interest rates, the availability of information concerning the pool and its structures, the creditworthiness of the

10

servicing agent for the pool, the originator of the loans or receivables, or the entities providing the credit enhancement. In addition, these securities may be subject to prepayment risk.

\*       \*       \*

Mortgage Securities are issued by government and non-government entities such as banks, mortgage lenders, or other institutions. A mortgage security is an obligation of the issuer backed by a mortgage or pool of mortgages or a direct interest in an underlying pool of mortgages . . . . The value of mortgage securities may change due to shifts in the market's perception of issuers and changes in interest rates. In addition, regulatory or tax changes may adversely affect the mortgage securities market as a whole. Non-government mortgage securities may offer higher yields than those issued by government entities, but also may be subject to greater price changes than government issues. Mortgage securities are subject to prepayment risk . . . . [I]n a rising interest rate environment, mortgage security values may be adversely affected when prepayments on underlying mortgages do not occur as anticipated . . . .

(Ex. B at 4, 9.)

### c.       The Fund Disclosed Its Substantial Mortgage Securities Holdings.

The Fund's shareholder reports at all times disclosed its mortgage securities holdings in its holdings tables, as well as in pie charts showing the breakdown of the Fund's holdings by category, including "Asset-Backed Securities" and "CMOs and Other Mortgage-Related Securities." (See, e.g., Ex. H at 9-42.) These reports showed that mortgage securities comprised a significant portion of the Fund's assets throughout the Class Period:[11]

---

[11]       The Fund's public disclosures also made clear that some of the Fund's exposure to mortgage securities was through the Fund's position in the Fidelity Ultra-Short Central Fund (the "Central Fund"). (See, e.g., Ex. E at 6 ("I held [ABS and mortgage securities] directly and indirectly through the [Central Fund]"); Ex. I at IV (same).) The Central Fund is an internally managed pool of securities that was managed similarly to the Fund.

| Date | ABS | CMOs and Other Mortgage-Related Securities | Total |
|---|---|---|---|
| January 1, 2003 | 32.2% | 9.7% | 41.9% |
| July 31, 2003 | 42.0% | 13.3% | 55.3% |
| January 1, 2004 | 35.7% | 12.5% | 48.2% |
| July 31, 2004 | 32.1% | 15.4% | 47.5% |
| January 31, 2005 | 31.5% | 20.8% | 52.3% |
| July 31, 2005 | 33.7% | 22.8% | 56.5% |
| January 31, 2006 | 33.9% | 22.8% | 56.7% |
| July 31, 2006 | 39.0% | 23.1% | 62.1% |
| January 31, 2007 | 37.3% | 20.6% | 57.9% |
| July 31, 2007 | 39.3% | 26.0% | 65.3% |

The portfolio manager also repeatedly commented on the Fund's emphasis on ABS and mortgage securities. For example, in the 2005 annual report, before any hint of difficulties in the market for these securities, the portfolio manager reported, "I kept the fund <u>tilted heavily toward</u> non-government bonds, which were helped by their yield advantage over Treasuries and spread tightening. I held these securities—<u>namely asset-backed bonds and mortgage securities</u>— directly and indirectly through the Fidelity Ultra-Short Central Fund . . . ." (Ex. E at 6 (emphasis added); <u>see also, e.g.,</u> Ex. C at 5 (noting the Fund's "sizable position" in ABS); Ex. D at 6 (noting the Fund's "focus on attractively valued home equity ABS and CMOs, both of which did especially well"); Ex. F at IV ("My stake in [ABS] was the fund's largest sector weighting throughout the year."); Ex. G at IV ("I maintained an out-of-index stake in mortgage securities . . . ."); Ex. H at 6 (noting the Fund's "heavy emphasis on non-government bonds, including structured products such as [ABS], [CMOs], and commercial [MBS]").)

As prospects for housing-related investments became more uncertain, the portfolio manager disclosed these developments, while reiterating his belief in the value of these investments. By early 2006, the portfolio manager noted "uncertainty" and cautioned that "[a] notable housing market slowdown" could impact the Fund. (Ex. G at V.) He continued to

emphasize mortgage securities because, in his view, they "offer[ed] a combination of attractive valuations, high quality and a yield advantage over Treasuries." (Ex. I at V.)

In early 2007, the portfolio manager reported that there had recently been "a steady stream of news about troubles in the [subprime mortgage market]. A slowing housing market precipitated rising delinquencies for these loans, which, in turn, caused declining valuations for the bonds backed by this type of collateral." (Ex. J at V.) The portfolio manager noted that, despite these concerns, he continued to "emphasize[] subprime mortgage securities rated AAA or AA by the major bond rating agencies." (Id.)

When concerns about subprime mortgages intensified in mid-2007, the portfolio manager reported:

> Initially, only the fund's modest stake in lower-rated investment grade subprime securities suffered, while higher-quality subprime holdings—which ma[de] up the bulk of the fund's investments in this sector—held up reasonably well. But in the second quarter of 2007, technical factors joined ongoing fundamental deterioration to push both low- and high-quality subprime securities substantially lower.

(Ex. L at IV.) He explained, however, that he "continued to hold onto many of the higher-quality securities based on [his] conviction that they ultimately would return full value to bondholders." (Id.)

In late 2007 and 2008, the concerns that began in the subprime mortgage market spread throughout the credit markets, ultimately leading to a global financial crisis and a 40% decline in the principal stock market indices. The Fund's portfolio manager continued to expressly attribute the Fund's decline to investments in mortgage securities. (See Ex. M at IV.) In short, Plaintiff may disagree with the portfolio manager's investment judgments, but he cannot complain about lack of disclosure.

Finally, the Fund's daily NAV pricing process reflected the declining value of the Fund's holdings throughout the last year of the Class Period:

| January 31, 2007 | $10.01 |
|---|---|
| February 28, 2007 | $10.01 |
| March 30, 2007 | $9.98 |
| April 30, 2007 | $9.97 |
| May 31, 2007 | $9.97 |
| June 29, 2007 | $9.94 |
| July 31, 2007 | $9.81 |
| August 31, 2007 | $9.49 |
| September 28, 2007 | $9.53 |
| October 31, 2007 | $9.31 |
| November 30, 2007 | $9.02 |
| December 31, 2007 | $9.02 |
| January 31, 2008 | $8.84 |
| February 29, 2008 | $8.69 |
| March 31, 2008 | $8.31 |
| April 30, 2008 | $8.27 |
| May 30, 2008 | $8.29 |

**ARGUMENT**

I.     **PLAINTIFF CANNOT BRING AN ACTION FOR MISMANAGEMENT UNDER THE FEDERAL SECURITIES LAWS.**

Although styled as a disclosure claim, Plaintiff actually complains about Defendants' alleged mistakes in carrying out discretionary professional responsibilities that were fully disclosed and clearly assigned—i.e., making investments in mortgage securities and pricing of the Fund's securities.  It is well-established that such allegations of corporate mismanagement are not actionable under the federal securities laws and must be dismissed.  See Santa Fe, 430 U.S. at 479 (securities laws do not regulate "corporate mismanagement"); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1206 (1st Cir. 1996) ("To the extent that the claim comprises allegations of mismanagement, it is not cognizable under the securities laws.").

**A.**     **Allegations of Corporate Mismanagement Are Not Actionable Under the Federal Securities Laws.**

In <u>Santa Fe</u>, the Supreme Court rejected plaintiff's attempt to bring claims for alleged breach of fiduciary duty by the corporation's majority stockholders under the federal securities laws.  <u>Santa Fe</u>, 430 U.S. at 479.  The Court held that to permit such claims would be inconsistent with the plain language of the statute, which only prohibits manipulative or deceptive conduct, and would not further the statute's purpose of promoting disclosure.  <u>Id.</u> at 473 ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception."); <u>id.</u> at 478 ("[W]e are reluctant to recognize a cause of action here to serve what is 'at best a subsidiary purpose' of the federal legislation.").  The Court further emphasized that recognizing claims for corporate misconduct, unrelated to disclosure obligations, would "bring within the [federal securities laws] a wide variety of corporate conduct traditionally left to state regulation.  In addition to posing a danger of vexatious litigation . . . , this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law."  <u>Id.</u> at 478-79.

<u>Santa Fe</u> has been widely followed, including by this court.  For example, in <u>Wilkes v. Heritage Bancorp, Inc.</u>, 767 F. Supp. 1166 (D. Mass. 1991), the court relied on <u>Santa Fe</u> to reject claims that a bank defendant concealed problems within its loan portfolio by improperly calculating loan loss reserves.  The court reasoned:

> Accepting plaintiffs' loan loss reserve allegation as an adequate Rule 10b-5 claim would require this Court to accept questionable corporate business judgments as the basis for securities fraud suits brought by stock purchasers who become disappointed by their investments.  This would require the Court to recognize a cause of action . . . to serve what is at best a subsidiary purpose of the federal legislation [and] would also open up a vast new area of federal scrutiny of corporate conduct traditionally left to state regulation.  The Court is not willing to take such a step.

Id. at 1171 (internal citations and quotes omitted). Numerous courts have held likewise. See, e.g., Vachon v. BayBanks, Inc., 780 F. Supp. 79, 80 (D. Mass. 1991) (rejecting claim that "the economic recession affecting the New England real-estate market made [defendants'] loan loss reserves 'grossly inadequate,' and that [defendants'] failure to disclose this inadequacy was a materially misleading omission"); Burstein v. Applied Extrusion Techs., Inc., 150 F.R.D. 433, 440 (D. Mass. 1993) ("[A]llegations constitute adequate claims under federal securities law [when] their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well.").

Moreover, courts have rejected attempts to bootstrap common law claims into federal disclosure claims by pleading that defendants failed to disclose the alleged mismanagement. See, e.g., In re Craftmatic Sec. Litig., 890 F.2d 628, 638-39 (3d Cir. 1989); Panter v. Marshall Field & Co., 646 F.2d 271, 287 (7th Cir. 1981); Scritchfield v. Paolo, 274 F. Supp. 2d 163, 184 (D.R.I. 2003).

**B.      Plaintiff's Allegations Challenge Management of the Fund and Its Performance.**

Plaintiff takes issue with two aspects of Fund management: (1) Defendants' decision to invest in ABS and mortgage securities; and (2) Defendants' valuation of these mortgage securities. These cannot be disclosure claims. The prospectus and shareholder reports clearly show that FMR had investment discretion, including express authority to invest in mortgage securities; that the Fund consistently had substantial positions in those securities; and that those positions were priced daily under the disclosed Board procedures (as well as audited annually).

**1.      Decisions to Invest in Mortgage Securities Are Not Actionable Under Federal Securities Law.**

The Complaint primarily attacks management decisions to invest the Fund's assets in mortgage securities and, tellingly, the timing of those decisions. For example, Plaintiff alleges

that Defendants "directly exposed the Fund to the volatility of the subprime mortgage market at precisely the time when it was publicly reported that defaults of subprime mortgages were skyrocketing, and that numerous subprime lenders were facing insolvency." (Compl. ¶ 50.)

Investment decisions made on behalf of the Fund, such as these, are quintessential business decisions that, even if proven unsuccessful with the benefit of hindsight, do not amount to securities law violations. See Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 33 (D. Mass. 2000) ("turning every corporate missed opportunity, if not disclosed, into a potential securities fraud" would be improper); see also Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 117 (2d Cir. 1982) ("Economic prognostication, though faulty, does not, without more, amount to fraud."); Shields v. Amoskeag Bank Shares Inc., 766 F. Supp. 32, 40 (D.N.H. 1991) (determining that real complaint was "based on the company's failure to act 'conservatively' and 'prudently' in managing their loans" and dismissing plaintiff's securities fraud claims).

Lerner v. FNB Rochester Corp., 841 F. Supp. 97 (W.D.N.Y. 1993), is instructive. Plaintiffs in Lerner filed suit in the wake of a widespread real estate downturn, alleging the defendant engaged in imprudent lending practices aimed at highly leveraged real estate promoters and developers, but failed to disclose the quality of its loan portfolio and the likelihood of increases in non-performing assets, thereby misrepresenting its true financial condition. See id. at 100-01. The court dismissed plaintiffs' federal securities law claims, finding that they were predicated on allegations of inactionable corporate mismanagement: "Far from alleging fraudulent misstatements or omissions, however, plaintiff is more accurately expressing his displeasure with the judgment calls made by management, which turned out to be poorly made, and with management's failure to anticipate that its portfolio would be particularly vulnerable in an economic slump." Id. at 1001.

The same rationale applies equally here and requires the same result. Defendants were authorized to and did make investment decisions for the Fund. Even if, with the benefit of hindsight, some investments in mortgage securities proved unwise, they do not give rise to a disclosure claim under the federal securities laws.

### 2. Alleged Errors in Valuation of Mortgage Securities Do Not Support a Disclosure Claim Under the Securities Act.

Plaintiff's remaining allegations focus on the valuation of the Fund's investments. Plaintiff does not challenge the prospectus disclosure that the Fund would price securities using "a pricing service or market quotations" or, if those sources did not work, using a fair valuation procedure approved by the Board. At most, Plaintiff alleges mere mistakes in pricing: that Defendants were "unable to adequately value risky mortgage-related securities"; that they "heavily relied upon external pricing sources"; that the pricing group "was not adequately staffed and had limited experience"; and that the pricing policies were vaguely "inadequate." (Compl. ¶¶ 55, 85, 89, 99, 101.)

Courts have deemed nearly identical allegations to be mismanagement claims not actionable under the federal securities laws. See Wilkes, 767 F. Supp. at 1171 (valuation of loan loss reserves); Vachon, 780 F. Supp. at 80 (same).[12] This Court should similarly hold.

## II. PLAINTIFF FAILS TO ADEQUATELY ALLEGE ANY ACTIONABLE MISREPRESENTATIONS OR OMISSIONS.

Even if considered as disclosure claims, Plaintiff's claims must be dismissed because the Complaint fails to allege that the Fund's disclosures contained material misrepresentations or omissions in violation of Section 11 or 12(a)(2).[13]

---

[12] See also, e.g., Burstein, 150 F.R.D. at 442 (inexperienced employees); Fitzer, 119 F. Supp. 2d at 31 ("poorly-trained sales and service personnel"); In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (managers failing to inform themselves).

**A.** **Plaintiff Must Plead Facts Supporting Falsity, Materiality, and Duty to Disclose, Without Relying on Hindsight.**

As explained by the Supreme Court in Twombly, and reinforced in Iqbal, under Rule 8(a) a plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). Instead, a complaint must plead "[f]actual allegations . . . to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. It will not suffice to establish "a sheer possibility" of unlawful conduct; rather, "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.

Where, as here, alleged misrepresentations relate to matters of opinion, those opinions must be both subjectively false (i.e., Defendants did not honestly hold the opinion) and objectively false (i.e., provable facts contradicted the opinion). See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095 (1991); Brown v. Credit Suisse First Boston LLC, 431 F.3d 36, 47 (1st Cir. 2005); Coronel v. Quanta Capital Holdings Ltd., 07 Civ. 1405 (RPP), 2009 U.S. Dist. LEXIS 6633, at *45-*46 (S.D.N.Y. Jan. 26, 2009); Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670, at *35-*36 (S.D.N.Y. Sept. 30, 2008). The First Circuit equates the requirement for subjective falsity to the element of scienter in a claim for securities fraud and requires that it be pled with particularity.[14] Brown, 431 F.3d at 48-50.

---

[13] Section 11 imposes liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability for "a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. 77*l*(a)(2).

[14] In Section 11 and 12(a)(2) claims based on allegations of fraud or mistake, Rule 9(b) further imposes a heightened pleading standard, requiring the plaintiff to "state with particularity the

This rule has been applied to complaints very much like Plaintiff's.  See In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004).

In addition, the alleged misrepresentations or omissions must be material, meaning that their disclosure would alter the "total mix" of facts available to investors and "there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision.  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Kaplan v. First Hartford Corp., 447 F. Supp. 2d 3, 8 (D. Mass. 2006).  Where the alleged omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," the absence of materiality can serve as the basis for a motion to dismiss.  In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 n.13 (3d Cir. 1993).

With respect to omissions claims, a plaintiff must further allege that the omitted information was either (a) required to be disclosed by law or regulation or (b) necessary to make other statements not misleading.  See Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 174 (1994); Cooperman v. Individual, Inc., 171 F.3d 43, 49-50 (1st Cir. 1999) ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all material information."). "Whether a duty to disclose exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder."  Panther Partners, Inc. v. Ikanos Commc'ns Inc., 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).  Accordingly, courts look to the requirements of the relevant disclosure forms, such as the mutual fund registration Form N-1A, when determining whether a defendant was required to disclose allegedly omitted information. See, e.g., Cooperman, 171 F.3d at 49-50; Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d

---

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 68 (1st Cir. 2008).

598, 608 (6th Cir. 2005); In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp.

2d 243, 249 (S.D.N.Y. 2003).

Finally, a plaintiff may not rely on hindsight to establish that the defendant's disclosures

were misleading or omitted material information.  See ACA Fin., 512 F.3d at 62 (holding that "a

complaint 'may not simply contrast a defendant's past optimism with less favorable actual

results' in support of a claim of securities fraud").[15]  Instead, a plaintiff must allege facts

showing "defendant[s] possessed the omitted information at the time the registration statement

became effective."  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y.

2005).

**B.      Plaintiff's Alleged Misrepresentations and Omissions Are Insufficient
         Under Any Standard.**

Plaintiff contends that the Fund's disclosures misrepresented and/or failed to disclose

information regarding the Fund's investments in mortgage securities.  Plaintiff groups the

alleged misrepresentations and omissions into several categories:  (1) the Fund's investment

strategy and risks (Compl. ¶¶ 84-93); (2) the Fund's exposure to mortgage securities (id. ¶¶ 106-

111); and (3) the value of the Fund's mortgage-related holdings (id. ¶¶ 94-97), including

Defendants' valuation procedures (id. ¶¶ 98-101).[16]  These alleged misrepresentations are

insufficient to state a claim under Section 11 or 12(a)(2).

_____

[15]      Even before Twombly and Iqbal, courts routinely held that "this type of retrospective analysis of
awareness cannot be the basis for a [Securities Act] claim."  Kinder v. Acceptance Ins. Cos., 423 F.3d
899, 903 (8th Cir. 2005); see also, e.g., Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 8 (2d Cir.
1996) ("To show misrepresentation, the complaint must offer more than allegations that the portfolios
failed to perform as predicted.").

[16]      Plaintiff alleges certain misrepresentations and omissions regarding the Fidelity Ultra-Short
Central Fund.  (See Compl. ¶¶ 102-105.)  Each of the alleged misrepresentations and omissions is
essentially identical to those alleged with respect to the Fund itself, and they fail for all of the same
reasons.

### 1. The Alleged Misrepresentations and Omissions Regarding the Fund's Investment Strategy and Risks Are Not Actionable.

#### a. The Fund's Investment Objective "Bespeaks Caution."

The bespeaks caution doctrine "embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws." Shaw, 82 F.3d at 1213; Scritchfield, 274 F. Supp. 2d at 177-178.[17] Under this doctrine, "claims can be dismissed because the materiality of the alleged misrepresentation or omission is negated by the surrounding cautionary language." Cooperman v. Individual, Inc., No. 96-12272-DPW, 1998 U.S. Dist. LEXIS 22126, at *33 (D. Mass. May 27, 1998), aff'd, 171 F.3d 43 (1st Cir. 1999); In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 494 (S.D.N.Y. 2004).

Statements of a mutual fund's investment objective, which are mandated by Form N-1A, are classic examples of forward-looking statements that qualify for protection under the bespeaks caution doctrine. "The investment objective announces the goal of the Fund, rather than a promise to investors . . . .  Such general, forward looking statements, which make no promise to investors, are not actionable under the securities laws." In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig., 95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS 14209, at *12-*13 (S.D.N.Y. Sept. 26, 1996).

Here, the prospectus casts the Fund's investment objective in forward-looking, aspirational terms and accompanies it with clear and appropriate warnings.  The prospectus states that the Fund "seeks to obtain a high level of current income consistent with preservation of

---

[17] The bespeaks caution doctrine largely overlaps with, and has the same practical effect as, the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 77z-2.  See Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1132-33 (9th Cir. 2004).

capital." (Ex. A at 3 (emphasis added).)  The prospectus starkly warns that "[i]f FMR's strategies do not work as intended, the fund may not achieve its objective." (Id. at 8.)[18]  In a section entitled "Principal Investment Risks," the prospectus details various types of risks that may prevent the Fund from achieving its investment objective (see id. at 8-9), and the Fund's SAI provides still further information about the Fund's investment objective and the risks that may impact performance.  (See Ex. B at 2-11.)  The prospectus's cautionary language and risk disclosures clearly bespeak caution.  See Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir. 1991) (the statement "there can be no assurance that the investment objectives of the Partnership will be attained" was held to sufficiently "bespeak caution" to warn potential investors about the investment); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (statements that "no assurance [could] be given that these projections [would] be realized" and "actual results may vary from the predictions and these variations may be material" were found to clearly "bespeak caution").

In light of the extensive disclosures about the uncertainty of the Fund's future performance and the risk factors that could prevent the Fund from achieving its investment objective, Plaintiff's claims based on the Fund's investment objective fail under the bespeaks caution doctrine.  See In re Hyperion Sec. Litig., No. 93 Civ. 7179 (MBM), 1995 WL 422480, at *7 (S.D.N.Y. July 14, 1995) (misrepresentations as to investment strategy found inactionable because the "prospectuses clearly 'bespeak caution' through a mantra of caveats, disclaimers, and qualifications"); Alliance N. Am. Gov't Income Trust, 1996 U.S. Dist. LEXIS 14209, at *12-*13.

---

[18]     The prospectus also explains that "[w]hen you sell your shares, they may be worth more or less than you paid for them, which means that you could lose money."  (Ex. A at 3.)

### b. Defendants Made All Required Disclosures.

Plaintiff also fails to allege any actionable omissions, primarily because Defendants made full disclosure of information required by SEC Form N-1A.

The SEC has emphasized that a fund's prospectus should focus on "the fund's overall portfolio management" and "the risks to which the fund's particular portfolio <u>as a whole</u> is expected to be subject," rather than "the characteristics and risks of each type of instrument in which the fund may invest."  SEC Release No. 33-7398, <u>Registration Form Used By Open-End Management Investment Companies</u>, 1997 WL 87357, at *16-*17, *20 (Feb. 27, 1997).  The SEC explicitly discouraged funds from providing "an inventory of the various investments a fund may make" or "detailed, . . . technical, descriptions of the risks associated with particular securities in which a fund may invest" because such disclosure "does not appear to effectively communicate the overall risks of investing in the fund."  <u>Id.</u> at *17, *19.

Accordingly, in addition to requiring a statement of "the Fund's investment objectives," SEC Form N-1A calls for prospectuses to "[d]escribe the Fund's principal investment strategies" and "the particular type or types of securities in which the Fund principally invests or will invest."  SEC Form N-1A, Item 4(a)-(b), <u>available at</u> http://www.sec.gov/about/forms/formn-1a.pdf.  With respect to risk, Form N-1A requires disclosure of "the principal risks of investing in the Fund, including the risks to which the Fund's particular portfolio as a whole is expected to be subject . . . ."  SEC Form N-1A, Item 4(c).

The Fund's prospectus plainly satisfied these requirements.  The prospectus identified the Fund's investment strategies and described the types of securities in which the Fund invests. (<u>See</u> Ex. A at 7-8.)  In addition, the prospectus discussed the <u>overall</u> risks of investing in the Fund.  It advised investors that the Fund's "yield and share price change daily based on changes in interest rates and market conditions and in response to other economic, political, or financial

24

developments." (Id. at 8.)  It provided that the Fund would concentrate its investments by investing more than 25% of its assets in financial services securities (which include mortgage securities issued by financial institutions).  (See id. at 3.)  The prospectus cautioned that financial services securities "can be sensitive . . . to economic downturns"; that increases in interest rates could cause the price of debt securities to fall; and specifically that "mortgage securities . . . can be more sensitive to interest rate changes."  (Id. at 8-9.)  It also stated that "changes in general economic or political conditions can affect a security's or instrument's credit quality or value" and that "if the structure of a security fails to function as intended, the security could decline in value."  (Id. at 9.)

The Fund's SAI provided additional risk disclosure specifically with respect to mortgage securities, explaining that "[t]he value of mortgage securities may change due to shifts in the market's perception of issuers and changes in interest rates," among other factors, and that the value of mortgage securities "may be adversely affected" "in a rising interest rate environment." (Ex. B at 9.)  The SAI further disclosed that the value of the ABS "may be largely dependent upon the cash flows generated by the assets backing the securities" and "may also be affected by other factors including changes in interest rates, the availability of information concerning the pool and its structure, the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables, or the entities providing the credit enhancement."  (Id. at 4.)

These more than satisfy Form N-1A's requirements, and accordingly preclude any claim based on alleged omissions, absent a showing that the allegedly omitted information was material and necessary to render the Fund's disclosures not misleading.  See Press v. Quick & Reilly, Inc., 218 F.3d 121, 129 (2d Cir. 2000); Benzon, 420 F.3d at 608-09; Merrill Lynch Research Reports, 272 F. Supp. 2d at 249.

### c.    Plaintiff Has Failed to Identify Any Material Omissions.

In light of these extensive disclosures, neither of the specific omissions alleged by Plaintiff would be material to a reasonable investor.

First, Plaintiff contends that the prospectus "failed to inform investors of the interest rate changes risk that the Fund was exposed to, significantly because rising interest rates would increase the risk of default on mortgage-related securities." (Compl. ¶ 91.) This risk was not omitted: the Fund's prospectus and SAI clearly disclosed that its investments could be adversely affected by rising interest rates and called out mortgage securities as being "more sensitive to interest rate changes." (Ex. A at 8; Ex. B at 9.)

In light of these disclosures, Plaintiff is forced to contend that Defendants should have further specified one particular impact of rising interest rates, which would be to increase the risk of default on certain mortgage-related securities. Given the extensive disclosure of the potential adverse impact of rising interest rates, however, the additional disclosure of one of many potential adverse impacts of rising interest rates would not alter the "total mix" of information. See Olkey, 98 F.3d 2 (rejecting claim that defendants failed to disclose the specific risk that the investment was designed "with a bias toward a rising interest rate environment" where the general risk that fluctuating interest rates could affect the fund's value was already communicated in the prospectus); Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 176 (S.D.N.Y. 1996) (same); In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993) (defendants "need not predict the precise manner in which the risks will manifest themselves").[19] Moreover, adding this level of detail about the effect of rising interest rates on

---

[19]    See also Krouner v. Am. Heritage Fund, Inc., 899 F. Supp. 142, 147 (S.D.N.Y. 1995) ("We fail to see how a reasonable potential investor in the Fund, informed that it regularly invested in bankrupt companies, could have been influenced in any way by the knowledge that it also invested in poorly capitalized companies or companies without a proven marketing track record.").

mortgage-related securities would be inconsistent with the SEC's guidance against "detailed, . . . technical, descriptions of the risks associated with particular securities."  SEC Release No. 33-7398, 1997 WL 87357, at *19.

Second, Plaintiff claims Defendants should have disclosed that there was a "valuation risk due to the fact that Fidelity was unable to adequately price" mortgage-related assets and "heavily relied upon external pricing sources, including Bear Stearns."  (Compl. ¶ 89.)  But the Fund's disclosure complied fully with SEC requirements, which provide that the Fund need only "[d]escribe the procedures for pricing the Fund's shares, including . . . [a]n explanation that the price of Fund shares is based on the Fund's net asset value and the method used to value Fund shares (market price, fair value, or amortized cost)."  SEC Form N-1A, Item 6.  Plaintiff does not allege that Defendants failed to follow its disclosed procedures.  Moreover, the Fund's prospectus disclosed the alleged "valuation risk" by stating that, if reliable third-party prices are not available, the Fund would employ Board-approved fair valuation procedures, and that "[a] security's valuation may differ depending on the method used for determining fair value." (Ex. A at 10; see also Ex. B at 13 (describing the Fund's valuation policies and procedures).)

### d. The Disclosures Regarding the Fund's Investment Strategy and Risks Were Not Misleading.

Plaintiff also claims that Defendants affirmatively misrepresented the risk of investing in the Fund, alleging that such risk "was significantly greater than represented."  (Compl. ¶ 85.) Plaintiff, however, does not point to any statement in the Fund's disclosures that characterizes the level of risk of investing in the Fund.[20]  Rather, Plaintiff attempts to twist other disclosures

---

[20]    Plaintiff cites to reports by Morningstar analysts characterizing the Fund as a "conservative" investment with "low volatility" and "just one step up the risk ladder from a money market fund." (Compl. ¶¶ 39-40.)  Defendants may not be held liable for statements made by third-parties, such as Morningstar analysts.  See Suna v. Bailey Corp., 107 F.3d 64, 74 (1st Cir. 1997) (no liability for third-party analyst reports absent allegations that defendant "endorsed the contents of those reports, adopted

into <u>implicit</u> representations about the level of risk of investing in the Fund.  As discussed below, none of these allegedly implicit representations is actionable.

(i)      Allegations that Defendants Characterized the Fund<br>as "Conservative" Are Unavailing.

Plaintiff first contends that "Defendants marketed the Fund as a conservative bond fund" because the stated investment objective was "to obtain a high level of current income consistent with preservation of capital."  (Compl. ¶ 37.)  As noted above, the Fund's investment objective is a forward-looking statement, which bespeaks caution and was surrounded by appropriate warnings that belie Plaintiff's marketing-based claim.  Even if that were not the case, Plaintiff has not alleged that such assessment of risk was subjectively or objectively false.

Any assessment of the risks associated with the Fund's investment strategy constitutes an opinion.  <u>See</u> <u>In re USF&G Corp. Sec. Litig.</u>, No. B-90-2928, 1993 U.S. Dist. LEXIS 10064, at *16 (D. Md. Feb. 11, 1993) (allegation that defendants misled investors by describing the investment strategy as conservative is defective because "such a characterization [is] a matter of opinion").  Plaintiff therefore must allege particularized facts establishing that Defendants subjectively did not believe the assessment and that it "was not plausibly premised on, or was inconsistent with, the information available . . . at that time."  <u>Brown</u>, 431 F.3d at 53; <u>In re CIT Group</u>, 349 F. Supp. 2d at 691 (statements of opinion actionable only if "beyond the pale of reason").  Plaintiff makes no such allegations.

The Complaint is devoid of any allegations with respect to any of the thirteen Defendants' subjective opinions about the level of risk in the Fund.  Indeed, Plaintiff does not cite any evidence indicating that any Defendant did not honestly hold the opinion that the Fund's

---

them as its own, and placed its imprimatur on them").  In any event, the Morningstar reports acknowledged that the Fund's "value will fluctuate."  (Compl. ¶ 39.)

risk profile was consistent with preservation of capital.  Because Plaintiff has not alleged subjective falsity, his claim necessarily fails.  See Brown, 431 F.3d at 47.

In addition, the Complaint does not include any allegations that would support a finding that Defendants' opinions about the level of risk in the Fund were objectively false.  Plaintiff relies primarily on the theory that the Fund's risk profile was not consistent with preservation of capital because the Fund ultimately decreased in value.  Such fraud-by-hindsight allegations that opinions turned out to be inaccurate do not suffice to establish objective falsity.  Indeed, the First Circuit has emphasized that "a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud."  ACA Fin., 512 F.3d at 62 (quoting Shaw, 82 F.3d at 1223); see also In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held.").

Plaintiff also contends that certain developments in the real estate and subprime mortgage markets during the Class Period were "strong indicator[s] that the problems being experienced by sub-prime lenders would generate huge losses for mortgage-related securities, such as those held by the Fund."  (Compl. ¶ 79; see also id. ¶¶ 63-79.)  This was and is a matter of pure opinion.  The Fund's portfolio manager discussed many of the same developments in the Fund's shareholder reports, which explained his belief the Fund's holdings of investment grade mortgage securities were "well protected from concerns plaguing the lowest-quality securities" because of credit enhancement in the securities' capital structure.  (Ex. J at IV.)  Plaintiff does not and cannot allege facts showing that the portfolio manager's views were "not plausible" or

"beyond the pale of reason," as required to allege objective falsity. To the contrary, these views were shared by other market participants, and the nation's leading government officials publicly declared that the subprime crisis was contained and would not affect the wider financial markets or senior tranches of ABS and mortgage securities.[21] The Complaint simply provides no basis for a finding that Defendants' widely shared views on the impact of the developments in the subprime mortgage market were objectively false.

Nor do the Complaint's allegations that certain Fidelity analysts "expressed concerns about the housing market and sub-prime mortgage market" (Compl. ¶¶ 80-81) support a finding of objective falsity. The Complaint does not include any allegations suggesting that Fidelity analysts expected developments in the real estate and subprime mortgage markets to impact high quality, investment grade mortgage securities, such as those held by the Fund. In any event, these allegations establish, at most, that there was a difference of opinion within Fidelity. Indeed, according to Plaintiff's confidential witness, "others at Fidelity" (apparently including the Fund's portfolio manager) believed "investing in sub-prime mortgage-related securities" could lead to "potential favorable returns." (Id. ¶ 81.) Mere differences of opinion about the anticipated impact of economic developments cannot establish objective falsity. See Salomon Analyst Level 3 Litig., 373 F. Supp. 2d at 252 ("An analyst who sets out his own opinion of a stock's value . . . does not omit a material fact by failing to note that others may have different opinions or analytic approaches.").

---

[21]   See, e.g., Testimony of Ben S. Bernanke Before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007), available at 2007 WL 927663 ("At this juncture, however, the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."); Int'l Monetary Fund, Global Financial Stability Report at 7 (Apr. 2007) ("[E]ven under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses.") (Ex. N).

     (ii)  The Fund's Daily NAV Did Not "Represent" that
        the Fund Was "Stable."

  Without citing any express statements of Defendants, Plaintiff claims that Defendants

"represented that the Fund was stable with little to no volatility" based on the prior reported

NAV for the Fund.  (Compl. ¶ 92.)  The Fund's pricing process is not an investment

representation, but a statutorily required function, which is necessary for shareholder purchase

and sale activity.  Even if it had occurred, any "implicit" representation that the Fund was

"stable" and had "low volatility" would be a forward-looking statement and protected by the

bespeaks caution doctrine.  Importantly, the Fund's prospectus warns against drawing precisely

the inference that underlies Plaintiff's claim—<u>i.e.</u>, that past performance will be indicative of

future performance.  (<u>See</u> Ex. A at 4.)  In addition, the prospectus plainly states "[w]hen you sell

your shares of the fund, they could be worth more or less than what you paid for them."  (<u>Id.</u> at

3.)  Finally, of course, Plaintiff is just factually incorrect:  the Fund's NAV <u>did</u> change when the

market values of its holdings fell.  <u>See</u> NAV Table, <u>supra</u>, at 14.

     (iii)  Plaintiff's Claims that Defendants Misrepresented
        the Fund's Investment Strategy Are Without Merit.

  Plaintiff also contends that Defendants misrepresented the Fund's investment strategy in

two ways, both of which are entirely without merit and cannot support a claim.

  First, Plaintiff claims that "the statement . . . that '80% of the fund's assets' were 'in

investment-grade debt securities' was an inaccurate statement . . . because the risky mortgage-

related securities were not investment grade <u>even though they may have had investment grade</u>

<u>ratings by the ratings agencies</u>."  (Compl. ¶ 86 (emphasis added).)  This argument is unavailing

because a security with an investment-grade rating from a ratings agency is <u>by definition</u> an

investment-grade security.  (<u>See, e.g.</u>, Ex. B at 8 ("Investment grade debt securities include all

types of debt instruments that are of medium and high-quality . . . .  An investment-grade rating

means the security or issuer is rated investment-grade by Moody's Investor Service, Standard & Poor's, Fitch Inc., Dominion Bond Rating Service Limited, or another [NRSRO].").)[22] Plaintiff nowhere alleges that more than 20% of the Fund's assets were invested in securities that were not given investment-grade ratings by the NRSROs.

Second, Plaintiff alleges that statements about the use of the Lehman Brothers 6 Month Swap Index (the "Index") in managing the Fund were misleading because "the Fund was structured differently from, and was much riskier than" the Index.  (Compl. ¶ 87.)  These allegations are unavailing.  The prospectus stated only that FMR uses the Index "<u>as a guide</u> in structuring the fund and selecting its investments" (Ex. A at 7 (emphasis added)), and it nowhere suggested that the Fund would be <u>identical</u> to the Index.  To the contrary, the prospectus disclosed that there are differences between the Fund and the Index.  For example, the prospectus stated that the Index is a portfolio of swaps, whereas the Fund invests primarily in investment-grade debt securities.  (<u>See</u> <u>id.</u>)

Moreover, Plaintiff does not provide any factual support for the allegation that the Fund "was much riskier than" the Index.  (Compl. ¶ 87.)  Importantly, the prospectus stated only that "FMR manages the fund to have similar overall <u>interest rate risk</u> to the index."  (Ex. A at 7 (emphasis added).)  The Complaint does not include any allegations about the level of interest rate risk in the Fund, much less quantify any difference between the Fund's interest rate risk and that of the Index or demonstrate that the two were not "similar."  Indeed, all of Plaintiff's

---

[22] In addition, investment policies, including those regarding quality standards, are "determined immediately after and as a result of the fund's acquisition of such security."  (Ex. B at 2.)  This prevents Plaintiff from employing hindsight to suggest that some securities should not have received high ratings.

allegations about the Fund's level of risk focus on credit risk (i.e., risk of default) or market risk (i.e., risk of price changes on individual securities), not interest rate risk.[23]

### 2. Defendants Openly Disclosed and Discussed the Fund's Exposure to Mortgage Securities.

The Fund's shareholder reports always put shareholders on notice of the Fund's significant holdings of mortgage securities, in the form of holdings tables, charts, and portfolio manager commentary. (See, e.g., Ex. H at 9 (graphs showing the breakdown of the Fund's holdings by security type, including "Asset-Backed Securities" and "CMOs and Other Mortgage Related Securities"); id. at 10-42 (detailed lists of all of the individual securities holdings, grouped by security type).) During the Class Period, the Fund reported allocations to mortgage securities ranging from 56% to 65%. The Fund's exposure to this sector could not have been clearer.

Although Plaintiff concedes these disclosures were made, he contends that they "obfuscated, concealed or otherwise understated the Fund's true exposure to high risk mortgage-related securities." (Compl. ¶ 106.) Plaintiff bases this claim solely on the fact that the reports group the Fund's holdings by security type, with the result that "mortgage-related securities were listed under other groups, such as the Asset Backed Securities group and were held by the Fidelity Ultra-Short Central Fund." (Id.) Plaintiff does not allege that the Fund's holdings disclosures failed to comply with applicable SEC regulations, and this choice of grouping in no way misled investors about the extent of the Fund's holdings of mortgage securities.

---

[23] For example, Plaintiff contends that "mortgage-related securities were subject to a rising interest rate risk since rising interest rates would increase the risk of default on the mortgage-related securities" (Compl. ¶ 85), but any increase in the risk of default relates to credit risk, not interest rate risk. Compare John Downes and Jordan Elliot Goodman, Dictionary of Finance and Investment Terms at 153 (2006) (defining credit risk as "financial and moral risk that an obligation will not be paid and a loss will result") (Ex. O), with id. at 343 (defining interest rate risk as "risk that changes in interest rates will adversely affect the value of an investor's securities portfolio").

First, as explicitly noted in the annual and semi-annual reports, the charts showing the Fund's holdings by security type do reflect the Fund's holdings through the Central Fund. (See Ex. H at 9.) The portfolio manager also repeatedly commented on the Fund's exposure to mortgage-related assets through the Central Fund. (See, e.g., id. at 6 ("I held [structured products such as ABS, CMOs and MBS] directly and also indirectly through our investment in the Fidelity Ultra-Short Central Fund.").)[24]

Second, ABS were defined as "interests in pools of <u>mortgages</u>, loans, receivables, or other assets." (Ex. B at 4 (emphasis added).) Plaintiff claims that Defendants' disclosures were nevertheless misleading because the names of a few ABS, as listed in the Fund's annual and semi-annual reports, did not include the word "mortgage." (See Compl. ¶¶ 108-109.) Plaintiff, however, does not allege that Defendants did anything other than accurately state the actual names of the ABS held by the Fund. The Complaint nowhere alleges that Defendants modified the names of the ABS to conceal that they were mortgage-related exposure. Accurately disclosing the Fund's portfolio holdings by name is hardly deception.[25]

### 3. Plaintiff's Allegations Regarding Pricing Accuracy and Pricing Process Deficiencies Cannot Support a Claim.

Plaintiff also alleges that Defendants "reported inflated values" of the Fund's holdings of mortgage securities because Defendants "fail[ed] to properly value and write-down" those securities to reflect "prevailing economic conditions." (Id. ¶¶ 95-96.) These allegations are

---

[24] Furthermore, any investor interested in knowing the specific securities held by the Central Fund could obtain complete list of holdings upon request or from Fidelity's website. (See Ex. H at 42, 59.)

[25] It bears noting that the Fund held literally dozens of ABS, with the list in the 2006 Annual Report running more than ten pages, yet Plaintiff identifies only six individual ABS whose names supposedly do not reveal their exposure to mortgage securities. On the other hand, the names of many of the ABS held by the Fund in 2006 specifically identified the securities as mortgage-related. For example, the 2006 Annual Report listed ABS with names such as Ameriquest Mortgage Securities, Inc., Bayview Financial Mortgage Loan Trust, Carrington Mortgage Loan Trust, CS First Boston Mortgage Securities Corp., and Fieldstone Mortgage Investment Corp., to name but a few. (See Ex. H at 13-25.)

unavailing because: (a) the Fund's NAV declined along with the mortgage securities market; (b) Plaintiff fails to allege any facts supporting a finding that Defendants' valuations were subjectively and objectively false; and (c) Defendants disclosed that a pricing process would be used, and Plaintiff does not contend Defendants failed to use it.

First, as noted above, the Fund's NAV declined throughout the second half of 2007 and into 2008. See NAV Table, supra, at 14. This contradicts any suggestion that Defendants were attempting to maintain price stability though the market decline.

Second, the establishment and oversight of a securities valuation process, including the implementation of a fair value process where reliable third-party pricing is not available, involves judgment, and the resulting valuations constitute opinions. See Salomon Analyst Level 3 Litig., 373 F. Supp. 2d at 251-52 ("[F]inancial valuation models depend so heavily on the discretionary choice of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions."). Indeed, the SEC has recognized that "[n]o single standard for determining 'fair value . . . in good faith' can be laid down" and various methodologies may be used in valuing portfolio holdings. SEC Release No. AS-118, Accounting for Investment Securities by Registered Investment Companies, 1970 WL 10502, at *4-*5 (Dec. 23, 1970). As opinions, Defendants' valuations of the Funds' holdings of mortgage securities would be actionable only if they were both subjectively and objectively false.

Plaintiff, however, does not allege that Defendants subjectively knew the valuations of the Fund's mortgage-related securities were incorrect. Plaintiff also fails to allege objective falsity. Plaintiff merely contends that the valuations were inflated because they failed to reflect "prevailing economic conditions." (Compl. ¶ 95.) Nowhere does Plaintiff allege what the "true" values of the mortgage securities actually were or that Defendants' valuations were greater than

(or even different from) contemporaneous trading prices or market quotes for comparable securities. Plaintiff's unmoored assertions that Defendants' valuations were "inflated" simply cannot establish objective falsity.

Third, Plaintiff does not allege any misrepresentations concerning the pricing process. Form N-1A requires disclosure of "the method used to value Fund shares (market price, fair value, or amortized cost)," as well as "a brief explanation of the circumstances under which [the Fund] will use fair value pricing and the effects of using fair value pricing." SEC Form N-1A, Item 6(a)(1). The Fund's prospectus satisfied these requirements by disclosing that "[t]he fund's assets are valued primarily on the basis of information furnished by a pricing service or market quotations," but that, as provided in the Fund's Board of Trustees' fair value pricing policies, other methods will be used in certain circumstances, including where "market quotations or information furnished by a pricing service are not readily available or do not accurately reflect fair value" for the security. (Ex. A at 10.) Based on this very language, Plaintiff is also incorrect in contending that Defendants failed to disclose reliance upon external pricing sources to value mortgage securities.[26] (See Compl. ¶¶ 95, 101.)

---

[26] The SAI also states:

> Debt securities and other assets for which market quotations are readily available may be valued at market values determined by such securities' most recent bid prices (sales prices if the principal market is an exchange) in the principal market in which they normally are traded, as furnished by recognized dealers in such securities or assets. Or, debt securities and convertible securities may be valued on the basis of information furnished by a pricing service that uses a valuation matrix which incorporates both dealer-supplied valuations and electronic data processing techniques. Use of pricing services has been approved by the Board of Trustees.

(Ex. B at 13 (emphasis added).) The SAI also discloses that "bid/ask quotes of brokers" are one source of information the Fair Value Committee may consider in making a good faith determination of the value of a security. (Id.)

Plaintiff further alleges that Defendants should have specifically disclosed their reliance on information provided by Bear Stearns because Bear Stearns was an active participant in the market for mortgage securities. (See id. ¶¶ 95, 101.) However, Form N-1A contains no such source disclosure requirement. In any event, the Fund's SAI and shareholder reports disclosed that Defendants utilized market quotations and other pricing information provided by "recognized dealers in such securities or assets." (Ex. B at 13; Ex. E at 47.) Specifically identifying Bear Stearns as a broker-dealer providing pricing information would not alter the total mix of information, and therefore would not be material.

Plaintiff also alleges that Defendants failed to disclose certain deficiencies in Fidelity's pricing process: that Fidelity's valuation group was "not adequately staffed and was staffed with individuals with limited experience"; that "Fidelity was unable to adequately value risky mortgage-related securities and heavily relied upon external pricing sources"; and that "the Fair Value Oversight Committee failed to adequately monitor or provide oversight with respect to mortgage-related securities."[27] (Compl. ¶¶ 99, 101.) These claims are nothing more than hindsight second-guessing of business judgments, which cannot give rise to a disclosure claim. See, e.g., Vachon, 780 F. Supp. at 82; In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d at

---

[27]     Plaintiff also claims that Defendants misrepresented the credentials of the members of the Fair Value Oversight Committee because the Independent Trustees who serve on the committee "were not 'experienced executives' with respect to the valuation of risky mortgage-related securities." (Compl. ¶ 99.) Notably, the paragraph in the SAI regarding the Fair Value Oversight Committee does not include the phrase "experienced executives" or make any representation whatsoever about the Trustees' experience with determining the fair value of mortgage securities or any other type of security. (Ex. B at 20.) Rather, the phrase "experienced executives" appears multiple pages earlier, in a paragraph identifying the trustees and officers of the Fund. (Id. at 14.) Certainly in this general context, there can be no dispute that the Fund's Independent Trustees were "experienced executives." Among the Independent Trustees during the Class Period were former CEOs, CFOs, and other executives of Fortune 500 companies, such as IBM and the Dow Chemical Company, as well as current Secretary of Defense Robert Gates. (Id. at 14-20.) In any event, the SEC has specifically recognized that fund board members may rely on those familiar with valuation techniques to assist them in the fair valuation process. See SEC Release No. AS-118, 1970 WL 10502, at *4.

160 (claims for failure to disclose "insufficient internal accounting controls" are inactionable under the securities laws absent affirmative misrepresentations).[28]

## III. PLAINTIFF'S CLAIMS ARE BARRED BY THE APPLICABLE ONE-YEAR STATUTE OF LIMITATIONS.

Plaintiff's claims also must be dismissed on the independent ground of statute of limitations. Plaintiff had (or should have had) notice of the facts he alleges more than one year before he filed his complaint on June 5, 2008.

### A. Claims Under the Securities Act Must Be Brought Within One Year After Plaintiff Is on Notice of the Claims.

Claims under Sections 11 and 12(a)(2) must be brought within one year from the date on which the plaintiff discovered, or reasonably should have discovered, the facts that give rise to the claims. See 15 U.S.C. § 77m. Either actual notice or inquiry notice is sufficient to trigger the statute of limitations. See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224 (1st Cir. 1997); Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-28 (1st Cir. 1987).

A potential plaintiff is deemed to have inquiry notice when circumstances, typically referred to as "storm warnings," would suggest to a reasonable investor that he has a cause of action. See Maggio, 824 F.2d at 128. Once it is determined that a plaintiff is on inquiry notice, the focus shifts to when the investor, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. Where, as here, a plaintiff fails to undertake any investigation after storm warnings sufficient to put him on notice of his claims appear, knowledge of the facts underlying his claims shall be imputed to him as of the date the duty to

---

[28]     Defendants' use of pricing information from external sources does not support the conclusion that Fidelity's valuation capabilities were inadequate. Indeed, the SEC has specifically instructed mutual funds to use market quotes and other information from pricing services in valuing portfolio securities. See SEC Release No. AS-118, 1970 WL 10502, at *4.

inquire arose.  See Slavin v. Morgan Stanley & Co., 791 F. Supp. 327, 330 (D. Mass. 1992); see also LC Capital Partners LP v. Frontier Ins. Group Inc., 318 F.3d 148, 154 (2d Cir. 2003); In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) (collecting cases).

"Storm warnings" include "the accumulation of information over a period of time that conflicts with representations . . . made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability" of misleading statements.  In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 n.5, 1327 (3d Cir. 2002).  Courts examine the full array of information available to investors from any number of sources, including SEC filings, press releases, news reports, and other publicly available documents.  See Cooperativa de Ahorro y Credito Aguada, 129 F.3d at 225 (newspaper articles); LC Capital, 318 F.3d at 154-56 (news articles and another filed action); In re Tyco Int'l, Ltd., Sec. Litig., 185 F. Supp. 2d 102, 107-08 (D.N.H. 2002) (news articles and fund manager report).

**B.      Plaintiff Was on Notice of His Claims More Than One Year Before the Initial Complaint Was Filed.**

Two facts form the core of Plaintiff's claims:  (1) the Fund invested a significant portion of its assets in mortgage securities, and (2) those securities presented a risk of loss.  Plaintiff was on inquiry notice (if not actual notice) of both of these facts more than one year before he filed his complaint.

Plaintiff cannot and does not contest that Defendants disclosed that the Fund was heavily invested in mortgage securities.  Indeed, Plaintiff concedes that the Fund's shareholder reports disclosed that mortgage securities comprised greater than 50% of the Fund's assets from at least the beginning of 2005 and had comprised greater than 40% of the Fund's assets since the beginning of 2003.  (See Compl. ¶¶ 49, 107-110.)  Moreover, beginning at least as early as 2003, the portfolio manager's commentary in the Fund's shareholder reports specifically addressed the

Fund's investments in mortgage securities, noting the Fund's "sizable position in asset-backed securities (ABS)." (Ex. C at 108.) In later years, the portfolio manager explained that the Fund was "focus[ed] on," "tilted heavily toward," and placed "heavy emphasis on" mortgage securities. (Ex. D at 6; Ex. F at 6; Ex. I at 6.)

In addition, Plaintiff put himself on notice of the very risks he alleges. The Complaint cites articles published beginning as early as August 2006 in widely read media, including The Wall Street Journal, Dow Jones Newswires, CBSMarketWatch, and CNNMoney.com, which discuss developments in the mortgage and real estate markets that Plaintiff contends were "strong indicators" of "huge losses for mortgage related securities, such as those held by the Fund." (See Compl. ¶ 79; see also id. ¶¶ 63-78.) If these news reports are sufficient to support Plaintiff's claims, they likewise were sufficient to put him on notice of the facts giving rise to those claims. See In re Merrill Lynch & Co., 273 F. Supp. 2d at 381.

The Fund's shareholder reports were equally direct. By early 2006, the portfolio manager discussed the "uncertainty surrounding the prospects . . . for housing prices and the overall economy" and the potential adverse impact of a "notable housing market slow down." (See Ex. G at V.) Perhaps most critically, in the January 2007 shareholder update, the Fund's portfolio manager reported:

> As for disappointments, certain ABS, including those backed by subprime mortgage loans—meaning loans to borrowers with poor credit records—detracted from fund performance. They came under pressure due to concerns about delinquencies and the growing likelihood of great defaults. Even higher-quality subprime securities—which are my area of emphasis—couldn't escape investors' concerns over rising delinquencies.

(Ex. J at IV.) These securities remained part of his strategy: he "continued to hold onto many of the higher-quality securities based on [his] conviction that they ultimately would return full value to bondholders." (Ex. L at IV; see also Ex. J at IV.)

**IV.    PLAINTIFF HAD KNOWLEDGE OF THE ALLEGED
        MISREPRESENTATIONS AND OMISSIONS AT THE TIME HE
        PURCHASED SHARES IN THE FUND.**

Recovery is not permitted under Section 11 or 12(a)(2) if, at the time the plaintiff made

the purchase of securities, he had knowledge of the alleged misrepresentations or omissions.  See

15 U.S.C. § 77k(a); 15 U.S.C. § 77*l*(a)(2).  Courts do not hesitate to dismiss Securities Act

claims where, as here, it is clear on the face of the pleadings that the plaintiff knew the true facts

concerning the alleged misrepresentations or omissions at the time he purchased the securities.

See Mayer v. Oil Field Sys. Corp., 803 F.2d 749, 750, 755 (2d Cir. 1986).

Plaintiff contends that Defendants failed to disclose the risk of loss from the Fund's

investments in mortgage securities and that the Fund's NAV was more volatile than represented.

Plaintiff, however, purchased shares of the Fund on August 22, 2007, by which time Defendants

had disclosed that the Fund was experiencing losses on its investments in mortgage securities.

Indeed, the Fund's per share NAV had already declined by more than 5% to $9.49, versus $10.01

when Plaintiff initially purchased shares in the Fund on January 9, 2007.  (See Docket Entry No.

1 at 18.)  Thus, Plaintiff undeniably was aware of the allegedly undisclosed risk of loss.  Because

Plaintiff purchased shares of the Fund with knowledge of these facts, he is precluded from

asserting claims under Section 11 or 12(a)(2).

**V.    PLAINTIFF'S CLAIMED LOSSES WERE NOT CAUSED BY THE
        ALLEGED MISREPRESENTATIONS OR OMISSIONS.**

Both Sections 11 and 12 limit a plaintiff's recovery to losses actually caused by the

alleged misrepresentations or omissions:  a plaintiff may not recover any portion of the alleged

damages resulting from other factors.  See 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*(b).  Thus, the

absence of such loss causation, or "negative causation," is an affirmative defense that may be

raised on a motion to dismiss where established on the face of the pleadings.  See In re Merrill

<u>Lynch Inv. Mgmt. Funds Sec. Litig.</u>, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006); <u>Merrill Lynch Research Reports</u>, 272 F. Supp. 2d at 254.  Here, there is no causal connection between the alleged misrepresentations and omissions and any decrease in the price of the Fund's shares, and Plaintiff's claims therefore must be dismissed.

Unlike a typical share of stock traded on a stock exchange, the price of a mutual fund share is calculated pursuant to a statutory formula and is not affected by the buy-sell decisions of investors.  Specifically, the price of a mutual fund share is the Fund's per-share NAV, which Rule 22c-1 defines to be the sum of the value of the fund's portfolio holdings, less any expenses or other liabilities, divided by the number of shares outstanding.  <u>See</u> 17 C.F.R. 270.22c-1.  The disclosure (or absence of disclosure) of information about the fund, its adviser, its investment strategy, or any other issue has no impact whatsoever on the price of a mutual fund share.  Accordingly, even if Defendants had made all of the disclosures sought by Plaintiff, using exactly the language Plaintiff prefers, the Fund would have owned the same securities, experienced the same investment performance, and reported the same NAV throughout the Class Period.[29]

Because the Fund's decrease in NAV was caused by a decline in the value of the portfolio securities, not by any alleged misrepresentations or omissions, any loss suffered by Plaintiff <u>necessarily</u> resulted from other factors and cannot be recovered under Section 11 or 12.  Indeed, courts have rejected similar securities fraud claims by mutual fund shareholders as a matter of law because the statutory pricing mechanism for fund shares precludes a finding of loss

---

[29]     It is not enough for Plaintiff to claim that he would not have invested in the Fund if Defendants had made these disclosures.  <u>See</u> <u>In re Alkermes Secs. Litig.</u>, No. Civ.A 03-12091, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005) ("Loss causation is causation in the traditional 'proximate cause' sense—that the allegedly unlawful conduct caused the economic harm.  Transaction causation means that 'the violations in question caused the plaintiffs to engage in the transaction in question.'").

causation.  See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208

(RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) ("This theory is incorrect as a matter

of law . . . .  Plaintiffs explain no mechanism by which a mutual fund share's price could differ

from its objective 'value.'"); see also In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F.

Supp. 2d 579, 588-91 (S.D.N.Y. 2006); Merrill Lynch Inv. Mgmt., 434 F. Supp. 2d at 238-39.

Furthermore, Plaintiff himself specifically alleges that the Fund's shares decreased in

value not because of any corrective disclosure by Defendants (which tellingly appears nowhere

in the Complaint), but rather because of decreases in the value of the Fund's holdings of ABS

and mortgage securities.  (See Compl. ¶¶ 112, 117 ("[T]he Fund suffered losses as a direct result

of its investments in risky mortgage-related securities.") (emphasis added).)  The Complaint

attributes the decrease in value of the Fund's holdings of mortgage securities to developments in

the mortgage and real estate market, including interest rate increases, rising default and

delinquency rates among U.S. subprime mortgages, and a stagnating housing market.  (See id.

¶¶ 63-79.)  These developments were in no way particular to the Fund or the mortgage securities

held by the Fund.  To the contrary, the troubles that originated in the subprime mortgage market

eventually developed into a global economic crisis, and investors of all types, including every

major U.S. financial institution, suffered losses on mortgage securities and other debt securities

beginning in 2007.  These facts foreclose any claim that the Fund's disclosures caused any loss

to Plaintiff.  Accordingly, the absence of loss causation is established on the face of the

pleadings, and Plaintiff's claims must be dismissed.

## VI.  FMR LLC IS NOT A PROPER DEFENDANT FOR PURPOSES OF SECTION 11.

Only specific persons may be liable under Section 11:  signatories, directors,

underwriters, or those who prepared or authorized the allegedly misleading registration

statement.  See 15 U.S.C. § 77k(a).  Courts routinely reject claims brought pursuant to

Section 11 against persons who do not fall within the categories set forth in Section 11(a).  In re

Am. Bank Note Holographics, Inv. Sec. Litig., 93 F. Supp. 2d 424, 437 (S.D.N.Y. 2000) (strictly

construing categories listed under Section 11(a) and refusing to impute liability to non-signatory

parent of issuer, despite claims that parent "functioned" as the issuer); see also In re Elscint, Ltd.

Sec. Litig., 674 F. Supp. 374, 385 (D. Mass. 1987) (dismissing Section 11 claim against

accounting firm and COO, where neither was alleged to have prepared or certified prospectus).

Here, Plaintiff does not allege that FMR LLC was a signatory, director, underwriter, or in

any way prepared the registration statements of the Fund, as required by Section 11(a).  Plaintiff

merely asserts that FMR LLC "oversees a wide group of privately held companies in the

financial services industry" (Compl. ¶ 8), and that the "Registration Statements instruct investors

to contact Fidelity Investments concerning buying and selling shares of the Fund."[30]  (Id.)  These

allegations do not create liability for FMR LLC under Section 11.

Nor can Plaintiff impute primary Section 11 liability onto FMR LLC as the parent entity

of FMR.  Allegations about corporate parentage or management structure do not suffice to

invoke Section 11 liability.  See In re Worldcom, Inc. Sec. Litig., 308 F. Supp. 2d 338, 345

(S.D.N.Y. 2004) ("[T]here is no legal basis for an 'enterprise' theory of liability for a Section 11

claim."); Elscint, 674 F. Supp. at 385 (allegation that defendant was a "high ranking officer" not

sufficient to state a claim under Section 11).

---

[30]     "Fidelity Investments" is a retail trade name used by several Fidelity subsidiaries.  The prospectus
does not actually invite customers to call FMR LLC for fund information.

## VII. PLAINTIFF'S CLAIM UNDER SECTION 15 FOR CONTROL PERSON LIABILITY MUST BE DISMISSED.

Section 15 imposes liability on any person who controls another person or entity who violates any provision of the Securities Act.  See 15 U.S.C. § 77o.  Here, Plaintiff has failed to state a primary violation of the Securities Act, and his Section 15 claim must be dismissed.  See Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 13 n.12 (1st Cir. 2006).

The control person claims against FMR LLC and the Individual Defendants fail for the additional reason that the Complaint does not specifically allege that these Defendants exercised control.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002) (denying control person liability in the absence of an allegation demonstrating control).  Plaintiff's bald assertion that FMR LLC and the Individual Defendants had business and personal relationships with the other Defendants (see Compl. ¶¶ 145-147), are insufficient as a matter of law.  See Aldridge, 284 F.3d at 85 (plaintiff must allege facts demonstrating "some indicia of the exercise of control over the entity primarily liable").

## CONCLUSION

For the foregoing reasons, Plaintiff's Amended Complaint should be dismissed in its entirety.  Because Plaintiff has already had an opportunity to amend and had many months to investigate his claims before filing the Amended Complaint, the dismissal should be with prejudice.

Dated: July 17, 2009

Respectfully submitted,

GOODWIN PROCTER LLP
/s/ James S. Dittmar
   James S. Dittmar (BBO# 126320)
   Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231
jdittmar@goodwinprocter.com
sconcannon@goodwinprocter.com

MILBANK, TWEED, HADLEY & McCLOY LLP

   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert R. Miller
   Andrew W. Robertson (*pro hac vice*)
   Jennie Woltz
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants  Fidelity Management &
Research Co., FMR Corp. (n/k/a FMR LLC),
Fidelity Brokerage Services LLC, Edward C.
Johnson 3d, Abigail P. Johnson, James C. Curvey,
Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas,
Kimberley Monasterio, Christine Reynolds, and
Robert L. Reynolds*

DECHERT LLP

/s/ William K. Dodds
    William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036-6797
Tel: (212) 698-3557
Fax: (212) 698-3599

  - and -

    Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, MA 02116
Tel: (617) 728-7100
Fax: (617) 426-6567

  - and -

    Thomas C. Bogle
    Robert W. Helm
1775 I Street, NW
Washington, DC 20006-2401
Tel: (202) 261-3300
Fax: (202) 261-3333

*Attorneys for Defendant Fidelity Income Fund*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 17, 2009.

    /s/ James S. Dittmar