UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALAN ZAMETKIN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 1:08-cv-10960-MLW |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| FIDELITY MANAGEMENT & RESEARCH COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................2

III.  ARGUMENT AND ANALYSIS ............................................................................9

    A.   The Standards Governing a Motion to Dismiss.........................................9

    B.   The Standard Governing Sections 11 and 12(a)(2).................................10

    C.   Plaintiff Has Pled an Actionable Claim Under the Securities Laws.......11

    D.   Plaintiff Alleges Actionable Misstatements and Omissions...................13

        1.   Defendants Misrepresented the Fund and Its Risks...................13

        2.   Defendants Misrepresented Their Ability to Value Risky
            Mortgage-Related Securities and Their Use of Conflicted Third-
            Party Valuation Services.............................................................19

        3.   Defendants Misrepresented the "Ultra-Short Central Fund" ....22

    E.   Defendants' Arguments that Their Misrepresentations and Material
        Omissions Are Inactionable Must Be Rejected .....................................23

        1.   Defendants' Characterization of the Fund and Valuation of
            Securities Are Not "Opinions"..................................................23

        2.   Defendants' Boilerplate Recitation of Risks Does Not "Bespeak
            Caution" ...................................................................................27

        3.   Compliance with General SEC Form Instructions Does Not
            Relieve Defendants of Liability for Failure to Disclose Information
            Required to Make Statements Made Not Misleading ................30

        4.   Plaintiff's Allegations Are Based on Statements that Were
            Misleading at the Time They Were Made .................................33

    F.   Plaintiff's Claims Are Not Time-Barred................................................33

    G.   Defendants Have Not Demonstrated Plaintiff's Knowledge of the Specific
        Material Misstatements in the Complaint ..............................................36

**Page**

H.    Defendants Have Not Met Their Burden of Demonstrating a "Negative Causation" Affirmative Defense ...................................................................... 38

I.    Plaintiff Adequately Alleges Control Person Liability .......................................... 41

IV.    CONCLUSION ................................................................................................... 44

# TABLE OF AUTHORITIES

**Page**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972).................................................................43

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)........................................................9

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).........................................................9, 13

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007).....................................................9, 13, 14

*Benzon v. Morgan Stanley Distribs.*,
   420 F.3d 598, 609 (6th Cir. 2005) ..............................................32

*Bond Opportunity Fund II, LLC v. Heffernan*,
   340 F. Supp. 2d 146 (D.R.I. 2004)...............................................30

*Caremark, Inc. v. Coram Healthcare Corp.*,
   113 F.3d 645 (7th Cir. 1997) ....................................................40

*Chao v. Ballista*,
   No. 07 cv 10934-NG, 2009 WL 1910954
   (D. Mass. July 1, 2009)..............................................................9

*Cooperman v. Individual Inc.*,
   171 F.3d 43 (1st Cir. 1999)........................................................31

*Coronel v. Quanta Capital Holdings Ltd.*,
   No. 07 Civ. 1405 (RPP), 2009 WL 174656
   (S.D.N.Y. Jan. 26, 2009)...........................................................23

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
   No. 99 CIV 12046 WHP, 2001 WL 300733
   (S.D.N.Y. Mar. 28, 2001) .....................................................21, 29

*Doe v. GTE Corp.*,
   347 F.3d 655 (7th Cir. 2003) ....................................................38

*EP Medsystems, Inc. v. Echocath, Inc.*,
   235 F.3d 865 (3d Cir. 2000).......................................................29

**Page**

*Fecht v. The Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ........................................................................14, 22

*Fraternity Fund LTD v. Beacon Hill Asset Mgmt. LLC*,
  376 F. Supp. 2d 385 (S.D.N.Y. 2005)....................................................................41

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ........................................................................27, 30

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)................................................................................................10

*Huddleston v. Herman & MacLean*,
  640 F.2d 534, 543-44 (5th Cir. 1981)
  *rev'd in part on other grounds*, 459 U.S. 375 (1983) ...........................................28

*Hurley v. Federal Deposit Ins. Corp.*,
  719 F. Supp. 27 (D. Mass. 1989) ..........................................................................12

*In the Matter of Evergreen Investment Mngmt. Co., LLC et al.*,
  Cease and Desist Order, SEC Release No. 60059 (June 8, 2009) ................... *passim*

*In re Acceptance Ins. Cos. Sec. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ........................................................................10, 24

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004)...................................................................................38

*In re AIG Advisor Group Sec. Litig.*,
  No. 06 cv 1625(JG), 2007 WL 1213395
  (E.D.N.Y. Apr. 25, 2007)........................................................................................32

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................................................43

*In re Brooks Automation Inc. Sec. Litig.*,
  No. 06-11068-RWZ, 2007 WL 4754051
  (D. Mass. Nov. 6, 2007).................................................................................41, 42

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)............................................................................31, 42

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)....................................................................... *passim*

**Page**

*In re Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989).................................................................11

*In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.*,
  431 F.3d 36 (1st Cir. 2005)...............................................................24

*In re DaimlerChrysler AG Sec. Litig.*,
  269 F. Supp. 2d 508 (D. Del. 2003).....................................................36

*In re Donald Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) ................................................................28

*In re Elscint, Ltd. Sec. Litig.*,
  674 F. Supp. 374 (D. Mass. 1987) ......................................................43

*In re Global Crossing, Ltd., Sec. Litig.*,
  No. 02 Civ. 910(GEL), 2005 WL 1875445
  (S.D.N.Y. Aug. 5, 2005) ...................................................................43

*In re Initial Public Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................42

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................31

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
  434 F. Supp. 2d 233 (S.D.N.Y. 2006).............................................40, 41

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009)........................................... *passim*

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
  No. 03 Civ. 8208 (RO), 2006 WL 1008138
  (S.D.N.Y Apr. 18, 2006)....................................................................40

*In re N2K Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 1999)....................................................31

*In re NationsMart Corp. Sec. Litig.*,
  130 F.3d 309 (8th Cir. 1997) .............................................................24

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) ......................................................10

**Page**

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)...................................................................42

*In re Salomon Analysts Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)...........................................................24, 27

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)...................................................................40

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)...................................................................9, 13, 28

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................30

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)...................................................................................29

*In re Worldcom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................21

*In re WorldCom Sec. Litig.*,
    308 F. Supp. 2d 338 (S.D.N.Y. 2004)...................................................................43

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    No. 07 Civ. 0976, 2008 WL 4449280
    (S.D.N.Y. Sept. 30, 2008)...................................................................................23

*Lalor v. Omtool, Ltd.*,
    No. CIV. 99-469M, 2000 WL 1843247
    (D.N.H. Dec. 14, 2000)......................................................................................33

*Lerner v. FNB Rochester Corp.*,
    841 F. Supp. 97 (W.D.N.Y. 1993)........................................................................13

*Mayer v. Oil Field Sys. Corp.*,
    803 F.2d 749 (2d Cir. 1986)...........................................................................37, 38

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249 (1991).........13, 14, 19, 28

*Miss. Pub. Emp. Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)..................................................................................42

**Page**

*Olcott v. Delaware Flood Co.*,
   76 F.3d 1538 (10th Cir. 1996) ..............................................................................33

*Panther Partners, Inc. v. Ikanos Communs., Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................31

*Roeder v. Alpha Indus., Inc.*,
   814 F.2d 22 (1st Cir. 1987)......................................................................................27

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) .....................................................................................28

*Salois v. Dime Sav. Bank of New York, FSB*,
   128 F.3d 20 (1st Cir. 1997)......................................................................................34

*Santa Fe Industries, Inc. v. Green*,
   430 U.S. 462 (1977)..........................................................................................11, 13

*Shaw v. Digital Equipment Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ........................................................................ *passim*

*Siemers v. Wells Fargo & Co.*,
   No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 21935
   (N.D. Cal. Mar. 9, 2007) .........................................................................................40

*Slavin v. Morgan Stanley & Co.*,
   791 F. Supp. 327 (D. Mass. 1992) ...................................................................12, 40

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)......................................................................................12

*Thomas v. Rhode Island*,
   542 F.3d 944 (1st Cir. 2008)......................................................................................9

*Va. Bankshares v. Sandberg*,
   501 U.S. 1083 (1991)...............................................................................................24

*Wolinetz v. Berkshire Life Ins. Co.*,
   361 F.3d 44 (1st Cir. 2004).......................................................................................37

*Young v. Lepone*,
   305 F.3d 1 (1st Cir. 2002)............................................................................34, 36, 37

Page

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
 §77k ........................................................................................................1, 38
 §77k(a) ..................................................................................................10, 30
 §77k(a)(2) ....................................................................................................43
 §77k(e) ........................................................................................................38
 §77l .............................................................................................................38
 §77l(a)(2) .........................................................................................1, 10, 30
 §77l(b) ........................................................................................................38
 §77m ...........................................................................................................33
 §77o ........................................................................................................1, 41
 §78a ............................................................................................................24

Federal Rules of Civil Procedure
 Rule 8 .........................................................................................................42
 Rule 8(a) ...................................................................................1, 9, 10, 13
 Rule 10b-5 ..................................................................................................24
 Rule 12(b)(6) ........................................................................................14, 38

17 C.F.R.
 §230.408(a) ................................................................................................31


## SECONDARY AUTHORITIES

Black's Law Dictionary 1126
 8th ed. 2004 ................................................................................................24


## LEGISLATIVE HISTORY

Congressional Record:
 *The Economic Outlook: Hearing Before Joint Economic Committee*,
 110th Cong. D431 (2007) (Testimony of Ben S. Bernanke, Chairman, Board of
 Governors of the Federal Reserve System), *available at* 2007 WL 927663 ............................26

Lead Plaintiff Dr. Alan Zametkin ("Plaintiff") submits this memorandum in opposition to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint dated July 17, 2009 ("Def. Mem.").

## I.    INTRODUCTION

Plaintiff alleges that Defendants offered shares of the Fidelity Ultra-Short Bond Fund (the "Fund") to the public through registration statements and prospectuses (collectively, the "Registration Statement") that were materially false and misleading.  Specifically, Defendants represented the Fund as being structured and managed to be low risk and with low volatility, similar to a money market fund.  Defendants had, however, secretly abandoned the Fund's stated investment philosophy by chasing higher returns and investing heavily in risky mortgage-related securities in the midst of the mortgage meltdown.  Defendants also reported stable net asset values ("NAVs") for the Fund throughout the Class Period while the true value of the Fund was declining.  By failing to follow their own purported valuation procedures, Defendants failed to timely write-down the securities as their value declined.  Ultimately, the Registration Statement misrepresented, among other things, the characteristics and risks of the Fund; the true extent of its exposure to risky mortgage-related securities; its valuation procedures and capabilities; and the value of the securities held by the Fund as reflected in the NAV.  When the risks associated with these misrepresentations and omissions materialized, the Fund's NAV plummeted, injuring Plaintiff and other Fund investors.

Plaintiff asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§77k, 77l(a)(2), and 77o]; thus, Plaintiff is not required to allege either scienter or loss causation.  Under Fed. R. Civ. P. 8(a), which applies here, Plaintiff must only present a short and plain statement of his claims alleging material misrepresentations and omissions in the Registration Statement.  As set forth below, the Complaint easily satisfies this requirement.

## II.    STATEMENT OF FACTS

Plaintiff, like other members of the putative class, purchased shares of the Fund pursuant to the Registration Statement and suffered significant financial losses when the NAV of the Fund plummeted.  *See* Amended Complaint ("Complaint") dated April 23, 2009 at ¶¶5, 32, 92, 112-115, 132, 140 (hereinafter "¶__" or "¶¶__").  Plaintiff alleges Defendants violated the Securities Act by misrepresenting, among other things, the Fund's profile, objectives, exposure to mortgage-related securities and the related risks.  ¶¶126-147.

**The Fund's False and Misleading Description and Disclosure of Risks**

According to the Registration Statement, the Fund sought to obtain a high level of current income ***consistent with the preservation of capital***.  ¶¶37, 84, 104-05; *see also* ¶36 (alleging that ultra-short bond funds in general have very low volatility and risk).  The Lehman Brothers 6 Month Swap Index (the "6 Month Swap Index" or "Index"), renowned for its low volatility and low interest rate risk, was supposedly the benchmark and "guide" for structuring the Fund and selecting its investments.  ¶¶38, 84.  According to Defendants, the 6 Month Swap Index "represents the market for the types of securities in which the fund invests," and the Fund was managed to have similar interest rate risk.  ¶84.  The Registration Statement further represented that such investments included a variety of low risk/low return securities including money market securities, investment-grade debt securities (including the internal Fidelity Central Fund) and repurchase agreements.  ¶¶53, 84.  Specifically, the Registration Statement stated:

- "Ultra-Short Bond Fund seeks to obtain a high level of current income ***consistent with preservation of capital***."

- "***FMR uses an index [i.e., the 6 Month Swap Index]*** that represents the market for types of securities in which the fund invests ***as a guide in structuring the fund and selecting its investments***."

- "***FMR manages the fund to have similar overall interest rate risk*** to the [6 Month Swap] index."

- "FMR normally invests at least 80% of the fund's assets in **investment-grade** debt securities (those of medium and high quality) of all types and repurchase agreements for those securities."

¶¶37-38, 84 (emphasis added).

Accordingly, investors and analysts understandably believed that the Fund was a conservative and stable investment that was appropriately structured to preserve capital. In two analyst reports, Morningstar, a leading provider of mutual fund investment analysis, repeatedly described the Fund as "low risk" and "conservative," and touted its "low volatility," "stability" and "restrained approach" to investing. ¶¶39-40. On the other hand, it cautioned that, like a money market fund, the trade off for safety/low volatility would be a low rate of return. *See* ¶39 ("Don't expect a lot of return from Fidelity Ultra-Short Bond"); ¶40 ("Fidelity Ultra-Short Bond doesn't pack much of a punch").[1] The Fund was therefore positioned as playing an "ultra-conservative role in [investors'] portfolios." ¶39. This positioning was consistent with the perception of ultra-short bond funds in general, which are well-known in the mutual fund industry for having "very low volatility and low risk." ¶36. ***Fidelity itself opined that the Fund would appeal to "relatively conservative, income oriented investors" who "want to minimize share-price volatility*.*"*** ¶37 (emphasis added).

The representations in the Registration Statement, however, were untrue and misleading when made. In actuality, during the Class Period, the Fund was no longer structured in a way that it could achieve current income in a manner that was "consistent with the preservation of capital." ¶85. Nor were its investments or structure any longer modeled after the low-volatility, 6 Month Swap Index. ¶¶85, 87, 92-93; *see* ¶115 (chart showing that unlike the Fund, the Index's performance

---

[1]    On August 19, 2008, in reporting on the Fund's dismal performance, Morningstar again recognized that investors "were counting on this vehicle to preserve capital." ¶119.

remained constant throughout the Class Period). Instead, the Fund had surreptitiously abandoned these fundamental principles in its quest to chase higher returns. ¶¶48-54, 85-87, 106-111.

By the start of the Class Period, the Fund had become so heavily invested in risky mortgage-related securities, including sub-prime mortgage securities, that the overall risk to investors was far greater than represented. ¶¶85, 87, 89, 91, 105-111. Not only did Defendants fail to adequately disclose this exponentially increasing risk, they also failed to disclose the real extent to which the Fund was exposed to these high risk/high return investments. Defendants categorized many of the mortgage securities as Asset-Backed Securities ("ABS") (which by definition includes not only mortgages but other loans, receivables and assets), without disclosing the portion of these ABS investments that were mortgage-related. ¶¶106-111. For example, while the 2006 Annual Report disclosed 15.7% of the assets were "Collateralized Mortgage Obligations," this number significantly understated mortgage-related securities held by the Fund since they were also contained separately within the ABS category and the Central Fund. ¶107. Exactly how much of these other two categories also consisted of mortgage-related securities was never disclosed, but is substantial. ¶¶106-111.[2]

Defendants were well aware of the considerable risks taken on by the Fund, but nonetheless failed to disclose these risks to investors or otherwise correct their presently misleading description of the Fund. As early as 2003, internal Fidelity analysts, including Lisa Emsbo-Mattingly, were

---

[2]      Defendants incorrectly claim that they always disclosed the true extent of mortgage-related securities held in the Fund. For instance, they state that on July 31, 2007 they disclosed that the Fund held 65.3% of its assets in these risky securities. *See, e, g.*, Def. Mem. at 12, 33. This is demonstrably false since they really showed only 26% "CMOs and Other Mortgage-Related Securities" and 39.3% "ABS," which by definition could, but not necessarily would, include any mortgage-related securities. *Id.* Thus, investors could not have known that the ABS category became more and more comprised of mortgage securities throughout the Class Period.

expressing their concerns about the impending sub-prime crisis. ¶¶80-82. These risks subsequently increased further as interest rates rose, property value appreciation slowed, delinquencies rose, and mortgage lenders reported devastating losses. ¶¶63-79.[3] Nevertheless, the true extent of these significant *risks*, given the Fund's enormous investment in such securities, never appeared in the Registration Statement and remained hidden from investors. ¶¶89, 91.[4]

Making matters worse, as described below, Defendants did not understand, were unable to properly value and were unwilling to timely write-down the Fund's mortgage-related securities as their true values plummeted. ¶85.

**The Fund's NAV and Valuation Capabilities**

Plaintiff alleges multiple levels of misrepresentations and omissions related to Defendants' valuation of the mortgage-related securities held by the Fund that ultimately resulted in its artificially inflated NAVs. ¶¶57-62, 95-97. During the Class Period, Defendants represented that the Fund employed robust valuation procedures overseen by the "Fair Value Oversight Committee" which, among its other duties, "monitors and establishes policies concerning procedures and controls

---

[3]     Plaintiff is not alleging that Defendants should have predicted the timing and extent of the sub-prime mortgage meltdown. Rather, they should have disclosed the known and increasing risks of the mortgage-related securities, particularly in light of the (undisclosed) level of the Fund's holdings of these risky securities and their mischaracterization of the Fund in the Registration Statement. Similarly, he does not allege that the Fund could not invest in these securities, only that it must provide sufficient disclosures if it chooses to invest to the extent it did.

[4]     Unlike the Index, the mortgage-related securities were subject to and experiencing a rising interest rate risk during the Class Period which resulted in substantially increased volatility. ¶¶50, 63, 65. Defendants made only generic, boilerplate disclosures regarding the interest rate risks that were misleading because they did not adequately inform investors of the Fund's exaggerated interest rate change risk that was increasing due to rising default rates. ¶¶90-91. Moreover, Defendants misled investors by claiming to hold 80% investment grade securities in the Fund during the mortgage meltdown, when it was clear that the securities backed by mortgages were not rated appropriately, were overvalued and were rapidly losing value. ¶¶63-79, 84, 86.

regarding the valuation of fund investments." ¶98. Defendants further represented that they would depend on a "pricing service or market quotations," *but only to the extent that the "information . . . accurately reflect[s] the fair value of the security*." ¶100 (emphasis added). Whenever a price quote did not accurately reflect the fair value of the security, Defendants' stated procedure was to have a committee value those securities in "good faith" according to board approved "fair value pricing policies." *Id.* Thus, investors and analysts were led to believe that Defendants: (a) understood the mortgage-related securities they were causing the Fund to purchase (including the securities' risks); (b) had appropriate policies and procedures in place to ensure they were fairly valued; and (c) would utilize third-party pricing services only to the extent they verified that the pricing information reflected the securities' true value.

Yet, unbeknownst to investors, Defendants were overstating the Fund's NAV by failing to "properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion." ¶85. According to confidential witnesses, Fidelity was understaffed, its trustees and employees inexperienced, and Defendants were content with hopefully obtaining an *eventual* understanding of the securities (and their value) that they were *presently* adding to the Fund. ¶¶58-61. And the Valuation Committee members did not even "know the analytics and the pricing that goes behind pricing out each bond." ¶59. Fidelity simply did not have an internal team capable of sufficiently understanding, valuing or evaluating pricing information concerning the Fund's holdings of Collateralized Debt Obligations ("CDOs"), many of which were mortgage-related. ¶60. Thus, Defendants did not disclose and misrepresented the true facts that they could not properly value these mortgage-related securities, they could not adequately oversee third-party pricing services or otherwise evaluate whether the "information . . . accurately reflect[s] the fair value of the security."

- 6 -

Likewise, Defendants did not disclose their exclusive reliance on Bear Stearns for pricing, or its conflict of interest that incentivized its reporting of inflated prices for mortgage-related securities. ¶¶43-46, 56-57. According to a confidential witness, Defendants depended exclusively on Bear Stearns as the only source for valuing CDOs through its "Price Direct" website. ¶56. Bear Stearns, however, had a significant incentive to overvalue these securities, and therefore a blatant conflict of interest. ¶57. Bear Stearns developed and sold these and similar CDOs and was motivated to sustain a strong and lucrative market for its investment banking and hedge fund businesses. *Id.* Again, nowhere was Bear Stearns' conflict or the resulting valuation risk disclosed. Nor did investors know that they were overpaying for Fund shares due to the artificially inflated NAVs. Ultimately, Defendants gained some understanding of the investments and belatedly wrote down the value of securities held by the Fund, causing the Fund's value to drop off at the tail-end of the mortgage meltdown. ¶¶62, 112-14.

**The Ultra-Short Central Fund**

Plaintiff also alleges material misrepresentations and omissions regarding the "Ultra-Short Central Fund," an internal Fidelity investment vehicle in which the Fund was invested. ¶¶52-54, 102-105. According to the Registration Statement, the Ultra-Short Central Fund is "a diversified internal pool of short-term assets designed to outperform cash-like instruments ***with similar risk characteristics*** – and an overweighting in bonds with maturities in the one-to-two year range." ¶102 (emphasis added). The Registration Statement further described the Central Funds, including the Ultra-Short Central Fund, as follows:

> Central Funds are money market or short-term bond funds managed by FMR or its affiliates . . . The short-term bond central funds seek to obtain a high level of current income ***consistent with the preservation of capital***. [The] Ultra-Short Central Fund . . . seeks to obtain a high level of current income ***consistent with preservation of capital*** by investing in U.S. dollar denominated ***money market and investment-grade securities.***

¶¶52, 104 (emphasis added).  Instead, Defendants' representations severely distorted the true level of risk, the type of investments and the characterization of the Ultra-Short Central Fund as its investments, like the Fund itself, were highly concentrated in risky mortgage-related securities.[5] ¶¶52, 54, 103-105.  Significantly, the Fund's investments in the Ultra-Short Central Fund caused its risk profile and volatility to deviate even further from the Index and from Defendants' characterization of the Fund as being structured "consistent with the preservation of capital."  ¶54.

**Plaintiff's and Class Members' Losses**

By abandoning the Fund's stated objectives in search of higher returns, Defendants have caused the Fund and its shareholders to incur tens of millions of dollars in losses, if not more.  The Fund's shocking divergence from the stable returns reflected in the 6 Month Swap Index is depicted below:



¶115.  Shareholders like Plaintiff have thus watched their supposedly safe and secure Fund shares crater.  The NAV plummeted from $10.04 per share at the beginning of the Class Period to $8.30 on

---

[5]    Defendants omitted the Ultra-Short Central Fund's holdings from the Fund's Registration Statement, thereby downplaying its importance in the Fund's portfolio to investors and concealing the nature of its investments.  ¶53.

June 5, 2008.  ¶113.  During this same period, the 6 Month Swap Index, consistent with the preservation of capital, remained stable and steadily increased.  ¶115.

Not surprisingly, one of the Fund's managers quietly exited the Company after these dreadful results, and the remaining manager belatedly overhauled the portfolio to reflect the Fund's stated objectives.  ¶¶116, 118-19.  In reporting these events, Morningstar once again noted the obvious – that given the Fund's stated profile, the injured investors had been "counting on this vehicle to protect their capital."  ¶119.

## III.   ARGUMENT AND ANALYSIS

### A.     The Standards Governing a Motion to Dismiss

In analyzing allegations on a motion to dismiss, a court must take all well-pleaded facts as true, give plaintiff the "benefit of all reasonable inferences," and read the complaint in a light most favorable to plaintiff.  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79 (1st Cir. 2002); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 200 (1st Cir. 2005); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996).  Dismissal is only appropriate if the plaintiff fails to provide factual allegations sufficient to "raise a right to relief above a speculative level" to being "plausible."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (basing discussion of standard of review for motion to dismiss on *Twombly*).  In carefully balancing Fed. R. Civ. P. 8(a) with the "plausibility" requirement from *Twombly*, the First Circuit reiterated that "specific facts are not necessary; the statements need only give defendants notice of what the . . . claim is and the ground upon which it rests."  *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008) (internal quotations omitted); *see also Chao v. Ballista*, No. 07 cv 10934-NG, 2009 WL 1910954, at *5 (D. Mass. July 1, 2009) ("[A] complaint should only be dismissed at the pleading stage where the allegations are so broad . . . that the claims no longer appear plausible.").

### B.    The Standard Governing Sections 11 and 12(a)(2)

Section 11 of the Securities Act imposes liability on, *inter alia*, the issuer of a security and every person who signed a registration statement or was named therein as a director or served similar functions if the registration statement, when it became effective: (1) "contained an untrue statement of a material fact"; (2) "omitted to state a material fact required to be stated"; or (3) omitted a material fact necessary "to make the statements therein not misleading." 15 U.S.C. §77k(a); *Shaw*, 82 F.3d at 1204. Section 12(a)(2) provides liability for any person who offers or sells a security by means of "a prospectus or oral communication . . . [that] includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2); *Shaw*, 82 F.3d at 1201.

"If a plaintiff purchased a security pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie [Section 11] case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (finding that Section 11 places a "relatively minimal burden on a plaintiff"). An issuer's liability for even innocent misstatements is "virtually absolute." *Id.* Correspondingly, a plaintiff asserting claims under Section 11 or 12(a)(2) is not required to show that defendants acted with scienter. *Shaw*, 82 F.3d at 1217; *accord In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005).

Accordingly, Section 11 and 12(a)(2) claims are only held to the liberal Rule 8(a) pleading standard, unless the allegations "sound[ ] in fraud," which is not the case here. *Shaw*, 82 F.3d at 1223; *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 12 (D. Mass. 1999).

- 10 -

### C.    Plaintiff Has Pled an Actionable Claim Under the Securities Laws

Plaintiff adequately alleges a claim under the securities laws.  As discussed more fully below, the Complaint alleges in detail that the Registration Statement contains untrue statements of material facts and omitted to state material facts required to be stated therein.

Defendants, however, attempt to re-write Plaintiff's claims as complaining of corporate mismanagement.  Def. Mem. at 14.  Their argument is based upon the basic rule in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977) that allegations of mere mismanagement cannot be the basis of a claim under the federal securities laws.  Def. Mem. at 15.  As the Third Circuit has noted, however, "[a]lthough allegations of failure to disclose mismanagement alone do not state a claim under federal securities law, a claim that defendants failed to disclose material facts may be actionable."  *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 639 (3d Cir. 1989).  The *Craftmatic* court "emphasized the importance of distinguishing *Santa Fe*, in which the Court found no material misrepresentation or omission, from other cases in which the plaintiff alleges the omission of specific material facts."  *Id.*  This case is distinguishable from *Santa Fe* for that very reason – Plaintiff does not allege mismanagement on the part of Defendants.  Rather, Plaintiff has alleged specific material misstatements by Defendants in the Registration Statement.  ¶¶83-111.

Defendants mischaracterize Plaintiff's allegations as complaining only about Defendants' decision to improperly invest in risky asset-backed and mortgage-related securities.  Def. Mem. at 16.  Even though Defendants may have mismanaged the Fund, Plaintiff's allegations go much further than this management decision – Plaintiff avers, among other things, that Defendants failed to disclose the true risk profile of the Fund and the extent to which it was exposed to risky subprime mortgage-related securities.  *See* ¶¶84-93, 106-111.  In addition, Plaintiff alleges that Defendants

misstated the valuation capabilities and methodologies of the Fund (¶¶98-101) which, in turn resulted in misstatements with regard to the value of the Fund.  ¶¶94-97.[6]

Defendants confuse this case with a simple case of breach of fiduciary duty – or a mere "*post hoc* critique of management decisions." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001).  As in *Suez*, Plaintiff is not merely complaining about management **decisions** after they had been made.  *See id*.  Rather, Plaintiff has alleged specific misstatements Defendants proffered to the market through the offering documents.  ¶¶83-111.  Any discussion about Defendant's inability to accurately value the Fund merely explains how the affirmative statements during the Class Period were misleading and why the Fund's NAV was artificially inflated during the Class Period.  *Compare* ¶¶55-62 with ¶¶97-101.  *See Suez*, 250 F.3d at 99 (distinguishing mere mismanagement claims from those where the defendants make affirmative misrepresentations to the plaintiffs "concerning the quality of the proffered securities"); *Slavin v. Morgan Stanley & Co.*, 791 F. Supp. 327, 333 (D. Mass. 1992) (noting that while the "plaintiffs' bedrock difficulty may be with the corporate mismanagement," the complaint alleged "specific material information" which was not disclosed and which met the standard for misstatements); *Hurley v. Federal Deposit Ins. Corp.*, 719 F. Supp. 27, 30 (D. Mass. 1989) (rejecting mismanagement argument by defendants where plaintiffs alleged material misrepresentations and

---

[6]    If Defendants had made appropriate disclosures, Plaintiff would not have a claim since he, and other investors and analysts, would have known exactly what they were investing in and the related risks.  Again, Plaintiff is not simply alleging the decision to invest in mortgage securities was wrong.  Def. Mem. at 16-17.  Defendants needed to disclose their variance from the Fund's stated structure and philosophy, and the true extent of the associated risks, to make the statements made in the Registration Statement not false or misleading.

omissions).[7]    Because Plaintiff has alleged specific material misstatements and omissions by

Defendants, Defendants' motion to dismiss based on the rule in *Santa Fe* must be rejected.

### D.    Plaintiff Alleges Actionable Misstatements and Omissions

#### 1.    Defendants Misrepresented the Fund and Its Risks

The central inquiry in determining whether a registration statement is materially misleading

is "whether defendant's representations, *taken together and in context*, would have [misled] a

reasonable investor" about the nature of the investment.[8] *McMahan & Co. v. Wherehouse Entm't,*

*Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249 (1991) (emphasis added).

Plaintiff here goes well beyond the Rule 8(a) pleading requirement by demonstrating that not only

***would*** a reasonable investor be misled about the nature of the investment, but that a sophisticated

mutual fund analyst—Morningstar—***was*** misled.[9] ¶¶39-40.  In two separate reports, Morningstar, a

leading provider of mutual fund investment analysis, repeatedly described the Fund as "low risk"

and "conservative," and touted its "low volatility," "stability" and "restrained approach" to investing.

---

[7]    Defendants' reliance upon *Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97 (W.D.N.Y. 1993) is completely misplaced.  In that case, the plaintiff alleged that two "innocuous" statements were misleading, and offered "no facts" to support the allegations.  *Id.* at 102.  Here, Plaintiff has demonstrated how Defendants' statements in the offering documents were not "innocuous," but instead, were materially misleading.  In addition, Defendants' other cases, regarding the inadequacy of loan loss reserves are also distinguishable.  *See* Def. Mem. at 15-16.  This is not a case where Defendants miscalculated a reserve that later turned out to be inadequate.  In this case, Defendants misstated the Fund's *then-known* investments, gave the impression that their "sophisticated experience" allowed them to value the investments and later *admitted* that the Fund had a sizeable exposure to subprime mortgages, which had never been previously made known to investors

[8]    Because Defendants are required to disclose information to investors such that the "totality of information" is not false or misleading, their attempts to isolate portions of allegations to their benefit must fail.  *Stone & Webster*, 414 F.3d at 208.

[9]    Under *Iqbal*, 129 S. Ct. at 1950, Plaintiff need only plead sufficient facts to establish that his claims are "plausible."  *See also Twombly*, 127 S. Ct. at 1974 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").

*Id.* On the other hand, it cautioned that, like a money market fund, the trade off for safety/low volatility would be a low rate of return. *Id.* The Fund was therefore positioned as playing an "ultra-conservative role in [investors'] portfolios." ¶39. Indeed, this positioning was consistent with the perception of ultra-short bond funds in general, which are well-known in the mutual fund industry for having "very low volatility and low risk." ¶36. Fidelity itself confirmed that the Fund would appeal to "relatively conservative, income oriented investors" who "want to minimize share-price volatility." ¶37. Why did Plaintiff, other investors and Morningstar believe that the Fund was conservative, low risk and stable? Quite simply because the disclosures in the Registration Statement "taken together and in context" reasonably led them to that inaccurate conclusion. *McMahan & Co.*, 900 F.2d at 579.[10]

According to the Registration Statement, the "Ultra-Short Bond Fund seeks to obtain a high level of current income ***consistent with the preservation of capital***." ¶84 (emphasis added). In doing so, the Registration Statement states that the Fund normally invests in money market securities, investment-grade debt securities (including the internal Fidelity Central Fund) and repurchase agreements. ¶¶53, 84. The Fund further purportedly models its selection of investments, management and "overall interest rate risk" on the Index, which consists of securities with relatively short maturities that are renowned for their low volatility and low risk. ¶¶38, 84. Of course, the name of the Fund itself – the "Fidelity Ultra-Short Bond Fund" – reinforces this perception. Moreover, the Registration Statements represent that the Fund invests "at least 80% of the [F]und's assets in investment-grade debt securities (those of medium and high quality) of all types." ¶84.

---

[10]    In Section 11 and 12(a)(2) cases, Fed. R. Civ. P. 12(b)(6) requires, without more, that "[t]he Complaint set [ ] forth public statements and omissions that reasonable jurors could find to be materially misleading." *Fecht v. The Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995).

Thus, reasonable investors were presented with the false picture that the Fund was and would continue to be structured as a conservative and stable investment with a volatility and risk similar to (but admittedly not identical to) the Index. ¶¶37-40, 50-51, 84-86. That is, it was a small step up from a money market fund. ¶¶37, 39-40.

What Fund investors received was quite different. In actuality, by the beginning of the Class Period, the Fund was neither structured "consistent with the preservation of capital," nor was its investments or structure modeled after the Index. ¶¶48-50, 85. Instead, Defendants had abandoned these fundamental principles in an effort to chase higher returns, thereby creating a risk to investors that was significantly greater than represented. ¶¶48-54, 85-87, 106-111; *see In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 543, 562 (N.D. Cal. 2009) (denying motion to dismiss based on allegations that investors in a mutual fund were "unwittingly exposed to significant risks, and as the nation's credit crisis unfolded, those risks led to substantial losses"); Def. Mem. at 32 (wrongly claiming that Plaintiff alleges that Fund was represented to be structured identically to the Index).

Despite Defendants' pleas to the contrary, the Fund was structured markedly differently from, and was significantly more risky and volatile than the Index – its supposed guide and benchmark. ¶87; *see also* ¶115 (chart comparing the Fund's performance diverging dramatically with that of the Index). As a result, the Fund's structure did not even remotely resemble that of the Index or another relatively low risk make-up consistent with the preservation of capital. ¶¶48-50, 54, 85.

First and foremost, the Fund became so heavily invested in risky mortgage-related securities, including sub-prime mortgages, that the overall risk to investors was significantly greater than

represented. *Id.*[11] As discussed below, Defendants obscured the full extent of the Fund's exposure to these high risk/high return investments by categorizing many of them as ABS (which by definition includes not only mortgages but other loans, receivables and assets) without disclosing which investments were mortgage-related, including subprime mortgage-related, making purchases through Fidelity's Ultra-Short Central Fund (which was characterized as essentially a cash equivalent) and by maintaining incorrect and artificially-inflated valuations for many of the securities. *See* ¶¶55-62, 102-111; Def. Mem. at 10.

Although Defendants claim that they openly discussed the Fund's exposure to mortgage-related securities, this is simply not true. *See* Def. Mem. at 29. They made no mention of the increasing risk of such securities, of which they were well aware from internal discussions and external events. ¶¶63-81. Nor did they explain to investors that the Ultra-Short Central Fund was not really a cash-equivalent but instead just another vehicle for purchasing these risky mortgage assets. *See* ¶¶52-54, 102-105; §III(D)(3), *infra.* Lastly, they further concealed the Fund's true exposure to risky subprime mortgage-related securities by not only classifying these securities as "Collateralized Mortgage Obligations," but also including them in a separate category of "Asset-Backed Securities." ¶¶106-111. Therefore, a disclosure of 15.7% CMOs materially understated the exposure since these mortgage-related securities were also included at some level within the 29.3% ABS. ¶107. It is impossible to tell from the disclosures, however, the true percentage of risky mortgage securities in ABS. Defendants nonetheless claim they disclosed an exposure of 56% to 65% during the Class Period. Def. Mem. at 12, 33. Yet, the ABS percentages relied upon by

---

[11] Contrary to Defendants' assertion, Plaintiff does not contend that the Fund could not invest in such instruments, only that is was required to make sufficient disclosures if it did, to the extent the investment significantly increased the Fund's overall risk. *See* Def. Mem. at 16-18.

Defendants would include not only mortgages but other loans, receivables and assets. Def. Mem. at 34. Accordingly, investors would only know that mortgage-related securities represented 22.8% to 26% of the portfolio, not the 56% to 65% now claimed by Defendants. And, if the 56% to 65% range is really correct, then Plaintiff was further misled in that, contrary to representations, the ABS would have consisted of 100% in risky mortgage-related holdings.[12]

Second, the value of these risky holdings was declining at a significant rate, although Defendants were unwilling and unable to properly value and timely write-down these securities. ¶¶42, 62, 81-82, 95-97, 101. Thus, the NAV for the Fund was misrepresented. *See In the Matter of Evergreen Investment Mngmt. Co., LLC et al.*, Cease and Desist Order, SEC Release No. 60059 (June 8, 2009) ("*Evergreen* C&D") at ¶¶1-2, 10-14 (attached to the Declaration of Adam M. Stewart, submitted herewith) (finding that undisclosed failure to timely write down mortgage backed securities is actionable under the securities laws). Defendants blindly relied almost exclusively on Bear Stearns for pricing of mortgage-related securities, even though Bear Stearns had a clear conflict of interest and was providing inflated values, which Defendants then improperly incorporated into the Fund's NAV calculation. ¶¶55-57, 95-97. This blind reliance on Bear Stearns occurred despite Defendants' representation that a committee would value securities in good faith according to "fair value pricing policies" if "market quotations or information furnished by a pricing service . . . *do [ ] not accurately reflect fair value for a security*." ¶100 (emphasis added). Bear Stearns' price quotes were blatantly inaccurate, yet Defendants did not comply with its own stated policy to have a

---

[12]    Defendants conclude that "this choice of grouping in no way misled investors about the extent of the Fund's holding of mortgage securities." Def. Mem. at 33. In so arguing, Defendants essentially asks the Court to disregard Plaintiff's well-pleaded allegations and find as a matter of law that investors knew the extent of the Fund's mortgage-related holdings. Such a finding would be contrary to the record before the Court, and in any event, is demonstrably false.

committee value them in good faith.  ¶¶95, 101; *Evergreen* C&D at ¶10 (failure to follow stated valuation procedures for mortgage securities is actionable).  In fact, Fidelity employees and committee members were unable to properly value the securities because they did not understand the complex risky mortgage-related securities or the analytics involved.  ¶¶55-62.  Therefore, Defendants not only omitted to disclose their reliance on Bear Stearns for pricing and its conflict of interest, they affirmatively and materially misrepresented their valuation procedures, capabilities and the Fund's actual NAVs. ¶¶57, 95, 101.  *See* §III(D)(2), *infra*.

Third, unlike the Index, the mortgage-related securities were subject to and experiencing a rising interest rate risk during the Class Period which resulted in substantially increased volatility. ¶¶50, 63, 65.  Defendants made only generic, boilerplate disclosures regarding the interest rate risks that were misleading because they did not adequately inform investors of the Fund's exaggerated interest rate change risk that was increasing due to rising default rates.  ¶90 (disclosure addressing only generally "varying levels of sensitivity to changes in interest rates"); ¶94 (disclosure altogether failing to address risk due to defaults on mortgages); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 975 (D. Minn. 2009) (determining that defendants had a duty to provide more detailed information regarding the portfolio's exposure to subprime and Alt-A collateral based on the "external market indicators alleged in the complaint" and defendants' internal problems valuing the securities, among other allegations).

For these reasons, Defendants' overall disclosures regarding the Fund's structure and strategy, and specific statements regarding purported risks, were materially false and misleading when made.  ¶¶83, 85-87, 89, 91, 93, 95, 99, 101, 103, 105, 110.[13]

---

[13]    Moreover, Defendants misled investors by claiming to hold 80% investment grade securities in the Fund during the mortgage meltdown, when it was clear that the securities backed by subprime

2.    **Defendants Misrepresented Their Ability to Value Risky Mortgage-Related Securities and Their Use of Conflicted Third-Party Valuation Services**

Plaintiff alleges multiple levels of misrepresentations and omissions related to Defendants' valuation of the securities held by the Fund that ultimately resulted in inflated NAVs. ¶¶57-62, 95-97. Plaintiff avers that Defendants were overstating the Fund's NAV by "failing to properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion." ¶85. For example, Defendants: (1) misrepresented their valuation procedures and capabilities; and (2) omitted the material fact that they relied on inflated price quotes from Bear Stearns, who had a serious conflict of interest that incentivized it to provide inaccurate quotes. ¶95. These misrepresentations and omissions compounded to create false, inflated NAVs during the Class Period, which directly caused Plaintiff's and the Class Members' losses. *See generally Evergreen C&D.*

Defendants represented a valuation procedure to investors that they failed to implement because, according to the confidential witnesses referenced in the Complaint, Fidelity was understaffed and Defendants were content with hopefully obtaining an *eventual* understanding of the securities they were *presently* adding to the Fund. ¶¶58-61. Defendants represented that they were undertaking valuation with multiple levels of oversight, yet there were material deficiencies at each level. ¶¶58-61, 98-100. Specifically, Defendants affirmatively represented that they would depend

---

mortgages were not rated appropriately and were being rapidly downgraded. ¶¶63-79, 84, 86; *see McMahon & Co.*, 900 F.2d at 579 ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *see also MoneyGram*, 626 F. Supp. 2d at 976 (finding a duty to disclose "specific information about [ ] securities' ratings and method of reporting those ratings" because the general information disclosed may have misled a reasonable investor).

on a "pricing service or market quotations," *but only to the extent that the "information . . .* *accurately reflect[s] the fair value of the security."* ¶100 (emphasis added); Def. Mem. at 7, 27. Whenever the quote did not accurately reflect the fair value of the security, Defendants' stated procedure was to have a committee value those securities in "good faith" according to board approved "fair value pricing policies." *Id.* Despite Defendants' contention to the contrary,[14] Plaintiff does allege that these statements were false because Defendants relied on inflated prices from Bear Stearns even though they did not accurately reflect the securities' fair values and the committee did not, and could not, value those securities in "good faith." ¶101. Ultimately, Defendants were unable to properly value the mortgage-related securities held by the Fund because they did not understand the securities, and the Valuation Committee, purportedly providing review of the valuations, did not understand the analytics and pricing. ¶¶59-61, 99-101. In the summer of 2007, Defendants finally put together a "complex securities group" that was "capable of understanding CDOs and other complex risky mortgage-related securities" and gradually began writing down the value of the securities. ¶62. Indeed, prior to that point in time, Fidelity did not fully understand the securities in which it was investing and therefore was not even able to disclose the true risk of those securities.

Defendants contend they made a sufficient disclosure of external pricing sources by stating they were using "market quotations" and "pricing services." Def. Mem. at 27. To the contrary, these disclosures were so general as to be misleading under the circumstances because Defendants omitted disclosing that their pricing source was Bear Stearns, a conflicted third party providing inflated values. ¶¶43-47, 56-57, 60, 95. Defendants' vague, misleading disclosure gave rise to a

---

[14]   *See* Def. Mem. at 27 ("Plaintiff does not allege that Defendants failed to follow [their] disclosed procedures.").

duty to disclose Bear Stearns as practically their exclusive source of pricing for certain mortgage-related securities, some of which were also issued by Bear Stearns, and the fact that Bear Stearns had a material conflict of interest. *Id.*; *see In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004) (finding nondisclosure of conflict of interest that undermines the independence of an underwriter's judgment about the quality of an investment a material omission, "even where no regulation expressly compels the disclosure of such conflicts"). Defendants' omission of material information regarding Bear Stearns misled investors. *MoneyGram*, 626 F. Supp. 2d at 975 (failure to disclose "specifics about how and from whom it obtained 'quoted market prices,' or the number of securities requiring management pricing," where defendants represented that its management valued investments that were not readily marketable, was materially misleading); *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, No. 99 CIV 12046 WHP, 2001 WL 300733, at *8-*9 (S.D.N.Y. Mar. 28, 2001) (requiring disclosure of more specific information to make general statement not misleading).

As a result of Defendants' reliance on conflicted and erroneous pricing by Bear Stearns and failure to properly value the securities in the Fund as the value of mortgage-related securities was declining, Defendants' representation that the Fund's NAV was stable from the beginning of the Class Period through 2007 was false. ¶92. Significantly, the reported NAVs themselves were faulty. ¶¶42, 95. Moreover, Defendants misled investors to believe that the Fund was actually low risk with low volatility during the Class Period by representing that the Fund had a stable value when in fact, its NAV was declining.[15] ¶¶90-97; *see Evergreen* C&D at ¶¶1-2, 8-10, 36 (failure to disclose similar conduct resulted in "untrue statements of material fact" under the securities laws).

_____

[15]     Defendants mischaracterize Plaintiff's allegation regarding the stability of the Fund's NAV during the Class Period as implying that investors would be misled into believing the Fund would

While Defendants made some very general risk disclosures, they omitted statements that would have sufficiently warned investors about the specific, material risks the Fund presently faced. *See Fecht*, 70 F.3d at 1082 ("Inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading."). For example, Defendants disclosed that the Fund's share price may change in response to "economic, political or financial developments" and would be affected by "the types and maturities of securities in which the fund invests." ¶88. This risk disclosure did not adequately warn investors about the specific risks the Fund faced and was misleading because Defendants belatedly adjusted the NAV in response to the mortgage crisis, a significant "economic" development. ¶89.

### 3.    Defendants Misrepresented the "Ultra-Short Central Fund"

Plaintiff also alleges material misrepresentations regarding the "Ultra-Short Central Fund," an internal Fidelity investment vehicle in which the Fund was invested. ¶¶52-54, 102-105. According to the Registration Statement, the Ultra-Short Central Fund is "a diversified internal pool of short-term assets designed to outperform cash-like instruments with similar risk characteristics - and an overweighting in bonds with maturities in the one-to-two year range." ¶102. Furthermore, the Registration Statements described the Central Funds, including the Ultra-Short Central Fund as follows:

> Central Funds are money market or short-term bond funds managed by FMR or its affiliates . . . The short-term bond central funds seek to obtain a high level of current income *consistent with the preservation of capital*. [The] Ultra-Short Central Fund . . . seeks to obtain a high level of current income ***consistent with preservation***

---

continue to be stable in the future. Def. Mem. at 31. Instead, Defendants' representation of stable NAVs was misleading and actionable because: (1) the NAVs were incorrect *at the time reported*; and (2) they misled investors as to the Fund's *current* characteristics because they *did not reflect accurate NAVs.*

*of capital* by investing in U.S. dollar denominated ***money market and investment-grade securities.***

¶¶52, 104 (emphasis added).    Indeed, Defendants represented the Central Funds as being exceedingly conservative, based on their "cash-like instrument" level of risk, diversification, and investments only in money market and investment-grade securities.    ¶¶102, 104.    Defendants' representations severely distorted the true level of risk, the type of investments and the characterization of the Central Ultra-Short Fund as its investments were highly concentrated in risky mortgage-related securities.    ¶¶52, 54, 103-105.    Furthermore, Defendants omitted the Central Ultra-Short Fund's holdings from the Fund's Registration Statements from 2006 to 2008, thereby downplaying its importance in the Fund's portfolio to investors and concealing its investments.    ¶53. Significantly, the Fund's investments in the Central Ultra-Short Fund caused the risk profile and volatility to deviate even further from the Index and from Defendants' characterization of the Fund. ¶54.

### E.    Defendants' Arguments that Their Misrepresentations and Material Omissions Are Inactionable Must Be Rejected

#### 1.    Defendants' Characterization of the Fund and Valuation of Securities Are Not "Opinions"

Defendants erroneously characterize the alleged misrepresentations as "matters of opinion" and then take an unprecedented and illogical leap to attempt to require "subjective and objective falsity," essentially inserting a scienter requirement into Sections 11 and 12(a)(2) that does not exist in the statute or case law.[16]    This argument distorts the standard for Sections 11 and 12(a)(2) cases.

---

[16]    Defendants rely on several cases that are simply inapplicable here in an attempt to impose requirements to plead scienter and to plead with particularity, requirements that only exist in Section 11 or 12(a)(2) claims that "sound in fraud."    *See, e.g., Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *15 (S.D.N.Y. Jan. 26, 2009) (plaintiff's claims sound in fraud so required to plead with particularity); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ.

*See Shaw*, 82 F.3d at 1217 ("a Rule 10b-5 plaintiff, unlike a plaintiff asserting claims under Section 11 or 12(2) of the Securities Act, must establish that the defendant acted with scienter."); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) ("The liability of the issuer of a materially misleading registration statement is "virtually absolute, even for innocent misstatements."); *Acceptance Ins.*, 423 F.3d at 903 ("[T]here is no scienter requirement for a Section 11 claim.").

Defendants curiously assert that securities valuations, used to calculate the statutory NAV for mutual funds, are mere "opinions."[17] An "opinion" is "a thought, belief or inference . . . as opposed to personal knowledge of the facts themselves." Black's Law Dictionary 1126 (8th ed. 2004). If Defendants had affirmatively represented that they lacked personal knowledge of the facts that were supposed to form the basis for their valuation of securities in the Fund, it may have warned investors of the undisclosed reality of Fidelity's behind-the-scenes reliance on unreliable pricing information,

---

0976, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (same); *see also Va. Bankshares v. Sandberg*, 501 U.S. 1083 (1991) (requiring knowledge of false or misleading information under Securities and Exchange Act of 1934 where directors provided a fairness opinion while soliciting the proxies of shareholders to approve a merger); *In re Credit Suisse First Boston Corp. Analyst Reports Sec. Litig.*, 431 F.3d 36 (1st Cir. 2005) (requiring allegations of scienter under the PSLRA where defendants provided analyst reports containing buy recommendations for defendants' stock). Defendants do not assert that Plaintiff's allegations "sound in fraud."

[17]    Defendants cite *In re Salomon Analysts Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) for their characterization of valuations as "opinions." Def. Mem. at 35. In *Salomon*, the defendant was an analyst who had been asked for *his personal opinion* with regard to the value of stock, and the court declined to hold him liable for misrepresentation for his valuation. *Salomon*, 373 F. Supp. 2d at 252. This case, in which Fidelity marketed a mutual fund, is distinguishable because as Defendants themselves note, "[t]he Fund's pricing process is a statutorily required function, which is necessary for shareholder purchase and sale activity." Def. Mem. at 31. The inflated NAVs caused investors significant losses when Defendants belatedly acknowledged the decreased value of the mortgage-related securities. ¶¶118-19. Thus, Defendants' characterization of the valuations that are used to calculate the Fund's NAV as "opinions" is concerning.

and that Defendants did not even understand the securities they were attempting to value.  ¶¶55, 56, 59-61.

Instead, Defendants misrepresented internal procedures for valuation of securities and multiple levels of oversight by the Fair Value and Fair Value Oversight Committees.  ¶¶98, 99.  The Registration Statements represented that prices would be "furnished by a pricing service or market quotations" unless the information "is not readily available *or* does not accurately reflect fair value for a security."  ¶100.  In such a case, a committee would value those securities in "good faith" according to board-approved "fair value pricing policies."  *Id.*  A Fair Valuation Report was then to be provided to the Valuation Committee, responsible for "approv[ing] the valuation attributed to securities that were not actively traded."  ¶58.  However, Plaintiff alleges that Fidelity failed to follow these procedures, and that it did not and could not determine whether "risky mortgage-related securities accurately reflected fair value" to be able to then value them in "good faith."  ¶101.  The valuations were further afflicted by Defendants' failure to write-down mortgage-related securities in a timely fashion.  ¶101.  Plaintiff specifically ties this failure to Fidelity's understaffed and under-qualified group charged with valuing risky mortgage-related securities, and to the Valuation Committee that, according to a confidential witness, did not understand the analytics involved in pricing.  ¶¶55, 59-61; *see MoneyGram*, 626 F. Supp. 2d at 978 (determining that defendants disclosing their fair value determination method but concealing their "inability to reliably price the fifteen percent of securities requiring internal pricing and the extent and quantitative effect of MoneyGram's disagreements with third-party pricers" may have misled a reasonable investor).

Thus, Defendants' representations regarding their procedures were misleading because they did not, and in fact could not, effectuate them.[18]

Similarly, Plaintiff adequately alleges that signals of the worsening subprime crisis were "strong indicators" that risky mortgage-related investments would "generat[e] huge losses for mortgage-related securities,"[19] such that disclosure of the Fund's increasing exposure to the mortgage market was necessary to make the Registration Statement not misleading. *See Evergreen* C&D at ¶¶1, 10 (*Evergreen* failed to take into consideration media reports of weakening of a benchmark index and increasing subprime defaults in valuing mortgage-backed securities). Defendants cite a statement by the Fund's portfolio manager about the mortgage securities in the Fund being "well protected from concerns plaguing the lowest-quality securities." Def. Mem. at 29. Such a positive assessment was also misleading absent subsequent disclosure of the material risks

---

[18]    Moreover, Defendants mischaracterize Plaintiff's factual allegation regarding the "stable" value of the Fund's NAV over time, claiming that disclosing the Fund's NAV does not constitute an actionable implied "representation" of stability over time. Def. Mem. at 14, 31. In context, Plaintiff alleges that Defendants failed to properly value the securities, and thus misrepresented, the actual NAVs, which directly caused Plaintiff's and the class members' losses. ¶¶42, 55-62, 98-101. Defendants further urge that Plaintiff's allegations are "factually incorrect" because the Fund's NAV did decline. Def. Mem. at 35. But Defendants' chart showing the decline of the Fund's NAV starting in January 2007 (Def. Mem. at 14) actually reinforces Plaintiff's contention that Defendants "belatedly" wrote-down the mortgage-related securities, since the true value of the Fund actually started declining at the beginning of the Class Period in 2005. ¶¶50, 52, 57, 62, 63-79, 112.

[19]    Ben Bernanke's testimony, taken in context, is further support for Plaintiff's allegations that there were serious problems in the subprime market during the Class Period, such that Defendants should have disclosed the Fund's holdings clearly and unambiguously and should have disclosed the increased risk that its investments created. *See The Economic Outlook: Hearing Before Joint Economic Committee*, 110th Cong. D431 (2007) (Testimony of Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System), *available at* 2007 WL 927663 ("In addition, a large increase in early defaults on recently originated subprime variable-rate mortgages casts serious doubt on the adequacy of the underwriting standards for these products, especially those originated over the past year or so. As a result of this deterioration in loan performance, investors have increased their scrutiny of the credit quality of securitized mortgages.").

and the actual exposure of the Fund to the risky mortgage-related securities. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ("When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) ("[G]eneral expressions of optimism may be actionable under the federal securities laws.").

The Complaint's allegations that Fidelity analysts expressed concerns about the subprime mortgage market directly support the allegations that the Fund was investing in mortgage-related securities with material risks that should have been disclosed. ¶¶80-81. Regardless of whether there were differing "opinions" within Fidelity about whether those securities would lead to "potential favorable returns," the fact that these analysts' concerns were expressed during the Class Period further bolsters the allegation that there were material **risks** related to those securities that Defendants problematically failed to disclose.[20]

### 2.    Defendants' Boilerplate Recitation of Risks Does Not "Bespeak Caution"

"The bespeaks caution doctrine is essentially shorthand for the well-established principle that a statement or omission must be considered in context." *Shaw*, 82 F.3d at 1213. Bespeaks caution only provides a basis for dismissal as a matter of law in extremely limited circumstances where "reasonable minds could not disagree as to whether the *mix* of information in the [allegedly

---

[20]    Tellingly, the opposing views that may have been expressed internally at Fidelity are *not* the misrepresentations upon which the Complaint is based, so requiring subjective and objective falsity would not even make sense, if that was the standard. The mere fact that Fidelity analysts were discussing the implications of the problems with mortgage-related securities supports a finding that omitting this discussion of risks from the Registration Statement was materially misleading. Still, Defendants unconvincingly cite a case declining to hold an analyst liable for misrepresentation for espousing his view and omitting the views of others *when asked for his personal opinion* for the proposition that Fidelity was somehow not required to disclose material information required to make its Registration Statement not misleading. Def. Mem. at 30; *Salomon*, 373 F. Supp. 2d at 252.

actionable] document is misleading." *Shaw*, 82 F.3d at 1213 (emphasis in the original). The doctrine may only be applied to dismiss a claim as a matter of law if there is sufficient "***prominent*** cautionary language that ***clearly*** disclaims or discounts the drawing of a particular inference." *Id.* (emphasis added); *see also Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994) (finding cautionary language "not per se dispositive"); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543-44 (5th Cir. 1981) *rev'd in part on other grounds*, 459 U.S. 375 (1983) ("boilerplate" cautionary language was insufficient to negate failure to disclose material adverse fact). Finally, it applies exclusively to forward-looking statements in restrictive circumstances. *Stone & Webster*, 414 F.3d at 212.

Here, Defendants argue that the statement that the Fund "seeks" high income in a manner focusing on the "preservation of capital" is a forward-looking statement protected by the bespeaks caution doctrine. Def. Mem. at 22. To the contrary, "seeks" is the ***present*** form of the verb "to seek," and the statement relates to how the Fund was presently structured and managed. *Shaw*, 82 F.3d at 1213 (finding surrounding cautionary language insufficient as a matter of law to render immaterial false or misleading statements of present fact); *see also Charles Schwab*, 257 F.R.D. at 542 (complaint stated a claim based on allegations that defendants erroneously characterized the mutual fund as an "ultra short term bond fund" meant to limit "principle risk" and "preserve capital"). Moreover, the statement must be considered in the full context of the Registration Statement disclosures, which affirmatively portrayed the Fund as being conservative, stable and with low risk/return. *See McMahan & Co*., 900 F.2d at 579.

Nevertheless, Defendants' description of the Fund is readily distinguishable from economic projections that may be protected by the doctrine when accompanied by detailed warning statements that are directly on point. *See, e.g., In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir.

- 28 -

1993) (finding economic projection that partnership "believe[d]" funds generated by project would be sufficient to cover debt immaterial in light of a prospectus warning in detail of "extreme risks inherent in the venture while simultaneously carefully alerting the investors to a variety of obstacles the Taj Mahal would face, all of which were relevant to a potential investor's decision concerning purchase of the bonds.") (emphasis added).  Unlike those cases, a reasonable investor here would have wanted to know that the Fund was currently investing in risky mortgage-related securities that Fidelity was unable to properly value, the true extent of that investment and the associated risk, and not just be warned in boilerplate fashion that he or she may "lose money."  *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) ("A reasonable investor would be very interested in knowing, not merely that future economic developments might cause further losses, but that (as plaintiffs allege) current reserves were known to be insufficient under current economic conditions.").  Of course, in the first instance, an investor would want to be apprised of the risk (that had already materialized) that the Fund would abandon its stated investment structure and philosophy altogether.[21]  *See Credit Suisse*, 2001 WL 300733, at \*8-\*9 (although defendants made disclosures regarding interest rate increases and the possibility of a downgrade in credit rating, failure to disclose 7-day call feature on redemptions that would magnify the risk of losses constituted "failure to disclose hard facts critical to appreciating the magnitude of the risks described").

Similarly, Plaintiff's contention that the Fund's NAV was inflated from 2005 through 2008 relates to ***past*** representations, not forward-looking statements; therefore, the reported NAVs cannot be discounted by the cautionary statement that past performance is not indicative of future

---

[21]    The risk disclosures are ineffective for the additional reason that they do not "relate directly" to "that on which investors claim to have relied."  *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000).

performance.  Def. Mem. at 31; *Hanon*, 976 F.2d at 502-03 ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems."); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").  Indeed, the Registration Statement reported NAVs that were overstated and therefore false at the time they were made.  ¶¶42, 62, 85, 89, 92, 95-97, 101.

Therefore, the Court should not consider whether the purported warnings are sufficient because the allegedly misleading statements are of ***present or historical fact***.  Even if the Court does consider the whether a statement "bespeaks caution," the boilerplate disclosures of risks are insufficient to render the positive statements immaterial as a matter of law.

> **3.    Compliance with General SEC Form Instructions Does Not Relieve Defendants of Liability for Failure to Disclose Information Required to Make Statements Made Not Misleading**

Sections 11 and 12(a)(2) provide liability for omissions that are either: (1) required to be stated; or (2) necessary to make material statements not misleading.  15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2).  "Omission of a fact may be misleading even though a governing statute and/or regulations do not expressly require disclosure." *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 159 (D.R.I. 2004).  Defendants attempt to circumvent Sections 11 and 12(a)(2) with regard to alleged material omissions by claiming that general compliance with SEC form instructions releases them from their statutory obligations.  Def. Mem. at 20, 24-25, 27.  Essentially, they argue that the Court should not inquire into what they actually said, as long as they said anything at all. *See* Def. Mem. at 27 (citing SEC form N-1A instructions, Defendants argue "the Fund's disclosure

complied fully with SEC requirements, which provide that the Fund need only '[d]escribe the procedures for pricing the Fund's shares. . . .'").

This argument is particularly unavailing. The SEC Form N-1A §(B)(4) explicitly incorporates an SEC regulation echoing the Section 11 and 12(a)(2) standard. *See* 17 C.F.R. §230.408(a) ("In addition to the information required to be included in a registration statement, *there shall be added such further information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.*") (emphasis added); *see also In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207-208 (S.D.N.Y. 1999) (§230.408 applies to Securities Act of 1933 claim).

Defendants rely on a case in which a defendant was not found liable for an omission where the SEC did not require disclosure of the particular information that plaintiff claimed was omitted. *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003). Defendants' reliance on *Merrill Lynch* is curious considering they concede that sections of the Form N-1A affirmatively require disclosure of the Fund's investment strategies, the types of securities in which a Fund will invest, and the "principle risks of investing in the Fund." Def. Mem. at 24. Once Defendants made statements regarding the Fund's structure, risks and management philosophy (which they did throughout the Registration Statement), a duty arose to disclose all facts necessary to make their disclosures not misleading.[22] *In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002).

_____

[22]     Defendants further rely on *Cooperman v. Individual Inc.*, 171 F.3d 43 (1st Cir. 1999) in an attempt to escape liability for their material omissions. Def. Mem. at 20. *Cooperman* is distinguishable because the alleged omission was a board-level conflict in which one board member disagreed with the business model. *Id.* at 50. In this case, knowledge of the mortgage meltdown was widespread; failure to disclose the Fund's true exposure to the affected securities and the attendant risks was undoubtedly material in such an environment. *See* ¶¶66-82. Defendants further cite *Panther Partners, Inc. v. Ikanos Communs., Inc.*, also inapplicable here because the ruling in favor of dismissal was based on plaintiff's failure to allege that defendants had knowledge of the

Defendants attempt to apply this nonstarter argument to multiple material omissions.  For instance, Defendants released a list of securities in which the Fund was invested, but omitted to disclose that the Fund was highly invested in risky mortgage-backed securities[23] that were a major concern in the marketplace during the Class Period.  ¶¶50-52, 63-82, 106-11.   General risk disclosures regarding mortgage-related securities being affected by a "rising rate environment" do not address the unique problems with the underlying subprime investments in the Fund.  Similarly, Defendants disclosed that the Fund was using the Index as a guide, but failed to disclose the material differences between the two once they abandoned that conservative model in search of higher returns.  ¶¶84-85, 88-89, 92-93, 115.   Moreover, Defendants represented a thorough valuation procedure with multiple layers of oversight, but failed to disclose material weaknesses and their blind reliance on conflict of interest-burdened Bear Stearns for pricing.  ¶¶98-101; *In re AIG Advisor Group Sec. Litig.*, No. 06 cv 1625(JG), 2007 WL 1213395, at *9 (E.D.N.Y. Apr. 25, 2007) ("So even if defendants are correct that they fully complied with their Form N1-A disclosure obligations, *it does not follow* that their failure to disclose the AIG Brokers' alleged conflict of interest is

---

facts surrounding the omission at the relevant time, which was required by a regulation not at issue here. 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008); Def. Mem. at 20. Finally, Defendants' reliance on *Benzon v. Morgan Stanley Distribs.* is unavailing because the *Benzon* court determined that the defendants **did** disclose the allegedly omitted fee structure in easy-to-read chart form that plaintiff claimed was omitted. 420 F.3d 598, 609 (6th Cir. 2005); Def. Mem. at 21.

[23]     Again, Defendants' chart attempting to depict the total mortgage-related securities held by the Fund based on Fidelity's disclosures exemplifies the problems inherent in including mortgage-related securities under both the "ABS" and the "CMOs and Other Mortgage-Related Securities" categories.  Def. Mem. at 12.  Simply adding them together does not provide a total percentage of mortgage-related securities because ABS contained securities backed by "pools of mortgages, loans, receivables, or other assets."  Fidelity Investments, Statement of Additional Info. (Form N-1A), at 4 (Sept. 29, 2005).  Furthermore, there is no way to determine which of the securities are backed by high-risk subprime versus prime mortgages. ¶108.

necessarily immaterial.").  Ultimately, Plaintiff adequately alleges that Fidelity omitted material information necessary to make its statements not misleading.

### 4.    Plaintiff's Allegations Are Based on Statements that Were Misleading at the Time They Were Made

That Defendants may look back with regret on their multiple failures during the Class Period does not mean that Plaintiff is pleading with "hindsight."  Def. Mem. at 19-21; *MoneyGram*, 626 F. Supp. 2d at 980 ("[T]he court recognizes that hindsight is twenty-twenty and companies need not be clairvoyant.   The complaint, however, alleges facts permitting inferences that certain misrepresentations and omissions were false and misleading *at the time they were made*.") (internal citation omitted).  Defendants did not even understand the risky securities in which they were investing, and yet continued to make representations to investors in each registration statement and prospectus filed from 2004 through 2008 about, among other things, the Fund's supposed, but not actual, characteristics; the pricing procedure they were supposed to be implementing, but were not; and the Fund's reported NAVs that were supposedly accurate, but were actually inflated.  *See* ¶32 (listing each relevant registration statement and prospectus from September 28, 2004 through March 12, 2008).  These are actionable misrepresentations and omissions under the federal securities laws.

### F.    Plaintiff's Claims Are Not Time-Barred

Actions for violations of Sections 11 or 12 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. §77m.  "[A]ny determination of when the statute of limitations began to run is most appropriately made in the context of summary judgment or, if there are disputed and material factual issues, following an evidentiary hearing."  *Lalor v. Omtool, Ltd.*, No. CIV. 99-469M, 2000 WL 1843247, at *6 (D.N.H. Dec. 14, 2000) (citing *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996)).  A statute of limitation question may be resolved

through a motion to dismiss if the complaint demonstrates that the plaintiff failed to timely assert its cause of action. *See Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 26 (1st Cir. 1997). That is not the case here. Plaintiff brought this case within the one year statute of limitations.

In the First Circuit, courts use a two-fold approach to analyze a statute of limitations issue in securities cases. *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002). First, the Court must determine whether sufficient "storm warnings" existed which "should have alerted a similarly situated investor that fraud was in the wind." *Id.* at 8. If the storm warnings do exist, the Court must determine if "the investor probed the matter in a reasonably diligent manner." *Id.* Where a defendant seeks to use "storm warnings" to "claim[ ] that the plaintiff had advance notice of the fraud," "the defendant bears the initial burden of establishing the existence of such warnings." *Id.* at 9. Here, Defendants have not met this burden.

Defendants begin their "storm warnings" argument by completely misstating the "core of Plaintiff's claims." Def. Mem. at 39. Defendants claim this "core" is based upon two facts: "(1) the Fund invested a significant portion of its assets in mortgage securities, and (2) those securities presented a risk of loss." *Id.* Defendants then go on to argue how Plaintiff should have been aware of these facts more than a year prior to filing suit. *See id.* at 39-40. These two facts, even if known by Plaintiff, do not amount to "storm warnings," and are far from the "core" of Plaintiff's allegations.

First, there are no "storm warnings" which demonstrate that Plaintiff should have been aware of the extent to which the Fund had invested in mortgage-related risky securities during the Class Period. While Defendants reported certain amounts of these investments, a significant amount of mortgage-related securities were concealed in other categories of securities. ¶¶106-111. In addition, Plaintiff had no way of knowing that these risky mortgage-related securities were not valued

correctly because of Fidelity's inability to accurately value them. ¶¶55-62. Moreover, Defendants gave the impression that they had considered all the risks and used their "sophisticated mortgage research and expertise" to identify the "high quality" mortgage investments for the Fund. *See* Ex. C at 6; Ex. F at IV; Ex. G at V to the Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss, dated July 17, 2009 ("Ex. __").

While Defendants emphasize that the Fund disclosed an emphasis or focus on asset-backed securities and mortgage securities, Defendants fail to give the Court the complete story. Throughout the Class Period and before, Defendants discussed the Fund's mortgage-related securities in terms of *helping* the Fund's performance, and stressed that there was an emphasis on "high-quality" asset-backed securities and mortgage-related securities. Ex. C at 6; Ex. F at IV; Ex. G at IV; Ex. H at 6; Ex. I at V. Furthermore, nothing in the Statement of Additional Information for the offering documents stated anything about *subprime* mortgage-related securities in the Mortgage Securities section. Ex. B at 9. Nothing in any of the reports throughout the Class Period or before disclosed anything about the Fund's exposure to these subprime securities.

In January 2007, there was a small disclosure about certain asset-backed securities which saw some pressures, including subprime mortgage loans, and some concerns were raised about higher-quality subprime securities. Ex. J. at IV. While this information alone might appear to be the beginning of a "storm warning," the information was severely tempered by the inclusion of an entire section on how Fidelity took certain extra measures to ensure that any subprime mortgage securities losses were cushioned against realized losses. Ex. J. at V ("At Fidelity, we employ sophisticated techniques that incorporate a full evaluation of the collateral of the loans and a bond's structure, meaning its credit enhancement. Credit enhancement provides a cushion – often a significant one –

- 35 -

against realized losses from the underlying pool of collateral").[24] Thus, the mild warning in January 2007, which Defendants spin as "most critical[ ]" falls far short of being a "storm warning" when juxtaposed with the half page assurances by Fidelity. *See Young*, 305 F.3d at 11 (finding no storm warning, and thus no inquiry notice despite a warning letter directly to the plaintiff where the defendants had given the plaintiff a "steady stream of comforting words" which offset the warning); *see also In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 515 (D. Del. 2003), (mixed messages in disclosures are insufficient to trigger inquiry notice).

The first time any reasonable investor could have been on notice of anything resembling a "storm warning" was on July 31, 2007. On that date, Defendants faulted the Fund's underperformance to its "*sizeable* exposure to subprime mortgages." Ex. K at 6; Ex. L at III (emphasis added). While in January 2007, subprime assets were just a passing concern couched in "a steady stream of comforting words," July 2007 was the very first time Defendants ever told investors that the Fund had a *sizeable* exposure to subprime mortgages. Previously, when discussing the mortgage-related securities, Defendants used only terms like "high-quality" asset-backed and mortgage securities. Ex. C at 6; Ex. F at IV; Ex. G at IV. Thus, it was not until this time that any "storm warnings" started. Accordingly, Plaintiff's claims were timely filed on June 5, 2008, thereby negating any grounds for Defendants' statute of limitations argument.

### G.     Defendants Have Not Demonstrated Plaintiff's Knowledge of the Specific Material Misstatements in the Complaint

Defendants argue that Plaintiff personally has no cause of action under Sections 11 or 12(a)(2) because he knew about the misstatements at the time of his January 2007 and August 2007

---

[24]     Defendants had also given the impression that they had adequately assessed any risks in regard to mortgage-related securities in January 2006 by emphasizing Fidelity's "sophisticated mortgage research." Ex. G at V.

purchases. Def. Mem. at 41; *but see Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 48 (1st Cir. 2004) ("Factual disputes concerning the date on which the plaintiff knew or should have known of his cause(s) of action are resolved by a jury."). Defendants argue that as of January 2007, the Fund had declined in value from $10.01 to $9.49. Def. Mem. at 41. From this slight decline, Defendants' argument implies that Plaintiff had personal knowledge that Defendants had misrepresented the: (1) description and risks of the Fund; (2) value of the Fund; (3) valuation capabilities and methodologies of the Fund; and (4) Fidelity Ultra-Short Central Fund. Defendants' argument is clearly meritless. The slight decline before Plaintiff's January purchase did not disclose any of the misrepresentations in the offering documents.

Defendants also argue that they had disclosed by August 22, 2007, that "the Fund was experiencing losses on its investments in mortgage securities," and "Plaintiff undeniably was aware of the allegedly undisclosed" information. *Id.* Again, Defendants' argument is wrong. Defendants did state on July 31, 2007 that the Fund had experienced losses due to a sizeable exposure to subprime mortgage securities. This, however, did not reveal that they had misrepresented the four areas noted above. Rather, this statement was, at most, a possible "storm warning" which, for purposes of statute of limitations arguments, merely begins a responsibility to investigate whether there has been a fraud for purposes of inquiry notice. *Young*, 305 F.3d at 9. Nothing regarding when Plaintiff is put on inquiry notice can be translated into knowledge of the misstatements alleged in the Complaint.

None of the facts which were disclosed prior to August 2007 would have given knowledge to any reasonable investor of the specific misstatements regarding the four specific areas set forth in the Complaint. ¶¶83-111. Not surprisingly, Defendants' only support for their argument is *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir. 1986), which is wholly distinguishable from the case at

hand.  In *Mayer*, the court held that the plaintiff had no cause of action under Section 11 where the facts from the plaintiff's own deposition (following discovery and cross motions for summary judgment) demonstrated without question, that she, personally, had actual knowledge of the alleged misstatements.  *Id*. at 750, 755.  Here, there are no facts which demonstrate that Plaintiff or any other members of the Class were aware of the misrepresentations by the brief disclosure of exposure to subprime loans in the July report.  Thus, Defendants' argument that Plaintiff is not entitled to recovery because he had knowledge of the false statements should be rejected.

### H.    Defendants Have Not Met Their Burden of Demonstrating a "Negative Causation" Affirmative Defense

Loss causation is not an element of Section 11 and 12(a)(2) claims.  15 U.S.C. §§77k; 77l. Rather, Defendants may assert a "negative causation" defense that Plaintiff's damages were not caused by the material misstatements and omissions.  *See* 15 U.S.C. §77k(e); 15 U.S.C. §77l(b). Although Defendants here claim that they may establish their defense at the motion to dismiss stage, the law is far from settled.  Several circuit courts have held that affirmative defenses, like negative causation, cannot be established on the pleadings.  *See*, *e.g.*, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint"); *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses.").

Even if the Court considers the defense at this juncture, Defendants' arguments still fail since Plaintiff alleges two accepted theories of causation.  First, Plaintiff alleges losses caused by the materialization of the undisclosed risks associated with the Fund's significant holdings of mortgage-related securities.  *See, e.g.*, ¶¶112-115, 133.  The court in *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) recently addressed this theory in response to an argument

concerning loss causation identical to the one made by Defendants here.  The defendants in *Charles*

*Schwab* argued:

> Plaintiffs are investors in a mutual fund rather than in an individual security.  The price of shares in a mutual fund – the fund's net asset value [NAV] – is determined entirely by the value of the assets in the fund's portfolio: 'the value of a mutual fund share is calculated according to a statutory formula.'  Share price is a function of 'Net Asset Value,' the pro-rata share of assets under management, minus liabilities such as fees.  Thus, even if the fund misrepresented its investment policies and/or risk profile, those misrepresentations could not have caused plaintiffs' losses because the misrepresentations did not cause the decline in the value of the portfolio's asset holdings.

*Id.* at 546 (citation omitted); *compare* Def. Mem. at 42.  In rejecting this argument, the court

discussed the somewhat unique loss causation theories in mutual fund cases:

> Although the loss causation inquiry often hinges on the timing of purchases and sales in relation to the typical inflation-disclosure-deflation cycle, loss causation is not limited to that scenario.  Indeed, although *Dura* addressed that scenario, the decision explained that it "need not, and d[id] not, consider other proximate cause or loss-related questions."  Moreover, the Ninth Circuit has explained that "[a] plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation."

> Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions.  Defendants would immunize a scheme that purported to invest in low-risk government bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions.  ***Loss causation, however, is not limited to the common "corrective disclosure-price drop" scenario.***

> As courts in other circuits have explained, ***a plaintiff may establish loss causation by alleging "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security***.

*Id.* at 547 (emphasis added) (citations omitted).

Similarly, in this case, Plaintiff alleges that the Registration Statement contained materially

inaccurate statements concerning, *inter alia*: (i) the risks of the Fund; (ii) the valuation capabilities

and methodologies of the Fund; (iii) the composition of the Fidelity Ultra-Short Central Fund; and

(iv) the Fund's true exposure to risky mortgage-related securities.  ¶¶84-111.  As in *Charles Schwab*, Plaintiff's injuries were caused by a materialization of the undisclosed risks associated with the foregoing.[25]  *See, e.g.*, ¶¶85, 87-91; *Charles Schwab*, 257 F.R.D. at 546; *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 U.S. Dist. LEXIS 21935, at *46 (N.D. Cal. Mar. 9, 2007) (it is unnecessary to show a drop in NAV after the truth is revealed to establish loss causation in a mutual fund case); *cf. Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) (finding loss causation where failure to disclose material fact "caused [the] injury through [the plaintiff's] undervaluation of the risk it was undertaking in accepting the [investment].").

Second, Plaintiff also alleges a more traditional theory of loss causation as it relates to the mis-valuation and inflation of the Fund's NAV.  Plaintiff alleges that the NAV itself reported during the Class Period was artificially inflated because of the failure of Defendants to properly value the underlying assets of the Fund and timely write down mortgage-related securities.  *See, e.g.*, ¶95 (alleging statements were materially inaccurate because the "Fund's risky mortgage-related securities had already declined but the Fund's NAV did not properly reflect the decline in value"); *see also* ¶¶42, 62, 85, 89, 92, 96-97, 101.  Had Defendants accurately calculated the value of the mortgage-backed securities, the Fund's reported NAV throughout the Class Period would have been substantially lower and Plaintiff would have paid less for his shares.  *See id.*  Instead, when

---

[25]     This case stands in stark contrast to *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, where plaintiffs failed to allege a "materialization of risk" theory of loss causation or, in the alternative, explain how the misrepresentations or omissions caused the mutual fund's NAV to be overstated.  No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006); Def. Mem. at 43.  Further, the *Charles Schwab* court, on practically identical facts to this case, explicitly rejected the *Morgan Stanley* approach advocated by Defendants.  *Charles Schwab*, 257 F.R.D. at 546.  Similarly, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006); and *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) are easily distinguished because plaintiffs failed to even allege that they lost money on their purchases of mutual fund shares, which is not the case here.

Defendants belatedly wrote down the mortgage-related securities from their inflated to their true values, Plaintiff suffered damages as the Fund's NAV declined. *See Fraternity Fund LTD v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005) (finding loss causation allegations sufficient where, as here, "the Complaint justifies an inference that the NAVs were [materially] overstated").

Accordingly, Plaintiff's losses were a result of the materialization of the undisclosed risks and were a foreseeable consequence of the misrepresentations and omissions. Defendants have therefore failed to establish their affirmative defense of "negative causation." *See In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006).[26]

## I.       Plaintiff Adequately Alleges Control Person Liability

Section 15 of the Securities Act provides investors with a remedy against persons or entities that exercise control over primary violators of Sections 11 or 12(a)(2). 15 U.S.C. §77o. A plaintiff claiming violations of Section 15 must only allege a primary violation of the Securities Act and control over the primary violator. *In re Brooks Automation Inc. Sec. Litig.*, No. 06-11068-RWZ, 2007 WL 4754051, at *13 (D. Mass. Nov. 6, 2007). Here, Plaintiff's allegations demonstrate that the Individual Defendants and FMR Corp. controlled primary violators of the Securities Act.[27]

---

[26]     Plaintiff does not attempt to establish loss causation by alleging that the mere faltering of the subprime market caused the losses, as Defendants contend. Def. Mem. at 43. Instead, Defendants' misrepresentations and omissions regarding the Fund's true exposure to the subprime market caused Plaintiff and the Class Members' losses as the undisclosed risks materialized.

[27]     Plaintiff also alleges Defendant Fidelity Management & Research Company ("FMR") violated Section 15. ¶143. Defendants do not challenge the sufficiency of the allegations against Defendant FMR beyond the general statement that "Plaintiff has failed to state a primary violation of the Securities Act[.]." Def. Mem. at 45. As demonstrated herein, Plaintiff's allegations are sufficient to state a claim for primary violations of the Securities Act by several defendants, thereby negating Defendants' argument.

Plaintiff's allegations are therefore sufficient, and Defendants' Motion should be denied.[28] *Cabletron*, 311 F.3d at 42 ("Control is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.'"); *Miss. Pub. Emp. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 93 (1st Cir. 2008) (same).

Plaintiff alleges that each Individual Defendant served as trustee or officer of the Fund and that each signed the Registration Statements which contain the alleged misrepresentations. ¶¶12-20, 22-25. Other courts considering what facts demonstrate "control" for purposes of pleading violations of Section 15 have found such allegations to be sufficient to state a claim.[29] In *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004), the court found that individual defendants who served as officers of the company and signed its registration statement could be liable under Section 20 of the Securities Exchange Act as "control persons." *Id.* at 485. The court noted that "it 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'" *Id; see also Charles Schwab*, 257 F.R.D. at 550 (finding similar allegations sufficient to show "control").

Likewise, Plaintiff's allegations against FMR Corp. are sufficient to state a claim for violations of Section 15. Plaintiff alleges FMR Corp. is the parent company of Defendant FMR and that FMR Corp. oversees Defendant FMR.[30] ¶¶8, 146. Further, Plaintiff alleges that investors were

---

[28]    "Section 15 claims need only be pleaded under Rule 8; a defendant is only entitled to notice that she allegedly controlled an entity that violated Section 11." *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003).

[29]    "The standard for 'control' under Section 15 is the same as under Section 20(a)." *Brooks Automation*, 2007 WL 4754051, at *13.

[30]    As detailed above, Plaintiff adequately alleges that FMR violated Sections 11 and 12(a)(2) of the Securities Act. *See* §III(C-E), *supra*.

directed to contact FMR Corp. if they were interested in "buying or selling shares of the Fund" and that several signatories to the Registration Statements also serve as directors of FMR Corp. ¶¶8, 12, 15-17, 20. Far from "bald" assertions, these allegations of day-to-day involvement in the marketing and sale of the Fund, taken together with close corporate relationship between FMR Corp. and FMR, are sufficient to create a reasonable inference that FMR Corp. controlled a primary violator of the Securities Act, which is all that is required at this stage of the proceeding. *In re Global Crossing, Ltd., Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (finding allegations of control sufficient where plaintiff alleged primary violator was wholly-owned subsidiary, companies had "interchangeable" directors, and the parent company was involved in the day-to-day operations of the subsidiary).[31]

---

[31]    These allegations against FMR Corp. also support liability under Section 11 despite Defendants' arguments to the contrary. *See* Def. Mem. at 43-44. First, Defendants' constrictive interpretation of Section 11 conflicts with both the plain language of the statute and its intent to be construed "flexibly to effectuate its remedial purpose." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972). Pursuant to §11(a)(2), liability attaches to "every person who was a director of (or person performing similar functions) ***or partner*** in, the issuer at the time of the filing of the part of the registration statement. . . ." 15 U.S.C. §77k(a)(2) (emphasis added). Second, Defendants' case authority is distinguishable. *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 437 (S.D.N.Y. 2000) (addressing whether a corporation, whose name was absent from the registration statement functioned as the "issuer"); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 384-85 (D. Mass. 1987) (addressing subsections of §11(a) relating to accountants and individuals); *In re WorldCom Sec. Litig.*, 308 F. Supp. 2d 338, 342, 345 (S.D.N.Y. 2004) (addressing the fifth subsection of §11(a) relating to underwriters and "indirect" participation). Third, the lack of precedent for alleging a §11 claim against an entity such as FMR Corp. should not foreclose consideration that FMR Corp. was a "partner in" the issuer at the time of the filing of the registration statement. *See* ¶8 (FMR Corp. was alleged to be a direct participant by being named in the Registration Statements as the point of contact for investors); ¶146 (FMR Corp. is alleged to have had a series of direct business relationships with FMR and its directors and officers).

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants'

motion to dismiss.

DATED:  September 14, 2009                      SHAPIRO HABER & URMY LLP
                                                THOMAS G. SHAPIRO (BBO# 454680)
                                                ADAM M. STEWART (BBO# 661090)


                                                    _____*/s/ Adam M. Stewart*_____
                                                         ADAM M. STEWART
                                                53 State Street
                                                Boston, MA  02109
                                                Telephone:  617/439-3939
                                                617/439-0134 (fax)
                                                tshapiro@shulaw.com
                                                astewart@shulaw.com

                                                *Liaison Counsel*

                                                COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
                                                SAMUEL H. RUDMAN
                                                EVAN J. KAUFMAN
                                                58 South Service Road, Suite 200
                                                Melville, NY  11747
                                                Telephone:  631/367-7100
                                                631/367-1173 (fax)
                                                srudman@csgrr.com
                                                ekaufman@csgrr.com

                                                *Lead Counsel*

                                                DYER & BERENS LLP
                                                ROBERT J. DYER III
                                                JEFFREY A. BERENS
                                                682 Grant Street
                                                Denver, CO  80203
                                                Telephone: 303/861-1764
                                                303/395-0393 (fax)
                                                bob@dyerberens.com
                                                jeff@dyerberens.com

                                                *Lead Counsel*

- 44 -

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mfistel@holzerlaw.com

*Additional Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
on September 14, 2009.

**/s/ Adam M. Stewart**_____
Adam M. Stewart

- 45 -