# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALAN ZAMETKIN, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:08-CV-10960-MLW |
| FIDELITY MANAGEMENT & RESEARCH COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Goodwin Procter LLP
  James S. Dittmar (BBO# 126320)
  Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, MA 02109

Milbank, Tweed, Hadley & McCloy LLP
  James N. Benedict (*pro hac vice*)
  Sean M. Murphy (*pro hac vice*)
  Robert R. Miller
  Andrew W. Robertson (*pro hac vice*)
  Jennie Woltz
1 Chase Manhattan Plaza
New York, NY 10005-1413

*Attorneys for Defendants Fidelity Management & Research Co., FMR Corp. (n/k/a FMR LLC), Fidelity Brokerage Services LLC, Edward C. Johnson 3d, Abigail P. Johnson, James C. Curvey, Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas, Kimberley Monasterio, Christine Reynolds, and Robert L. Reynolds*

(Other counsel listed below)

Dechert LLP

    William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036-6797

   - and -

    Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, MA 02116

   - and -

    Thomas C. Bogle
    Robert W. Helm
1775 I Street, NW
Washington, DC 20006-2401

*Attorneys for Defendant Fidelity Income Fund*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT...................................................................................................................3

I.     PLAINTIFF'S EX POST ATTACK ON DEFENDANTS' MANAGEMENT OF
       THE FUND IS NOT ACTIONABLE UNDER THE SECURITIES LAWS. ....................3

II.    PLAINTIFF'S CLAIMS ARE TIME-BARRED...................................................4

III.   PLAINTIFF FAILS TO ADEQUATELY PLEAD THAT THE DISCLOSURES
       REGARDING THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES
       WERE MATERIALLY MISLEADING. ............................................................7

       A.     Defendants' Disclosures Would Not Have Misled a Reasonable Investor
              Regarding the Risk and Volatility of the Fund. ........................................7

       B.     The Bespeaks Caution Doctrine Bars Any Claims Based on Alleged
              Misrepresentations and Omissions Regarding the Fund's Investment
              Objective and Strategies. ......................................................................9

       C.     Defendants Appropriately Disclosed the Risks Associated with the Fund's
              Holdings of Mortgage-Related Securities................................................11

       D.     Defendants Fully Disclosed the Fund's Holdings of Mortgage-Related
              Securities..............................................................................................13

IV.    PLAINTIFF'S PRICING CLAIMS MISSTATE THE RULES AND THE
       RECORD AND DO NOT SUPPORT A SECURITIES ACT CLAIM............................14

       A.     Plaintiff Does Not Allege Facts Supporting a Reasonable Inference that
              Fidelity Misvalued the Fund's Holdings of Mortgage Securities.....................15

       B.     Plaintiff Fails to Allege that Defendants' Disclosures Regarding the
              Pricing Process Were Materially Misleading. ........................................17

V.     PLAINTIFF HAD KNOWLEDGE OF THE ALLEGED DISCLOSURE
       DEFICIENCIES AT THE TIME HE PURCHASED SHARES OF THE FUND.............19

VI.    PLAINTIFF'S CLAIMED LOSSES WERE NOT CAUSED BY THE ALLEGED
       MISREPRESENTATIONS AND OMISSIONS. ...............................................19

VII.   PLAINTIFF'S CONTROL PERSON CLAIMS MUST BE DISMISSED. .....................20

CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ashcroft v. Iqbal,
   129 S. Ct. 1937 (2009) .................................................................................................. 3

Bell Atl. Corp. v. Twombly,
   550 U.S. 544  (2007) ..................................................................................................... 3

Coronel v. Quanta Capital Holdings Ltd.,
   No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...................................... 17

DiLeo v. Ernst & Young,
   901 F.2d 624 (7th Cir. 1990) ...................................................................................... 16

I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,
   936 F.2d 759 (2d Cir. 1991) ..................................................................................... 8, 9

In re Alkermes Sec. Litig.,
   No. Civ.A 03-12091-RCL, 2005 WL 2848341 (D. Mass. Oct. 6, 2005) ................................ 20

In re Alliance N. Am. Gov't Income Trust Sec. Litig.,
   No. 95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 27, 1996)... 8, 10, 12

In re Charles Schwab Corp. Sec. Litig.,
   257 F.R.D. 534 (N.D. Cal. 2009) ......................................................................... 9, 19, 20

In re Craftmatic Sec. Litig.,
   890 F.2d 628 (3d Cir. 1989) ........................................................................................ 4

In re DaimlerChrysler AG Sec. Litig.,
   269 F. Supp. 2d 508 (D. Del. 2003) .............................................................................. 6

In re Hyperion Sec. Litig.,
   No. 93 Civ. 7179 (MBM), 1995 WL 422480 (S.D.N.Y. July 14, 1995),
   aff'd sub nom. Olkey v. Hyperion 1999 Term Trust,
   98 F.3d 2 (2d Cir. 1996) ....................................................................................... 8, 10

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................................ 17

In re MoneyGram Int'l, Inc. Sec. Litig.,
   626 F. Supp. 2d 947 (D. Minn. 2009) ......................................................................... 18

In re Salomon Analyst AT&T Litig.,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ........................................................................ 17

Isquith v. Caremark Int'l, Inc.,
  136 F.3d 531 (7th Cir. 1998) ................................................................ 4

Kennedy v. Josephthal & Co.,
  814 F.2d 798 (1st Cir. 1987) ................................................................ 5

Panter v. Marshall Field & Co.,
  646 F.2d 271 (7th Cir. 1981) ................................................................ 4

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
  No. 08-10446-RGS, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ....................... 8

Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.,
  No. 08-10615-JLT, 2009 WL 2251471 (D. Mass. July 29, 2009) ....................... 18

Santa Fe Indus., Inc. v. Green,
  430 U.S. 462 (1977) ...................................................................... 4

Shaw v. Digital Equip. Corp.,
  82 F.3d 1194  (1st Cir. 1996) ............................................................. 10

Sheppard v. TCW/DW Term Trust 2000,
  938 F. Supp. 171 (S.D.N.Y. 1996) ........................................................ 11

TSC Indus. v. Northway, Inc.,
  426 U.S. 438 (1976) ...................................................................... 11

Young v. Lepone,
  305 F.3d 1 (1st Cir. 2002) ................................................................. 6

**Statutes**

15 U.S.C. § 77k ............................................................................. 9

15 U.S.C. § 77$l$(a)(2) ...................................................................... 9

15 U.S.C. § 80a-2(a)(41)(B) ............................................................... 15

**Rules**

17 C.F.R. 270.2a-4 ...................................................................... 2, 15

**Other Authorities**

Investment Company Institute, SEC No-Action Letter,
  2001 SEC No-Act. LEXIS 543 (Apr. 30, 2001) ........................................... 15

SEC Release No. 33-7398, Registration Form Used by Open-End Management Investment
  Companies, 1997 WL 87357 (Feb. 27, 1997) ............................................. 11

## PRELIMINARY STATEMENT

Plaintiff's Opposition fails to mask the Complaint's fatal deficiencies.

1.      Plaintiff concedes there can be no Securities Act claim based on allegations of mismanagement, so he repackages his claims as a failure to underline disclose mismanagement (i.e., failure to disclose alleged deficiencies in the investment and pricing process).  Courts do not honor this type of artful pleading.

2.      Plaintiff contends that Defendants failed to make sufficiently specific warnings about the risks of the Fund's holdings of mortgage securities.  But Plaintiff does not contest that the January 2007 Shareholder Update explicitly disclosed, well over a year before he filed his complaint, the facts that form the core of his claims:  that the Fund "heavily emphasized" mortgage securities, and that subprime mortgage securities not only presented a risk of loss, but had already "detracted from fund performance."  (Ex.[1] J at III-IV.)  Even had there not been additional, extensive disclosures, the Shareholder Update alone would suffice to bar Plaintiff's claim under the one-year statute of limitations and to defeat any disclosure claim.

3.      Plaintiff argues that the Fund's prospectus contained representations of safety and stability based on its stated investment objective, its focus on investment-grade debt securities, and Fidelity's use of the Index as "a guide" in managing the Fund.  However, no explicit promises of safety and stability appear in the Fund's registration statement, and disclosures of risk are plentiful.  This Fund lost 15% of its value during a period of unprecedented decline in the market for the securities it held.  No reasonable investor could have been misled by the totality of the Fund's disclosures into believing that the Fund was structured so as to be immune from a 15% decrease in a period of unprecedented financial disruption.

---

[1]      Capitalized and abbreviated terms have the same meaning as defined in Defendants' initial brief.

4.      Plaintiff contends that Defendants concealed the extent of the Fund's holdings of mortgage securities because some mortgage securities were categorized as ABS and others were held through the Central Fund.  However, the securities laws do not mandate any particular categorization.  Further, Plaintiff ignores the Fund's plain disclosure of the definitions and risks of ABS themselves.  Even by Plaintiff's hindsight reckoning, the Fund disclosed a position in excess of 20% in mortgage securities and another 20+% in ABS throughout the Class Period— amounts more than sufficient to put Plaintiff on notice of the Fund's exposure to these securities.

5.      Plaintiff claims in hindsight that Defendants should have described AAA- and AA-rated mortgage securities as "highly risky."  Plaintiff, however, does not allege that Defendants actually held such an opinion at the time of investment or that this was the general view held by market participants prior to the market developments of 2007 and 2008.

6.      Faced with the indisputable fact that the Fund's share price (NAV) did fluctuate and that Plaintiff himself purchased shares after a drop of more than 5% (a third of the total decline), Plaintiff argues that Fidelity should have "written down" the value of mortgage securities to their "true value."  Plaintiff's argument ignores the law governing mutual fund pricing.  Funds may not "write down" the value of assets like a bank assessing its non-performing loans, but must price their holdings to market values.  17 C.F.R. 270.2a-4(a)(1).  Even the "fair value" exception process is to be an estimate of current liquidation prices, not intrinsic value.  Even if Fidelity had believed that prevailing market prices occurred in a "bubble" environment (which Plaintiff does not allege), it was required to price the Fund's holdings at market prices as long as market prices were readily available.  Plaintiff does not allege that the prices at which these securities were valued were not market prices or a good faith estimate thereof.

In the end, the Opposition merely underscores that Plaintiff's allegations consist of selective quotation from and hindsight criticisms of the Fund's disclosures.  Such allegations simply cannot meet Plaintiff's burden of alleging "factual content" sufficient to raise a right to relief "above a speculative level" and to provide "plausible grounds" for a claim that a reasonable investor would have been misled by the Fund's disclosures.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).

## ARGUMENT

**I.      PLAINTIFF'S EX POST ATTACK ON DEFENDANTS' MANAGEMENT OF THE FUND IS NOT ACTIONABLE UNDER THE SECURITIES LAWS.**

Plaintiff concedes that he cannot bring a claim under the Securities Act based on allegations of mismanagement.  (See Opp. at 11.)  He also concedes that the Fund was permitted to invest in mortgage-related securities, including subprime mortgage securities.  (Id. at 16 n.11.)  All that remains are Plaintiff's attempts to repackage hindsight criticisms of Defendants' business judgments in the language of disclosure.  (See id. at 11-13.)

Having acknowledged that the Fund was permitted by its governing documents to invest in mortgage securities, Plaintiff's critique comes down to a difference of opinion about whether the extent of such investments was prudent and whether, at the time those largely AAA- and AA-rated investments were made, the level of risk they carried should have been better appreciated.  These are classic mismanagement claims, as any assessment of their merit would require the Court to second-guess the risk and reward judgments of the portfolio manager.

Similarly, Plaintiff attempts to disguise his complaint that Fidelity's pricing policies and staffing were inadequate as a failure to disclose the allegedly inadequate policies and staffing.  These, too, are mismanagement claims:  They would require the Court to adjudicate the adequacy of the policies and staffing levels in question.

Courts routinely reject similar attempts to "bootstrap" mismanagement claims into a federal securities action on the theory that defendants were required to disclose the alleged mismanagement.  See, e.g., Panter v. Marshall Field & Co., 646 F.2d 271, 287-89 (7th Cir. 1981); Isquith v. Caremark Int'l, Inc., 136 F.3d 531, 534 (7th Cir. 1998).  As the Seventh Circuit emphasized in Panter, the "central thrust" of the complaint's allegations, not the labels applied by plaintiff, determines whether an action is for disclosure violations or inactionable corporate mismanagement.  See Panter, 646 F.2d at 287-89; see also In re Craftmatic Sec. Litig., 890 F.2d 628, 638-39 (3d Cir. 1989) ("[W]e must be alert to ensure that the purpose of [Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977)] is not undermined by 'artful legal draftsmanship.'").

## II.    PLAINTIFF'S CLAIMS ARE TIME-BARRED.

As shown in the below table, the January 2007 Shareholder Update indisputably includes a detailed discussion of the same facts the Complaint alleges were not disclosed in the Fund's registration statement and prospectus:

| Plaintiff's Allegations | January 31, 2007 Shareholder Update |
|---|---|
| Defendants failed to disclose that "the Fund was heavily invested in risky mortgage related securities, including sub-prime mortgage related securities."  (Compl. ¶ 85.) | The Fund's portfolio manager states that he "heavily emphasized" investments which included mortgage securities and provides details as to how holdings of "securities backed by subprime mortgages" detracted from the Fund's performance.  (Ex. J at III-V.) |
| Defendants "concealed" the Fund's "true exposure to high risk mortgage related securities" because those securities were also held through the Central Fund.  (Compl. ¶¶ 106, 111.) | The portfolio manager states that the Fund held mortgage securities "not only directly, but also indirectly through the Fidelity Ultra-Short Central Fund."  (Ex. J at IV.) |

| Plaintiff's Allegations | January 31, 2007 Shareholder Update |
|---|---|
| Defendants concealed their investments in mortgage-related securities by listing those securities "under other groups, such as the Asset Backed Securities group." (Compl. ¶¶ 106, 110.) | "[C]ertain ABS, including those backed by subprime mortgages—meaning loans to borrowers with poor credit records—detracted from fund performance." (Ex. J at IV.) |
| Defendants failed to disclose that mortgage securities "were subject to a rising interest rate risk since rising interest rates would increase the risk of default on the mortgage-related securities." (Compl. ¶¶ 85, 91.) | The first page of the Update states, in bold, "**Bond funds contain interest rate risk (as interest rates rise bond prices usually fall); the risk of issuer default; and inflation risk.**" (Ex. J at II (emphasis in original).) |

Plaintiff concedes, as he must, that the January 2007 Shareholder Update was at least the "beginning of a storm warning" and a "mild warning" to the Fund's shareholders. (Opp. at 35-36.) Even ignoring the many other "storm warnings" (see Br. at 38-40), Plaintiff fails to explain why this disclosure standing alone was not sufficient to put investors on inquiry notice.

Plaintiff's primary response is that the January 2007 Shareholder Update was "severely tempered" by accompanying assurances such that it cannot constitute a "storm warning."[2] (Opp. at 35-36.) Specifically, Plaintiff argues that two sentences in the Update indicating that Fidelity "employs sophisticated techniques" to analyze subprime mortgages render all of the other disclosures in the document insufficient to trigger inquiry notice. This argument falls well short.

The alleged "assurances" about the technique Fidelity used to evaluate subprime mortgages are not even related to the alleged omissions. For example, Plaintiff claims that Defendants failed to disclose "anything about the Fund's exposure to these subprime securities." (Id. at 35.) Assuming that was true, the Shareholder Update's disclosure that the Fund invested

---

[2]    Plaintiff points out that the "storm warnings" covered most but not all of the omissions alleged in the Complaint. However, a storm warning need not cover all of the details relevant to a potential plaintiff's claims in order to trigger inquiry notice. Instead, storm warnings are sufficient if they provide enough information to raise suspicions. See Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987) ("[Claimants] need not . . . have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.").

in subprime securities <u>at all</u> is a major storm warning.  The process Fidelity used to evaluate those securities would not undercut the significance of this disclosure to a Fund investor claiming to be misled into believing the Fund did not invest in the securities in the first place.[3]

In any event, the Shareholder Update was not a disclosure that contained a "steady stream of comforting words," as Plaintiff attempts to portray it.  (<u>Id.</u> at 36.)  The Update plainly disclosed that subprime mortgage securities were "disappointments" and "detracted from fund performance" because "[t]hey [had come] under pressure due to concerns about delinquencies and the growing likelihood of greater defaults."  (Ex. J at III-IV.)  It further explained that "there [had been] a steady stream of news about troubles in [the subprime mortgage] market place" and that "[a] slowing housing market precipitated rising delinquencies for these loans, which, in turn, caused declining valuations for the bonds backed by this type of collateral."  (<u>Id.</u> at V.)

In addition, the Update states that "[e]ven higher-quality subprime securities . . . couldn't escape investors' concerns over rising delinquencies," which hurt Fund performance.  (<u>Id.</u> at IV.)  No reasonable investor could read this document and believe that the Fund was immune to risk of loss from these securities.[4]  The portfolio manager's candid assessment that other investors had "concerns" about these securities, but that he nonetheless "continued to hold onto these securities" (<u>id.</u>), was clearly sufficient to put Plaintiff on inquiry notice of his potential claims.

---

[3]     In addition, Plaintiff has alleged that it was public knowledge by 2007 that subprime mortgage securities were risky; therefore, he cannot argue that the disclosure that the Fund held these securities would not alert a reasonable investor to the potential for losses.  Indeed, the Complaint includes 16 paragraphs of allegations about events during the 2005–2007 period, each of which Plaintiff alleges was "a strong indicator that the problems being experienced by sub-prime lenders would generate huge losses for mortgage related securities, such as those held by the Fund."  (Compl. ¶¶ 63-79.)

[4]     The cases cited by Plaintiff are totally inapposite.  <u>See</u> <u>Young v. Lepone</u>, 305 F.3d 1, 11 (1st Cir. 2002) (involving an investor who, in the face of storm warnings, made inquiries to defendant and was assured that there was no cause for concern); <u>In re DaimlerChrysler AG Sec. Litig.</u>, 269 F. Supp. 2d 508, 515 (D. Del. 2003) (finding news articles insufficient to place investors on inquiry notice where management explicitly rebutted information contained therein).

III.    **PLAINTIFF FAILS TO ADEQUATELY PLEAD THAT THE DISCLOSURES
REGARDING THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES
WERE MATERIALLY MISLEADING.**

The Fund's disclosures (i) made no promises of safety or stability, but warned of risk of

loss, and (ii) fully disclosed that the Fund would invest in mortgage-related securities and the

risks of those investments.  (See Br. at 22-34.)  Plaintiff's Opposition fails to explain how a

reasonable investor could have been misled by those disclosures.

### A.    **Defendants' Disclosures Would Not Have Misled a Reasonable Investor Regarding the Risk and Volatility of the Fund.**

Plaintiff wrongly contends that Defendants "affirmatively portrayed the Fund as being

conservative, stable, and with low risk/return."  (Opp. at 28; see also id. at 14-15.)  The words

"conservative," "stable," and "low risk" do not appear anywhere in the description of the Fund's

investment objective and strategies set forth in the Fund's prospectus and SAI.  Even were the

Court to accept Plaintiff's invitation to "imply" those representations, the claim would fail.

Plaintiff apparently contends that the "affirmative" representations of safety and stability

were "implied" via forward-looking policy statements that the Fund "seeks to obtain a high level

of current income consistent with the preservation of capital," would be managed to have

"similar overall interest rate risk to the [Index]," and would invest primarily in investment-grade

debt securities.  (See id. at 14-15.)  These statements are surrounded by pages of disclosures on

risk.  Plaintiff's selective focus on a handful of phrases pulled from pages of risk disclosures is

patently misleading, and ignores the black letter rule, acknowledged by Plaintiff, that the Court

must consider the total mix of information available to investors.  (See, e.g., id. at 13 & n.8.)

Here, no reasonable investor would have been misled by the Fund's disclosures into

believing that the Fund was so safe that it would be immune from potentially significant losses,

much less that the Fund would escape a 15% decrease in value in the midst of a massive and

unprecedented decline in the value of housing and mortgage-related securities.  The prospectus

warned investors that they "could lose money" and that the Fund might not achieve its

investment objective.  (Ex. A at 3.)  The prospectus also specifically emphasized that the Fund

invests more than 25% of its assets in the financial services sector, including mortgage securities,

and highlighted the attendant risk that "[c]hanges in government regulation and interest rates and

economic downturns can have a significant negative effect on issuers in the financial services

sector."  (Id. (emphasis added).)  Indeed, as early as the January 31, 2006 Shareholder Update,

the Fund's portfolio manager cautioned that the Fund was "in for a more volatile market

environment than we've faced in a number of years due to . . . uncertainty surrounding the

prospects for consumer spending, housing prices and the overall economy."  (Ex. G at V.)  These

disclosures would alert a reasonable investor to the possibility that the Fund could experience

significant decreases in value, particularly in the event of severe market dislocations.  See

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08-10446-

RGS, 2009 WL 3149775, at *6 (D. Mass. Sept. 30, 2009) (rejecting claim where allegedly

misleading statement was accompanied by a "fusillade of cautionary statements").[5]

　　　　Although Plaintiff contends that the Fund's public disclosures misled Morningstar into

believing the Fund was safe and stable (see Opp. at 13-14), he does not cite any statement by

---

[5]　　　See also, e.g., I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.
1991) (affirming dismissal because "[r]ead in context, the [challenged] language . . . could not mislead
any reasonable investor into believing that the Fund was predicting a bright trading future for its shares");
In re Alliance N. Am. Gov't Income Trust Sec. Litig., No. 95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS
14209, at *22-*25 (S.D.N.Y. Sept. 27, 1996) (rejecting claim that statement that "high current income
could be achieved by investing in relatively safe and secure debt securities" was misleading because the
prospectus disclosed the material risks of such securities); In re Hyperion Sec. Litig., No. 93 Civ. 7179
(MBM), 1995 WL 422480, at *7 (S.D.N.Y. July 14, 1995) (dismissing claims because "references in the
prospectus to offsetting gains with losses, and to safety, appeared amidst abundant factual disclosures and
appraisals of risk" and "[n]o investor could have believed that net asset values would not be volatile and
capital would not be vulnerable unless that investor deliberately ignored explicit warnings"), aff'd sub
nom. Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2 (2d Cir. 1996).

Morningstar that it based its evaluation of the Fund on its public disclosures, rather than on Morningstar's proprietary research.  Morningstar, like Plaintiff, had access to the full listing of the Fund's holdings disclosed in the Fund's annual reports, and had the expertise to form its own judgment as to the risk level of those securities.  Like most market participants during this time period, Morningstar presumably believed mortgage securities were indeed low risk.[6]

**B.    The Bespeaks Caution Doctrine Bars Any Claims Based on Alleged Misrepresentations and Omissions Regarding the Fund's Investment Objective and Strategies.**

Plaintiff fails to address, much less distinguish, the numerous cases that have held that disclosures regarding investment objectives and strategies fall within the bespeaks caution doctrine and are not actionable under the federal securities laws.[7]  See, e.g., I. Meyer Pincus & Assocs., 936 F.2d at 763, and cases cited in Br. at 22-23.  Instead, Plaintiff contends that the bespeaks caution doctrine does not apply here because the Fund's stated investment objective is not a forward-looking statement since it uses the present tense of the verb "to seek" and thus "relates to how the Fund was presently structured and managed."  (See Opp. at 28.)

As an initial matter, Plaintiff pleads no "factual content" from which the Court could draw a reasonable inference that the Fund did not "seek" its stated objective.  Rather, Plaintiff relies solely on the hindsight determination that those objectives were not in fact achieved.

---

[6]    Plaintiff may not state a claim based on a September 2002 press release in which a Fidelity representative stated, "We believe this fund will appeal to relatively conservative, income-oriented investors who are willing to take on more risk than a money market fund, but want to minimize share-price volatility."  (See Compl. ¶ 37; Opp. at 3.)  The statement may not serve as the basis for a claim under Section 11 or 12(a)(2) because it was made nearly three years before the beginning of the Class Period and more than four years before Plaintiff made his first purchase, and it is not part of the Fund's registration statement or any prospectus delivered to Plaintiff or others.  See 15 U.S.C. § 77k, 77*l*(a)(2).  In any event, the statement clearly indicated that the Fund would involve "more risk than a money market fund."  (Compl. ¶ 37.)

[7]    The one mutual fund case cited by Plaintiff, In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534 (N.D. Cal. 2009), does not consider, let alone reject, the bespeaks caution doctrine.

Moreover, the bespeaks caution doctrine applies to statements that a reasonable investor would recognize as uncertain and subject to future events, such as forecasts, opinions, and projections.  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996).  Here, in addition to the prospectus's explicit warning that "the fund may not achieve its objective" (Ex. A at 8), the phrase "seeks to obtain," even in the present tense, clearly conveys uncertainty and contingency—it is not the same as "finds."  See Webster's New World College Dictionary (3d ed. 1997) (defining "to seek" as "to go in search of; look for;" "to try to discover;" "to try to acquire or gain;" or "to bend one's efforts toward; aim at; pursue").  Indeed, courts have applied the bespeaks caution doctrine to nearly identical statements of a fund's investment objective. See, e.g., Alliance N. Am. Gov't Income Trust, 1996 U.S. Dist. LEXIS 14209, at *12 (applying bespeaks caution doctrine to disclosure that fund "seeks the highest level of current income, consistent with what the Fund's Adviser considers prudent investment risk") (emphasis added).

Plaintiff also argues that the bespeaks caution doctrine does not apply because the Fund's risk disclosures were mere "boilerplate," as opposed to the "prominent cautionary language" and "clear[] disclaim[ers]" that Plaintiff contends are necessary.  (Opp. at 28-30.)  To the contrary, the Fund's risk disclosures were both clear and prominent.  The first page of the prospectus highlighted the Fund's principal investment risks, concluding with the plainspoken warning that "[w]hen you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money."  (Ex. A at 3 (emphasis added).)  The prospectus also laid out the Fund's principal investment risks and cautioned that "[i]f FMR's strategies do not work as intended, the fund may not achieve its investment objective."  (Id. at 8.)

Plaintiff's wholesale dismissal of the Fund's risk disclosures as "boilerplate" is unavailing.  See Olkey, 98 F.3d at 8 (rejecting argument that "all of the warnings in the

prospectuses should be ignored as boilerplate"); <u>Sheppard v. TCW/DW Term Trust 2000</u>, 938 F. Supp. 171, 175-76 (S.D.N.Y. 1996) (same). Moreover, accepting Plaintiff's argument would encourage mutual funds to include the kind of "detailed, . . . technical, descriptions of the risks associated with particular securities in which a fund may invest" that the SEC has discouraged because such disclosure "does not appear to effectively communicate the overall risks of investing in the fund." SEC Release No. 33-7398, <u>Registration Form Used by Open-End Management Investment Companies</u>, 1997 WL 87357, at *19 (Feb. 27, 1997). <u>Cf.</u> <u>TSC Indus. v. Northway, Inc.</u>, 426 U.S. 438, 448-49 (1976) (cautioning against setting too low a standard of materiality lest it lead management to bury shareholders in an excess of information).

### C. Defendants Appropriately Disclosed the Risks Associated with the Fund's Holdings of Mortgage-Related Securities.

The prospectus and SAI plainly disclosed the risks associated with the Fund's holdings of ABS and mortgage securities. (<u>See</u> Br. at 25.) Plaintiff vaguely contends that those disclosures were insufficient, but he does not specify what risks were undisclosed. Instead, Plaintiff argues that Defendants' disclosures were insufficient because they did not portray highly rated mortgage securities as "risky" or "high risk." (<u>See, e.g.</u>, Opp. at 15-16, 32.) Plaintiff's argument fails.

As an initial matter, Defendants were not required to characterize ABS and mortgage securities as "risky" or "high risk." <u>See</u> <u>Sheppard</u>, 938 F. Supp. at 175 (rejecting argument that "prospectus should have characterized [MBS] as 'exotic mortgage derivatives'"). Moreover, Plaintiff's characterization of mortgage securities as high risk is pure hindsight. Indeed, Plaintiff does not and cannot allege that it was the general view of market participants prior to the market developments of 2007 and 2008 that AAA- and AA-rated mortgage securities were "high risk."

In addition, in order to contend that the Fund's interest rate risk was not "similar to" that of the Index, Plaintiff tries to conflate the macroeconomic factor of interest rate risk with the

11

microeconomic factors of mortgage defaults (a credit risk) and market risk.  (See, e.g., Opp. at 5 n.4, 18; see also Br. at 33 & n.23.)  Plaintiff further argues that Defendants failed to "adequately inform investors of the Fund's exaggerated interest rate change risk that was increasing due to rising default rates."  (See Opp. at 18.)  These arguments also fail because Defendants provided detailed disclosures of not only interest rate risk, but also credit and market risks.

With respect to interest rate risk, the prospectus and SAI plainly disclosed that the value of both ABS and mortgage securities may be affected by changes in interest rates.  (See Ex. B at 4 ("[ABS] values may . . . be affected by . . . changes in interest rates."); id. at 9 ("[I]n a rising interest rate environment, mortgage security values may be adversely affected.").)  With respect to credit and market risk, the SAI disclosed that the value of ABS "may be largely dependent upon the cash flows generated by the assets backing the securities," as well as by "the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables, or the entities providing the credit enhancement" (id. at 4), and that "[t]he value of mortgage securities may change due to shifts in the market's perception of issuers."  (Id. at 9.)

Defendants were not obligated to further disclose the possible interaction of interest rate and credit risks (see Br. at 26) or infer that the risks would result in substantial losses.  See Alliance N. Am. Gov't Income Trust, 1996 U.S. Dist. LEXIS 14209, at *22 n.13 ("Defendants were not required to infer from [disclosed] risks that the Fund would suffer substantial losses."). However, the Fund's shareholder reports in fact did discuss adverse market developments impacting the Fund's holdings of mortgage securities.  (See, e.g., Ex. G at V (predicting "a more volatile market environment" in light of "uncertainty surrounding the prospects for consumer spending, housing prices and the overall economy," and cautioning that "[a] notable housing market slowdown would likely cause a divergence in the performance of various mortgage types,

12

particularly those that are credit sensitive"); Ex. J at IV-V (explaining that ABS "came under

pressure due to concern about delinquencies and the growing likelihood of greater defaults").)

>    **D.    Defendants Fully Disclosed the Fund's Holdings of Mortgage-Related
>            Securities.**

Plaintiff contends that Defendants "obscured the full extent" of the Fund's exposure to

mortgage-related securities "by categorizing many of them as ABS . . . without disclosing which

investments were mortgage-related" and by holding some of the Fund's exposure through the

Fund's position in the Central Fund.  (Opp. at 16.)  Both of these arguments are unavailing.

To begin with, Plaintiff is factually incorrect.  The Fund's annual and semi-annual reports

plainly disclosed the Fund's holdings of MBS and ABS in colorful pie charts and in holdings

tables.  (See, e.g., Ex. H at 9-42.)  Plaintiff concedes that these disclosures made clear that

mortgage securities comprised at least 20% of the Fund's portfolio throughout the Class Period,

with additional exposure through ABS.  (See Opp. at 17.)  Furthermore, the Fund's portfolio

manager repeatedly commented on the Fund's emphasis on mortgage-related securities in

shareholder reports, noting variously that the Fund was "tilted heavily toward" (Ex. E at 6), had a

"sizable position" in (Ex. C at 5), placed "heavy emphasis on" (Ex. H at 6), "focus[ed] on"

(Ex. D at 6), and "maintained an out-of-index stake in" (Ex. G at IV) such securities.  Moreover,

the Fund's disclosures made it clear that ABS were composed of various types of collateral,

including mortgages.  (See Ex. B at 4 (defining ABS to be "interests in pools of mortgages,

loans, receivables, or other assets") (emphasis added).)  In light of these clear disclosures that the

Fund held a significant position in mortgage-related securities, the precise percentage of the

portfolio invested in such securities would not alter the total mix of information available.

Plaintiff does not dispute that the Fund's disclosures of ABS holdings fully complied

with governing SEC guidelines, none of which require Defendants to categorize or catalogue

fund securities holdings, much less to specifically break out which ABS contain mortgages (or any other type of collateral). Indeed, it is only with hindsight that Plaintiff can contend that the particular holding that should have been isolated for disclosure is ABS with exposure to subprime mortgages. The logical implication of Plaintiff's argument is that fund disclosures must slice and dice holdings by all conceivable categories, in the event that any of the underlying securities is impacted by a subsequent market downturn. Such a requirement would result in unduly complicated and lengthy disclosures, fully justifying the SEC's judgment as to the level of disclosure that should be made. Even more critically, Plaintiff fails to explain why specific disclosure of mortgage-related ABS would be material here in light of other clear disclosures that the Fund had substantial exposure to mortgage-related securities.

Furthermore, the pie charts showing the Fund's holdings by security type contained in the shareholder reports clearly <u>do</u> reflect the Fund's holdings through the Central Fund. (<u>See</u> Ex. H at 9 ("The information in the above tables is based on the combined investments of the fund and its pro-rata share of the investments of Fidelity's fixed income central fund.").) Investors also could obtain a list of the securities held by the Central Fund upon request or from Fidelity's website. (<u>Id.</u> at 9, 42, 59.) Finally, Plaintiff's contention that Defendants "downplay[ed] [the Central Fund's] importance in the Fund's portfolio" (Opp. at 23) is belied by prospectus, SAI, and shareholder report disclosures of the Fund's investment in the Central Fund, including holdings of mortgage-related securities. (<u>See, e.g.</u>, Ex. A at 8; Ex. B at 4; Ex. H at 6.)

## IV.    PLAINTIFF'S PRICING CLAIMS MISSTATE THE RULES AND THE RECORD AND DO NOT SUPPORT A SECURITIES ACT CLAIM.

Faced with the Fund's declining NAV throughout 2007, Plaintiff now claims that Defendants should have "written down" the Fund's holdings of mortgage securities sooner, according to Plaintiff's hindsight timetable.

To begin with, Plaintiff mischaracterizes the law of mutual fund pricing and the Fund's compliant pricing policy.  As required by the Investment Company Act, the Fund bases its daily NAV on current market values for its portfolio securities.  15 U.S.C. § 80a-2(a)(41)(B); 17 C.F.R. 270.2a-4.  If market prices are not readily available, the Fund employs Board-approved fair value procedures, but those procedures are required to estimate market value, not to generate a "true" or "intrinsic" value.  Ibid.; Inv. Co. Inst., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 543, at *14 n.19 (Apr. 30, 2001).  In other words, mutual funds (unlike operating companies) value their assets at market prices every day and do not "write down" assets based on projected default rates or other criteria.  If the market price of a bond is 100 cents on the dollar on a given day, the fund must use that value.

In addition, the SEC has described the decisions about when and how to employ the fair value process as a series of business judgments to be made by the Board "in good faith":

> [T]he good faith requirement is a flexible concept that can accommodate many different considerations, and . . . the specific actions that a board must take will vary, depending on the nature of the particular fund, the context in which the board must fair value price, and the pricing procedures adopted by the board.

Inv. Co. Inst., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 543, at *15.

In this light, Plaintiff's allegations that Fidelity should have acted more quickly in "writing down" the Fund's portfolio securities (a) are contrary to governing law during periods when market values were available and (b) as applied to the deployment and results of the fair value process, are inactionable criticisms of business judgments, not disclosure claims.

### A.     Plaintiff Does Not Allege Facts Supporting a Reasonable Inference that Fidelity Misvalued the Fund's Holdings of Mortgage Securities.

Unable to dispute that Fidelity recognized market value decreases in the Fund's mortgage securities holdings throughout 2007 and 2008, Plaintiff is left to contend that Fidelity should

have taken "write downs" as early as 2005, when interest rates began to increase, leading eventually to declining real estate values and higher subprime mortgage default rates. (See Opp. at 26 n.18; see also Compl. ¶¶ 63-65.) Critically, however, Plaintiff fails to allege that market prices of the Fund's mortgage securities actually declined in 2005 or any time before 2007.[8]

Plaintiff then resorts to guilt-by-association, contending that an SEC consent decree with an unrelated investment adviser, Evergreen, supports an inference that Fidelity improperly valued the Fund's holdings of mortgage securities. (See Opp. at 17 & Stewart Decl. Ex. A.) As an initial matter, the Evergreen consent decree completely undermines Plaintiff's demand for write downs in 2005. The SEC contends only that Evergreen should have first recognized lower market prices in February 2007 (see Stewart Decl. Ex. A at 2), by which point the Fidelity Fund's NAV had already begun to decline. (See Br. at 14.)

In any event, settled allegations of improper pricing at Evergreen do not support allegations about Fidelity's practices. Indeed, the record shows substantial factual differences:

- The pattern of the funds' price declines does not match. The Fund's NAV decreased beginning in 2007 and had lost 5% of its value by August 2007. (See id.) By contrast, the Evergreen fund experienced much smaller NAV decreases in 2007 and early 2008 before taking drastic write downs over the course of three weeks in May and June 2008. (See Stewart Decl. Ex. A at 3.)

- Moreover, the SEC made allegations against Evergreen that are not made here. It alleged that Evergreen used so-called "vendor overrides" to disregard readily available pricing information and that Evergreen employees selectively disclosed the 2008 write downs to favored clients. (See id. at 6-10.)

Plaintiff also argues that the absence of a scienter requirement under Sections 11 and 12(a)(2) relieves him of the duty to allege objective and/or subjective falsity. (Opp. at 23-24.) He is mistaken. Unless the Fund used market values that were objectively incorrect, there is no

---

[8]    Even where real "write downs" are required, courts treat challenges to the timing of write downs with skepticism because "[n]o matter when a [defendant writes down the value of an asset], someone may say that it should have acted sooner." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

misrepresentation.  Similarly, if the business judgments supporting the fair value process were

not subjectively incorrect, there is no claim.[9]  Of course, Plaintiff's hindsight allegation that

Fidelity's valuations must have been wrong because prices later declined is plainly insufficient.[10]

B.    **Plaintiff Fails to Allege that Defendants' Disclosures Regarding the Pricing Process Were Materially Misleading.**

Plaintiff's allegations that the disclosures in the prospectus and SAI regarding the Fund's

pricing process were misleading are unavailing because (1) Plaintiff does not allege facts

supporting a reasonable inference that Defendants failed to follow the disclosed valuation

process and (2) the alleged omissions are not material.

First, Plaintiff contends that Defendants misrepresented the valuation process because

Fidelity relied on broker quotes even where that information did not accurately reflect fair value.

(See Opp. at 17-20.)  However, the Complaint is bereft of facts supporting a reasonable inference

that the broker quotes and other information used by Fidelity did not accurately reflect the

market value of any mortgage securities held by the Fund.  Indeed, Plaintiff merely asserts, with

no factual support, that "Bear Stearns price quotes were blatantly inaccurate."  (Id. at 17.)  This

kind of conclusory allegation is insufficient under any pleading standard.  See In re Merrill

Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003).

Second, Plaintiff contends that Defendants failed to disclose that Fidelity's valuation

group was understaffed and unqualified.  This is a classic mismanagement claim.  (See Br. at

---

[9]    Plaintiff also fails to address cases, such as Coronel v. Quanta Capital Holdings Ltd., No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009), and cases cited therein, that have required allegations of objective and/or subjective falsity for claims under Sections 11 and 12(a)(2) and other claims governed by Rule 8(a) that are based on alleged misrepresentations and omissions involving matters of judgment or opinion.  See id. at *13-*14.  Plaintiff's cases are totally inapposite because none involves alleged misrepresentations with respect to matters of judgment or opinion.

[10]    See, e.g., In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held.").

18.)  Moreover, the Complaint does not contain any well-pleaded factual allegations supporting a reasonable inference that Fidelity's valuation group was understaffed or unqualified.  Indeed, the allegation is based exclusively on vague and indefinite assertions by a confidential witness, such as "there <u>definitely probably</u> should have been <u>a little more knowledge</u> as to how these things are priced out."  (Compl. ¶ 60 (emphasis added).)  See <u>Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.</u>, No. 08-10615-JLT, 2009 WL 2251471, at *5-*6 (D. Mass. July 29, 2009) (disregarding confidential witness statements that consisted of "subjective generalizations" and lacked "a meaningful degree of specificity" and "contextualizing information").

Finally, Plaintiff argues that Defendants failed to disclose Fidelity's reliance on pricing information obtained from Bear Stearns, which Plaintiff contends had a conflict of interest because it was an active participant in the mortgage securities market.  (Opp. at 20-21.)  In fact, Defendants plainly disclosed that Fidelity, like many other fund companies, used pricing information provided by "recognized dealers in such securities or assets."  (Ex. B at 13; Ex. E at 47.)  Defendants had no duty to list Bear Stearns or other broker-dealers used, and Plaintiff fails to explain why such a listing would alter the total mix of information available to investors.[11]

---

[11]     Plaintiff's reliance on <u>In re MoneyGram Int'l, Inc. Sec. Litig.</u>, 626 F. Supp. 2d 947 (D. Minn. 2009), is misplaced.  To begin with, the court in <u>MoneyGram</u> held that the types of allegations Plaintiff makes here, standing alone, would be insufficient to state a claim.  <u>See id.</u> at 970-71 (rejecting hindsight misvaluation claims).  MoneyGram was a very different business, faced with very different allegations.  Unlike the Fund, MoneyGram was an operating company and, as such, did not have to (and did not) price its assets daily at market prices or publish its full holdings information to shareholders.  Further, the court in <u>MoneyGram</u> relied on additional detailed allegations not present here.  The plaintiffs in <u>MoneyGram</u> alleged that defendants committed a "significant violation" of MoneyGram's internal controls by leaving the company's general accounting ledger open (a concept not relevant to mutual funds); that defendants failed to disclose their use of third-party pricing services of brokers and their use of discretion in fair valuation; and that defendants failed to disclose that they were exploring bankruptcy or merger transactions due to the company's possible inability to service its debt.  <u>See id.</u> at 974.

**V.    PLAINTIFF HAD KNOWLEDGE OF THE ALLEGED DISCLOSURE
          DEFICIENCIES AT THE TIME HE PURCHASED SHARES OF THE FUND.**

Plaintiff's claims are expressly precluded by Sections 11 and 12(a)(2) because he

purchased shares in August 2007, by which time the allegedly "stable" Fund had already

declined by over 5%—nearly one-third of the Fund's entire price decline—and investors

concededly were on notice of the Fund's "sizeable exposure to subprime mortgages."  (See Br. at

41; Opp. at 36.)  Nevertheless, Plaintiff argues, without any factual or legal support, that he may

pursue his claims because he was not aware of each and every specific misstatement and

omission prior to his purchase in August 2007.  (See Opp. at 36-38.)  Plaintiff's argument defies

logic and would render the Securities Act's express lack-of-knowledge requirement a nullity.

**VI.    PLAINTIFF'S CLAIMED LOSSES WERE NOT CAUSED BY THE ALLEGED
           MISREPRESENTATIONS AND OMISSIONS.**

Plaintiff's claims fail because the statutory pricing mechanism for mutual fund shares

prevents Plaintiff from establishing any causal connection between Defendants' disclosures and

the decrease in the Fund's NAV.  (See Br. at 41-43.)  Relying on a single case, Plaintiff contends

that he can nevertheless establish loss causation by demonstrating that the losses were caused by

the materialization of risks that Defendants failed to disclose.  (See Opp. at 39 (citing Schwab,

257 F.R.D. at 546-47).)  Plaintiff's theory must fail.

Plaintiff does not contest that Defendants' risk disclosures had absolutely no impact on

the price Plaintiff paid when he purchased shares of the Fund.  That is, Defendants could have

mischaracterized the Fund as "speculative," "highly risky," "extremely volatile," or with any

other pejorative term Plaintiff can conjure up, but the Fund's NAV, and hence the price paid by

Plaintiff, would have been exactly the same.  Neither Plaintiff nor the court in Schwab explains

how, under these circumstances, additional risk disclosures would have spared Plaintiff any

portion of his loss, as required to demonstrate loss causation.  The only conceivable way for

Plaintiff to have avoided his loss would be if the additional risk disclosure caused him not to buy

the Fund in the first place or prompted him to sell his shares earlier.  However, any such

allegations go to transaction causation and cannot establish loss causation.[12]  See In re Alkermes

Sec. Litig., No. Civ.A 03-12091-RCL, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005) ("Loss

causation is causation in the traditional 'proximate cause' sense—that the allegedly unlawful

conduct caused the economic harm.  Transaction causation means that 'the violations in question

caused the [plaintiffs] to engage in the transaction in question.'").

**VII.    PLAINTIFF'S CONTROL PERSON CLAIMS MUST BE DISMISSED.**

Even if Plaintiff could otherwise state a claim, the control person claims against FMR

LLC and the Individual Defendants would fail because the Complaint alleges no facts

establishing that these Defendants exercised the requisite control.  Plaintiff merely asserts that

these defendants "controlled" the so-called "primary violators" by dint of their corporate

structure and titles.  (See Opp. at 42-43.)  These types of conclusory allegations are wholly

insufficient to satisfy the requirements of Iqbal and Twombly.

## **CONCLUSION**

For the foregoing reasons and those stated in Defendants' initial brief, Plaintiff's

Amended Complaint should be dismissed in its entirety and with prejudice.

---

[12]    Schwab's suggestion that applying the negative causation defense in mutual fund cases will "insulate" or "immunize" mutual funds from liability for prospectus misrepresentations and omissions (see Opp. at 39 (quoting Schwab, 257 F.R.D. at 547)) ignores the extensive regulatory regime to which mutual funds are subject.  For example, the SEC could, without alleging or proving loss causation, bring an action under any number of provisions of the Securities Act, the Securities Exchange Act, the Investment Advisers Act, or the Investment Company Act if a fund violated its disclosure obligations.

Dated: October 14, 2009

Respectfully submitted,

GOODWIN PROCTER LLP
/s/ James S. Dittmar   _____
   James S. Dittmar (BBO# 126320)
   Sarah Heaton Concannon (BBO# 646884)
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231

MILBANK, TWEED, HADLEY & MᶜCLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Robert R. Miller
   Andrew W. Robertson (*pro hac vice*)
   Jennie Woltz
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants  Fidelity Management &
Research Co., FMR Corp. (n/k/a FMR LLC),
Fidelity Brokerage Services LLC, Edward C.
Johnson 3d, Abigail P. Johnson, James C. Curvey,
Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas,
Kimberley Monasterio, Christine Reynolds, and
Robert L. Reynolds*

21

DECHERT LLP

/s/ William K. Dodds
    William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036-6797
Tel: (212) 698-3557
Fax: (212) 698-3599

  - and -

    Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, MA 02116
Tel: (617) 728-7100
Fax: (617) 426-6567

  - and -

    Thomas C. Bogle
    Robert W. Helm
1775 I Street, NW
Washington, DC 20006-2401
Tel: (202) 261-3300
Fax: (202) 261-3333

*Attorneys for Defendant Fidelity Income Fund*

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 14, 2009.

       /s/ James S. Dittmar