James S. Dittmar
617.570.1944
jdittmar@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

March 2, 2010

**Via CM/ECF Filing**

Honorable Chief Judge Mark L. Wolf
United States District Court for the
 District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA   02210

> Re:    *Zametkin v. Fidelity Management & Research Co., et al.*,
>           No. 1:08-CV-10960-MLW (D. Mass.)

Dear Chief Judge Wolf:

This firm along with Milbank Tweed represents the Fidelity Defendants[1] in the above-referenced action.  I will be arguing Defendants' pending motion to dismiss at the hearing before your Honor currently scheduled for March 30, 2010.  In connection with the upcoming hearing, I write to bring to your Honor's attention this past Thursday's decision by Judge Richard Holwell of the Southern District of New York allowing defendants' motion to dismiss, with prejudice, in *Yu v. State Street Corp., et al.*, No. 08 Civ. 8235 (S.D.N.Y. Feb. 25, 2010).  A copy of Judge Holwell's opinion is enclosed.

Plaintiffs in *Yu*, like the Plaintiff here, raised claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, based on alleged misrepresentations and omissions in an open end mutual fund's disclosure documents concerning the fund's investments in mortgage-related securities. Specifically, the *Yu* plaintiffs alleged that the offering documents for State Street's Yield Plus Fund misled investors in "three basic ways": (i) By describing the fund as one that invested in "high quality" securities, even though the fund was invested in risky mortgage-related securities; (ii) by masking the fund's true exposure in mortgage-related securities by classifying a portion of those investments as "asset-backed" rather than "mortgage-backed" securities; and (iii) by overstating the value of the fund's mortgage-related securities, and thereby overstating the fund's

---

[1]        The Fidelity Defendants are Fidelity Management & Research Co., FMR Corp. (n/k/a FMR LLC), Fidelity Brokerage Services LLC, Edward C. Johnson 3d, Abigail P. Johnson, James C. Curvey, Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas, Kimberley Monasterio, Christine Reynolds, and Robert L. Reynolds.

Honorable Chief Judge Mark L. Wolf
March 2, 2010
Page 2

NAV.  *See Yu*, slip op. at 5.  Plaintiff here has made identical allegations regarding Fidelity's
Ultra-Short Bond Fund.

Based on a review of the fund prospectus and registration materials at issue, Judge Holwell
dismissed the entirety of the *Yu* complaint based on many of the exact points the Fidelity
Defendants have advanced.  He found, *inter alia*, that: (i) the fund's designation of its
investments as "high quality" was not a guarantee of no losses, and in any event could not be
deemed material given the total mix of information available in the fund's prospectus and in the
marketplace – *id*. at 10-14; (ii) the scope of the fund's investments in mortgage-related securities
was not masked especially since the shareholder reports included detailed schedules of all
investments, and many of the listed "asset-backed" securities included names with words like
"mortgage" and "home equity" – *id*. at 15-17; and (iii) plaintiff failed to allege that any specific
mortgage-related security had been overvalued or how any stated valuation deviated from the
fund's disclosed valuation methods.  - - id. at 17-18.  Furthermore, the court observed that the
fact that the fund eventually took large write downs on its investments in mortgage-related
securities does not show that the values stated before the write-downs were inaccurate.  *Id*. at 19.

We believe that Judge Holwell's decision and reasoning may be helpful to your Honor in your
consideration of the Fidelity Defendants' motion to dismiss.  Please let us know if you would
want us to submit a supplemental brief further detailing our views of the *Yu* decision and why we
believe the result here should be the same as in *Yu*.

                    Respectfully submitted,

                    THE FIDELITY DEFENDANTS,

                    By: /s/ James S. Dittmar
                    James S. Dittmar (BBO #126320)
                    David J. Apfel (BBO #551139)
                    Goodwin Procter LLP
                    Exchange Place
                    Boston, MA  02109
                    Telephone: (617) 570-1000
                    jdittmar@goodwinprocter.com
                    dapfel@goodwinprocter.com

                    James N. Benedict (admitted *pro hac vice*)
                    Sean M. Murphy (admitted *pro hac vice*)
                    Andrew W. Robertson (admitted *pro hac vice*)
                    Milbank, Tweed, Hadley & McCloy LLP
                    1 Chase Manhattan Plaza
                    New York, New York 10005-1413

cc:  All counsel of record

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 2, 2010.


/s/ James S. Dittmar

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NING YU, On Behalf of Himself and All Others
Similarly Situated,

Plaintiffs,

-against-

STATE STREET CORPORATION, et al.,

Defendants.

MDL No. 1945

08 Civ. 8235 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

This is a putative securities class action asserting claims under Sections 11,
12(a)(2), and 15 of the Securities Act of 1933. The action is part of a web of multi-
district litigation over losses at mutual funds managed by State Street Corporation ("State
Street") flowing from investments in mortgage-related securities. *See In re State Street
Bank and Trust Co.*, 07 Civ. 8488 (RJH), 2009 WL 3458705 (S.D.N.Y. Oct. 28, 2009); *In
re State Street Bank and Trust Co.*, 579 F. Supp. 2d 512 (S.D.N.Y. 2008). Plaintiffs in
this action allege that defendants misrepresented the nature, extent, and consequences of
the investments of one such fund, called the Yield Plus Fund (the "Fund"), in such
mortgage-related securities. Those investments eventually crippled the Fund, causing it
to wind down in 2008.

Now before the Court are defendants' motions to dismiss the Amended Complaint
(the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the

Complaint fails to plead actionable material misrepresentations in the Fund's offering documents, the motions are granted and the Complaint is dismissed in its entirety.

BACKGROUND

**A. Parties**

Lead Plaintiff Anatoly Alexander invested in the Fund. He brings this action on behalf of himself and a putative class of all persons and entities who purchased shares in the Fund between July 1, 2005 and June 30, 2008.

The Complaint names two groups of defendants: "State Street Defendants" and "Individual Defendants." The State Street Defendants are State Street and its investment management arm, State Street Global Advisers ("SSgA"), which managed the Fund and offered its shares to the public. (Compl. ¶¶ 6-9.) The Individual Defendants are two executives and eight trustees of SSgA and the Fund. (*Id.* at ¶¶ 11-20.) Seven of the Individual Defendants call themselves "Independent Trustees," as they claim they were not controlled by State Street or SSgA.

**B. The Fund**

The Fund was one of a series of more than twenty SSgA mutual funds that defendants offered to the public through a combined registration statement filed annually with the Securities and Exchange Commission ("SEC"). The registration statements included a prospectus that contained a brief description of each fund and a chart of "financial highlights" listing such information as net investment income, operating expenses, and share price. With regard to the Yield Plus Fund specifically, the prospectuses stated that it sought to generate "high current income and liquidity by investing primarily in a diversified portfolio of high-quality debt securities . . . such as

2

mortgage-related securities, corporate notes, variable and floating rate notes and asset-backed securities." (Skinner Decl. Ex. A ("Prospectus") at 4.) The prospectuses also disclosed certain risks of investing in SSgA funds, including the risks posed by asset-backed and mortgage-backed securities.[1]

Defendants also communicated further information about the Fund to the public through annual reports and Statements of Additional Information, both of which were incorporated into each year's prospectus by reference. (Compl. ¶ 31.) The annual reports contained schedules listing all of the Fund's investments under three major category headings: asset-backed securities, mortgage-backed securities, and international debt. (*Id.* at ¶ 68, Skinner Decl. Ex. C, Ex. D.) The reports also included a table showing each category as a percentage of the Fund's total assets. In the 2006 annual report, for example, this percentage table disclosed the following figures: asset-backed securities—68.3%; international debt—21.0%; mortgage-backed securities—11.3%. (Skinner Decl. Ex. C at 12.) The "mortgage-*backed* securities" category, however, did not capture the full extent of the Fund's investments in mortgage-*related* securities, because some such

---

[1] Portions of the disclosure language read as follows:

> **Asset-backed Securities Risk.** Asset-backed securities are obligations whose principal and interest payments are supported or collateralized by pools of other assets, such as automobile loans, credit card receivables and leases. Defaults on the underlying assets may impair the value of an asset-backed security. Furthermore, there may be legal and practical limitations on the enforceability of any security interest granted with respect to those underlying assets. Asset-backed securities are also subject to prepayment risk. . . .

> **Mortgage-Backed Securities Risk.** Mortgage-backed securities represent either direct or indirect participation in, or obligations collateralized by and payable from, mortgage loans secured by real property. The investment characteristics of mortgages differ from those of traditional fixed-income securities. These differences can result in significantly greater price and yield volatility than is the case with traditional fixed-income securities. Furthermore, mortgage-backed securities are subject to prepayment risk . . . [and] may also be subject to call and extension risk . . . .

(Prospectus at 15, 18.)

securities were listed in the asset-backed category.[2] (*Id.* at 8-9.) The Complaint does not allege what percentage of the Fund's portfolio mortgage-related securities actually represented.

The Fund's share price, called the Net Asset Value ("NAV"), depended on the value of its portfolio. NAV was calculated twice daily according to the following formula: (Assets – Liabilities)/Number of Shares. (Compl. ¶ 34; Prospectus at 58-59.) The prospectuses disclosed this formula as well as the methods that defendants would use to value each portfolio security. (Prospectus at 59.) Under those methods, securities were to be valued at market price. Where a market price was unavailable or deemed unreliable, the security would be valued in accordance with "Fair Value Procedures," which generally meant "on the basis of the last sale price or, lacking any sales, at the closing bid price . . . ." (*Id.*)

**C. Decline and Liquidation**

The Fund's NAV fell 34% during the class period. The NAV had remained stable from July 2005 through July 2007, hovering around $9.96 per share, but it began to drop precipitously in August 2007, falling to $6.60 by May 2008. (Compl. ¶ 77.) According to the Complaint, this decline reflected large write-downs to the value of the Fund's mortgage-related holdings. (*Id.* at ¶ 76.) The Fund was liquidated on May 30, 2008. (*Id.* at ¶ 85.)

---

[2] Both parties use the terms "mortgage-related securities" and "mortgage-backed securities" without articulating the distinction between them. In this opinion, the Court uses "mortgage-related securities" as a general term meaning any security that is secured by mortgage loans. "Mortgage-backed securities," on the other hand, refers to the specific subset of mortgage-related securities that the prospectuses carve out as a distinct category: securities secured by "first mortgages or first deeds of trust or other similar security instruments creating a first lein . . . ." (Prospectus at 48.) Thus, all mortgage-backed securities are mortgage-related securities but not all mortgage-related securities are mortgage-backed securities.

4

### D. Plaintiffs' Claims

The Complaint alleges that the Fund's offering documents misled investors in three basic ways. First, it alleges that the description of the Fund as one that invested in "high-quality" securities was misleading, because the Fund in fact invested in risky mortgage-related instruments. (*Id.* at ¶¶ 58-62.) Second, the Complaint alleges that the offering documents masked the extent of the Fund's mortgage-related holdings by classifying a portion of those holdings as "asset-backed," rather than "mortgage-backed," securities. (*Id.* at ¶¶ 67-72.) Third, the Complaint alleges that defendants overstated the value of the Fund's mortgage-related securities, which in turn led to overstatements of the Fund's NAV.[3] (*Id.* at ¶¶ 63-66.)

With regard to the inflated valuation claims, plaintiffs' thesis is that defendants failed to write down the value of the Fund's mortgage-related securities until August 2007, at least a year after the emergence of troubles in the subprime mortgage market, and that this failure plausibly demonstrates that the Fund carried securities on its books at inflated values before those write-downs occurred. The Complaint contains a detailed overview of the subprime crisis that explains how the confluence of rising interest rates and stagnant property values led to higher rates of delinquency, default, and foreclosure, and ultimately to losses on loans to subprime borrowers. (*Id.* at ¶¶ 40-55.) The

---

[3] The Complaint also states that the prospectuses "failed to adequately inform investors of the risks of investing in the Fund." (Compl. ¶ 72). This allegation does not identify an additional misrepresentation in the offering documents, but instead simply restates the claim that defendants obfuscated the nature and extent of the mortgage-related investments. That is, the Complaint does not allege that the prospectuses' disclosure language concerning the risks of asset-backed and mortgage-backed securities was itself inadequate or misleading, but rather that investors could not properly appreciate those risks because the documents said the Fund's securities were "high-quality" and because investors did not know that the asset-backed holdings included mortgage-related securities. (*Id.* at ¶ 72 (referencing ¶ 59).)

Additionally, the Complaint alleges that the prospectuses incorrectly described the Fund's portfolio as having a "duration of one year or less." (*Id.* at ¶ 60.) Plaintiffs make no response to defendants' argument that this description was in fact accurate. (*See* Def. Mem. at 14 n.12.) The Court considers this allegation abandoned.

Complaint does not, however, include any such detail as to the mortgage-related securities that the Fund held, or as to whether those particular securities declined in value in ways that defendants failed to disclose.

Defendants move in two groups to dismiss the Complaint. The State Street Defendants, the two SSgA executives, and the one "interested" Fund trustee bring one motion, arguing failure to plead actionable misrepresentations, lack of loss causation, lack of "seller" status under Section 12(a)(2), and lack of control person liability for the three individual defendants. The Independent Trustees join in that motion but also bring a separate motion contending that they are not "sellers" under Section 12(a)(2). Because the Court finds that the Complaint does not plead actionable misrepresentations, it does not reach defendants' other arguments.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (*quoting Iqbal*, 129 S. Ct. at 1950). In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S. Ct.

at 1949. On a motion to dismiss, the Court may properly consider documents referenced in or integral to the complaint, as well as public filings with the Securities and Exchange Commission ("SEC"). *In re IAC/Interactivecorp*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).

## DISCUSSION

### A. Applicable Law

Plaintiffs bring Section 11 and 12(a)(2) claims against all defendants and Section 15 control person liability claims against the Individual Defendants. Section 11 creates civil liability for false or misleading statements of material fact in registration statements. *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 415 (S.D.N.Y. 2008) (*citing* 15 U.S.C. § 77k(a)). Section 12(a)(2) creates the same liability for prospectuses and oral communications. *Id.* at 416 (*citing* 15 U.S.C. § 77l(a)(2)). "Claims under Sections 11 and 12 are usually evaluated in tandem, because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)." *Landmen Partners, Inc., v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 539 n.6 (S.D.N.Y. Sept. 22, 2009) (*quoting Lin*, 574 F. Supp. 2d at 416). Similarly, a cause of action under Section 15 for control person liability requires an underlying Section 11 or Section 12 violation. *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 692 (S.D.N.Y. 2004).

To state a claim under Sections 11 and 12(a)(2), a security purchaser must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *In re Fuwei Films*, 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009). In other words, the plaintiff must allege that a statement was either false or misleading (in light of

omitted information), and that that same statement was material. *Rubin v. MF Global,*
*Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009).

A false or misleading statement is material if "there is a substantial likelihood that
a reasonable shareholder would consider it important in deciding how to act." *ECA,*
*Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187,
197 (2d Cir. 2009) ("*JP Morgan Chase*") (citations and alterations omitted). Materiality
turns on context. "The touchstone of the inquiry is not whether isolated statements
within a document were true, but whether defendants' representations or omissions,
considered together and in context, would affect the total mix of information and thereby
mislead a reasonable investor regarding the nature of the securities offered." *Halperin v.*
*EBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002). Thus, even if a particular
statement is false or misleading, it is only actionable as material if, when read in context
of the "total mix" of defendants' disclosures, it would mislead a reasonable investor. *Id.*

This "reasonable investor" standard requires fact-specific application; it is far
from a bright-line rule. *Landmen*, 659 F. Supp. 2d at 540. As such, the Second Circuit
has cautioned that "a complaint may not properly be dismissed . . . on the ground that the
alleged misstatements or omissions are not material unless they are so obviously
unimportant to a reasonable investor that reasonable minds could not differ on the
question of their importance." *JP Morgan Chase*, 553 F.3d at 197 (*quoting Ganino v.*
*Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). That is a high bar for defendants
bringing a 12(b)(6) motion to satisfy. But dismissal is nonetheless appropriate where the
offering document as a whole, despite isolated inaccuracies, so clearly communicates the
information alleged to have been misrepresented, hidden, or obfuscated that a reasonable

8

investor could not have been misled as to that information's substance. *See Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 302 (S.D.N.Y. 2000) (dismissing claims based on "isolated references, [which] even if not 'literally true,' [we]re not material in light of the entire prospectus."); *see also Halperin*, 295 F.3d at 352; *Lin*, 574 F. Supp. 2d at 420.

In another vein, Section 11 and 12(a) claims will not survive a 12(b)(6) motion if the complaint does not contain sufficient factual content to plausibly support the conclusion that the alleged misrepresentations were in fact false or misleading. *See Iqbal*, 129 S. Ct. at 1949; *In re Morgan Stanley Tech. Fund*, 643 F. Supp. 2d 366, 377-78 (S.D.N.Y. 2009) (dismissing Section 11 and 12 claims where plaintiffs had not alleged sufficient facts to support allegations that mutual fund selected investments to promote related entity's investment banking business), *aff'd*, 592 F.3d 347 (2d Cir. 2010). For example, a court in this district recently dismissed claims that a financial corporation with large real estate investments had misrepresented the impact of the subprime crisis upon its portfolio, because the complaint did not allege facts showing any connection between the crisis and the corporation's specific investments. *Landmen*, 659 F. Supp. 2d at 544 ("The [complaint] does not identify a single real estate investment or allege a single fact capable of linking the problems in the subprime residential mortgage market . . . to Blackstone's real estate investments . . . ."). Similarly, another court dismissed claims that an issuer had misrepresented the problems caused by a recent acquisition because the complaint did not include concrete averments to substantiate the existence of such problems. *Rubin*, 634 F. Supp. 2d at 470 ("Plaintiffs have not made any factual averments that the Refco acquisition imposed a burden of any kind on the risk management system . . . or that any brokers employed as a result were of lesser quality

than the brokers already employed . . . ."). Of course, plaintiffs need not provide exhaustively "detailed factual allegations" to survive a motion to dismiss, but they do have to aver at least *some* concrete facts to back up conclusory allegations of misconduct so as to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## B. Plaintiffs' Claims

Plaintiffs allege that the Fund's offering documents contained three categories of material misrepresentations: (1) a misleading description of the Fund's investment strategy; (2) misrepresentations of the extent of the Fund's exposure to mortgage-related securities; and (3) inflated valuations of the Fund's mortgage-related holdings. Under the principles discussed above, the Complaint fails to adequately plead claims based on any of these alleged misstatements.

### 1. Fund Description

The offering documents stated that the Fund's "nonfundamental investment objective" was to "seek high current income and liquidity by investing primarily in a diversified portfolio of high-quality debt securities . . . ." (Prospectus at 4.) Plaintiffs allege that this statement was materially false because the fund in fact invested "primarily in risky mortgage-related investments," (Compl. ¶ 60), which "were *not* high-quality." (Opp. Br. at 18 (emphasis in original).)

As an initial matter, the Complaint does not adequately plead falsity. Though the phrase "high-quality" is somewhat vague when read in isolation, it surely cannot be understood as a guarantee that investors would not suffer losses. Consider, for example, language from the same page of the prospectus describing the apparently more

10

conservative Tax Free Money Market Fund: "[The] objective is to maximize current income . . . to the extent consistent with the preservation of capital and liquidity . . . ." (Prospectus at 4.) In contrast, the prospectuses stated that the Yield Plus Fund would "seek high current income," but included no similar limitation about preserving capital or liquidity. (Prospectus at 4.) The juxtaposition of these two descriptions, which appear right next to each other, indicates that the "high-quality" language cannot be read as an implicit representation that the Fund posed little or no risk.

Instead, the prospectuses employed the term "high-quality" specifically to describe the relative credit grade of the Fund's holdings, which the language made clear would include mortgage-related securities: "The Fund attempts to meet its objective by investing primarily in high-quality, dollar-denominated, *investment grade debt instruments, such as mortgage related securities*, corporate notes, variable and floating rate notes and asset-backed securities." (Prospectus at 4 (emphasis added).) Further, the prospectuses defined "investment grade securities" as securities "rated in one of the four highest categories" by a national ratings agency. (Prospectus at 47.) The offering documents indicate that 80% of the Fund's holdings were in fact rated "AAA" or "AA" by Standard & Poor's, and that every security in the portfolio received at least an "A" rating. (Skinner Decl. Ex. C at 6.) Thus, the contents of the Fund's portfolio complied with defendants' description of the Fund's investment objective and the nature of its securities. (Skinner Decl. Ex. B at 41 (listing "AAA," "AA," and "A" as the three highest Standard & Poor's ratings).) Plaintiffs do not make any factual allegations to the contrary. Indeed, aside from some conclusory fragments, (*e.g* ., Compl. ¶ 39 ("[M]uch of [the portfolio] w[as] comprised of risky subprime mortgage related assets")), the

Complaint contains no factual allegations about the Fund's mortgage-related holdings. It does not say, for example, to what extent those securities (each of which is identified in the offering documents) were backed by subprime loans, as opposed to loans to credit-worthy corporate or individual borrowers; nor does it include other facts by which the "quality" of the mortgage-related holdings might be judged. Plaintiffs cannot plead that it was false for defendants to describe the Fund's investments as "high-quality" without averring facts showing that the investments' actual quality—in the sense used in the prospectuses—was in fact otherwise. *See Starr*, 592 F.3d at 321 (complaint must plead "enough facts to state a claim that is plausible on its face"); *Rubin*, 634 F. Supp. 2d at 472 (finding that falsity was not pleaded where plaintiffs did not "offer any factual averments showing that any of the statements about specific practices . . . were false."). Given this dearth of relevant factual allegations, and in light of the ratings information in the offering documents that affirmatively supports the accuracy of the prospectuses' declaration that the Fund would invest in "high-quality . . . investment grade instruments, such as mortgage related securities," the claim that the Fund's description was false must be dismissed for lack of facial plausibility. *See Twombly*, 550 U.S. at 570; *Rubin*, 634 F. Supp. 2d at 470.

Of course, from our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the rating agencies did not perceive. *See* John Crawford, *Hitting the Sweet Spot by Accident*, 42 CONNtemplations 13, 13 (2009) ("Broad reliance on excessively optimistic credit ratings of structured financial products helped ignite and spread the recent financial crisis."). And not surprisingly, the Fund sustained most of its calamitous losses on

12

securities with the highest investment ratings. (Skinner Decl. Ex. D at 6 ("The Fund experienced underperformance due to its holdings in primarily high credit quality instruments related to mortgage and home-equity payments . . . the AAA and AA sectors of this market experienced significant price depreciation.").) In hindsight, then, it could be alleged that investments that were viewed by defendants—and the marketplace—to be "high-quality . . . investment grade instruments" in fact stood on shaky foundations. But the accuracy of offering documents must be assessed in light of information available at the time they were published. *Lin*, 574 F. Supp. 2d at 421 ("To be actionable under Section 11, the registration statement must contain an untruth or material omission 'when such part became effective' . . . plaintiffs [must] at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were [] knowable, at the time of the offering.") (*quoting* 15 U.S.C. § 77(k)(a)); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009). A backward-looking assessment of the infirmities of mortgage-related securities, therefore, cannot help plaintiffs' case.

Perhaps aware of the inefficacy of pleading with hindsight, plaintiffs allege that the "high-quality" description conflicted with contemporaneous market information about the developing subprime mortgage crisis. (Compl. ¶¶ 40-55.) Specifically, plaintiffs contend that the Fund description was false because existing turmoil in the mortgage market, which the prospectuses did not acknowledge, rendered mortgage-related securities particularly risky (*i.e.*, not "high-quality"). (Opp. Br. at 18.) They argue that the Complaint states a claim by adequately "contest[ing] the quality and value of [mortgage-related] securities in light of then-prevailing conditions." (Opp. Br. at 19.) Of

13

course, because the Complaint does not say anything about the particular mortgage-related holdings in the Fund's portfolio, plaintiffs' proposition is that the prospectuses misled them as to the desirability of mortgage-related securities *in general*, as a sector of debt instruments available on the market. Even assuming that these allegations show the Fund's reference to "high-quality . . . investment grade debt instruments, such as mortgage-related securities" to be in some measure false, plaintiffs have failed to allege that this general statement was *material* in the context of the totality of information disclosed in the prospectuses and available in the marketplace. Investors are presumed to be aware of public information concerning market trends. *See Landmen*, 659 F. Supp. 2d at 545 ("The omission of generally known macro-economic conditions is not material because such matters are already part of the 'total mix' of information available to investors."); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 320 (S.D.N.Y. 1996) ("[D]efendant . . . had no duty to report readily available industry trends."). Plaintiffs cannot state a claim that defendants misled them as to information readily available in the public domain because the law imputes knowledge of such market trends to the reasonable investor. *Landmen*, 659 F. Supp. 2d at 545. The prospectuses clearly communicated that mortgage-related securities were significant to the Fund's portfolio and allowed investors to evaluate that investment strategy against existing economic trends. Plaintiffs do not identify anything else about the Fund's nature or objective that was misrepresented to them; they do not, for example, plead that the Fund's holdings fell within an especially risky, "low-quality" subset of the mortgage-related sector. The claim that the Fund's description was materially false must therefore be dismissed. *See id.*

14

### 2. Exposure to Mortgage-Related Securities

Plaintiffs also allege that the Fund's offering documents misrepresented the extent to which the Fund invested in mortgage-related securities. (Compl. ¶¶ 67-71.)

The Fund's annual report included a table showing the holdings in each of three major categories—"Asset-Backed Securities," "Mortgage-Backed Securities," and "International Debt"—as a percentage of the Fund's total portfolio. (Skinner Decl. Ex. C at 8-12.) In 2006, the Fund reported that 68% of its holdings were in Asset-Backed Securities, 21% in International Debt, and 11.3% in Mortgage-Backed Securities. (*Id.* at 12.) As plaintiffs correctly point out, mortgage-related securities actually represented more than 11.3% of the portfolio, because the "Asset-Backed" category also contained mortgage-related securities. (*Id.* at 8-12.) Defendants say the percentages were not misleading because the prospectuses defined the "Mortgage-Backed Securities" category as having a limited scope, one that only included instruments backed by "first mortgages or first deeds of trust" and thereby implicitly excluded all other types of mortgage-related instruments. (Prospectus at 48.) The definition of the "Asset-Backed" category, however, did not explicitly identify mortgage bonds: "Asset-backed securities are securities whose principal and interest payments are collateralized by pools of assets such as auto loans, credit card receivables, leases, installment contracts and personal property." (*Id.* at 43.) Plaintiffs argue that the table showing the percentage of holdings by category, combined with the prospectuses' "Asset-Backed" definition, misleadingly understated the Fund's exposure to mortgage-related securities.

As an initial point, the annual report's percentage breakdown appears accurate because the "Mortgage-Backed Securities" category, as carefully defined in the

prospectuses, did not include all mortgage-related securities. *See supra*, note 2. But even

if the percentage table lent itself to a misunderstanding of the extent of the Fund's

mortgage-related holdings, the Complaint does not plead that this "misrepresentation"

was material. As with the allegations about the Fund's description, this group of

allegations is deficient due to the absolute dearth of factual content concerning the

characteristics of the Fund's mortgage-related holdings. The Court cannot discern

whether the table had the effect of cloaking particularly risky mortgage securities within

a category of safer bets, or whether the asset-backed securities—which included

instruments backed by credit card and other personal debt—were on the whole riskier

than the mortgage-related subcategory in their midst. To plead materiality, at least some

information about the "miscategorized" mortgage securities is needed to plausibly show

that the table distorted the Fund's risk profile or that its inaccuracy would have otherwise

been significant to a reasonable investor deciding how to act. *JP Morgan Chase*, 553

F.3d at 197. Because plaintiffs have not alleged sufficient facts to plead that the

categorizations were materially misleading, the claim must be dismissed. *Landmen*, 659

F. Supp. 2d at 544; *Fuwei*, 634 F. Supp. 2d at 434 ("claims brought pursuant to sections

11 and 12(a)(2) must plead materiality of the alleged misrepresentation or omission").

    The pleadings as to the materiality of inaccuracies in the percentage table also fail

because, when viewed in the context of the annual report "as a whole," the table would

not have misled a reasonable investor as to the extent of the Fund's mortgage holdings.

The table was not displayed prominently. Rather, it appeared on the final page of the

Fund's section in the annual report, *behind* three detailed schedules—one for each

category—listing every security held in each category. (Skinner Decl. Ex. C at 8-12.)

The schedule for the "Asset-Backed" category included the names of securities that were obviously mortgage-related, such as "Ameriquest Mortgage Securities," "Centex Home Equity," and "Chase Funding Mortgage Loan." (*Id.*) Thus, not only did portions of the annual report clearly communicate the presence of mortgage-related securities in the asset-backed category, but investors would have perused those portions of the report before arriving at the percentage table. Given this "total mix" of information, it would not be reasonable for an investor to believe that the "Mortgage-Backed Securities" category represented the extent of the Fund's mortgage holdings. Therefore, even if the table was inaccurate in isolation, that inaccuracy was immaterial as a matter of law.[4]
*Steinberg*, 88 F. Supp. 2d at 302.

### 3. Valuation of Mortgage-Related Securities

Finally, the Complaint alleges that the Fund overstated the value of its mortgage-related holdings, which in turn resulted in an overstated NAV.[5] (Compl. ¶¶ 63-66.)

There is no single, objectively acceptable method for valuing the complex asset-backed instruments at issue here. *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*,

---

[4] Plaintiffs argue that the schedules do not correct the misleading nature of the percentage table because "not every mortgage-related security listed among the Asset-Backed Securities . . . contains the word 'mortgage,' 'home,' or something similar." (Opp. Br. at 16 n.10.) This misses the point. The argument is not that every single mortgage-related security in the asset-backed category was facially apparent, but rather that so many mortgage-related securities in that category were obvious by their names that, judging by the "total mix" of information, no reasonable investor would have been misled into believing that the "Mortgage-Backed Securities" category accounted for every mortgage-related investment in the portfolio.
    Also, plaintiffs have appended to their papers several Bloomberg reports describing mortgage-related securities listed in the asset-backed category. (Kaufman Decl. Ex. C – F.) These documents are not referenced in or integral to the Complaint and, as such, cannot be considered on a motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

[5] Defendants argue that the overstated valuation claims are grounded in fraud and therefore must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. (Def. Mem. at 26-28.) The Court finds that the claims do not sound in fraud because the relevant allegations against defendants are premised solely on their having misstated the value of securities, not on their having done so knowingly or with intent to mislead investors. *See Fuwei*, 634 F. Supp. 2d at 437. Therefore, the claims need only satisfy the notice pleading requirements of Rule 8. *See id.*

376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005) (Kaplan, J.) ("[V]aluation of such [mortgage-backed and related] securities [is] not a matter of looking up closing prices in the *Wall Street Journal*, but involve[s] the exercise of judgment."). Probably for that reason, the offering documents set out the specific methods by which the Fund's holdings were to be valued. The documents said that values would correspond to market price. (Skinner Decl. Ex. G at 62.) Where market quotations were unavailable or unreliable, the Board of Trustees would price securities according to their "fair value," which generally meant on the basis of the last available sale price or bid for that security. (*Id.*) The claim that defendants misstated the value of mortgage securities can only be assessed in the context of these prescribed valuation methods, because by logic defendants' valuations could only be false or misleading if they were inconsistent with those methods. *See JP Morgan Chase*, 553 F.3d at 197; *In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d 1173, 1182 (N.D. Cal. 2004) (reported valuations not false or misleading where they complied with disclosed method of valuing securities "at cost"). That is, if the stated valuations complied with the disclosed methods, they would not be actionable as "false or misleading," because they would correspond to the values that the offering documents led investors to expect.

Plaintiffs' over-valuation claims fail because the Complaint does not aver a single concrete fact to suggest that defendants deviated from the prescribed valuation methods. Most of the relevant allegations are conclusory. (Compl. ¶ 63 ("The Registration Statements reported inflated values . . ."); ¶ 65 ("the Fund . . . failed to properly value the securities as represented and reported inflated values for mortgage-related investments, which failed to take into account prevailing economic conditions.").) There are no

averments about which securities were overvalued or how any valuation conflicted with the procedures set out in the Registration Statements. The closest thing to a non-conclusory allegation about inflated values is that the Fund eventually took large write-downs on its mortgage-related securities. (*Id.* at ¶ 76.) But the simple fact of a write-down does not stand for the proposition that values stated before the write-down were inaccurate, and the write-downs certainly do not substitute for facts about the supposedly false valuations themselves. *See In re MoneyGram Intern., Inc.*, 626 F. Supp. 2d 947, 970 (D. Minn. 2009) ("the crescendo in [defendants'] unrealized losses [on mortgage-backed securities] during 2007 may merely have reflected the growing deterioration of the market"). At best, they raise the "mere possibility" that previous values were inaccurate, but that possibility—standing, as it does, against the competing inference that the write-downs accurately tracked the declining value of the securities during a precipitous market crash—is not enough to withstand a motion to dismiss. *See id*; *Iqbal*, 129 S. Ct. at 1950.

Similarly, though the complaint states that troubles in the subprime mortgage market (rising delinquency, default, and early payment rates, and resulting losses to subprime lenders) began emerging before the write-downs occurred, the Complaint does not contain allegations showing that those market events diminished the value of any the Fund's holdings in a way that should have been, but was not, reflected under the "fair value" methods. To survive a motion to dismiss, plaintiffs must allege some facts to close the loop between the market turmoil and the accuracy of the Fund's valuations. *See Landmen*, 659 F. Supp. at 544; *In re MoneyGram Intern.*, 626 F. Supp. 2d at 970 (finding that overvaluation allegations must "directly connect the general external market

19

conditions and ratings downgrades to the actual [securities] in the Portfolio."). Because they have not alleged any facts about the Fund's mortgage-related holdings or about how the value of those holdings conflicted with defendants' valuations, the overvaluation claims must be dismissed.

In reaching this decision, the Court does not ignore historical context. Numerous financial entities, including mutual funds, have been accused of carrying mortgage-related securities on their books at inflated values in 2007 and 2008. *See Testimony Concerning Mortgage Fraud, Securities Fraud and the Financial Meltdown: Prosecuting Those Responsible: Hearing Before the S. Comm. on the Judiciary* (statement of Robert Khuzami, Director, SEC Enforcement Div.), http://www.sec.gov/news/testimony/2009/ts120909rk.htm (Dec. 9, 2009) ("The SEC . . . has focused on the possible failures of public companies to disclose the fair asset value of toxic assets . . . ."); *In re Lehman Brothers Securities and Erisa Litigation*, -- F.Supp.2d --, 2010 WL 354937, at *2 (S.D.N.Y. Feb. 2, 2010) ("The [complaint] alleges that Lehman overvalued [mortgage-related] assets and that its financial condition therefore was weaker than disclosed."). But this historical context only works to emphasize the deficiency in plaintiffs' claims. Juxtaposed against the existence of information suggesting that other institutions overvalued their mortgage-related holdings, the Complaint's failure to identify information about how *State Street* overvalued its holdings is telling. To take a specific example, when the SEC sanctioned one mutual fund for its inaccurate valuations, it identified discrepancies between the mutual fund's stated valuation methods and the methods it actually used to assign values to certain mortgage-backed holdings. *In re Evergreen Investment Mgmt. Co.*, SEC Admin. Proceeding File No. 3-13507 (June 8,

2009) (finding that Evergreen deviated from disclosed fair value procedures by overriding prices provided by third-party pricing vendors). Plaintiffs' overvaluation claims fail because they offer no facts to render plausible the assertion that State Street similarly deviated from its disclosed valuation methods.[6]

---

[6] Though neither party has raised the issue, the Court notes that the SEC recently charged State Street with violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act. The agency accuses State Street of misleading certain investors in unregistered bond funds about the funds' exposure to subprime investments, while simultaneously encouraging other, favored investors to redeem their positions in the funds. *See In re State Street Bank and Trust*, Securities Act Release No. 9107, at 2 (Feb. 4. 2010). State Street has agreed to pay approximately $300 million to settle the charges without admitting or denying wrongdoing. *Id.* at 1. Although the sufficiency of plaintiffs' allegations must be judged by the contents of the complaint, not by the contents of an agency order, it nonetheless merits mention that the SEC's charges against State Street bear little relationship to plaintiffs' claims. First, the charges concern a set of unregistered State Street funds, not the registered Yield Plus Fund at issue here. *Id.* at 3. Second, the SEC allegations rest on substantially different facts than plaintiffs' claims. Unlike plaintiffs, the SEC does not accuse State Street of over-valuing any securities. Third, though the agency alleges that State Street misrepresented the extent of the unregistered funds' mortgage holdings, it claims that State Street did so through fact sheets, presentations, and other unregistered communications that did not contain language similar to the relevant statements in the Yield Plus Fund prospectuses. *Id.* at 3-6. The agency does not rely, for example, on anything like the "high-quality" description upon which plaintiffs place so much weight. In the closest parallel between the cases, the SEC contends that State Street misled investors by categorizing all of the unregistered funds' mortgage-related securities as "asset-backed securities" and representing that the funds held no securities that fell in to the separate "mortgage-*backed*" category. *Id.* at 4. But unlike the Yield Plus Fund prospectuses, the unregistered communications in which those representations appeared did not provide any definition of the asset-backed or mortgage-backed categories, nor does it seem that the communications included a complete schedule of the unregistered funds' holdings. (*See* Skinner Decl. Ex. C at 8-12.) Plaintiffs' and the SEC's allegations about State Street's supposedly misleading "categories" are therefore substantially distinct. For all these reasons, the SEC's charges do not lend weight or factual support to plaintiffs' claims that the description of the Yield Plus Fund, the representations about the extent of its mortgage-related holdings, or the valuation of its securities were materially false or misleading.

**CONCLUSION**

For the reasons stated, defendants' motions to dismiss [**32, 36**] the Complaint are granted. Because plaintiffs have not requested leave to replead, and because they amended the Complaint once already after receiving notice of the grounds for these motions to dismiss, the claims are dismissed with prejudice. *See Landmen*, 659 F. Supp. 2d at 547 (*citing Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005) ("A court . . . has discretion to dismiss with prejudice if it believes that [the] amendment would be futile or would unnecessarily expend judicial resources.")). The Clerk of the Court is requested to close this case (08 Civ. 8235).

SO ORDERED.

Dated: New York, New York
      February 22, 2010

                                  Richard J. Holwell
                          United States District Judge

22