UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN ZAMETKIN, On Behalf of Himself and All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>     vs.<br><br>FIDELITY MANAGEMENT & RESEARCH COMPANY, et al.,<br><br>                    Defendants. | No. 1:08-cv-10960-MLW<br><br>SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiff Alan Zametkin ("Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which investigation included analysis of public filings, publicly available news articles and reports about Fidelity Management & Research Company, FMR Corp., Fidelity Brokerage Services LLC, Fidelity Income Fund, and the Fidelity Ultra-Short Bond Fund, interviews with former employees of the Fidelity entities and people knowledgeable about Fidelity's business, as well as press releases, investor communications, other public statements issued by Defendants and media reports about the Defendants and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities (other than Defendants and certain others identified below) who purchased shares of the Fidelity Ultra-Short Bond Fund (the "Ultra-Short Fund" or "Fund") between June 6, 2005 and June 5, 2008 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  In connection with the acts complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act [15 U.S.C. §77v].

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the Ultra-Short Bond Fund is a fund of Fidelity Income Fund, an open-end management investment company organized as a Massachusetts business trust.

## PARTIES

5.     Plaintiff purchased shares of the Fund, pursuant and/or traceable to the Registration Statements (defined below) accompanying the issuance of the Fund as set forth in his certification previously filed in this case and incorporated herein by reference, and has been damaged thereby.

6.     Defendant Fidelity Management & Research Company ("FMR") is the investment advisor to the entire group of mutual funds under the Fidelity name.  FMR is headquartered at 82 Devonshire Street, Boston, MA, 02109.  FMR is the investment advisor and manager of the Fund with overall responsibilities for handling the Fund's business and affairs, including the preparation and issuance of the Registration Statements.

7.     FMR performs (or arranges for the performance by its affiliates of) the management and administrative services necessary for the operation of the Fund.  FMR, subject to the supervision of the Board of Trustees, performs various services for the Fund, including but not limited to: (i) providing the Fund with office space, equipment and facilities (which may be its own) for maintaining its organization; (ii) on behalf of the Fund, supervising relations with, and monitoring the performance of, custodians, depositories, transfer and pricing agents, accountants, attorneys, underwriters, brokers and dealers, insurers and other persons in any capacity deemed to be necessary or desirable; (iii) preparing all general shareholder communications, including shareholder reports; (iv) conducting shareholder relations; (v) maintaining the Fund's existence and its records; (vi) during such times as shares are publicly offered, maintaining the registration and qualification of the Fund's shares under federal and state law; and (vii) investigating the development of and

developing and implementing, if appropriate, management and shareholder services designed to enhance the value or convenience of the Fund as an investment vehicle.

8.      Defendant FMR Corp. (a/k/a "Fidelity Investments") is comprised of two companies: Defendant FMR and Fidelity International Limited.  Fidelity International Limited, which is registered in England and Wales, spun off from FMR in 1969 to provide investment products and services exclusively to clients outside of North America.  Defendant Fidelity Investments oversees a wide group of privately held companies in the financial services industry and has its principal place of business at 82 Devonshire Street, Boston, MA, 02109.  The Registration Statements instruct investors to contact Fidelity Investments concerning buying and selling shares of the Fund.

9.      Defendant Fidelity Brokerage Services LLC ("Fidelity Brokerage") is one of the privately held companies overseen by Fidelity.  Their principal place of business is 100 Summer Street, Boston, MA, 02110.  Fidelity Brokerage is a Delaware limited liability company based in Boston, Massachusetts.  It is a New York Stock Exchange ("NYSE") member.  Fidelity Brokerage is a large multi-service broker-dealer with more than 3.4 million clients and investors purchased shares of the Fund through Fidelity Brokerage.

10.      Defendant Fidelity Income Fund ("Income Fund") is a management investment company overseen by Fidelity Investment and FMR and is the issuer of the securities purchased by members of the Class.  Their principal place of business is 82 Devonshire Street, Boston, MA, 02109.  Defendant Income Fund was created under an initial declaration of trust dated August 7, 1984.  The Fidelity Ultra-Short Bond Fund is a fund of the Income Fund.  The Income Fund offers 5 funds within the trust: Fidelity Ultra-Short Bond Fund, Fidelity Ginnie Mae Fund, Fidelity Government Income Fund, Fidelity Intermediate Government Income Fund, and Fidelity Total Bond

Fund. The Fidelity Ultra-Short Bond Fund offers Class A, Class T, Class B, Class C, Ultra-Short Bond and Institutional Class Shares.

11.     Defendant James C. Curvey ("Curvey") was a Trustee of Fidelity and the Ultra-Short Bond Fund at time relevant herein. Curvey also serves as Trustee (2007-present) or Member of the Advisory Board (2007-present) of other investment companies advised by FMR. Curvey is Vice Chairman (2006-present) and Director of FMR Corp. Curvey joined Fidelity in 1982 and served in numerous senior management positions, including President and Chief Operating Officer of FMR Corp. (1997-2000) and President of Fidelity Strategic Investments (2000-2002). Curvey signed the Registration Statement filed on September 27, 2007.

12.     Defendant Timothy Hayes ("Hayes") was the Chief Financial Officer of Fidelity and the Ultra-Short Bond Fund. Hayes signed the Registration Statements that were filed on September 28, 2004 and September 28, 2005.

13.     Defendant Joseph B. Hollis ("Hollis") was Chief Financial Officer of Fidelity and the Ultra-Short Bond Fund. Hollis signed the Registration Statements that were filed on September 29, 2006 and September 27, 2007.

14.     Defendant Abigail Johnson ("A. Johnson") was President of Fidelity Employer Services Company. She is President and a Director of Fidelity Investments Money Management, Inc. (2001-present), FMR Co., Inc. (2001-present), and a Director of FMR Corp. Previously, Ms. Johnson served as President and a Director of FMR (2001-2005), Senior Vice President of the Fidelity Funds (2001-2005), and managed a number of Fidelity funds. A. Johnson is the daughter of Edward C. Johnson. A. Johnson signed the Registration Statements filed on September 27, 2004 and September 28, 2005.

15.     Defendant Edward C. Johnson 3rd ("Johnson") was President and a Trustee of Fidelity and the Ultra-Short Bond Fund.  Johnson is Chairman of the Board of Trustees. Johnson serves as President (2006-present), Chief Executive Officer, Chairman, and a Director of FMR Corp.; Chairman and a Director of FMR; Chairman and a Director of Fidelity Research & Analysis Company (FRAC); Chairman and a Director of Fidelity Investments Money Management, Inc.; and Chairman (2001-present) and a Director (1999-present) of FMR Co., Inc.  Johnson signed each of the Registration Statements.

16.     Defendant Stephen P. Jonas ("Jonas") was a Trustee of Fidelity and the Ultra-Short Bond Fund at time relevant herein.  Jonas is Senior Vice President of Ultra-Short Bond Fund (2005-present).  He also serves as Senior Vice President of other Fidelity funds (2005-present).  Jonas is Executive Director of FMR (2005-present) and FMR Co., Inc. (2005-present).  He also serves as a Director of Fidelity Investments Money Management, Inc. (2005-present) and FMR Corp. (2003-present).  Jonas signed the Registration Statements filed on September 28, 2005 and September 29, 2006.

17.     Defendant Kimberley Monasterio ("Monasterio") was President and Trustee of Fidelity and the Ultra-Short Bond Fund.  Monasterio signed the Registration Statement that was filed on September 27, 2007.

18.     Defendant Christine Reynolds ("C. Reynolds") was President and Treasurer of Fidelity and the Ultra-Short Bond Fund.  C. Reynolds signed the Registration Statements that were filed on September 28, 2004, September 28, 2005 and September 29, 2006.

19.     Defendant Robert L. Reynolds ("R. Reynolds") was a Trustee of Fidelity and the Ultra-Short Bond Fund at time relevant herein.  R. Reynolds is President and a Director of FMR (2005-present), Fidelity Investments Money Management, Inc. (2005-present), and FMR Co., Inc.

(2005-present).  R. Reynolds also serves as a Director (2003-present) and Chief Operating Officer (2000-present) of FMR Corp. and a Director of Strategic Advisers, Inc. (2005-present).  He also serves on the Board at Fidelity Investments Canada, Ltd. (2000-present).  R. Reynolds signed the Registration Statements that were filed on September 27, 2004, September 28, 2005 and September 29, 2006.

20.     All Defendants and the Fund are sometimes collectively referred to herein as "Fidelity."

21.     The following individuals, each of whom was a Trustee and/or officer of the Fund, signed the Registration Statement filed on September 27, 2004: Defendants Johnson, A. Johnson, R. Reynolds, C. Reynolds, and Hayes, J. Michael Cook, Ralph Cox, Laura B. Cronin, Robert M. Gates, George Heilmeier, Donald Kirk, Marie Knowles, Ned Lautenbach, Marvin Mann, William O. McCoy, and William Stravopolous.

22.     The following individuals, each of whom was a Trustee and/or officer of the Fund, signed the Registration Statement filed on September 28, 2005: Defendants Johnson, A. Johnson, Jonas, Hayes, C. Reynolds and R. Reynolds, Dennis Dirks, Robert Gates, George Heilmeier, Marie Knowles, Ned Lautenbach, Marvin Mann, William O. McCoy, Cornelia Small, William Stravopolous, and Kenneth L. Wolfe.

23.     The following individuals, each of whom was a Trustee and/or officer of the Fund, signed the Registration Statement filed on September 29, 2006: Defendants Johnson, R. Reynolds, C. Reynolds, and Jonas, and Dennis J. Dirks, Albert R. Gamper, Robert M. Gates, George H. Heilmeier, Joseph B. Hollis, Marie L. Knowles, Ned C. Lautenbach, William O. McCoy, Cornelia M. Small, William S. Stavropoulos, and Kenneth L. Wolfe.

24. The following individuals, each of whom was a Trustee and/or officer of the Fund, signed the Registration Statement filed on September 27, 2007: Defendants Johnson, Curvey, Monasterio and Hollis, and Dennis J. Dirks, Albert R. Gamper, George H. Heilmeier, James H. Keyes, Marie L. Knowles, Ned C. Lautenbach, Cornelia M. Small, William S. Stavropoulos, and Kenneth L. Wolfe.

25. The Registration Statements state that the Board of Trustees governs each fund and is responsible for protecting the interests of shareholders and that the Trustees are experienced executives who meet periodically throughout the year to oversee each fund's activities, review contractual arrangements with companies that provide services to each fund, and review each fund's performance.

26. Each of the individuals named in ¶¶11-19 (the "Individual Defendants") and ¶¶21-24 prepared, reviewed and/or signed or authorized the signing of some or all of the registration statements for the offering of shares of the Fund at times relevant herein.

## CONFIDENTIAL SOURCES

27. The allegations made herein are based upon information and belief and are supported by the first-hand knowledge of two confidential witnesses ("CWs"). These informants have direct first-hand knowledge about the business and operations of the Fidelity entities and the Fund.

28. Confidential Witness 1 ("CW1") is a former employee of Fidelity Investments and worked as a Pricing Analyst from August 2002 through September 2007. As a Pricing Analyst, CW1 analyzed real-time data and price accuracy in order to produce and release timely NAVs for Fidelity's funds. CW1 had direct contact with fixed income traders and external brokers and vendors through daily reporting for senior management and trading desk review.

29. Confidential Witness 2 ("CW2") is a former employee of Fidelity Investments and worked as a Research Analyst from 2001 to 2004. CW2 worked in the Private Real Estate Group

and supported a team of real estate investment professionals by providing analysis on the fundamental economic structure of US metropolitan areas and their commercial real estate markets.

## SUBSTANTIVE ALLEGATIONS

### The Ultra-Short Bond Fund and Relevant SEC Filings

30. On or about August 23, 2002, Defendants began offering shares of the Ultra-Short Bond Fund pursuant to an initial registration statement filed with the Securities and Exchange Commission ("SEC").

31. Defendants annually filed nearly identical Registration Statements and Prospectuses throughout the Class Period in connection with the continuous offerings of the Ultra-Short Bond Fund's shares. The Fund's shares were issued to investors pursuant to the following series of Registration Statements and Prospectuses that formed part of the Registration Statements filed with the SEC and made effective during the relevant period, which are referred to collectively herein as the "Registration Statements":

 (a) Registration Statement and Prospectus filed on September 28, 2004;

 (b) Prospectus Supplement filed on March 17, 2005;

 (c) Prospectus Supplement filed on June 1, 2005;

 (d) Registration Statement and Prospectus filed on July 14, 2005;

 (e) Registration Statement and Prospectus filed on September 28, 2005;

 (f) Prospectus Supplement filed on June 15, 2005;

 (g) Registration Statement and Prospectus filed on September 29, 2006;

 (h) Prospectus Supplement filed on July 12, 2007;

 (i) Registration Statement and Prospectus filed on September 27, 2007;

 (j) Prospectus Supplement filed on October 16, 2007; and

 (k) Prospectus Supplement filed on March 12, 2008.

32.     An SAI and the Fund's Annual Report for that year, which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations were incorporated by reference and filed with the Registration Statements.  The Fund filed Annual Reports with the SEC on Form N-CSR on September 28, 2004, September 28, 2005, September 29, 2006 and September 27, 2007, and stand-alone SAIs on January 28, 2005, May 27, 2005, July 19, 2006, June 29, 2007 and April 1, 2008, and semi-annual and quarterly reports which were part of the Registration Statements.

33.     The Registration Statements referred investors seeking more information to the SAI, which contains a "description of the fund's policies and procedures for disclosing its holdings" and "includes more detailed information about the fund and its investments."  Defendants reissued and updated the SAIs throughout the relevant time period.  The Registration Statements direct investors to review the SAIs, Annual Reports and Semi-Annual Reports for additional information.  The Annual Reports include "a discussion of the fund's holdings and recent market conditions."

34.     Disclosure of the Fund's complete holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the Annual Report and Semi-Annual Report to Fund shareholders and in the quarterly holdings report on Form N-Q.  The Semi-Annual Reports and Form N-Qs were part of the Registration Statements.  Each member of the Class purchased shares of the Ultra-Short Bond Fund pursuant to the Registration Statements.

**The Stated Investment Objectives/Strategies of the Ultra-Short Bond Fund**

35.     Ultra-short bond funds were developed by the mutual fund industry in order to provide a higher yield than money market funds but with very low volatility and low risk.  Ultra-short bond funds aim to keep their share price within a few pennies of the same price, minimizing any fluctuations.

36.     Defendants marketed the Fund as a conservative bond fund that "seeks to obtain a high level of current income *consistent with preservation of capital*." (Emphasis added.) Fidelity marketed the Fund as a money market alternative to investors with an investment horizon of six months or more and as an investment that is expected to have a similar overall interest-rate risk to the Lehman Brothers 6 Month Swap Index.

37.     Defendants used the Lehman Brothers 6 Month Swap Index as a benchmark for the Fund, which is a principal-weighted index of swaps with 6-month maturities. Defendants represented that the Lehman Brothers 6 Month Swap Index was used as a guide in structuring the Fund and selecting its investments, and that they manage the Fund to have similar overall interest rate risk to that index. Securities with short maturities, such as six month maturities, are generally less volatile than securities with longer maturities and are considered less risky.

38.     At the time of the initial launch of the Fund, Fidelity Investments reiterated in a press release that: "Fidelity Ultra-Short Bond Fund seeks to obtain a high level of current income consistent with the preservation of capital." Commenting on the Fund, Fidelity executive Sarah Libbey stated in the release: "*We believe this fund will appeal to relatively conservative, income-oriented investors who are willing to take on more risk than a money market fund, but want to minimize share-price volatility*." (Emphasis added.) The release continued: "We believe Fidelity Ultra-Short Bond Fund . . . will play important roles in our fixed-income product line for years to come, regardless of market conditions. This will be particularly true as more baby boomers enter retirement and begin distribution phases of their investing lifetimes." At the end of the release, Fidelity encouraged investors to write for a free prospectus for "more complete information."

39.     An analyst report by Morningstar, a leading provider of investment research on mutual funds, dated April 4, 2005, titled "Don't expect a lot of return from Fidelity Ultra-Short Bond

but don't expect a lot of volatility either," commented that the Fund is similar in respects to a money market fund and is a worthy alternative. This report stated, in pertinent part, as follows:

> It may seem odd to compare a mutual fund to a money market fund, but given the fund's low risk and the ultra-conservative role plays in many portfolios, we think the comparison is appropriate. We actually think the fund's conservative approach and reasonable costs make it a good money-market alternative. The fund's value will fluctuate, but we think its added return potential and low volatility make it a good pick for savings that needs to be liquid but that may not be tapped for a number of years.

40.     A Morningstar report dated December 19, 2006 described the Ultra-Short Bond Fund as an investment with "low volatility" that is "just one step up the risk ladder from a money market mutual fund." This research report, titled "Fidelity Ultra-Short Bond doesn't pack much of a punch, but its low volatility makes it one of our favorites," stated, in pertinent part, as follows:

> This fund is just one step up the risk ladder from a money market mutual fund. Unlike a money market fund, this fund does experience changes to its net asset value (NAV). However, those changes are typically very minor. For the year to date through Oct. 18, 2006, for example, the fund's NAV fluctuated between just $10.01 and $10.03. ***That stability makes the fund a good option for investors who are looking for an emergency savings fund that may never be tapped but that needs to be safe***. It also makes the fund a good option for investors who are saving for a goal that's close at hand, such as a house or other big purchase.
>
> The fund's low volatility owes to its restrained approach. Manager Andrew Dudley keeps the fund's interest-rate risk in line with the Lehman Brothers 6-Month Swap Index, which is typically a bit less sensitive to interest-rate changes than the ultrashort category as a whole. [Emphasis added.]

41.     Similarly, in a December 13, 2007 Morningstar article mentioning the Fund's 5% loss during part of 2007, the author commented: "that's a big decline ***for such a conservative fund***." (Emphasis added.)

42.     The Ultra-Short Bond Fund's net asset value per share (NAV) is the value of a single share. The Fund normally calculated the NAV as of the close of business of the NYSE, normally 4:00 p.m. Eastern time.

43.     As alleged further herein, the NAVs that were paid by investors during the Class Period were inflated because the Defendants failed to properly value the NAV and failed to timely write-down the troubled mortgage-related assets in the Fund's portfolio.

**Wall Street, and Bear Stearns in Particular,**
**Profited From Mortgage-Related Securities**

44.     Investment banks on Wall Street developed an extremely lucrative business by structuring, marketing, underwriting and selling collateralized debt obligations ("CDO"), collateralized mortgage obligations ("CMO") and other risky mortgage-related securities. One of the largest issuers of these securities, and a pioneer of this securitization market, was Bear Stearns & Co., Inc. ("Bear Stearns"). Bear Stearns had developed and sold the first mortgage-related CDO, was one of the investment banking firms primarily responsible for developing, marketing and selling these risky mortgage-related securities, and derived a substantial amount of its revenues and profits from this lucrative business.

45.     The first securitization of subprime loans – for a total of $385 million – was underwritten in October 1997 by Bear Stearns and First Union Capital Markets (which became part of Wachovia, which is now part of Wells Fargo) and Bear Stearns issued an additional $1.9 billion of subprime mortgage securitizations during just the next ten months. The subprime mortgage securitization market exploded for Bear Stearns and other investment banks and became an extremely lucrative business. Bear Stearns's dominance in the mortgage-related securities market continued throughout the Class Period.

46.     Bear Stearns was the leading, or one of the leading, mortgage-related securities issuers and was involved in many aspects of the mortgage and securitization process during the Class Period. For example, Bear Stearns purchased Encore Credit Corporation, a subprime mortgage originator and in 2005, Bear Stearns started Bear Stearns Residential Mortgage Corp. and originated

mortgages in 29 states through a (now defunct) Web site, Beardirect.com. By the third quarter of 2006, Bear Stearns originated 31 percent of the loans it securitized; almost double the amount it had originated a year earlier. Bear Stearns also owned EMC Mortgage Corporation, a loan acquisition and servicing operation. Bear Stearns was a fully vertically integrated mortgage factory capable of originating mortgages, servicing them, packaging them into marketable securities, and selling them off to investors, such as the Fund, and then pricing them for the marketplace.

47.     Indeed, Bear Stearns's Annual Report for 2006 which was distributed during early 2007 stated that the firm's "mortgage franchise continues to lead the industry." Bear Stearns's Annual Report for 2006 stated further that:

> We ranked number one for the third consecutive year in US Mortgage-backed securities underwriting, secured the top spot in the securitization of adjustable-rate mortgages, and ranked in the top five in the global collateralized debt obligation (CDO) market . . . Our vertically integrated mortgage franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing.
>
> *     *     *
>
> Our success across all sectors of the CDO market and in both European and US issuance reflects our 10-year presence in this business, combined with strong overall market growth.

48.     Ultimately, Bear Stearns's exposure to these risky subprime and other mortgage-related securities led to its downfall and eventual fire-sale to JP Morgan Chase in 2008.

### The Ultra-Short Bond Fund Heavily Invested in
### Risky Subprime and Other Mortgage-Related Securities

49.     During the Class Period, Defendants directly and indirectly devoted a large portion of the Fund's investments to financial instruments that included so-called "asset-backed" securities that overwhelmingly derived their value from subprime home-equity loans, mortgage-backed securities swaps, CDOs, CMOs, derivatives and other exotic financial instruments, thereby materially increasing the Fund's exposure to the subprime mortgage market. The Fund held these securities

directly and through a sizable investment in the Fidelity Ultra-Short Central Fund (the "Central Fund"), an internally managed fund open only to other funds managed by Fidelity.

50.     For example, according to Defendants, as of July 31, 2005, CMOs and other mortgage-related securities comprised approximately 22.8% of the Fund's overall portfolio and asset-backed securities comprised 33.7% of its portfolio, and as of July 31, 2006, CMOs and other mortgage-related securities comprised 23.1% and asset-backed securities comprised 39%. As of January 31, 2007, CMOs and other mortgage-related securities comprised approximately 20.6% of the Fund's portfolio and asset-backed securities comprised 37.3%. As of January 31, 2008, CMOs and other mortgage-related securities comprised approximately 29.6% of its portfolio and asset-backed securities comprised 32.6%.

51.     As the Fund was loading up on mortgage-related securities, it significantly increased its exposure to the very risky and highly volatile subprime mortgage market but the Fund did not disclose this to investors. Even though the Fund disclosed that it held CMOs and mortgage-related securities, it failed to disclose the full extent of these holdings, and critically, failed to disclose the Fund's true exposure to the risky subprime mortgage market. Given the disclosures made concerning the Fund, any significant exposure to the very risky and highly volatile subprime mortgage market was contrary to the Fund's positioning, stated objectives and purported investment strategies.

52.     The nature and true extent of the Fund's exposure to the subprime mortgage market was a material fact necessary in order to make the other statements made, in light of the circumstances under which they were made, not misleading. Yet, it was not until April 2, 2008 that Defendants belatedly disclosed the actual extent of the Fund's subprime exposure.

53.     During most of the Class Period investors were kept in the dark concerning the extent of the Fund's exposure to the subprime mortgage market.  For example, as of April 30, 2007, not including the Fund's investment in the Central Fund, Defendants represented that 28.8% of the Fund's direct holdings were Asset-Backed Securities ("ABS") and 13.3% were CMOs.  However, significant amounts of subprime mortgage securities were hidden within these categories. Unbeknownst to investors, Defendants had been overwhelmingly focusing their efforts on acquiring subprime securities for the Fund in the pursuit of higher returns.  Nearly half of the securities held in ABS as of April 30, 2007 (*i.e.*, 48%) were subprime mortgage securities and nearly 28% of the value of the Fund's direct ABS holdings was derived from these subprime investments.  Excluding the Fund's investment in the Central Fund (discussed below), a shocking 22% of the Fund's overall holdings were subprime securities and nearly 10% of its value was derived from these risky investments.  And the Fund's investment in the Central Fund further ***increased*** its exposure to these subprime securities.

54.     Also unknown to investors during the Class Period was the Fund's true exposure to mortgage-related securities.  For instance, as of April 30, 2007, investors were told that 13.3% of the Fund (again excluding the Central Fund) was comprised of CMOs.  While Fidelity separately defined "Mortgage Securities" in the Registration Statement, it failed to provide an accurate picture of the level of its unprecedented reliance on these investments and the true amount of such holdings in the Fund.  In reality, as of April 30, 2007, 67% of all securities in ABS were mortgage-related and almost half (*i.e.*, 49%) of the value of ABS was derived from mortgage-related securities.  Excluding the Fund's investment in the Central Fund, a mind-boggling 78% of the Fund's overall holdings were mortgage-related securities and more than a third of its value (*i.e.*, 37%) was derived from these risky investments.

55.     During the Class Period, Defendants held additional mortgage-related investments outside of the securities in the ABS and CMO categories that were wholly inconsistent with the Fund's positioning, stated objectives and purported investment strategies, and which further exposed the Fund to the risks of the mortgage and subprime markets.  For example, Defendants entered into a credit default swap with Morgan Stanley, Inc. whereby the Fund would pay to Morgan Stanley the par value of the underlying bonds upon default of Ameriquest Mortgage Securities, Inc.  It was not until April 2, 2008, that Defendants disclosed that this and similar investments were actually mortgage-related subprime securities.

56.     The Fund invested in various individual securities and other financial instruments.  In addition, the Fund heavily invested in the Central Fund, an internally managed mutual fund.  As discussed more fully below, for much of the Class Period, the Fund did not disclose the individual holdings of the Central Fund in the Registration Statements so the Central Fund served as a "Black Box" investment vehicle for Defendants.

57.     As of April 30, 2007, 26% of the Ultra-Short Fund was invested in the Central Fund. Incorporating the subprime and mortgage-related securities held by the Central Fund during the same time-frame significantly increases the percentage of the Fund's investment in subprime and mortgage-related securities.  For example, with the inclusion of its investment in the Central Fund, the value of the Fund's holdings in mortgage-related securities increases from to 37% to 50%.

58.     On April 2, 2008, for the first time, Fidelity began disclosing – albeit buried in a footnote to a lengthy SEC filing – the extent of the Fund's exposure to the subprime mortgage market.

59.     The Fund's concentration in risky subprime and other mortgage-related securities continued until the end of the Class Period.

**The Ultra-Short Bond Fund Owned Shares of the**
**Fidelity Ultra-Short Central Fund; an Internal Fidelity Fund**
**Heavily Invested in Risky Subprime and Mortgage-Related Securities**

60.     The Central Fund is an internal fund managed by Fidelity.  Investments in the Ultra-Short Central Fund are limited to investments by other Fidelity funds.  According to Fidelity, the Ultra-Short Central Fund "seeks to obtain a high level of current income *consistent with preservation of capital* by investing in U.S. dollar denominated money market and investment-grade debt securities."  (Emphasis added.)  As discussed below, however, the Ultra-Short Central Fund itself also invested heavily in risky subprime and mortgage-related securities.

61.     The Fund heavily invested in the Central Fund during the Class Period.  For example, *as of April 30, 2007, 26% of the Ultra-Short Fund was invested in the Central Fund*.  Throughout most of the Class Period (2006-2008), Annual Reports and other periodic holdings reports listed that the Fund held an interest in the Ultra-Short Central Fund but did not disclose what securities were held by the Central Fund.  Thus, during this period, the Ultra-Short Central Fund was a "Black Box" of investments and investors were unable to discern its holdings in the Registration Statements.  For example, as stated in the Fund's Annual Report filed with the SEC on September 29, 2006, "The Fund's Schedule of Investments lists the Central Fund as an investment of the Fund but does not include the underlying holdings of the Central Fund."  Additionally, even though the 2006 Annual Report stated that information about the Central Fund's holdings is "available upon request," those holdings were "unaudited" and Fidelity expressly excluded the list of holdings from the 2006 Annual Report by stating that "the Central Fund financial statements . . . are not covered by this Fund's Report of Independent Registered Public Accounting Firm."  The Fund's Annual Report filed with the SEC on September 27, 2007, contains the same language about the Ultra-Short Central Fund as contained in the 2006 Annual Report.

62.    As discussed herein, during the Class Period, the Fidelity Ultra-Short Central Fund invested heavily in risky mortgage-related securities, including subprime mortgage securities. For example, as of June 30, 2007, approximately half (*i.e.*, 49%) of the value of the Ultra-Short Central Fund was derived from mortgage-related securities and more than one-third of these mortgage-related securities were risky subprime mortgage securities. Indeed, as of June 30, 2007, at least 17% of the value of the Ultra-Short Central Fund was from risky subprime mortgage-related securities. Defendants, however, failed to disclose the extent of the Ultra-Short Central Fund's true exposure to subprime mortgage-related securities at this time.

63.    Similarly, risky mortgage-related securities comprised a significant percentage of the total number of securities held by the Ultra-Short Central Fund. For example, as of June 30, 2007, 78% of the individual securities held by the Fund were mortgage-related and 35% of its mortgage-related securities were risky subprime mortgage securities. In fact, 28% of the individual securities held by the Fund were risky subprime mortgage-related securities. The total number of individual mortgage-related securities held by the Ultra-Short Central Fund demonstrates the significant emphasis that it placed on these securities.

64.    As ultimately admitted by Defendants, losses in the Fidelity Ultra-Short Central Fund dragged down the NAV in the Fund and materially contributed to losses suffered by the Fund.

**Fidelity Was Unable to Accurately Price Risky Mortgage-Related
Securities and Relied on Bear Stearns to Price Mortgage-Related Securities**

65.    Even though the Fund purchased and held risky mortgage-related securities, including CDOs, Fidelity was unable to adequately or accurately value these securities and relied on external pricing services in setting their value and the NAV for the Fund. According to CW1, during the Class Period, Fidelity was not able to value CDOs and other risky mortgage-related securities and depended on external pricing of those securities.

66.     Throughout the Class Period, according to CW1, Fidelity depended exclusively on Bear Stearns to provide valuations for CDOs and utilized the Bear Stearns "Pricing Direct" website. Bear Stearns was often the only source for pricing data so Fidelity was often unable to verify the accuracy of the data provided by Bear Stearns by comparing the data with other pricing services.

67.     Bear Stearns had a conflict of interest when pricing these securities because it had an incentive to provide, and did provide, inflated prices for risky mortgage-related securities that would sustain a strong and lucrative market for its investment banking and hedge fund businesses. Indeed, the Fund held various risky mortgage-related securities developed and sold by Bear Stearns. Thus, Fidelity relied on the same firm that developed and sold CDOs to provide pricing data for those same CDOs. These facts were not disclosed to Plaintiff or the Class.

68.     Indeed, the Fund utilized and reported inflated values for individual holdings; inflating the Fund's underlying holdings and NAV. For one example, as of July 31, 2007, the Fund valued of the Fund's interest in the Bear Stearns Asset Backed Securities Trust: Series 2004-BO1: Class M4, 6.52% 9/25/34 at $203,957 when, according to external pricing services at the time, the value of that security was actually $192,234, 6% less than reported. Furthermore, the pricing services that provided quotes at the time, including Bear Stearns, themselves reported inflated values, causing the securities to be inflated by a larger amount. Because market quotations were unavailable and the information provided by these services did not accurately reflect the fair value of the securities, Defendants were required to, but failed to, further write-down the values. There are numerous other examples of mortgage-related securities in the Fund that Defendants mis-valued, overstated, and/or failed to timely write-down as required by its own valuation procedures.

69.     Similarly, the Fund failed to properly value the holdings in the Ultra-Short Central Fund. As one example, on June 30, 2007, the Ultra-Short Central Fund valued its interest in the

ACE Securities Corp.: Series 2006-NC2: Class M7, 6.07% 7/25/36 at $4,902,000 when, according to external pricing services at the time, the value of that security was actually $4,735,050, 8% less than reported. Furthermore, the pricing services that provided quotes at the time, including Bear Stearns, reported inflated values, causing the securities to be inflated by a larger amount. Because market quotations were often unavailable and the information provided by these services did not accurately reflect the fair value of the securities, Defendants were required to, but failed to, further write-down the values. There are numerous other examples of mortgage-related securities in the Central Fund that Defendants mis-valued, overstated, and/or failed to timely write-down as required by its own valuation procedures.

70.     Relying in substantial part on outside pricing services, including Bear Stearns, for valuations, Fidelity attempted to determine the "fair value" for securities. Fidelity employees would attempt to value these securities and then provide a "Fair Valuation Report" to the Valuation Committee. The Valuation Committee at Fidelity would approve the valuation attributed to securities that were not actively traded.

71.     During the Class Period, the group at Fidelity set up to value risky mortgage-related securities was understaffed, the Fidelity employees that prepared the Fair Valuation Reports were often not able to adequately value mortgage-related securities, and the Valuation Committee was not qualified to provide proper oversight of the valuations. According to CW1, the members of the Valuation Committee didn't "know the analytics and the pricing that goes behind pricing out each bond."

72.     According to CW1, CDOs were "difficult to price" and "it was very hard to get a second or third pricing source" other than Bear Stearns. During the Class Period, Fidelity did not have an internal team that was capable of sufficiently evaluating, understanding and valuing CDOs.

CW1 acknowledged that "there definitely probably should have been a little more knowledge as to how these things are priced out." CW1 also stated that institutional investors, such as Fidelity, wanted to buy these products and acquired them before they were fully understood at Fidelity and that Fidelity "figured they would evaluate their investment worthiness as time passed."

73.     Thus, during the Class Period, the Fund purchased and held significant amounts of risky mortgage-related securities (including subprime mortgage securities) even though the Fund's investment advisor and manager did not fully understand these securities, know how to adequately evaluate such securities or understand how to properly value them for the purpose of setting the Fund's NAV. Not only did the Fund purchase some mortgage-related securities, but at times during the Class Period a vast majority of the individual securities selected by the Fund were mortgage-related securities. Indeed, as of April 30, 2007, 78% of the individual securities held by the Fund were mortgage-related securities and 22% of the individual securities held by the Fund were subprime mortgage-related securities.

74.     Similarly, during the Class Period, a vast majority of the individual holdings of the Ultra-Short Central Fund were mortgage-related securities. Indeed, as of June 30, 2007, 78% of the individual securities held by the Ultra-Short Central Fund were mortgage-related securities and 28% of the individual securities held by the Fund were subprime mortgage-related securities.

75.     According to CW1, it was not until the summer of 2007, at the earliest, that Fidelity finally put together a meaningful "complex securities group" that was capable of understanding CDOs and other complex risky mortgage-related securities. It was around this time that Fidelity began writing-down the risky mortgage-related securities and the Fund's NAV suffered significant declines. This group, however, failed to properly value the Fund's risky mortgage-related securities

during the rest of 2007 and until the end of the Class Period in 2008, resulting in a continued inflation of the Fund's NAV throughout this period.

<strong>The Meltdown of the Subprime Mortgage<br>Industry and Mortgage Related Securities</strong>

76. In June 2004, the U.S. Federal Reserve signaled that it would begin to increase key short-term interest rates. As a result, the U.S. prime interest rate, which had remained flat at four percent for more than a year, climbed steadily throughout 2005 and 2006 before reaching 8.25% in June 2006. As key short-term and the prime rates rose, other interest rates rose as well, including those for most residential mortgage loans. This rise in interest rates made it more difficult for borrowers to meet their payment obligations, particularly since many of the borrowers of the sub-prime mortgage pools held adjustable rate mortgages. This rise in interest rates subjected mortgage-related securities to heightened interest rate risks.

77. As illustrated in the chart below, at the same time that interest rates were rising, U.S. property value appreciation began to slow significantly and actually began a decline in several U.S. markets during 2006:



78.     The combination of higher interest rates and the dramatic slowing of U.S. property appreciation was devastating to U.S. non-prime borrowers who over-extended themselves by purchasing homes that they could not afford without low initial "teaser" mortgage interest rates. Previously, when property values were increasing, non-prime borrowers were able to refinance their loans as mortgages adjusted to higher interest rates. As interest rates rose and property prices leveled, many non-prime U.S. borrowers were unable to refinance their existing loans when they could not meet their payment obligations. The result – beginning in 2005 – was a significant increase in U.S. mortgage default rates, particularly for sub-prime mortgage loans.

79.     For example, in August 2005, HSBC Holdings PLC ("HSBC") issued a memo to companies from which it was buying loans. The paper, called "Threads of Early Payment Default," reported that delinquencies were rising. HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened fraud incidents." When borrowers didn't have to verify their incomes, the report said they were overstating them, and they bolstered their false claims by overstating their job positions.

80.     An August 23, 2006 story on CBS' *MarketWatch* noted, "July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday."

81.     On August 29, 2006, *Dow Jones Newswires* reported "[m]ore subprime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

82.     A September 15, 2006, article on *CNNMoney.com* noted:

In August, 115,292 properties entered into foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales.  That was 24 percent above the level in July and 53 percent higher than a year earlier.

It was the second highest monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.

Some of the bellwether real estate market states are among the leading foreclosure markets.  Florida had more than 16,533 properties in foreclosure in August.  That led all states and was 50 percent higher than in July and 62 percent higher than in August 2005.

California foreclosures are increasing at an even faster annual rate, up 160 percent since last year to 12,506.  And the formerly red-hot Nevada market recorded a spike of 24 percent compared with July and a whopping 255 percent increase from August 2005.

*     *     *

Usually, foreclosures are a lagging [market] indicator [ ] But we've never had a situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming up for adjustment over the rest of the year.

*     *     *

These exotic mortgages, which have been issued by lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate mortgages.  And sub-prime loans, which are much more common than in the past, have a higher default rate as well.

83.     On November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that sub-prime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year.  About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

84.     On November 30, 2006, the *National Mortgage News* reported:

"How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities].  We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.

Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever," he said.

Foreclosures have also risen. And the foreclosures, like the delinquency rates, are also happening at earlier dates. [Emphasis added.]

85.     On December 13, 2006, the *Associated Press* reported:

**U.S. mortgage delinquency rate rises sharply**

Late Mortgage Payments Jump in Summer

**Late mortgage payments shot up in the third quarter as higher interest rates squeezed budgets and made it harder for homeowners – especially those with weaker credit records – to keep up with their monthly obligations.**

The Mortgage Bankers Association, in its quarterly snapshot of the mortgage market released Wednesday, reported that the percentage of mortgage payments that were 30 or more days past due for all loans tracked jumped to 4.67 percent in the July-to-September quarter.

That marked a sharp rise from the second quarter's delinquency rate of 4.39 percent and was the worst showing since the final quarter of last year, when delinquent payments climbed to a 2 1/2-year high in the aftermath of the devastating Gulf Coast hurricanes.

The association's survey covers 42.6 million loans.

Delinquency rates in the third quarter were considerably higher for "subprime" borrowers – people with weaker credit records who are considered higher risks – especially those who have adjustable-rate mortgages.

Subprime borrowers had a delinquency rate of 12.56 percent in the third quarter, **the highest in more than three years**. The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher – at 13.22 percent in the third quarter, also the worst reading in more than three years. [Emphasis added.]

86.     By early 2007, some of the top mortgage lenders with sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future market losses. For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC announced that provisions for bad loans would be 20% higher than analysts expected. On that the same day, New

Century Financial, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults.

87.     Indications of turmoil in the U.S. sub-prime mortgage market continued as other mortgage lenders, including Countrywide Financial and Washington Mutual, reported huge losses. According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on sub-prime mortgage loans in 2006 ***more than doubled*** from 2005.

88.     By March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending business completely. Then, on April 2, 2007, New Century Financial Corporation announced that it was filing for Chapter 11 bankruptcy protection. In fact, by March 2007, more than 25 subprime lenders declared bankruptcy, announced significant losses or put themselves up for sale.

89.     In June 2007, Bill Gross, the manager of the world's largest bond fund PIMCO, warned that the subprime mortgage crisis was not an isolated event and will eventually take a toll on the economy and whose ultimate impact will be on the impaired prices of homes. At this time, Bill Gross also deeply criticized the credit ratings of the mortgage-based CDOs.

90.     Accordingly, during the Class Period, the following U.S. mortgage market events had occurred: (a) mortgage interest rates were trending higher; (b) home prices had stagnated and began to fall; (c) there was a dramatic rise in sub-prime mortgage loans delinquency rates; (d) there was a significant increase in early payment defaults on non-prime mortgage loans; and (e) subprime and Alt-A mortgage loan originators were closing or winding down business.

91.     In addition, numerous reports were published about non-prime loans being associated with rampant mortgage fraud, and public indices, like the ABX Index, which tracks the cost of

buying protection [*i.e.*, CDSs] for sub-prime mortgage-backed securities, indicating that sub-prime mortgage loan risk has increased dramatically.

92.     Each of these factors was a strong indicator that the problems being experienced by sub-prime lenders would generate huge losses for mortgage-related securities, such as those held by the Fund.  In addition, as a result of the foregoing, the presence of a significant amount of subprime securities and mortgage-related securities in a mutual fund such as the Fund unquestionably was a material fact necessary to make the statements made by the Fund not misleading.

### Fidelity Analysts Warned of an
### Impending Sub-prime Mortgage Crisis

93.     Prior to and during the Class Period, Fidelity employed analysts within internal research groups that analyzed the economy, sectors of the economy, and industry groups, including the housing market and sub-prime mortgage market.  During the Class Period, internal Fidelity analysts expressed concerns about the housing market and sub-prime mortgage market.  External analysts also expressed concerns about these markets to Fidelity analysts.

94.     Fidelity research analysts discussed concerns about the mortgage market, including concerns with Freddie Mac and Fannie Mae.  According to CW2, as early as 2003, a Fidelity economist named Lisa Emsbo-Mattingly raised concerns at several meetings about "an impending sub-prime mortgage crisis" and made presentations about a potential crisis at meetings of Fidelity analysts.  According to CW2, Ms. Emsbo-Mattingly was concerned that Americans, particularly in the lower income groups were overleveraged and Ms. Emsbo-Mattingly presented charts and tables to analysts in support of her views.  According to CW2, even though Ms. Emsbo-Mattingly repeatedly expressed her concerns about the impending sub-prime mortgage crisis, others at Fidelity did not want to lose out on the potential favorable returns for investing in sub-prime mortgage-related securities.

95.     According to CW2, there was a "disconnect" between concerns about the sub-prime mortgage market and the valuation of mortgage-related securities.

**The Registration Statements and Prospectuses Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

96.     Throughout the Class Period, Defendants issued and offered for sale shares of the Fund.  The Registration Statements, including Prospectuses, SAIs and Annual, SemiAnnual and quarterly Reports used throughout the Class Period to register and offer shares of the Fund to Plaintiff and the Class contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.  Even though the Registration Statements issued during the Class Period were not perfectly identical, they did contain many of the same untrue statements set forth below and were rendered misleading by the same omissions.

**The Registration Statements Misrepresented the Description and Risks of the Fund**

97.     The Registration Statements described the Investment Objective of the Fidelity Ultra-Short Bond Fund as follows:

*Investment Objective*

**Ultra-Short Bond Fund** seeks to obtain a high level of current income ***consistent with preservation of capital***.

*Principal Investment Strategies*

FMR normally invests at least 80% of the fund's assets in investment-grade debt securities (those of medium and high quality) of all types and repurchase agreements for those securities.

FMR normally invests the fund's assets in U.S. dollar-denominated money market and investment-grade debt securities, including shares of a short-term bond fund managed by an affiliate of FMR, and repurchase agreements.  FMR uses an index that represents the market for the types of securities in which the fund invests as a guide in structuring the fund and selecting its investments.  FMR manages the fund to have similar overall interest rate risk to the index.  As of July 31, 2006, FMR was using the Lehman Brothers 6 Month Swap Index in managing the fund's investments.

*       *       *

FMR allocates the fund's assets among different market sectors (for example, corporate or government securities) and different maturities based on its view of the relative value of each sector or maturity.

*       *       *

In buying and selling securities for the fund, FMR analyzes a security's structural features and current price compared to its estimated long-term value, any short-term trading opportunities resulting from market inefficiencies, and the credit quality of its issuer.

98.    The statements referenced above in ¶97 were each inaccurate statements of material fact when made because of the following facts that existed at the time of the Registration Statements: (i) the Fund was heavily invested in risky and volatile mortgage-related securities, including subprime mortgage related securities, and the risk of investing in the Fund was significantly greater than represented; (ii) the risk profile of the Fund was not consistent with preservation of capital; (iii) many of the holdings of the Fund had declined, and were continuing to decline, in value at a significant rate, but were not appropriately valued by the Fund; (iv) mortgage-related securities were subject to a rising interest rate risk since rising interest rates would increase the risk of default on the mortgage-related securities; (v) Fidelity was unable to adequately value risky mortgage-related securities and heavily relied upon external pricing sources, including Bear Stearns; and (vi) based upon facts existing at that time, including problems with the real estate and mortgage industries, the Fund materially overstated the value of its portfolio and NAV by failing to properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion.

99.    Additionally, the statement referenced above in ¶97 that "80% of the fund's assets" were "in investment-grade debt securities" was an inaccurate and/or misleading statement of material fact when made because the risky subprime and mortgage-related securities were not

investment grade even though some had investment grade ratings by the rating agencies. Because not all "AAA" rated debt securities are of equal soundness, for example, management could not rely solely on a bond's rating to judge its soundness and had to rely on other factors (*e.g.*, quoted yield) to judge the securities' risk, stability and overall quality. Moreover, the Fund held significant positions in the Central Fund which itself contained significant amounts of these low-quality securities.

100. The statements referenced above in ¶97 that "FMR analyzes a security's structural features and current price compared to its estimated long-term value" were each inaccurate statements of material fact when made because Defendants were not capable of properly analyzing the structural features or estimated long-term value of mortgage-related securities.

101. The statements that the Lehman Brothers 6 Month Swap Index "represents the market for the types of securities in which the fund invests," that the Fund uses that index "as a guide in structuring the fund and selecting its investments" and that "FMR manages the fund to have similar overall interest rate risk to the index" were inaccurate statements of material fact because the Fund was structured differently from, and was much riskier and more volatile than, the Lehman 6 Month Swap Index. Further, the Fund was not managed to have similar overall interest rate risk to the index because the Fund was subject to a rising interest rate risk that would increase the risk of default on mortgage-related securities.

102. The Registration Statements described the Principal Investment Risks of the Fidelity Ultra-Short Bond Fund as follows:

### Principal Investment Risks

Many factors affect the fund's performance. The fund's yield and share price change daily based on changes in interest rates and market conditions and in response to other economic, political, or financial developments. The fund's reaction to these developments will be affected by the types and maturities of securities in which the fund invests, the financial condition, industry and economic sector, and geographic

location of an issuer, and the fund's level of investment in the securities of that issuer. Because FMR may invest a significant percentage of the fund's assets in a single issuer, the fund's performance could be closely tied to that one issuer and could be more volatile than the performance of more diversified funds. When you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money.

103. The statements referenced above in ¶102 were each inaccurate statements of material fact when made because they failed to adequately inform investors of the risks of investing in the Fund for the reasons set forth above in ¶98. Furthermore, the statements that the Fund's performance and share price change based on "economic" or "financial developments" were inaccurate statements of material fact when made because even though there were substantial problems with the real estate and mortgage industries at that time and the value of the Fund's mortgage-related securities were inflated, the Fund did not appropriately reduce its NAV and instead left its NAV at inflated levels. Additionally, the Registration Statements omitted to disclose that there was a valuation risk due to the fact that Fidelity was unable to adequately value or price risky mortgage-related assets and heavily relied on external pricing sources, including Bear Stearns.

104. Further, there were significant undisclosed and increasing credit risks due to the Fund's concentration in mortgage-related and subprime mortgage securities. Defendants were well aware of these risks due to internal discussions and external events, but failed to appropriately revise the Fund's Risk Disclosures or otherwise appropriately warn investors.

105. The Registration Statements described an Interest Rate Changes risk as follows:

*Interest Rate Changes*. Debt and money market securities have varying levels of sensitivity to changes in interest rates. In general, the price of a debt or money market security can fall when interest rates rise and can rise when interest rates fall. Securities with longer maturities, mortgage securities, and the securities of issuers in the financial services sector can be more sensitive to interest rate changes. In other words, the longer the maturity of a security, the greater the impact a change in interest rates could have on the security's price. In addition, short-term and long-term interest rates do not necessarily move in the same amount or the same direction. Short-term securities tend to react to changes in short-term interest rates, and long-term securities tend to react to changes in long-term interest rates.

106. The statements referenced above in ¶105 were each inaccurate statements of material fact when made because they failed to adequately inform investors of the interest rate changes risk that the Fund was exposed to, significantly because rising interest rates would increase the risk of default on mortgage-related securities.

107. The Registration Statements represented that the Fund was stable with little to no volatility in its NAV. For example, the Registration Statements stated that the NAV as of the beginning of the fiscal years for 2004, 2005, 2006, 2007 and 2008 were $10.05, $10.05, $10.03, $10.02, and $9.81, respectively. Defendants also represented that the exceptionally stable Lehman Brothers 6 Month Swap Index was used as a guide in structuring the Fund and selecting its investments.

108. The Registration Statements, however, failed to disclose to investors that the Fund invested heavily in risky mortgage-related securities that increased the risk to the Fund, resulting in a less stable investment than represented and causing the Fund to deviate from its supposed guide for selecting its investments. It further failed to disclose that the Fund's stable NAVs were incorrect and overstated due to Defendants' inability to properly value the underlying mortgage-related securities.

## The Registration Statements
## Misrepresented the Value of the Fund

109. The Registration Statements described the changes in value of Mortgage Securities, in pertinent part, as follows:

> The value of mortgage securities may change due to shifts in the market's perception of issuers and changes in interest rates. In addition, regulatory or tax changes may adversely affect the mortgage securities market as a whole. Non-government mortgage securities may offer higher yields than those issued by government entities, but also may be subject to greater price changes than government issues. Mortgage securities are subject to prepayment risk, which is the risk that early principal payments made on the underlying mortgages, usually in response to a reduction in interest rates, will result in the return of principal to the investor, causing it to be invested subsequently at a lower current interest rate. Alternatively, in a rising interest rate environment, mortgage security values may be adversely affected when

prepayments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term instrument. The prices of stripped mortgage securities tend to be more volatile in response to changes in interest rates than those of non-stripped mortgage securities.

110. The statements referenced above in ¶109 were each inaccurate statements of material fact when made because the Registration Statements omitted to disclose and misrepresented that at that time, due to prevailing economic conditions and Defendants' inability to properly value CDOs and other similarly complex financial instruments, the valuation of the Fund's risky mortgage-related securities had already declined but the Fund's NAV did not properly reflect the decline in value. Indeed, Fidelity relied upon Bear Stearns to price mortgage-related securities even though Bear Stearns had a clear conflict of interest in pricing those securities. Bear Stearns had an incentive to create and maintain a strong market for those securities and Bear Stearns reported inflated values for mortgage-related securities held by the Fund. Additionally, the Fund held mortgage-related securities that were structured, marketed and sold by Bear Stearns and Bear Stearns also reported inflated values for those securities.

111. The Registration Statements reported inflated values for the Fund's risky mortgage-related securities. The inflation of the value of the Fund's portfolio in the Registration Statements resulted in an inflation of the Fund's NAV during the Class Period as a result of the Fund's failure to properly value and write-down these risky assets.

112. Each member of the Class that purchased shares of the Fund purchased those shares pursuant to the Registration Statements. The NAVs that were paid by each Class Member were inflated when purchased because the Fund failed to properly value the securities as represented and failed to timely write-down the troubled assets in its portfolio, including the risky mortgage-related securities.

113.    The Registration Statements described the Trustees and the Fair Value Oversight

Committee, in pertinent part, as follows:

> The Board of Trustees governs the fund and is responsible for protecting the interests
> of shareholders.  The Trustees are experienced executives who meet periodically
> throughout the year to oversee the fund's activities, review contractual arrangements
> with companies that provide services to the fund, and review the fund's performance.

*        *        *

> The Fair Value Oversight Committee is composed of all of the Independent Trustees,
> with Dr. Gates currently serving as Chair.  The committee normally meets quarterly,
> or more frequently as called by the Chair.  The Fair Value Oversight Committee
> monitors and establishes policies concerning procedures and controls regarding the
> valuation of fund investments and their classification as liquid or illiquid and
> monitors matters of disclosure to the extent required to fulfill its statutory
> responsibilities.  The committee provides oversight regarding the investment policies
> relating to, and Fidelity funds' investment in, non-traditional securities.   The
> committee also reviews actions taken by FMR's Fair Value Committee

114.    The statements referenced above in ¶113 were each inaccurate statements of material

fact when made because the Registration Statements omitted to state that Fidelity had inadequate

policies and procedures in place to properly value risky mortgage-related securities and the Fair

Value Oversight Committee failed to adequately monitor or provide oversight with respect to risky

mortgage-related securities.  The statement that the board of trustees was composed of "experienced

executives" was an inaccurate statement of material fact because the trustees were not "experienced

executives" with respect to the valuation of risky mortgage-related securities.  The Registration

Statements failed to disclose that the group at Fidelity that valued risky mortgage-related securities

was not adequately staffed and was staffed with individuals with limited experience in validating

prices provided by third-party pricing services, which left Fidelity highly reliant upon trading

personnel and external pricing sources that had an interest in providing inflated values.

115.     Furthermore, the Registration Statements stated that the securities in the Fund are valued "on the basis of information furnished by a pricing service or market quotations."  Many of the securities held by the Fund did not trade frequently or have prices that were readily available. According to the Registration Statements, "if market quotations or information furnished by a pricing service is not readily available or does not accurately reflect fair value for a security" those securities will be "valued in good faith by a committee" according to board-approved "fair value pricing policies."

116.     The statements referenced above in ¶115 were each inaccurate statements of material fact when made because the Registration Statements failed to disclose: (i) that Fidelity was unable to adequately value risky mortgage-related securities and follow its own disclosed valuation procedures, and heavily relied upon unreliable external pricing sources, including Bear Stearns; and (ii) based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Fund materially overstated the value of its portfolio and NAV by failing to properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion.  Furthermore, the statements "if market quotations or information furnished . . . does not accurately reflect fair value for a security" and "valued in good faith by a committee" were inaccurate statements of material fact when made because Fidelity was unable to determine whether risky mortgage-related securities accurately reflected fair value and was unable to value these securities in "good faith."

### The Registration Statements
### Misrepresented the Fidelity Ultra-Short Central Fund

117.     The Registration Statements described the Ultra-Short Central Fund as "a diversified internal pool of short-term assets designed to outperform cash-like instruments with similar risk characteristics - and an overweighting in bonds with maturities in the one-to-two year range."

118.     In SEC filings, including the Fund's July 31, 2007 Annual Report, Defendants also referred to the Ultra-Short Central Fund as "a diversified pool of short-term assets . . . designed to outperform cash-like instruments with similar risk characteristics."

119.     The statements referenced above in ¶¶117-18 were each inaccurate statements of material fact when made because the Ultra-Short Central Fund did not have "similar risk characteristics" to cash-like instruments but instead invested heavily in risky subprime and other mortgage-related securities.

120.     The Registration Statements described the Central Funds, which included the Ultra-Short Central Fund, in pertinent part, as follows:

> Central Funds are money market or short-term bond funds managed by FMR or its affiliates.  The money market central funds seek to earn a high level of current income (free from federal income tax in the case of a municipal money market fund) while maintaining a stable $1.00 share price.  The money market central funds comply with industry-standard regulatory requirements for money market funds regarding the quality, maturity, and diversification of their investments.  **The short-term bond central funds seek to obtain a high level of current income consistent with preservation of capital.**  Certain Fidelity funds are permitted to invest their assets allocated to debt in a central fund. ***Such an investment allows a fund to obtain the benefits of a fully diversified bond portfolio*** regardless of the amount of assets the fund invests in debt.  [Emphasis added.]

121.     The statements referenced above in ¶120 were each inaccurate statements of material fact when made because the portfolio composition of the Fidelity Ultra-Short Central Fund was not invested in securities "consistent with preservation of capital" but instead was heavily invested in risky mortgage-related securities, including a heavy emphasis on subprime mortgage securities.

122.     Furthermore, the statements referenced above in ¶¶117-18, 120 that the Fund "obtain[ed] the benefits of a fully diversified bond portfolio" by investing in the Ultra-Short Central Bond Fund and that the Central Fund was "a diversified pool of short-term assets" were inaccurate statements of material fact when made because the Fund did not obtain the benefits of a fully diversified bond portfolio through the Ultra-Short Central Bond Fund.  The Ultra-Short Bond Fund

did not have a diversified portfolio, as represented by Defendants. Instead, it was heavily-weighted with investments in risky mortgage-related securities, including a significant percentage of investments in subprime mortgages.

123. As discussed above, during the Class Period, mortgage-related securities comprised at least 50% of the value of the Ultra-Short Central Fund, and approximately 25% of the mortgage-related securities were very risky subprime mortgage-related securities. Mortgage-related securities were significant in terms of number of individual securities as well. As discussed above, during the Class Period, at least 78% of the individual holdings of the fund were mortgage-related securities and at least 28% of the mortgage-related securities were very risky subprime mortgage-related securities. Indeed, at times during the Class Period, at least 22% of the individual securities held by the Ultra-Short Central Fund were very risky subprime mortgage-related securities.

**The Registration Statements Misrepresented the Fund's
Exposure to Subprime and Other Risky Mortgage-Related Securities**

124. The Registration Statements, including the Annual Reports, omitted and misrepresented the Fund's true exposure to subprime and mortgage-related securities. The Annual Reports listed securities by type, including, Asset Backed Securities, Collateralized Mortgage Obligations, Commercial Mortgage Securities and Fidelity Ultra-Short Central Fund. The grouping of securities was materially misleading because it obfuscated, concealed and otherwise understated the Fund's true exposure to high risk subprime and mortgage-related securities because mortgage-related securities were listed under other groups, such as the Asset Backed Securities group and were held by the Fidelity Ultra-Short Central Fund. Indeed, the Fund did not first disclose the extent of its exposure to subprime mortgage securities until April 2, 2008, and did not ever undertake to quantify for investors its significant exposure to mortgage-related securities.

125.    For example, the Fund's Annual Report filed on September 29, 2006 contained a Schedule of Investments, including: (i) Asset-Backed Securities – 29.3%; (ii) Collateralized Mortgage Obligations 15.7%; and (iii) Fidelity Ultra-Short Central Fund – 3.1%.  Under each group, with the exception of Fidelity Ultra-Short Central Fund, was a list of securities.  The grouping of securities under the Schedule of Investments contained untrue statements of material fact and were materially misleading because they misrepresented the Fund's significant exposure to risky mortgage-related securities.

126.    In each of the Fund's Annual Reports filed throughout the Class Period, risky mortgage-related securities were not just listed under Collateralized Mortgage Obligations but were also listed under Asset-Backed Securities but it was unclear from the descriptions of many of these securities that they were risky mortgage-related securities.  Similarly, for most of the Class Period, the Fund did not identify which securities were subprime mortgage-related securities.

127.    For example, the Fund's Annual Report filed on September 29, 2006, listed, among many others, the following risky mortgage-related securities under Asset-Backed Securities, but it was not clear from their descriptions that they were mortgage-related:

(a)     ACE Securities Corp, Class M1, 6.135% 6/25/33 (d);

(b)     ACE Securities Corp, Class M2, 7.135% 6/25/33 (d);

(c)     Bayview Financial Acquisition Trust Series 2004-C Class A1, 5.82% 5/28/44 (d);

(d)     Bear Stearns Asset Backed Securities I, Series 2004-B01: Class M2, 6.135% 9/25/34 (d);

(e)     Bear Stearns Asset Backed Securities Trust: Series 2004-B01: Class M3, 6.435% 9/25/34 (d); and

(f)     Bear Stearns Asset Backed Securities Trust: Series 2004-HE9 Class M2, 6.585% 11/25/34 (d).

128.    The Fund's Annual Report filed on September 27, 2007 listed, among many others, the following risky mortgage-related securities under Asset-Backed Securities, but it was not clear from their descriptions that they were mortgage-related:

(a)     ACE Securities Corp, Series 2003-HS1: Class M1, 6.07% 6/25/33 (d);

(b)     ACE Securities Corp, Series 2003-HS1: Class M2, 7.07% 6/25/33 (d);

(c)     Bayview Financial Acquisition Trust Series 2004-C Class A1, 5.74% 5/28/44 (d);

(d)     Bear Stearns Asset Backed Securities Trust: Series 2004-B01: Class M2, 6.07% 9/25/34 (d);

(e)     Bear Stearns Asset Backed Securities Trust: Series 2004-B01: Class M3, 6.37% 9/25/34 (d); and

(f)     Bear Stearns Asset Backed Securities Trust: Series 2004-HE9 Class M2, 6.52% 11/25/34 (d).

129.    Each of the Annual Reports and other SEC filings listing the Fund's holdings throughout the Class Period contained similar language and didn't just list risky mortgage-related securities under Collateralized Mortgage Obligations but also listed them under Asset-Backed Securities and it was unclear from the descriptions of many of these securities that they were risky mortgage-related securities and for much of the Class Period none of the securities were identified as subprime mortgage-related securities.

130.    Furthermore, the failure to list the holdings of the Fidelity Ultra-Short Central Fund from 2006 to 2008 misrepresented the Fund's exposure to risky mortgage-related securities, including subprime mortgage-related securities.

### The Ultra-Short Bond Fund Loses Value

131.    Beginning in late 2007 and continuing during the first half of 2008, the Fund took massive write-downs as it belatedly marked down the value of mortgage-related investments. Those write-downs caused a commensurate decline in the Fund's NAV, which in turn resulted in losses to investors.

132.    The Fund's NAV plummeted from a price of approximately $10.04 per share at the beginning of the Class Period to $8.30 per share on June 5, 2008, or a loss of more than 17% since June 6, 2005. During May and June 2007, the Fund's NAV generally ranged between $9.97 and $9.96 per share. Then, Defendants slowly began lowering the NAV for the Fund. By July 23, 2007, the Fund's NAV was reduced to $9.87; by August 23, 2007 to $9.48; by November 28, 2007 to $9.01; by January 23, 2008 to $8.88; by May 19, 2008 to $8.50; and by June 5, 2008 to $8.30.

133.    The below chart depicts the drop of the NAV of the Fund:



134.     The following chart, taken from the Fund's Annual Report filed with the SEC on September 29, 2008, depicts the performance of the Fund relative to the Lehman Brothers 6 Month Swap Index:



135.     The Fund also substantially underperformed other ultra short bond funds since the Fund was more exposed to risky subprime and mortgage-related securities.  For example, according the Morningstar, during 2007, the average ultra-short bond fund returned positive 2.35% compared with a negative (5.12%) return for the Fund in 2007.  During 2007, the Fund ranked near the very bottom of all ultra-short bond funds, with 96 funds ranking higher.

136.     For the twelve months ended July 31, 2008, the Fund lost 12.42%, while the Lehman Brothers 6 Month Swap Index *gained* 4.62%.  Even the Lipper Ultra-Short Obligations Funds Average only lost 1.97%.

137.     Andrew Dudley ("Dudley") was the manager of the Fund prior to and during much of the Class Period.  In July 2007, Fidelity appointed Robert Galusza as lead manager of the Fund, with Dudley remaining as co-manager.  Dudley took a leave of absence from Fidelity in February 2008 and his departure was made official in June 2008.  On July 1, 2008, Robert Galusza became the sole portfolio manager of the Fund.

138.    On September 29, 2008, Fidelity issued its annual report for the Fund for the period

ending July 31, 2008 and admitted that the Fund suffered losses as a direct result of its investments

in risky mortgage-related securities.  Fidelity also acknowledged that the Fund was exposed to risky

mortgage-related securities through its investment in the Fidelity Ultra-Short Central Fund and that

the Fund sold much of its risky mortgage-related securities after the steep drop in NAV.  The Annual

Report stated in pertinent part as follows:

**Management's Discussion of Fund Performance**

\*       \*       \*

During the past year, the fund's Class A and Class T shares returned -12.71% and -12.72%, respectively (excluding sales charges), and the Lehman Brothers 6 Month Swap Index gained 4.62%.  **Throughout much of the reporting period, the fund held positions in a number of sectors that were hurt the worst by an expanding host of worries related to the credit crunch. Specifically, the bulk of the fund's underperformance stemmed from its exposure to asset-backed securities (ABS) – particularly those backed by subprime mortgages – commercial mortgage-backed securities (CMBS), collateralized mortgage obligations (CMOs) and corporate securities**.

**Though these short-duration instruments – held both directly and also through Fidelity® Ultra-Short Central Fund – were mostly highly rated (AA or AAA), their market values dropped significantly during the period.  In an attempt to reduce the fund's overall volatility, manage anticipated shareholder redemptions and position the fund based on our view of future market risk, we undertook a number of initiatives in accordance with the principal investment strategies of the fund**.  We considerably reduced our stake in subprime mortgage securities and other types of securitized investments.  We achieved this by initially reducing and ultimately liquidating the fund's underlying stake in Fidelity Ultra-Short Central Fund and by selling some holdings we believed would continue to experience extreme volatility.  At the end of the period, the fund's stake in cash and cash-like instruments stood at roughly 82% of net assets, with the remainder invested in ABS, CMBS, CMOs, commercial paper, corporate bonds and mortgage pass-through securities.  [Emphasis added.]

139.    For the period ending July 31, 2008, the Fund liquidated most of the risky mortgage-

related securities that resulted in the substantial losses to the Fund during the Class Period.  For

example, as of January 31, 2008, Asset-Backed Securities comprised 32.6% of the Fund and

Collateralized Mortgage Obligations and Other Mortgage Related Securities comprised 29.6% of the Fund, for a total of 62.6%. By July 31, 2008, Asset-Backed Securities comprised 6.4% of the Fund and Collateralized Mortgage Obligations and Other Mortgage Related Securities comprised 4.2% of the Fund, for a total of 10.6%. Similarly, the Fund liquidated 100% of its investment in the Fidelity Ultra-Short Central Fund as of July 31, 2008.

140. The Fund went from $1.0 billion in total assets on January 31, 2007 to only $325 million in assets by July 31, 2008.

141. An August 19, 2008 Morningstar research report titled "Fidelity Ultra-Short Bond is trying to put a dismal year behind it, but there's still work to do," stated, in pertinent part, as follows:

> By now, it's old news that this fund has fallen down on the job.

> \*       \*       \*

> Also, the missteps here have proved costly--the fund lost 10% for the 12 months ended Aug. 18, 2008--particularly for those who were counting on this vehicle to protect their capital.

> As conditions failed to improve earlier this year, Fidelity took evasive action. Manager Robert Galusza overhauled the portfolio, flushing out the fund's more volatile holdings. The bulk of the portfolio now sits in cash (86% as of June 30), alongside modest stakes in asset-backed and mortgage bonds (10% combined), all of which Galusza has vetted.

## CLASS ACTION ALLEGATIONS

142. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class. Excluded from the Class are Defendants, the officers and directors of the Defendant companies, at all relevant times, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, heirs, successors or assigns and any such excluded party.

143.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants, or specifically by Fidelity Income Fund, the Ultra-Short Bond Fund or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiff does not have any interests antagonistic to, or in conflict with, the other members of the Class.

145.    Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and has retained counsel competent and experienced in class and securities litigation.

146.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)    whether the Registration Statements negligently omitted and/or misrepresented material facts about the Fund;

(c)    whether the Registration Statements contained untrue statements of material fact; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

147.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 11 of the Securities Act**
**Against the Individual Defendants and FMR, FMR Corp. and Income Fund**

148.    Plaintiff repeats and realleges each and every allegation contained above.

149.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants and Defendants FMR, FMR Corp. and Income Fund.

150.    The Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

151.    Income Fund is the registrant for the shares of the Fund, and as such is strictly liable for the false statements contained in the Registration Statements. The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

152.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

153.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

154.     Plaintiff purchased shares of the Fund during the Class Period and pursuant to the Registration Statements.

155.     Plaintiff and the Class have sustained damages.  The value of the shares of the Fund declined substantially subsequent to and due to Defendants' violations.

156.     At the times they purchased shares of the Fund, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year had elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time of filing of the initial complaint in this action.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time of the filing of the initial complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

157.     Plaintiff repeats and realleges each and every allegation contained above.

158.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

159.     Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Fund offered pursuant to the Registration Statements, Prospectuses and other documents incorporated therein and were motivated by a desire to serve their own financial interests or those of the Income Fund.

160.     The Registration Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material

facts required to be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements and participating in marketing the shares of the Fund to investors.

161. Defendants owed to the purchasers of the shares of the Fund, including Plaintiff and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and corresponding amendments to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the offering materials as set forth above.

162. Plaintiff and other members of the Class purchased shares of the Fund pursuant to the defective Registration Statements. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in Defendants' solicitation materials.

163. By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold shares of the Fund have the right to rescind and recover the consideration paid for their shares of the Fund and hereby elect to rescind and tender those shares to the Defendants sued herein. Plaintiff and Class members who have sold their shares of the Fund are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants, FMR and FMR Corp.

164. Plaintiff repeats and realleges each and every allegation contained above.

165.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants, FMR and FMR Corp.

166.     Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a director, trustee and/or senior officer of Fund or other Defendant companies.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees, directors and/or officers and/or major shareholders of the Fund.

167.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the sale of the shares of the Fund to be successfully completed.

168.     FMR manages the business affairs of the Fund and Fidelity Income Fund and controls their affairs and was a control person of Fidelity Income Fund and the Fund.  FMR Corp. was the parent company of the other Fidelity defendants and was a control person of the other Fidelity defendants and the Fund.  FMR, FMR Corp. and their directors and officers each had a series of direct and/or indirect business and/or personal relationships with other trustees, directors and/or officers of the other Fidelity defendants and the Fund.

169.     The Individual Defendants, FMR and FMR Corp. were each culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their participation in the issuance of the Registration Statements and the process which allowed the sale of the shares of the Fund to be successfully completed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages as to Count II; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 07, 2010                    SHAPIRO HABER & URMY LLP
                                         THOMAS G. SHAPIRO (BBO # 454680)
                                         ADAM M. STEWART (BBO # 661090)


                                         _____
                                                 */s/ Thomas G. Shapiro*
                                         THOMAS G. SHAPIRO

                                         53 State Street
                                         Boston, MA  02109
                                         Telephone:  617/439-3939
                                         617/439-0134 (fax)
                                         tshapiro@shulaw.com
                                         astewart@shulaw.com

                                         *Liaison Counsel*

                                         ROBBINS GELLER RUDMAN & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         EVAN J. KAUFMAN
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         ekaufman@rgrdlaw.com

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)
bob@dyerberens.com
jeff@dyerberens.com

*Co-Lead Counsel for Plaintiff*

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mfistel@holzerlaw.com

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 8, 2010.

*/s/ Thomas G. Shapiro*
THOMAS G. SHAPIRO