# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN ZAMETKIN, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FIDELITY MANAGEMENT & RESEARCH COMPANY, et al., <br><br> Defendants. | 1:08-CV-10960-MLW |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>

GOODWIN PROCTER LLP
   James S. Dittmar (BBO# 126320)
   David J. Apfel (BBO# 551139)
   Joshua S. Lipshutz (BBO# 675305)
53 State Street
Boston, Massachusetts 02109

*Attorneys for Defendants Fidelity Management
& Research Co., FMR Corp. (n/k/a FMR LLC),
Fidelity Brokerage Services LLC, Edward C.
Johnson 3d, Abigail P. Johnson, James C.
Curvey, Timothy Hayes, Joseph B. Hollis,
Stephen P. Jonas, Kimberly Monasterio,
Christine Reynolds, and Robert L. Reynolds*

DECHERT LLP
   William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036
   Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, Massachusetts 02116

*Attorneys for Defendant Fidelity Income Fund*

MILBANK, TWEED, HADLEY
& McCLOY LLP
   James N. Benedict (*pro hac vice*)
   Sean M. Murphy (*pro hac vice*)
   Andrew W. Robertson (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005

## TABLE OF CONTENTS

Page(s)

I. PRELIMINARY STATEMENT .........................................................................1

II. STATEMENT OF FACTS ..............................................................................4

    A.    Overview of the Fund ...........................................................................4

    B.    Plaintiff's Allegations ............................................................................5

    C.    Overview of Fund Disclosures..............................................................7

        1.    Pre-2007 Disclosures ...............................................................7

        2.    The January 31, 2007 Shareholder Update ....................................9

    D.    The Filing of This Lawsuit ...................................................................11

III. ARGUMENT .................................................................................................11

    A.    The Fund's Investment Objective In and Of Itself Is Not Actionable.......11

    B.    Claims Alleging Mismanagement, Complaints About Disappointing
        Performance and Claims Based on Hindsight Are Not Actionable...........14

    C.    Plaintiff's Non-Disclosure Claims Fail Because All Alleged
        Misrepresentations or Omissions Were Either Disclosed or
        Immaterial. .............................................................................................15

        1.    The Fund Documents Disclosed the Extent of the Fund's
            Investments in Mortgage-Related Securities. ...............................16

        2.    The Fund Documents Disclosed All Material Information
            Regarding the Fund's Investments in Subprime Mortgage
            Securities.................................................................................19

        3.    The Fund Documents Disclosed the Effect That the Fund's
            Investment in the Central Fund Had on the Fund's Portfolio........23

        4.    Plaintiff Alleges No Facts to Support His Contention That the
            Fund's "Interest Rate Risk" Was Not Similar to the Lehman
            Brothers 6-Month Swap Index....................................................24

            a.    The Swap Index Was Disclosed as a Guide for Interest
                Rate Risk, Not Credit Risk or Performance.......................25

               b.     Plaintiff Alleges No Facts to Support His Contention That the Decline in the Fund's NAV Was the Manifestation of Interest Rate Risk............................................................26

     5.     Plaintiff Does Not Allege Facts to Support His Allegation That Defendants Failed to Follow The Fund's Disclosed Valuation Methodology.................................................................................28

     6.     The Complaint Contains No Plausible Allegation That the Fund's NAV Was Incorrect or Had To Be "Written Down."....................32

               a.     Plaintiff's Implausible Allegation of NAV "Inflation" .....32

               b.     Plaintiff's Implausible Allegation That the Fund's NAV Should Have Been "Writen Down" ...................................35

D.     Plaintiff's Claims Are Barred by the One-Year Statute of Limitations.....36

     1.     Claims Under the Securities Act Must Be Brought Within One Year After Plaintiff Is Put on Notice of the Claims.......................36

     2.     At the Latest, the Fund's January 2007 Disclosures Put Investors on Notice of Their Claims More Than One Year Before the Complaint Was Filed. ...................................................................37

E.     Plaintiff's Claimed Losses Were Not Proximately Caused by the Alleged Misrepresentations or Omissions.............................................................40

F.     FMR LLC Is Not a Proper Defendant for Purposes of Section 11. ...........41

G.     Defendants Were Not "Control Persons" for Purposes of Section 15 Liability.....................................................................................................42

**IV.    CONCLUSION .................................................................................43**

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008).................................................................................15

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).................................................................................42

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).......................................................................................29

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................15, 16, 23, 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................... passim

*Brown v. Credit Suisse First Boston LLC*,
431 F.3d 36 (1st Cir. 2005).................................................................................33

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)............................................................................................20

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
129 F.3d 222 (1st Cir. 1997)....................................................................36, 37, 39

*Cooperman v. Individual, Inc.*,
No. 96-12272-DPW, 1998 U.S. Dist. LEXIS 22126 (D. Mass. May 27, 1998), *aff'd*
171 F.3d 43 (1st Cir. 1999)..........................................................................13, 29

*Curran v. Cousins*,
509 F.3d 36 (1st Cir. 2007)...................................................................................4

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006)...................................................................................42

*Hoosier Energy Rural Elec. Coop. Inc. v. John Hancock Life Ins. Co.*,
588 F. Supp. 2d 919 (S.D. Ind. 2008)....................................................................6

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 26, 1996)...................12

*In re Am. Bank Note Holographics, Inv. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)....................................................................41

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) .....................................................................34, 41

*In re Craftmatic Sec. Litig.*,
   890 F.2d 628 (3d Cir. 1989) .............................................................................14, 31

*In re Elscint, Ltd. Sec. Litig.*,
   674 F. Supp. 374 (D. Mass. 1987) ....................................................................41, 42

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
   2010 WL 1253114 (D. Mass. Mar. 31, 2010) ...................................................12, 25

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..........................................................15, 30, 34

*In re Lehman Bros. Sec. & ERISA Litig.*,
   2010 U.S. Dist. LEXIS 13856 (S.D.N.Y. Feb. 19, 2010) .......................................30

*In re Merrill Lynch & Co.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ....................................................................36

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) ................................................................40, 41

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)...............40, 41

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .......................................................................20, 28, 30, 31

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ................................................................................37

*In re Salomon Analyst Level 3 Litig.*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005) ....................................................................33

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ....................................................................41

*In re Scudder Mutual Funds Fee Litig.*,
   2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ..........................................................6

*In re SeaChange Int'l, Inc. Sec. Litig.*,
   No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6. 2004) ............4

*In re Tyco Int'l, Ltd., Sec. Litig.*,
   185 F. Supp. 2d 102 (D.N.H. 2002)........................................................................37

*In re Worldcom, Inc. Sec. Litig.*,
   308 F. Supp. 2d 338 (S.D.N.Y. 2004) .................................................................42

*Kaplan v. First Hartford Corp.*,
   447 F. Supp. 2d 3 (D. Mass. 2006) .....................................................................15

*Kennedy v. Josephthal & Co.*,
   814 F.2d 798 (1st Cir. 1987) ...............................................................................40

*LC Capital Partners LP v. Frontier Ins. Group Inc.*,
   318 F.3d 148 (2d Cir. 2003) ...........................................................................36, 37

*Maggio v. Gerard Freezer & Ice Co.*,
   824 F.2d 123 (1st Cir. 1987) ...............................................................................36

*Merck & Co. v. Reynolds*,
   2010 WL 1655827 (Apr. 27, 2010) ......................................................................36

*Merrill Lynch Research Reports*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................................40

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
   98 F.3d 2 (2d Cir. 1996) ..................................................................................3, 13

*Panter v. Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) ..............................................................................32

*Panther Partners, Inc. v. Ikanos Commc'ns. Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) .................................................................20

*Press v. Quick & Reilly, Inc.*,
   218 F.3d 121 (2d Cir. 2000) ...............................................................................16

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ...............................................................................14, 16, 31

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003) ......................................................................32

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ..........................................................................13, 31

*Slavin v. Morgan Stanley & Co.*,
   791 F. Supp. 327 (D. Mass. 1992) .......................................................................36

*Tabankin v. Kemper Short-Term Global Income Fund*,
   1994 U.S. Dist. LEXIS 965 (N.D. Ill. Feb, 1, 1994) ....................................... passim

*Thompson v. Ill. Dep't of Prof'l Regulation*,
    300 F.3d 750 (7th Cir. 2002) ...............................................................3, 16, 19, 24

*Vachon v. BayBanks, Inc.*,
    780 F. Supp. 79 (D. Mass. 1991) ...........................................................................31

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)..............................................................................................33

*Warren Freedenfeld Assocs., Inc. v. McTigue*,
    531 F.3d 38 (1st Cir. 2008).......................................................................................4

*Wilkes v. Heritage Bancorp, Inc.*,
    767 F. Supp. 1166 (D. Mass. 1991) .......................................................................14

*Yu v. State Street Corp.*,
    2010 WL 668645 (S.D.N.Y. Feb. 25, 2010).................................................. passim

## STATUTES

15 U.S.C. § 77k......................................................................................6, 15, 40, 41

15 U.S.C. §77l.............................................................................................6, 15, 40

15 U.S.C. §77m.................................................................................................36, 40

15 U.S.C. § 77o................................................................................................6, 42

15 U.S.C. § 80a-2(a)(41)(B) .....................................................................................35

17 C.F.R. 270.2a-4 ....................................................................................................35

17 C.F.R. 270.22c-1 ..................................................................................................35

## OTHER AUTHORITIES

Barron's Dictionary of Business Terms (2007)...........................................22, 25, 26, 35

Federal Reserve Statistical Release, Selected Interest Rates, "3-month Treasury bill
    secondary market rate" (available at
    http://www.federalreserve.gov/releases/h15/data/Monthly/H15_TB_M3.txt).......................27

Fidelity Ultra-Short Bond: MUTF: FUSFX Historical Prices, (available at
    http://www.google.com/finance/historical?q=MUTF:FUSFX)....................................... passim

Fidelity Ultra-Short Bond Fund from June 6, 2005 to June 5, 2008, (*available at* http://quote.morningstar.com/fund/chart.aspx?t=FUSFX&region=&culture=en-US)..............6

Int'l Monetary Fund, *Global Stability Report* (Apr. 2007)...........................................................22

SEC Form N-1A (*available at* http://www.sec.gov/about/forms/formn-1a.pdf)....................20, 28

*In the Matter of Evergreen Investment Mgmt. Co.*, Cease and Desist Order, SEC Release No. 60059 (June 8, 2009).....................................................................................29, 32, 34, 41

*In the Matter of State Street Bank & Trust Co.*, Cease and Desist Order, SEC Release No. 9107 (Feb. 4, 2010)...............................................................................................................41

Inv. Co. Inst., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 543 (Apr. 30, 2001).........29, 35

SEC Release No. AS-118, *Accounting for Investment Securities by Registered Investment Companies*, 1970 WL 10502 (Dec. 23, 1970) ..................................................................31, 33

SEC Release No. 33-7398, Registration Form Used by Open-End Management Investment Companies, 1997 WL 87357 (Feb. 27, 1997)......................................................21

SEC Release No. 33-8998, *Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies*, *available at* http://www.sec.gov/rules/final/2009/33-8998.pdf (Jan. 13, 2009)......................21

The Wall Street Journal, *Fund Return*, Fidelity Income Fund: Fidelity Ultra-Short Bond Fund, (available at http://online.wsj.com/fund/page/fund_return.html?mod=2_0361)..............6

Defendants respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Second Amended Complaint ("Complaint" or "SAC").

## I. PRELIMINARY STATEMENT

The proposed class on whose behalf Plaintiff purports to sue (the "Proposed Class"), consists of investors who purchased shares in a bond fund shortly before an unprecedented global credit market meltdown.  These investors may be disappointed that the total return of the Fidelity Ultra Short Bond Fund (the "Fund") over the proposed class period (June 6, 2005 to June 5, 2008, hereinafter the "Class Period") was negative 5.4%.  But the Fund's disclosures informed Plaintiff and other Fund investors that their investment was not riskless.  The Fund's Registration Statements[1] explicitly defined the risks and disclosed that the Fund was designed for investors seeking greater reward, and who were willing to accept greater risk, than they would find in a money market fund.

With the benefit of hindsight, we now know that the unlikely events of 2007-2008 caused even low-probability investment risks to materialize into losses, particularly with respect to investment-grade mortgage-related securities.  We also now know that certain words and phrases that were once unremarkable—"mortgage-backed securities," "subprime," "Bear Stearns"— would eventually become buzzwords used to try to make disappointing investments look like securities law violations.  Of course, at the time of the investments at issue in this case, neither the Proposed Class members nor Fidelity could foresee the scope or magnitude of the global

---

[1]   The Fund was registered with the SEC pursuant to annually updated Registration Statements filed with the SEC and made effective throughout the proposed Class Period (collectively, the "Registration Statements").  The Registration Statements include Prospectuses and Statements of Additional Information, and incorporate by reference periodically filed financial statements (sometimes referred to as annual or semi-annual Shareholder Reports).  The Shareholder Reports are also filed with the SEC and distributed to shareholders via the mail or Internet.  In this Memorandum, all of these documents are collectively referred to as the "Fund Documents."  The effective Fund Documents were available on Fidelity's public website, www.fidelity.com, during the proposed Class Period.

credit crisis.  "[T]he accuracy of offering documents must be assessed in light of information

available at the time they were published."  *Yu v. State Street Corp.*, 2010 WL 668645, at *6

(S.D.N.Y. Feb. 25, 2010).  Here, the Fund's disclosures informed prospective Fund investors of

the types of investments they were buying and the associated risks they were assuming.

Plaintiff alleges that the Fund strayed from its investment mandate by investing heavily

in mortgage-related securities, including those backed by subprime mortgages, without providing

adequate disclosure to its investors.  "Plaintiff does not contend that the Fund could not invest in

such instruments, only that it was required to make sufficient disclosures if it did, to the extent

the investments significantly increased the Fund's overall risk."  [Lead Plaintiff's Memorandum

of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Prior

Opposition" or "Prior Opp.") at 16 n.11.]  But "increase" the Fund's overall risk relative to

what?  The Fund's disclosures contemplated such investments—and the risks inherent in them—

all along, *see infra*, Argument §§ C(1)-C(3), and the Fund's investment portfolio was well within

the risk parameters set forth for investors, *see infra*, Argument § C(4).  Plaintiff wants investors

to be made whole simply because the disclosed risks happened to materialize into losses.

Before Defendants address the gravamen of Plaintiff's Complaint, two allegations can be

readily discarded.  First, allegations that Defendants misrepresented the Fund's overall

investment objective must be dismissed per the "bespeaks caution" doctrine.  *See infra,*

Argument § A.  Second, allegations of mismanagement or disappointing Fund performance, as

opposed to nondisclosure, are not actionable under the Securities Act.  *See infra,* Argument § B.

Independent of these arguments, the Complaint must be dismissed in its entirety on two

principal, equally dispositive grounds:

1. ***Disclosures:***  The documents referenced in, and relied upon by, the Complaint make plain that there were no material misrepresentations or omissions.  To the contrary, everything material was disclosed.  *See infra*, Argument § C.  The pertinent Registration Statements, Prospectuses, Statements of Additional Information ("SAI"), Annual Reports and Shareholder Updates, all of which were available to Plaintiff and the Proposed Class, and all of which are referenced in, or relied upon by, the Complaint are wholly inconsistent with Plaintiff's allegations.  Securities law claims must be dismissed where, as here, they "are contradicted by the prospectuses on their face."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 3 (2d Cir. 1996); *see also Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (noting the "well-settled rule" that documents relied upon by a complaint "trump[ ] the allegations").

2. ***Statute of Limitations:***  The Fund disclosures put the Proposed Class members on inquiry notice of all alleged misrepresentations or non-disclosures no later than the January 2007 Shareholder Update.  Indeed, Plaintiff concedes that the January 31, 2007 Shareholder Update constituted a "warning" that the Fund was invested in subprime mortgage-backed securities, and that "pressures" on such securities were among the Fund's "concerns."  [Prior Opp. at 35-36.] Plaintiff did not file this lawsuit until June 2008.  The case is therefore time-barred by the applicable 1-year statute of limitations.  *See infra*, Argument § D.[2]

---

[2]   In addition to these grounds for dismissing the entire Complaint, claims against certain defendants must be dismissed on grounds unique to those defendants.  The Section 11 claim against defendant FMR LLC must be dismissed because FMR is not alleged to have been involved in preparing the registration statement for the Fund as required by Section 11.  *See infra,* Argument § F.  The Section 15 claim against FMR and the individual defendants must be dismissed because neither FMR nor any of the individual defendants were "control persons" within the meaning of Section 15.  *See infra,* Argument § G.

## II. <u>STATEMENT OF FACTS</u>[3]

### A.   <u>Overview of the Fund</u>

The Fidelity Ultra-Short Bond Fund is an open-end mutual fund[4] designed, in Plaintiff's words, for investors seeking "a higher yield than money market funds." [SAC ¶ 35.] Per SEC requirements, critical facts about the Fund are stated in plain English at the beginning of the Prospectus. The Fund's Prospectus begins, as the SEC requires, by stating the intended purpose, or "investment objective," of the Fund: The Fund "seeks to obtain a high level of current income consistent with preservation of capital." [Ex. A (Sept. 29, 2005 Prospectus), at 3.][5] The Prospectus then sets forth the specific parameters, called "principal investment strategies," that the Fund intends to follow to achieve the Fund's objective, which include:

- *Medium to high credit quality*: "Normally investing at least 80% of assets in investment-grade debt securities (those of medium and high quality) of all types";

- *Two-year average portfolio maturity*: "Normally maintaining a dollar-weighted average maturity of two years or less";

- *Industry concentration*: "Investing more than 25% of total assets in the financial services industries."

[Ex. A (Sept. 29, 2005 Prospectus), at 3.] The Prospectus further explains that the Fund would be managed to have "similar overall interest rate risk" as the Lehman Brothers 6-Month Swap Index (the "Swap Index"). [Ex. A (Sept. 29, 2005 Prospectus), at 3.] The Fund is not an index fund and does not purport to track the performance of any index.

---

[3]   This Statement of Facts is taken entirely from the Complaint and/or the documents referenced in and relied upon by the Complaint. In considering a motion to dismiss, the Court may take these documents into account. *See Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008); *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007); *In re SeaChange Int'l, Inc. Sec. Litig.*, No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687, at *10 (D. Mass. Feb. 6. 2004).

[4]   An open-end mutual fund pools investors' money and invests it in securities. Investors can buy and redeem shares in the fund at any time but cannot trade their shares on an exchange or any other secondary market. [*See* Ex. A (September 29, 2005 Prospectus), at 22.]

[5]   All exhibits ("Ex." or "Exhibit") referenced in this Memorandum are attached to the Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss the Second Amended Complaint filed herewith.

Immediately following this summary of the Fund's objective and parameters, the very same page of the Prospectus sets forth the Fund's "Principal Investment Risks."  [Ex. A (Sept. 29, 2005 Prospectus), at 3.]  These risks warn investors that changes in interest rates could affect the Fund's performance.  They warn that the Fund has a concentrated exposure to the financial services sector, which means that "[c]hanges in government regulation and interest rates and economic downturns can have a significant negative effect on issuers" of securities in the Fund. They warn that the Fund "is considered non-diversified" and therefore can experience "greater fluctuations in share price than would occur in a more diversified fund."  In addition, the same page of the Prospectus warns investors of the potential for principal loss:  "When you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money."  [Ex. A (Sept. 29, 2005 Prospectus), at 3.]

The Prospectus further informs investors of the "principal" types of securities that comprise the Fund's holdings, the first listed being "[d]ebt securities," including "mortgage and other-asset backed securities."  [Ex. A (Sept. 29, 2005 Prospectus), at 8.]  In addition, the Prospectus states that the Fund's assets may be invested "in other funds."  [Ex. A (Sept. 29, 2005 Prospectus), at 7-8.]  For example, the Fund "may invest" in Fidelity's "Central Funds."  [Ex. B (Sept. 29, 2005 SAI), at 3-4.]  Finally, the Prospectus cautions, "[i]f FMR's strategies do not work as intended, the fund may not achieve its objective."  [Ex. A (Sept. 29, 2005 Prospectus), at 8.]

**B.**     **Plaintiff's Allegations**

Plaintiff purports to sue on behalf of a Proposed Class consisting of persons and entities who purchased shares of the Fund between June 6, 2005 and June 5, 2008, [SAC ¶ 1], a time period that coincided with extreme market volatility and the early stages of an unprecedented

global credit market meltdown.  *See, e.g., Hoosier Energy Rural Elec. Coop. Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919, 924 (S.D. Ind. 2008) ("We are in the midst of a once-in-a-century credit tsunami." (quoting Federal Reserve Chairman Alan Greenspan's testimony before Congress on October 23, 2008)).  During the proposed Class Period, the Fund share price, or NAV, declined from $10.01 to $8.29 per share,[6] a decrease of approximately 17%, although the net loss inclusive of dividends—the performance figure that the SEC requires funds to use—was 5.4%.[7]  Plaintiff alleges that investors were misled into believing that the Fund would be an even more "conservative" investment than it was.  [SAC ¶ 36.]  His principal contention is that investors were unaware of the extent of the Fund's investments in mortgage-related securities, particularly those backed by subprime mortgages, and that they therefore underappreciated the risks of the Fund.  [*See, e.g.,* SAC ¶¶ 49-64.]  Specifically, Plaintiff asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 against Fidelity Management & Research Company, FMR Corp., Fidelity Brokerage Services LLC, Fidelity Income Fund, and various individual defendants.[8]

---

[6]  Plaintiff's Complaint sets forth a chart of the Fund's NAV throughout the Class Period.  [*See* SAC ¶ 133.]  To the extent there is a need to pinpoint the NAV on any particular day, this Memorandum relies on Google Finance: Fidelity Ultra-Short Bond: MUTF: FUSFX Historical Prices (*available at* http://www.google.com/finance/historical?q=MUTF:FUSFX) (hereinafter, "NAV Data").

[7]  Total return measures the change in the value of an investor's position inclusive of dividends (*i.e.*, assuming the investor reinvests in the Fund all dividends received during the period).  Total return data is available from Morningstar, a leading source of information on mutual funds, and The Wall Street Journal.  Morningstar is a source relied upon by Plaintiff.  [*See, e.g.,* SAC ¶¶ 39-41.]  Courts addressing cases involving mutual funds often discuss Morningstar data in the context of motions to dismiss.  *See, e.g., In re Scudder Mutual Funds Fee Litig.*, 2007 WL 2325862, at *5-6 (S.D.N.Y. Aug. 14, 2007).  The specific information cited is Morningstar's calculation of total return for the Fidelity Ultra-Short Bond Fund from June 6, 2005 to June 5, 2008, *available at* http://quote.morningstar.com/fund/chart.aspx?t=FUSFX&region=&culture=en-US.  *See also* The Wall Street Journal, *Fund Return*, Fidelity Income Fund: Fidelity Ultra-Short Bond Fund, *available at* http://online.wsj.com/fund/page/fund_return.html?mod=2_0361&symbol=fusfx (last accessed May 21, 2010) (showing the same negative 5.4% total return in graphical format).  The 17% diminution in NAV referenced by Plaintiff, [*see* SAC ¶ 132], ignores dividends paid by this bond Fund.

[8]  Defendant FMR Corp. (n/k/a FMR LLC) is a private financial services company and the ultimate parent company of Defendants Fidelity Management & Research Company ("FMR") and Fidelity Brokerage Services LLC ("FBS").  FMR is the investment adviser to the Fund.  FBS is a multi-service broker-dealer that sells shares of the Fund as well as other securities.  Defendant Fidelity Income Fund is an open-end management

C.      **Overview of Fund Disclosures**

    1.      **Pre-2007 Disclosures**

At all times during the proposed Class Period, the Fund Prospectus included a "Description of Principal Security Types" to be included in Fund investments.  [Ex. A (Sept. 29, 2005 Prospectus), at 8.]  The first type listed is "[d]ebt securities," which includes "mortgage and other asset-backed securities."   The Prospectus also directed investors to the SAI, incorporated by reference into the Prospectus, which lists both "Asset-Backed Securities" and "Mortgage Securities" as potential categories for investments.  [Ex. B (Sept. 29, 2005 SAI), at 3-9.]  Asset-Backed Securities ("ABSs") were defined to include "interests in pools of *mortgages*, loans, receivables, or other assets."  [Ex. B (Sept. 29, 2005 SAI), at 4 (emphasis added).]  Mortgage Securities were defined as "an obligation of the issuer backed by a mortgage or pool of mortgages or a direct interest in an underlying pool of mortgages."  [Ex. B (Sept. 29, 2005 SAI), at 9.]  The SAI further devoted four paragraphs to explaining exactly how mortgage securities work.  [Ex. B (Sept. 29, 2005 SAI), at 9 ("A mortgage security is an obligation of the issuer backed by a mortgage or pool of mortgages or a direct interest in an underlying pool of mortgages. . . .").]

The Fund Documents further disclosed the size of the Fund's exposure to mortgage-related securities—both directly and indirectly through the Fund's holdings in the Central Fund—in qualitative and quantitative terms:

- The Annual and Semi-Annual Reports[9] (incorporated by reference into the Registration Statements) contained pie charts illustrating the breakdown of Fund investments by (1)

_____

investment company that issues shares of the Fund.  The nine individual Defendants (collectively, the "Individual Defendants") served as trustees or officers of the Fund.  [SAC ¶¶ 11-19, 21-24, 26.]

[9]    This Memorandum uses the July 31, 2006 Annual Report as an example of the Annual and Semi-Annual Reports that were made available to investors throughout the proposed Class Period.  All other Annual and Semi-Annual Reports during the proposed Class Period followed substantially the same format.

credit risk and (2) asset type.  As an example, the July 31, 2006 Annual Report contained pie charts showing that 23.1% of the Fund's net assets as of July 31, 2006, were invested in "CMOs and Other Mortgage Related Securities," and 39.0% of net assets were invested in "Asset-Backed Securities," defined to include interests in pools of mortgages. The pie charts were "based on the combined investments of the fund and its prorata share of the investments of Fidelity's fixed-income central fund."  [Ex. C (July 31, 2006 Annual Report), at 9.]



- The Annual and Semi-Annual Reports also contained a list of *every single security in the Fund's portfolio* along with the value of the Fund's position in that security.  As an example, the July 31, 2006 Annual Report contains a 33-page list of investments.  The list contained 331 different bonds in the "Collateralized Mortgage Obligations" and "Commercial Mortgage Securities" categories.  The list also contained 344 different bonds in the "Asset Backed Securities" category, 136 of which contain the words "mortgage," "home," "real estate" or "residential" in their name.  These three categories filled 25 of the 33 pages required to list the Fund's investments.  [Ex. C (July 31, 2006 Annual Report), at 10-42.]

- The Annual Reports further contained a section entitled "Management's Discussion of Fund Performance," which explained the Fund's "heavy emphasis on non-government bonds, including structured products such as asset-backed securities, collateralized mortgage obligations and commercial mortgage-backed securities."  [Ex. C (July 31, 2006 Annual Report), at 6.]

- Investors were told how to obtain more information about the Central Fund:  "A complete unaudited list of holdings for the Central Fund, as of the Fund's report date, is available upon request or at fidelity.com and/or advisor.fidelity.com, as applicable."  [Ex. C (July 31, 2006 Annual Report), at 59.]

Shareholder Updates provided another source of information regarding the Fund's

emphasis on mortgage-related securities.  For example, Fund manager Andrew Dudley explained

in the July 31, 2006 Shareholder Update that, "[f]or the 12 months ending July 31, 2006," he

"maintained an out-of-index stake in mortgage securities, where [he] focused on agency-issued collateralized mortgage obligations (CMOs)."  [Ex. D (July 31, 2006 Shareholder Update), at iii-iv.]  Going forward, Mr. Dudley stated that he would "likely concentrate on more-attractively priced sectors, specifically mortgage- and asset-backed securities."  [Ex. D (July 31, 2006 Shareholder Update), at iv-v.]

Regarding the credit quality of the Fund's investments, the Fund Guidelines established specific criteria:  The Fund would "[n]ormally invest[] at least 80% of assets in *investment-grade debt securities* (those of medium and high quality) of all types."  [Ex. A (Sept. 29, 2005 Prospectus), at 3.]  In turn, the Fund Documents stated that "Investment-Grade Debt Securities . . . means the security or issuer is *rated investment-grade* by Moody's Investment Service, Standard & Poor's (S&P), Fitch, Inc., Dominion Bond Rating Service Limited, or another credit rating agency . . . ."  [Ex. B (Sept. 29, 2005 SAI), at 8.]  Thus, investors were told how "investment-grade" was defined and that, regardless of the credit quality of any subset of securities in the Fund's portfolio, such as mortgage-related securities backed by subprime mortgages, the Fund's overall portfolio would invest "at least 80%" in securities that were "rated investment-grade" by one of the nationally recognized ratings agencies.

### 2.   The January 31, 2007 Shareholder Update

In the January 31, 2007 Shareholder Update, Fund manager Andrew Dudley reiterated that, for the six-month period ending in January 2007, he had "heavily emphasized non-government bonds . . . including structured products such as asset-backed securities (ABS) and mortgage-backed securities (MBS)."  [Ex. E (Jan. 31, 2007 Shareholder Update), at iii-iv].  As before, Dudley explained that he "held [these] structured and other securities not only directly,

but also indirectly through the Fidelity Ultra-Short Central Fund."  [Ex. E (Jan. 31, 2007

Shareholder Update), at iv.]

Although the Fund had experienced a strong six months, the January 2007 Shareholder

Update was not all good news.  Dudley explained:

> *As for disappointments*, certain ABS, including those backed by *subprime* mortgage
> loans—meaning loans to borrowers with poor credit records—*detracted from fund*
> performance.  They came under pressure due to concerns about delinquencies and the
> growing likelihood of greater defaults.  *Even higher-quality subprime securities*—which
> are my area of emphasis—*couldn't escape investors' concerns over rising
> delinquencies*.

[Ex. E (Jan. 31, 2007 Shareholder Update), at iv (emphasis added).]

In projecting his outlook for the future, Dudley explained at least three different types of

risks that should concern investors: inflation, interest rate risk, and credit risk.  [Ex. E (Jan. 31,

2007 Shareholder Update), at iv-v.]  "Whether it's the risk of higher interest rates or the risk of

weakening creditworthiness in some segments of the market, I believe we're likely to experience

a repricing of sorts in which riskier types of bonds may underperform."  [*Id.*]

Finally, to highlight the concern over subprime mortgages, the January 2007 Shareholder

Update contained a special highlighted box entitled, "Andy Dudley on securities backed by

subprime mortgages."  In that section, Dudley explained the cause for concern:

> Over the past five years or so, subprime mortgages—which are home loans extended to
> higher-risk borrowers—have grown to become a more significant component of the
> securitized bond market.  During the final months of the period, there was a *steady
> stream of news about troubles in this marketplace*.  A slowing housing market
> precipitated rising delinquencies for these loans, which, in turn, caused declining
> valuations for the bonds backed by this type of collateral.

[Ex. E (Jan. 31, 2007 Shareholder Update), at v (emphasis added).]

In his Prior Opposition, Plaintiff agrees that the January 31, 2007 Shareholder Update

constituted a "warning" (albeit, in Plaintiff's view, a "mild" one) that subprime mortgage-backed

securities were a source of concern for the Fund.  [Prior Opp. at 36].  Plaintiff concedes that the

January 2007 update constituted a "disclosure about certain asset-backed securities which saw

some pressures, including subprime mortgage loans, and [that] some concerns were raised about

higher-quality subprime securities."  [Prior Opp. at 35].  Further, as Plaintiff observes, by

January 2007, the media had also reported widely on the growing crisis in the global credit

markets generally, and the subprime mortgage markets specifically.  [SAC ¶¶ 81-85, 92.]

**D.**     **The Filing of This Lawsuit**

Plaintiff filed this purported class action lawsuit on June 5, 2008, far more than one year

after he concedes investors received their first "warning"—in the form of the Fund's January

2007 disclosure—that mortgage-related securities in general, and subprime mortgage securities

in particular, were a source of concern for the Fund.  [Prior Opp. at 35-36.]  Since filing the

original Complaint two years ago, Plaintiff has twice amended the Complaint in an attempt to

cure various deficiencies.

## III. ARGUMENT

**A.**     **The Fund's Investment Objective In and Of Itself Is Not Actionable.**

Since its inception, the investment objective of the Fidelity Ultra-Short Bond Fund has

been to "seek[] to obtain a high level of current income consistent with preservation of capital."

[Ex. A (Sept. 29, 2005 Prospectus), at 3.]  The objective must be read in conjunction with the

principal investment *strategies*, which immediately follow the Fund's objective in the Prospectus

and "give meaning to th[is] general . . . statement" by establishing detailed criteria for the Fund's

investments.  *Tabankin v. Kemper Short-Term Global Income Fund*, 1994 U.S. Dist. LEXIS 965,

at *12 (N.D. Ill. Feb, 1, 1994).

To the extent Plaintiff alleges that the Fund's investment objective—standing alone—was materially misleading, such allegations must be dismissed because an investment objective is not actionable on its own. *See In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, 95 Civ. 0330 (LMM), 1996 U.S. Dist. LEXIS 14209, at *12-13 (S.D.N.Y. Sept. 26, 1996) ("The investment objective announces the goal of the Fund, rather than a promise to investors . . . . Such general, forward looking statements, which make no promise to investors, are not actionable under the securities laws."). This is true even when the investment objective suggests the Fund will be relatively conservative. *See Tabankin*, 1994 U.S. Dist. LEXIS 965 at *1, *11 (dismissing allegations that "the Fund managers pursued a risky course of investment" even though "the prospectuses for the Funds characterized the Funds as 'conservative' and the investment strategy as 'prudent'").

As Judge Gorton of this court recently held, investment objectives like the one the Fund described are "soft" disclosures that are given substance only in connection with the more tangible commitments contained in the investment strategies:

> [T]o the extent that the prospectus did contain general statements regarding the Fund's goals, the meaning of those statements was clarified by the context in which they appeared. For example, the basic claim that the Fund sought to "provide income consistent with preservation of capital and low principal fluctuation," which could be considered "***general and indefinite***" ***when read alone***, was surrounded by other more specific statements regarding the Fund's objectives . . . .

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 2010 WL 1253114, at *4 (D. Mass. Mar. 31, 2010) (emphasis added). In *Evergreen*, the allegations of misrepresentations and omissions survived a motion to dismiss because they alleged violations of the specific representations contained in the fund's stated strategies, not merely the fund's objective. *See id.* at *4-5.[10] To the extent that Plaintiff in this case alleges specific violations of stated Fund

---

[10]    For example, the plaintiffs in *Evergreen* alleged "that the defendants misled investors by claiming that the

strategies, such allegations are contradicted by the Fund Documents, which demonstrate on their

face "that the Fund[ ] pursued the very strategies identified in the Prospectus." *Tabankin*, 1994

U.S. Dist. LEXIS 965, at *12; *Olkey*, 98 F.3d at 4 (dismissing allegations that "the defendants

misrepresented the riskiness of" a mutual fund where the specific "investment strategy and risks

were fully revealed on the face of the prospectuses").  For a detailed discussion of how each of

Plaintiff's specific allegations is contradicted by the Fund Documents, see *infra*, Argument § C.

Even if a fund's investment objective could be actionable, the investment objective of the

Fund here cannot be because the Fund disclosures "bespeak caution" about the risks of achieving

the objective.  "[W]hen statements of 'soft' information such as forecasts, estimates, opinions, or

projections are accompanied by cautionary disclosures that adequately warn of the possibility

that actual results or events may turn out differently, the 'soft' statements may not be materially

misleading under the securities laws."  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213

(1st Cir. 1996), *superseded by statute on other grounds*; *see also Cooperman v. Individual, Inc.*,

No. 96-12272-DPW, 1998 U.S. Dist. LEXIS 22126, at *33 (D. Mass. May 27, 1998), *aff'd* 171

F.3d 43 (1st Cir. 1999).

Here, the Fund's investment objective is surrounded by multiple express disclosures—

both general and very specific—that "bespeak caution," warning investors that the Fund may not

achieve its objective.  For example, the Prospectus warned that "[i]f FMR's strategies do not

work as intended, the fund may not achieve its objective."  [Ex. A (Sept. 29, 2005 Prospectus), at

8.]  The Prospectus further cautioned investors that, despite the Fund's objective of preserving

capital, "[w]hen you sell your shares, they may be worth more or less than you paid for them,

which means that you could lose money."  [Ex. A (Sept. 29, 2005 Prospectus), at 3.]  In addition,

Fund 'would not invest more than 15% of its net assets in illiquid securities' when, in fact, the Fund invested a
much greater portion of its assets in illiquid private placement securities."  *Id.* at *5.  There is no such
allegation in this case.

the Fund's Prospectus expressly warned of the specific risks associated with the Fund's

investment strategies.  [*See, e.g.,* "Principal Investment Risks," Ex. A (Sept. 29, 2005

Prospectus), at 3]; *see also infra*, Argument § C.  "It is not tenable to base a securities fraud

claim on a general statement of the Fund's objective when the Prospectus clearly states that there

is no assurance that the objective will be achieved, goes on to list specific risks associated with

the particular Fund, and the plaintiffs' loss results from those very risks."  *See Tabankin*, 1994

U.S. Dist. LEXIS 965, at *13.

**B.**      **Claims Alleging Mismanagement, Complaints About Disappointing Performance and Claims Based on Hindsight Are Not Actionable.**

To the extent Plaintiff is complaining about the wisdom of the Fund manager's decision

to invest in mortgage-related securities, or about the disappointing performance of the Fund

during the proposed Class Period, such allegations are also not actionable under federal securities

laws.  Plaintiff's attempt to second-guess Defendants' business judgments and competence in

managing the Fund, [*see, e.g.,* SAC ¶ 100 ("Defendants were not capable of properly analyzing

the structural features or estimated long-term value of mortgage-related securities.")], is not a

Securities Act claim.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (securities

laws do not regulate "corporate mismanagement"); *Wilkes v. Heritage Bancorp, Inc.*, 767 F.

Supp. 1166, 1171 (D. Mass. 1991) ("Accepting plaintiffs' . . . allegation as an adequate Rule

10b-5 claim would require this Court to accept questionable corporate business judgments as the

basis for securities fraud suits brought by stock purchasers who become disappointed by their

investments. . . . The Court is not willing to take such a step.").  Nor can mismanagement claims

be bootstrapped into federal disclosure claims by pleading that defendants failed to disclose the

alleged mismanagement.  *See, e.g.*, *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 638-39 (3d Cir.

1989).  Indeed, Plaintiff concedes he could not bring a mismanagement claim under the

securities laws, and insists that his Complaint should not be read to include any such claim.  [*See* Prior Opp. at 11 ("Plaintiff does not allege mismanagement on the part of Defendants.").]

Moreover, a plaintiff may not rely on hindsight to establish that the defendant's disclosures were misleading or omitted material information.  *See State Street*, 2010 WL 668645, at *6 ("A backward-looking assessment of the infirmities of mortgage-related securities . . . cannot help plaintiff's case."); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) (holding that "a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud").   Instead, a plaintiff must allege facts showing "defendant[s] possessed the omitted information at the time the registration statement became effective."  *In re JP Morgan Chase Sec. Litig*., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).

**C.**    **Plaintiff's Non-Disclosure Claims Fail Because All Alleged Misrepresentations or Omissions Were Either Disclosed or Immaterial.**

As a non-disclosure case, Plaintiff's Complaint must be dismissed because everything material was properly disclosed.  Under Sections 11 and 12(a)(2) of the Securities Act of 1933,[11] the alleged misrepresentations or omissions must be material, meaning that their disclosure would have altered the "total mix" of facts available to investors.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  An alleged misrepresentation or omission, therefore, fails to state a claim unless "there is a substantial likelihood that a reasonable [investor] would consider it important" to his investment decision.  *Id. at 231*; *Kaplan v. First Hartford Corp.*, 447 F. Supp. 2d 3, 8 (D. Mass. 2006).

---

[11]    Section 11 imposes liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 12(a)(2) imposes liability for "a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading."  15 U.S.C. 77*l*(a)(2).

Plaintiff's allegations of material misrepresentations and omissions fall into six categories, each of which allegedly made the Fund riskier than was set forth in the Fund Documents:[12]

    i.  Failure to disclose the extent of the Fund's investments in mortgage-related securities;

    ii.  Failure to disclose the Fund's "true exposure" to the subprime mortgage market;

    iii.  Failure to disclose the extent of the Central Fund's investments in mortgage-related securities, including those backed by subprime mortgages;

    iv.  Misrepresentation of the Fund as being managed so as to have the same exposure to interest rate risk as the Lehman Brothers 6-Month Swap Index;

    v.  Misrepresentation of the Fund's valuation capabilities and methodologies, including failure to disclose reliance on Bear Stearns to price mortgage-related securities; and

    vi.  Misrepresentation of the Fund's Net Asset Value ("NAV"), including failure to timely "write down" mortgage-related securities in the portfolio.

Each of these allegations, however, fails for at least one of five reasons:

    (1)  It is contradicted by the Fund Documents on which Plaintiff relies, *see Thompson*, 300 F.3d at 754;

    (2)  It is a conclusory allegation devoid of factual support, *see Twombly*, 550 U.S. at 555;

    (3)  The alleged misstatement could not plausibly have been material to a reasonable investor's decision whether to invest in the Fund, *see Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988);

    (4)  The allegation is really a mismanagement claim disguised as a disclosure claim, *see Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); and/or

    (5)  The Fund disclosures complied with all relevant SEC guidance and were not misleading in the absence of the alleged omissions.  *See Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 129-32 (2d Cir. 2000).

    **1.**      **<u>The Fund Documents Disclosed the Extent of the Fund's Investments in Mortgage-Related Securities.</u>**

---

[12]    Plaintiff's substantive allegations appear intermittently throughout the Complaint.  [*See* SAC ¶¶ 43, 51-57, 61-62, 67-69, 75, 92, 98-130.]  *See* Appendix A for a complete mapping of these allegations to the six categories identified in this Memorandum.

Plaintiff's primary allegation is that the Fund failed to disclose the extent of its investments in mortgage-related securities.  [*See, e.g.,* SAC ¶ 51 (alleging that "the Fund was loading up on mortgage-related securities" and "did not disclose this to investors")].  This allegation is contradicted by the very documents on which Plaintiff relies.  The Prospectus, SAI, and Annual Reports in existence at all times during the proposed Class Period explicitly disclosed that:

- Mortgage-related securities were one of the Fund's "Principal Security Types."  [Ex. A (Sept. 29, 2005 Prospectus), at 8.]

- The Fund placed a "heavy emphasis on . . . structured products such as asset-backed securities, collateralized mortgage obligations and commercial mortgage-backed securities."  [Ex. C (July 31, 2006 Annual Report), at 6.]

- Mortgage-related securities were included in two separate categories of Fund investments: "Mortgage Securities" and "Asset-Backed Securities."  [Ex. B (Sept. 29, 2005 SAI), at 3-9.]

- As of July 31, 2006, 23.1% of the Fund's net assets were invested in "CMOs and Other Mortgage Related Securities," and another 39.0% of net assets were invested in "Asset-Backed Securities," defined to include interests in pools of mortgages.  [Ex. C (July 31, 2006 Annual Report), at 9.]

- A full 41% of the Asset Backed Securities held by the Fund—136 out of 344 separate bonds—contained the words "mortgage," "home," "real estate" or "residential" in their name, making it clear that the underlying assets were mortgage-related.  [Ex. C (July 31, 2006 Annual Report), at 10-41.]

- Twenty-five of the 33 pages required to list *every single investment in the Fund's portfolio* were devoted to listing "Collateralized Mortgage Obligations," "Commercial Mortgage Securities," and "Asset Backed Securities."  [Ex. C (July 31, 2006 Annual Report), at 10-41.]

As if all this information was not enough to inform Proposed Class members that the Fund was heavily invested in mortgage-related securities, Fund manager Andrew Dudley explicitly stated in the July 31, 2006 Shareholder Update that, going forward, he would "likely concentrate on . . . mortgage- and asset-backed securities."  [Ex. D (July 31, 2006 Shareholder Update), at iv-v.]

Faced with this mountain of disclosures, Plaintiff resorts to arguing that investors were unaware that so many mortgage-related securities were "hidden" in the "Asset-Backed Securities" category.  [SAC ¶¶ 49-54, 124-29.]  The presence of mortgage-related securities in the Asset-Backed Securities category, however, was anything but hidden.  The Fund Documents explicitly informed investors that the "Asset-Backed Securities" category included "interests in pools of mortgages."  [Ex. B (Sept. 29, 2005 SAI), at 4.]  Even a cursory glance at the comprehensive list of securities in the Asset-Backed category, reported in Annual and Semi-Annual Reports, demonstrates the weighty presence of mortgage-related securities in that category, including bonds issued by:

- Accredited Mortgage Loan Trust
- Ameriquest Mortgage Securities, Inc.
- Asset Backed Securities Corp. Home Equity Loan Trust
- Bayview Financial Mortgage Loan Trust
- Carrington Mortgage Loan Trust
- CDC Mortgage Capital Trust
- Countrywide Home Loans, Inc.
- CS First Boston Mortgage Securities Corp.
- Fieldstone Mortgage Investment Corp.
- First Franklin Mortgage Loan Trust
- Fremont Home Loan Trust
- Home Equity Asset Trust
- Household Home Equity Loan Trust
- Household Mortgage Loan Trust
- HSBC Home Equity Loan Trust
- Long Beach Mortgage Loan Trust
- Meritage Mortgage Loan Trust
- Merrill Lynch Mortgage Investors, Inc.
- New Century Home Equity Loan Trust
- NovaStar Home Equity Loan Trust
- Option One Mortgage Loan Trust
- Ownit Mortgage Loan Asset-Backed Certificates
- Residential Asset Mortgage Products, Inc.
- Salomon Brothers Mortgage Securities VII, Inc.
- Terwin Mortgage Trust

[Ex. C (July 31, 2006 Annual Report), at 13-25.]

Plaintiff's exact argument regarding the "hiding" of mortgage-related securities in the ABS category was rejected by the Southern District of New York only three months ago. *See State Street*, 2010 WL 668645.  In that case, like this one, "the 'mortgage-*backed* securities' category . . . did not capture the full extent of the Fund's investments in mortgage-*related* securities, because some such securities were listed in the asset-backed category." *Id.* at *2. Nonetheless, the Court ruled that the categories "would not have misled a reasonable investor as to the extent of the Fund's mortgage holdings," because the listing of securities in "the 'Asset-Backed' category included the names of securities that were obviously mortgage-related, such as 'Ameriquest Mortgage Securities,' 'Centex Home Equity,' and 'Chase Funding Mortgage Loan.'" *Id.* at *8.  "Given this 'total mix' of information, it would not be reasonable for an investor to believe that the 'Mortgage-Backed Securities' category represented the extent of the Fund's mortgage holdings." *Id.*  The inadequacy of Plaintiff's allegations in this case is even more pronounced than in *State Street* because State Street's definition of asset-backed securities did not explicitly include mortgage bonds, as the Fund's definition does here. *Compare State Street*, 2010 WL 668645, at *7, *with* [Ex. B (Sept. 29, 2005 SAI), at 4 (defining Asset-Backed Securities to include "interests in pools of mortgages")].

It is beyond the pale for Plaintiff to claim that investors were misled regarding the extent of the Fund's exposure to mortgage-related securities.  Where the documents cited in the Complaint contradict Plaintiff's allegations, as they do here, the documents trump and the allegations must be dismissed. *See Thompson*, 300 F.3d at 754.

**2.      The Fund Documents Disclosed All Material Information Regarding the Fund's Investments in Subprime Mortgage Securities.**

In addition to alleging that investors were unaware of the Fund's investments in mortgage-related securities generally, Plaintiff claims investors were not given adequate notice

of the extent to which the Fund's mortgage-related investments were backed by *subprime*

mortgages in particular.  [*See, e.g.*, SAC ¶ 51 (alleging that the Fund "increased its exposure to

the very risky and highly volatile subprime mortgage market")].  But Plaintiff concedes, as he

must, that the January 2007 Shareholder Update constituted an explicit "disclosure about certain

asset-backed securities which saw some pressures, including subprime mortgage loans, and [that]

some concerns were raised about higher-quality subprime securities."  [Prior Opp. at 35.][13]  The

January 2007 disclosure, without more, defeats Plaintiff's non-disclosure claim regarding

subprime mortgage-related securities.

Disclosures prior to January 2007 were also entirely adequate.  The pre-January 2007

Fund disclosures did not explicitly carve out subprime mortgage-related investments, just as they

did not identify other sub-categories of asset-backed securities such as those backed by student

loans, credit card receivables, or commercial real estate.  There was no SEC or other regulatory

requirement that any mutual fund prospectus identify sub-categories of securities.

SEC regulations set forth the controlling requirements for mutual fund prospectuses.  *See*

SEC Form N-1A (*available at* http://www.sec.gov/about/forms/formn-1a.pdf); *In re Morgan*

*Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 361 (2d Cir. 2010) (affirming dismissal of securities

disclosure claims that sought information beyond what was required by Form N-1A); *Cent. Bank*

*of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) (in

considering whether allegations of omissions are actionable, courts should consider whether the

omitted information was required to be disclosed by law or regulation); *Panther Partners, Inc. v.*

*Ikanos Commc'ns. Inc.,* 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("Whether a duty to disclose

---

[13]    The Fund's NAV remained substantially unchanged from the beginning of the proposed Class Period through mid-June 2007, i.e., well after January 2007.  *See* NAV Data (NAV remained at or above $10.00 until mid-March 2007 and at or above $9.97 until mid-June 2007).  Thus, any investor who was unaware of the Fund's investments in subprime mortgage securities prior to January 2007 could have sold his/her shares without losing money upon receiving the January 2007 disclosure.

exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder.").

Plaintiff's allegation that information related to a particular security type should have been disclosed prior to January 2007 is contradicted by SEC requirements.  The SEC directs mutual fund prospectuses to focus on the "the fund's *overall* portfolio management" and "the risks to which the fund's particular portfolio *as a whole* is expected to be subject . . . ."  SEC Release No. 33-7398, Registration Form Used by Open-End Management Investment Companies, 1997 WL 87357 at 17-20 Feb. 27, 1997) (emphasis added).  The SEC *discourages* funds from providing "an inventory of the various investments a fund may make" and "detailed . . . technical descriptions of the risks associated with particular securities in which a fund may invest" because such laundry-list disclosure "does not appear to effectively communicate the overall risks of investing in the fund."  *Id.*  If anything, the SEC's directive toward shorter, more accessible disclosure has become even more pronounced in recent years, with the SEC expressly discouraging detailed, asset-specific disclosures.  *See* SEC Release No. 33-8998, *Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies*, *available at* http://www.sec.gov/rules/final/2009/33-8998.pdf (Jan. 13, 2009) (noting the "strikingly broad consensus that investors would be best served by simplified, streamlined disclosure of essential fund information").

Even if Plaintiff can demonstrate that the specific identification of "subprime" as its own category prior to January 2007 would not have been contrary to SEC guidance and unnecessary, such a breakdown would have been immaterial to the reasonable investor.  The reason is simple: An asset-backed security can be rated investment grade regardless of whether it is backed by subprime mortgages or any other type of collateral, including auto loans, student loans or credit

card receivables.[14]  In fact, mortgage-related securities backed by *subprime* loans can carry

higher credit ratings than lower priority "tranches" of securities backed by *prime* loans.

The Fund's Prospectus disclosed that the Fund "[n]ormally invest[ed] at least 80% of

assets in *investment-grade debt securities* (those of medium and high quality)."  [Ex. A (Sept. 29,

2005 Prospectus), at 3.]  Furthermore, the Shareholder Reports disclosed the precise percentage

of assets that were invested in securities having each credit rating, from AAA to BB and below,

in an easy-to-read pie chart format.  [Ex. C (July 31, 2006 Annual Report), at 9.]  Plaintiff pleads

no facts, nor could he, demonstrating that the subprime mortgage securities in which the Fund

invested were anything other than investment-grade debt securities, defined in accordance with

the Fund Documents to mean that such securities were "*rated investment-grade*" by the major

rating agencies.  [Ex. B (Sept. 29, 2005 SAI), at 8].[15]  The Complaint does not allege, nor could

it, that the overall credit ratings of the Fund's portfolio securities were not exactly as disclosed.

Indeed, Plaintiff acknowledges that the Fund did not make any unauthorized investments.  [*See*

Prior Opp. At 16 n.11.]

The *State Street* decision is instructive.  In *State Street*, the court rejected allegations

similar to those made here because the complaint in that case did not include "facts by which the

'quality' of the mortgage-related holdings might be judged."  *State Street*, 2010 WL 668645, at

*5.  Absent such facts, "the ratings" of the securities were dispositive because they

---

[14]   This is because the assets underlying the security are pooled together and rated in "tranches" from AAA at the top to BB or lower.  *See* Barron's Dictionary of Business Terms (2007) (defining "Mortgage-Backed Certificate," "Collateralized Mortgage Obligation," and "Tranche").  Investors in the pool get paid in tranche priority with those in the AAA tranche getting paid first.  *See* Int'l Monetary Fund, *Global Stability Report* at 8-9 (Apr. 2007).  Thus, even if, for example, most of the subprime mortgages underlying a particular mortgage-backed security go into default, as long as *some* are paying, investors in the AAA tranche would likely continue to receive their payments because *all* payments go to them before anyone else gets paid.

[15]   Instead, Plaintiff states that the "risky mortgage-related securities were not investment grade *even though* they may have had investment grade ratings by the ratings agencies."  [SAC ¶ 99.]  This allegation is nonsensical as it ignores the very definition of "investment-grade" set forth in the Fund Documents.

"affirmatively support[ed] the accuracy of the prospectuses' declaration that the Fund would invest in 'high-quality . . . investment grade instruments.'" *Id.* As *State Street* pointed out, "from our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the rating agencies did not perceive . . . . But the accuracy of the offering documents must be assessed in light of information available at the time they were published." *Id.*, at *6.

If anything, the disclosures here, warning investors that the Fund would invest primarily in investment grade securities with "*medium* and high [credit] quality," [Ex. A (Sept. 29, 2005 Prospectus), at 3], were even more cautionary than in *State Street*, where the fund confined itself to "high-quality" securities only. *State Street*, 2010 WL 668645, at *5. Here, as in *State Street*, the alleged omissions regarding subprime securities could not have been material unless those subprime securities were not investment grade, a factual allegation that Plaintiff does not and could not make. *See Basic Inc.*, 485 U.S. at 231-32. Plaintiff's failure to allege any such fact, must result in the dismissal of his subprime-related claims. *See Twombly*, 550 U.S. at 570.

### 3.   The Fund Documents Disclosed the Effect That the Fund's Investment in the Central Fund Had on the Fund's Portfolio.

Plaintiff alleges that the Fund Documents failed to disclose the effect of the Fund's investment in the Central Fund on the overall mix of securities held by the Fund, and goes so far as to allege that the Central Fund was a mysterious "black box." [SAC ¶¶ 56-57, 117-23.] But the Central Fund was itself *registered with the SEC under the Investment Company Act*, not exactly a cloak-and-dagger strategy. If anything, the Central Fund was a transparent box as it filed registration statements and full financial statements with the SEC twice a year just like every other Fidelity mutual fund, with holdings posted on Fidelity's website. Further, Plaintiff's

Central Fund allegations are belied by the extensive disclosures in the Fund Documents

themselves:

- The pie charts included in every Annual Report, which break Fund assets down by credit risk and asset type, were "based on the combined investments of the fund and its prorata share of the investments in each Fidelity Central Fund." [Ex. C (July 31, 2006 Annual Report), at 9.] Thus, Plaintiff was given, in simple graphical form, the exact mix of Fund assets with the Central Fund investment already taken into account.

- Although the 33-page list of Fund investments in the Annual Report did not list out the Central Fund portfolio, the Annual Report directed investors to Fidelity's website for a complete list of holdings for the Central Fund. [Ex. C (July 31, 2006 Annual Report), at 59.] The same information was also filed with the SEC and available on the SEC's public website. Thus, investors in the Fund could see a periodic listing of *every single investment in the Central Fund*, just as they could for the Fund itself.

- For investors who did not take the time to review the complete list of Central Fund investments, the Fund's Annual Report explained that the Central Fund's investments "are *similar* to those of the investing fund," with "strategies [that] are *consistent* with the investment objectives of the Fund." [Ex. C (July 31, 2006 Annual Report), at 59.] Thus, any investor familiar with the extent of the Fund's investments in mortgage-related securities, *see supra* Argument § C(1), should have been well aware that the Central Fund provided more of the same.[16]

These disclosures informed investors (a) that the Fund invested in the Central Fund, (b) what the

holdings of the Central Fund were, and (c) the composition of the Fund's portfolio with the

Central Fund taken into account. Any argument that Proposed Class members were misled about

the Central Fund's investments and their impact on the Fund's portfolio must therefore be

dismissed on the face of Plaintiff's Complaint. *See Thompson*, 300 F.3d at 754.

    **4.**     **Plaintiff Alleges No Facts to Support His Contention That the Fund's "Interest Rate Risk" Was Not Similar to the Lehman Brothers 6-Month Swap Index.**

Plaintiff claims investors were misled by the Fund Documents' references to the Lehman

Brothers 6-Month Swap Index ("Swap Index"). He complains that the Fund was "structured

---

[16] The disclosure in the Fund's Annual Report that the Central Fund's investments "are similar to those of the investing fund," also belies Plaintiff's repeated assertion in his Prior Opposition that the Central Fund was misrepresented to be a "cash-equivalent." [Prior Opp. at 16; *see also* Prior Opp. at 7, 23.]

differently from, and was much riskier and more volatile than" the Swap Index.  [SAC ¶ 101.]  In

support, he points to a chart showing the divergence in overall "performance" between the Fund

and the Swap Index beginning in mid-2007.  [SAC ¶ 134.]

<h3>a.    <u>The Swap Index Was Disclosed as a Guide for Interest Rate Risk, Not Credit Risk or Performance</u>.</h3>

The Fund Documents disclosed that the Swap Index would be used for a very specific

purpose:  The Fund would be managed to have similar "interest rate risk" as the Swap Index, *not*

the same overall risk, volatility or performance.  [Ex. A (Sept. 29, 2005 Prospectus), at 3.]

"Interest rate risk" was, in turn, defined in accordance with ordinary usage to mean that, if

interest rates rise, bond prices will fall (and, hence, the net asset value of a fixed income mutual

fund will be lower).[17]  Thus, the disclosure that the Fund would be managed to have similar

"overall interest rate risk" to the Swap Index meant that, all else being equal, an increase in

interest rates would be expected to produce a contemporaneous decline in the Fund of

approximately the same magnitude as the Swap Index.[18]  Unlike *Evergreen*, where the fund's

prospectus allegedly made "specific statements regarding the Fund's objectives, including . . .

that its *returns* would likely be comparable to those in the Lehman indices,"  2010 WL 1253114,

---

[17]    As explained in the Prospectus, the risk of "Interest Rate Changes" means that "[i]n general, the price of a debt or money market security can fall when interest rates rise and can rise when interest rates fall."  (Ex. A (Sept. 29, 2005 Prospectus), at 8).  This definition was echoed in the July 31, 2006 Shareholder Update, which explains that "[b]ond funds contain interest rate risk (as interest rates rise bond prices usually fall)."  (Ex. D (July 31, 2006 Shareholder Update), at ii.)  *See* Barron's Dictionary of Business Terms (2007) (defining "interest rate risk" as "risk that changes in interest rates will adversely affect the value of an investor's securities portfolio . . . because the value of . . . bonds . . . will fall if interest rates rise").

[18]    The "Investment Details" section of the Prospectus is consistent with this understanding.  That section, which must be read as a whole, contains the following three consecutive sentences regarding the Swap Index:  "FMR uses an index that represents the market for the type of securities in which the fund invests as a guide in structuring the fund and selecting its investments.  FMR manages the fund to have similar overall interest rate risk to the index.  As of July 31, 2005, FMR was using the Lehman Brothers 6-Month Swap Index in managing the fund's investments."  [Ex. A (Sept. 29, 2005 Prospectus), at 7.]  Plaintiff distorts the meaning of this section by quoting selected excerpts while ignoring the rest of the passage.  [*See, e.g.*, SAC ¶¶ 107-108.]  The plain meaning of the entire section, read as a whole, is clear:  The first sentence explains that the Fund uses *some* index for *some* purpose, which naturally raises two questions:  For what purpose, and which index?  The next two sentences answer these questions:  respectively, for the purpose of managing interest rate risk, and the Lehman Brothers 6-Month Swap Index.

at *4 (emphasis added), the Fund Documents here made no such representations about "returns." The Fund did not purport to be an index fund tracking the Lehman Swap Index or any other index.  As disclosed, the Fund's use of the Lehman Swap Index was as a guide for "overall interest rate risk."

Further, consistent with ordinary usage, the Fund Documents repeatedly described interest rate risk as being separate and distinct from "credit risk," which is the risk of loss due to issuer default.  [*See, e.g.,* Ex. D (July 31, 2006 Shareholder Update), at iv ("Credit risk [is] the risk that the underlying assets will not generate all of the interest and principal payments owed to holders of the securities."); *see also* (Ex. D (July 31, 2006 Shareholder Update), at ii ("Bond funds contain interest rate risk (as interest rates rise bond prices usually fall); the risk of issuer default [*i.e.,* credit risk]; *and* inflation risk.").][19]  Plaintiff concedes that the Swap Index was to be used as a guide only for "interest rate risk," [*see* SAC ¶ 101], but attempts to expand the definition of interest rate risk beyond how that phrase is used in the Fund Documents—or in any other normal usage.  For example, Plaintiff uses the phrase "interest rate risk" in the Complaint to include "the risk of default on mortgage-related securities."  [SAC ¶ 101.]  Such "risk of default," however, is *credit risk*, not interest rate risk.  The assertion that the Fund was more sensitive to the default of mortgage-related securities than the Swap Index—in other words, that the Fund and the Swap Index did not share the same *credit risk*—may or may not be correct, but it does not impugn the disclosure regarding interest rate risk.  [*See* SAC ¶ 101.]

       **b.**       **Plaintiff Alleges No Facts to Support His Contention That the Decline in the Fund's NAV Was the Manifestation of Interest Rate Risk.**

---

[19]     *See also* Barron's Dictionary of Business Terms (2007) (defining "credit risk" as the "financial and moral risk that an obligation will not be paid and a loss will result"; and defining "credit rating" as the "formal evaluation of . . . credit history and capability of repaying obligations").

Plaintiff alleges no facts to support a theory that the Fund and the Swap Index did not share similar interest rate risk.  Plaintiff instead points to the Fund's declining NAV after mid-2007, and the divergence in its *performance* from the Swap Index, as evidence that "interest rate risk" must have been different.  [SAC, ¶ 101.]  But such conclusory allegations lack the requisite "plausibility."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Interest rate risk" could have caused the decline in the Fund's NAV only if interest rates were *increasing*, because interest rate risk is the risk that *rising* interest rates will cause bond values to fall.  In fact, while the Fund's NAV was declining, prevailing interest rates were *declining*.  *Compare* NAV Data *with* Federal Reserve Statistical Release, Selected Interest Rates, "3-month Treasury bill secondary market rate" (*available at* http://www.federalreserve.gov/releases/h15/data/Monthly/H15_TB_M3.txt):

**Fund NAV vs. 3-Month T-Bill Interest Rate**
**February 2007 to June 2008**

As explained by the Supreme Court in *Twombly*, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. Here, it is not "plausible" to attribute the decline in the Fund's NAV to "interest rate risk."

5.     **Plaintiff Does Not Allege Facts to Support His Allegation That Defendants Failed to Follow The Fund's Disclosed Valuation Methodology.**

Plaintiff alleges that Proposed Class members were misled as to the Fund's valuation capabilities and methodologies. In particular, he complains that the Fund failed to disclose its reliance on Bear Stearns to price certain securities. [SAC ¶¶ 110, 116.] But notwithstanding the Complaint's conclusory allegations, Plaintiff nowhere alleges facts suggesting that the Fund's valuation methodologies were not exactly as disclosed, nor did the Fund have a duty to make the allegedly omitted disclosures. Any additional disclosure regarding the use of Bear Stearns as a pricing service would have been immaterial. Further, the Complaint's critique regarding the Fund's valuation capabilities must be dismissed as a mismanagement claim that is not cognizable under the Securities Act of 1933.

SEC Form N-1A defines the disclosure requirements for mutual funds. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 361. Form N-1A requires disclosure of "the method used to value Fund shares (market price, fair value, or amortized cost)," as well as "a brief explanation of the circumstances under which [the Fund] will use fair value pricing and the effects of using fair value pricing." Item 6(a)(1), Form N-1A.

The Prospectus and SAI satisfied the requirements of Item 6(a)(1) by disclosing that "[t]he fund's assets are valued primarily on the basis" of "information furnished by a pricing service or market quotations." [Ex. A (Sept. 29, 2005 Prospectus), at 10.] These "market quotations" can also be "furnished by recognized *dealers* in such securities or assets." [Ex. B (September 29, 2005 SAI), at 13 (emphasis added).] Where both market quotations and pricing

-28-

service information are unavailable, the disclosures state that the Fund employs its "fair value"

pricing process, [Ex. A (Sept. 29, 2005 Prospectus), at 10], which takes into account "bid/ask

quotes of brokers," [Ex. B (September 29, 2005 SAI), at 13].  In addition, the SEC has described

the decisions about when and how to employ the "fair value" process as a series of business

judgments to be made by the Board "in good faith":

> [T]he good faith requirement is a flexible concept that can accommodate many different
> considerations, and . . . the specific actions that a board must take will vary, depending on
> the nature of the particular fund, the context in which the board must fair value price, and
> the pricing procedures adopted by the board.

Inv. Co. Inst., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 543, at *15.

A conclusory allegation of inconsistency with these disclosed procedures does not

suffice.  *See Twombly*, 550 U.S. at 555.  As the court in *State Street* noted, where, as here, "the

offering documents set out the specific methods by which the Fund's holdings were to be valued,

. . . [t]he claim that defendants misstated the value of mortgage securities can only be assessed in

the context of these prescribed valuation methods, because by logic defendants' valuations could

only be false or misleading if they were inconsistent with those methods."  *State Street*, 2010 WL

668645, at *8.  Here, Plaintiff fails to allege facts to support his conclusory allegation that the

Fund failed to follow the valuation procedures set forth in its disclosures.  *See Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949 (2009).[20]

Plaintiff alleges that the Fund should have disclosed that Bear Stearns was one of the

dealers providing it with pricing information.  [SAC ¶ 67.]  Form N-1A, however, does not

require the Fund to disclose the names of any particular dealer.  *See Cooperman*, 171 F.3d at 49-

---

[20]     By way of contrast see *In the Matter of Evergreen Investment Mgmt. Co.*, Cease and Desist Order, SEC
Release No. 60059 (June 8, 2009) (hereinafter "Evergreen SEC Order"), at 6, where the SEC found that the
Evergreen fund's management team was intentionally concealing information from its valuation committee,
leading, in one instance, to a security being valued at $98.93 even though its market price was $9.50.  There is
no such allegation here.

50; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 361 (2d Cir. 2010) (affirming dismissal of securities disclosure claims that sought information beyond what was required by Form N-1A).  Nor would such a disclosure have altered the "total mix" of information, *see Basic Inc.*, 485 U.S. at 231-32, given the disclosure that the Fund would rely on "recognized dealers in such securities or assets," [Ex. B (September 29, 2005 SAI), at 13], a group that indisputably included Bear Stearns.  That "Bear Stearns" later fell into disrepute and became a buzzword cannot be used to suggest that an earlier disclosure of Bear Stearns' name would have mattered to the reasonable investor.  Materiality is measured at the time of disclosure, not with 20/20 hindsight.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (holding that a plaintiff must allege facts showing "defendant[s] possessed the omitted information at the time the registration statement became effective").

Plaintiff attempts to buttress his allegations regarding the Fund's use of Bear Stearns pricing information by claiming that "Bear Stearns had a clear conflict of interest in pricing those securities" because the securities were "structured, marketed and sold by Bear Stearns."  [SAC ¶ 110.]  But the Fund had already disclosed that it might rely on dealers in the same securities for pricing data.  [Ex. B (Sept. 29, 2005 SAI), at 13.]  Furthermore, the alleged "conflict of interest" is one that is endemic to all securities dealers and should therefore be presumed to be publicly known.  As such, there is no disclosure requirement.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 2010 U.S. Dist. LEXIS 13856, at *14 (S.D.N.Y. Feb. 19, 2010) ("[T]here was no obligation for the Offering Documents to disclose the potential for a conflict of interest arising from the fact that Lehman paid the ratings agencies for their ratings.  The Securities Act does not require disclosure of that which is publicly known . . . ."); *In re Morgan Stanley Info. Fund Sec.*

*Litig.*, 592 F.3d at 366 (finding no obligation to disclose "the commonly understood [conflict-of-interest] risks associated with securities research").

Plaintiff also alleges that Defendants failed to disclose certain deficiencies in Fidelity's pricing process: that Fidelity's valuation group was "not adequately staffed and was staffed with individuals with limited experience"; that "Fidelity was unable to adequately value risky mortgage-related securities and heavily relied upon external pricing sources"; and that "the Fair Value Oversight Committee failed to adequately monitor or provide oversight with respect to mortgage-related securities."[21]  [SAC ¶¶ 114, 116.]  These claims are pure mismanagement claims masquerading as disclosure claims, in which Plaintiff endeavors to second-guess business judgments.  It is well settled that such claims are inactionable under the federal securities laws. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. at 479 (securities laws do not regulate "corporate mismanagement"); *Shaw*, 82 F.3d at 1206 ("To the extent that the claim comprises allegations of mismanagement, it is not cognizable under the securities laws."); *Vachon v. BayBanks, Inc.*, 780 F. Supp. 79, 82 (D. Mass. 1991).  Federal courts have routinely rejected attempts, like Plaintiff's here, to bootstrap mismanagement claims into federal disclosure claims by pleading that defendants failed to disclose the alleged mismanagement.  *See, e.g.*, *In re Craftmatic Sec. Litig.*,

---

[21]   Plaintiff further claims that Defendants misrepresented the credentials of the members of the Fair Value Oversight Committee because the Independent Trustees who serve on the committee "were not 'experienced executives' with respect to the valuation of risky mortgage-related securities."  [SAC ¶ 114.]  Notably, the paragraph in the SAI regarding the Fair Value Oversight Committee does not include the phrase "experienced executives" or make any representation whatsoever about the Trustees' experience determining the fair value of mortgage securities or any other type of security.  [Ex. B (September 29, 2005 SAI), at 20.]  Rather, the phrase "experienced executives" appears multiple pages earlier, in a paragraph identifying the trustees and officers of the Fund.  [*Id.* at 14.]  There can be no dispute that the Fund's Independent Trustees were "experienced executives."  Among the Independent Trustees during the Class Period were former CEOs, CFOs, and other executives of Fortune 500 companies, such as IBM and the Dow Chemical Company, as well as current Secretary of Defense, Robert Gates.  [*Id.* at 14-20.]  In any event, whether these unquestionably "experienced executives" had experience in the valuation of mortgage-related securities is beside the point: The SEC has specifically recognized that fund board members may rely on those familiar with valuation techniques to assist them in the fair valuation process.  *See* SEC Release No. AS-118, 1970 WL 10502, at *4.

890 F.2d at 638-39; *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287 (7th Cir. 1981);

*Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 184 (D.R.I. 2003).

> **6.   The Complaint Contains No Plausible Allegation That the Fund's NAV Was Incorrect or Had To Be "Written Down."**

Plaintiff alleges that the Fund's NAV was "inflated" and that Defendants failed to "write-down" the Fund's investments to reflect "prevailing economic conditions." [SAC ¶¶ 110-11.] These conclusory allegations lack any factual support and reflect a misunderstanding of the legal requirements for the calculation of NAV.

> **a.   Plaintiff's Implausible Allegation of NAV "Inflation"**

It is insufficient for Plaintiff to simply allege that the Fund's NAV was "inflated." [SAC ¶ 112]; *Twombly*, 550 U.S. at 555. Every mutual fund has a NAV every day. A bald allegation that the NAV is wrong cannot open the courthouse doors. Recognizing this deficiency in the First Amended Complaint, Plaintiff amended his Complaint again, this time to include *two* purportedly "mispriced" securities out of the hundreds of securities in the Fund's portfolio: Bear Stearns Asset Backed Securities Trust Series 2004-BO1 and ACE Securities Corp. Series 2006-NC2. [SAC ¶¶ 68-69.] Plaintiff's two examples do not, however, "plausibl[y]" suggest any material mispricing of the Fund's NAV. *Twombly*, 550 U.S. at 570.[22]

Plaintiff concedes that many of the bonds in the Fund's portfolio were "difficult to price." [SAC ¶ 72.] Indeed, as noted in *State Street*, 2010 WL 668645, at *8, "[t]here is no single,

---

[22]   Plaintiff's allegations are also belied by the fact that the Fund's NAV began *declining* at the same time the mortgage-backed securities market began declining in July 2007. [*See* SAC ¶ 133]; *see also* NAV Data. This indisputable fact contradicts Plaintiff's allegations that the Fund was artificially stabilizing its NAV at an inflated level, ignoring "prevailing economic conditions." [SAC ¶ 111.] And it renders this case distinct from cases in which the NAV of other funds remained stable for many months beyond mid-2007, while the mortgage-backed securities market trended downwards. *See, e.g.,* Evergreen SEC Order at 3 (finding that Evergreen's fund maintained an artificially inflated NAV—at or above $9.20 per share—until May 23, 2008, when it was rapidly devalued to $7.48 per share over a period of three weeks before being liquidated).

objectively acceptable method for valuing the complex asset-backed instruments at issue here."[23]

*See also Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at 251-52 ("[F]inancial valuation

models depend so heavily on the discretionary choices of the modeler . . . that the resulting

models and their predictions can only fairly be characterized as subjective opinions.").  As the

SEC recognizes, "[n]o single standard for determining 'fair value . . . in good faith' can be laid

down."  SEC Release No. AS-118, *Accounting for Investment Securities by Registered*

*Investment Companies*, 1970 WL 10502, at *4 (Dec. 23, 1970).  Nevertheless, the Complaint

asserts that the Fund's NAV was "inflated" because in the opinion of unnamed "external pricing

services," two bonds in the Fund's portfolio of hundreds of bonds were overvalued by 6% and

8%, respectively.  [SAC ¶¶ 68-69.]

Plaintiff fails to allege that such *de minimis* disparities are anything more than normal

variation between pricing services.  And there can be no dispute that the alleged 6% and 8%

pricing disparities were immaterial to the Fund's NAV.  The 6% "overpriced" security translates

to an "overpricing" of  $12,000 in a Fund with total assets of over $950 million, and the 8%

"overpriced" security translates into a difference of about $167,000 in the Central Fund, which

had assets of over $15 billion.  [SAC, ¶¶ 68-69; Ex. F (July 31, 2007 Annual Report) at 41; Ex.

G (June 30, 2007 Ultra-Short Central Fund Form N-Q) at 49.]  These alleged "overpricings"

represent a difference of about 0.001% in the NAV, the equivalent of one hundredth of one

penny for a fund with a $10.00 NAV—not nearly enough to change the reported NAV.  They are

---

[23]   Within a range, the prices of securities in a fund's portfolio constitute opinions that are only actionable under
federal securities laws if they are both subjectively and objectively false.  *See Virginia Bankshares, Inc. v.
Sandberg*, 501 U.S. 1083, 1095 (1991); *Brown v. Credit Suisse First Boston LLC*, 431 F.3d 36, 47 (1st Cir.
2005).  Here, Plaintiff nowhere alleges that Defendants did not subjectively believe that the prices of securities
in the Fund were correct.

the very definition of immaterial.[24]  *See, e.g., In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d

595, 631 (S.D.N.Y. 2005) ("[c]hanging the accounting treatment of approximately 0.3% of JPM

Chase's total assets . . . would not have been material to investors").

Plaintiff, of course, alleges that there are "numerous other examples" of mispriced

securities in the Fund's portfolio.  But this allegation adds nothing to Plaintiff's inadequate,

conclusory allegation that the NAV was incorrect.  If there were more than Plaintiff's two

allegedly "mispriced" securities, Plaintiff could have and should have alleged what they were in

his Second Amended Complaint.  As explained *supra*, Statement of Facts § C(1), the Fund

Documents listed every single security in which the Fund was invested along with the valuation

ascribed to each.  Accordingly, this is not a case in which discovery would be necessary to

discover other instances of "inflated" pricing.

Since Plaintiff's two examples are immaterial, and the assertion that there are "numerous

other[s]" is a mere conclusion, Plaintiff's mispricing allegations must stand or fall with the two

examples Plaintiff has offered.  Indeed, Plaintiff's mispricing/NAV inflation allegation based on

just two "mispriced" securities is even weaker than the allegation of NAV inflation in *In re*

*Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 561 (N.D. Cal. 2009), where the court, in

dismissing the mispricing claim observed that "the complaint identifies only *fourteen* assets

alleged to have been mispriced out of a portfolio of hundreds if not thousands of assets"

(emphasis added)).  Plaintiff's mispricing allegation must suffer the same fate as the similar

allegation in *Schwab*.

---

[24]  The alleged mispricing of securities here by 6% and 8% stand in stark contrast to the SEC enforcement action involving Evergreen where the SEC found that Evergreen had intentionally relied on inflated prices provided by one disreputable broker-dealer, resulting in various securities having to be repriced downward by more than 90%.  *See* Evergreen SEC Order at 6.  There are no similar allegations here, nor does the alleged inflation of two securities by 6% and 8% equate to the 90% price inflation of multiple securities found in the Evergreen SEC Order.

### b.   Plaintiff's Implausible Allegation That the Fund's NAV Should Have Been "Writen Down"

Plaintiff also makes the conclusory assertion that the Fund's NAV should have been "written down" to reflect "prevailing economic conditions." [SAC ¶¶ 110-12.] But NAV is not something a Fund is able to "write down"; rather, it is required to reflect the market value of the underlying investments on a daily basis.[25] 15 U.S.C. § 80a-2(a)(41)(B); 17 C.F.R. 270.2a-4. As disclosed in the Fund Documents, the Fund's NAV is a daily mathematical calculation based on the valuations of the underlying investments.[26] In turn, each underlying investment is valued at its current market price as furnished by a third party, typically an independent pricing service or a dealer of that security. Where a market price is unavailable or certain other conditions are present, the Fund implements a "fair value" process. [Ex. A (Sept. 29, 2005 Prospectus), at 10.] But the fair value process is required to estimate market value—the price for which the securities could be sold on that date—not to generate a "true" or "intrinsic" value. *See* Inv. Co. Inst., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 543, at *14 n.19 (Apr. 30, 2001). In other words, mutual funds (unlike operating companies) value their assets at market prices every day and do not "write down" assets based on projected default rates or other criteria. If the market price of a bond is 100 cents on the dollar on a given day, the fund *must* use that value. In this regard,

---

[25]   The term "write-down" typically applies to a bank, which holds assets on its books at some accounting-based valuation and then actively decides to "write down" those assets to their market value at the end of an accounting period. *See* Barron's Dictionary of Business Terms (2007) (defining "write-down" as "the reduction in an asset value on the financial statements, often following a drop in the market price").

[26]   Unlike stocks, shares of an open-end mutual fund like the Fund at issue in this case are not traded between investors in the secondary market. Any investor who wishes to purchase shares of the Fund must purchase new shares from the Fund itself. Similarly, when an investor wishes to sell his shares, he must sell the shares back to the Fund. Thus, there is no market price for Fund shares. Instead, the price of a Fund share is a mathematical calculation based on the values of the securities in the Fund's portfolio. Fidelity performs that calculation every day by taking the sum of the value of all the securities and other assets held by the Fund, subtracting expenses and liabilities, and dividing by the total number of Fund shares outstanding. [*See* Ex. B (Sept. 29, 2005 SAI), at 13]; 17 C.F.R. 270.22c-1.

Plaintiff's allegation that the NAV should have been written down is implausible, and fails to support any of Plaintiff's claims. *Twombly*, 550 U.S. at 570.

**D.**     **Plaintiff's Claims Are Barred by the One-Year Statute of Limitations.**

       **1.**     **Claims Under the Securities Act Must Be Brought Within One Year After Plaintiff Is Put on Notice of the Claims.**

Claims under Sections 11 and 12(a)(2) must be brought within one year from the date on which the plaintiff discovered, or reasonably should have discovered, the facts that give rise to the claims. *See* 15 U.S.C. § 77m. Either actual notice or inquiry notice is sufficient to trigger the statute of limitations. *See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 224 (1st Cir. 1997); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 127-28 (1st Cir. 1987).

A potential plaintiff is deemed to have inquiry notice when circumstances, typically referred to as "storm warnings," would suggest to a reasonable investor that he has a cause of action. *See Maggio*, 824 F.2d at 128. Once it is determined that a plaintiff is on inquiry notice, the focus shifts to when the investor, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. *See Merck & Co. v. Reynolds*, 2010 WL 1655827, at *15 (Apr. 27, 2010). Where, as here, a plaintiff fails to undertake any investigation after storm warnings appear that are sufficient to put him on notice of his claims, knowledge of the facts underlying his claims shall be imputed to him as of the date the duty to inquire arose. *See Slavin v. Morgan Stanley & Co.*, 791 F. Supp. 327, 330 (D. Mass. 1992); *see also LC Capital Partners LP v. Frontier Ins. Group Inc.*, 318 F.3d 148, 154 (2d Cir. 2003); *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) (collecting cases). *See also Tabankin*, 1994 U.S. Dist. LEXIS 965, at *17-18 (dismissing securities claims as time-barred where "investors were on inquiry notice of their claims").

"Storm warnings" include "the accumulation of information over a period of time that conflicts with representations . . . made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability" of misleading statements.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 n.5, 1327 (3d Cir. 2002).  Courts examine the full array of information available to investors from any number of sources, including SEC filings, press releases, news reports, and other publicly available documents.  *See Cooperativa de Ahorro y Credito Aguada*, 129 F.3d at 225 (newspaper articles); *LC Capital*, 318 F.3d at 154-56 (news articles and another filed action); *In re Tyco Int'l, Ltd., Sec. Litig.*, 185 F. Supp. 2d 102, 107-08 (D.N.H. 2002) (news articles and fund manager report).

## 2.    At the Latest, the Fund's January 2007 Disclosures Put Investors on Notice of Their Claims More Than One Year Before the Complaint Was Filed.

Even if the Fund's Prospectus and SAI were somehow misleading—which they were not—and even if investors had not been placed on notice prior to January 2007 of all the "wrongs" about which Plaintiff now complains—which they were, *see, e.g., supra*, Argument § C—there can be no question that the Fund's January 2007 Shareholder Update placed Proposed Class members on inquiry notice sufficient to start the running of the applicable one-year statute of limitations.  That Update addressed all of Plaintiff's putative concerns, warning him that the Fund manager "heavily emphasized . . . mortgage-backed securities (MBS)" including "those backed by subprime mortgage loans."  [Ex. E (January 31, 2007 Shareholder Update), at iii.]  Indeed, there was even a special section of boxed text entitled "Andrew Dudley on securities backed by subprime mortgages," in which the Fund manager explained the impact of the "slowing housing market" and "rising delinquencies" on the Fund in light of the Fund's exposure to subprime mortgage securities.  As Dudley explained, "Even higher-quality subprime securities—which are my area of emphasis—couldn't escape investors' concerns over rising

-37-

delinquencies."  Further, the Update explained that the Fund held such securities "not only directly, but also indirectly through the Fidelity Ultra-Short Central Fund."  As a result, Dudley reached the conclusion, which he shared with investors, that "we're likely to experience a repricing of sorts in which riskier types of bonds may underperform."  [Ex. E (January 31, 2007 Shareholder Update), at iii-v.][27]

Considering Plaintiff's contention that investors knew *nothing* about the Fund holding subprime mortgage securities prior to the January 2007 disclosure, the news that the Fund invested in subprime mortgage securities *at all* should have been a major storm warning.  But the Shareholder Update went much further, disclosing that subprime mortgage securities were "disappointments" and "detracted from fund performance" because "[t]hey [had come] under pressure due to concerns about delinquencies and the growing likelihood of greater defaults." [Ex. E (January 31, 2007 Shareholder Update), at iii-v.]  Any reasonable investor who read this document would have been aware that the Fund was at risk of loss from subprime mortgage securities.[28]

Further, Plaintiff contends that by the time this disclosure reached investors, extensive media coverage of subprime mortgage securities had already provided "a strong indicator that the problems being experienced by sub-prime lenders *would generate huge losses for mortgage-related securities, such as those held by the Fund.*"  [SAC ¶ 92 (emphasis added).]  By way of example, Plaintiff points to numerous articles in the months leading up to the January 2007

---

[27]  The January 2007 Shareholder Update did not contain an explicit discussion of the Fund's valuation capabilities or methodologies, or the calculation of the Fund's NAV.  Plaintiff's allegations regarding these two topics, however, are entirely insufficient and meritless, as explained *supra*, Argument §§ C(5)-C(6).  Thus, there was nothing to disclose.

[28]  Notably, as of the  time of the January 2007 disclosure, the Fund's NAV had not yet declined.  *See* NAV Data.  Thus, Proposed Class members who purchased their shares before January 2007 could have sold their shares upon reading that disclosure without suffering any loss.  This is not a case in which any member of the Proposed Class could have lost money as a result of Defendants' alleged conduct.

Shareholder Update, which, according to Plaintiff, warned investors about the rising default and

delinquency rates among subprime mortgage borrowers and the concomitant risks facing

subprime mortgage securities:

- *Dow Jones Newswires* reported that "[m]ore subprime borrowers are defaulting . . . , a trend that has led to greater fear among investors . . . ."  [SAC ¶ 81.]

- *American Banker* reported that "sub-prime loans made this year [*i.e.*, 2006] are 'going bad' at a rate that is 50% faster than the rate for those made last year."  [SAC ¶ 83.]

- *Associated Press* reported that "[s]ubprime borrowers had a delinquency rate of 12.56 percent in the third quarter [of 2006], **the highest in more than three years**."  [SAC ¶ 85 (emphasis in original).]

- *The Wall Street Journal* reported that "foreclosure rates on sub-prime mortgage loans in 2006 **more than doubled** from 2005."  [SAC ¶ 87 (emphasis in original).]

Thus, by the time the January 2007 Shareholder Update unequivocally informed Plaintiff that the

Fund was invested in subprime mortgage securities, Plaintiff contends that investors should

already have been alert to the serious risks of such securities.  *See Cooperativa de Ahorro y

Credito Aguada*, 129 F.3d at 225 (holding that newspaper articles are sufficient to trigger inquiry

notice).  The January 2007 Shareholder Update itself acknowledged the "steady stream of news

about troubles in this [the subprime] marketplace," and the "declining valuations for the bonds

backed by this type of collateral."  [Ex. E (January 31, 2007 Shareholder Update) at v.]

Plaintiff concedes that the January 2007 Shareholder Update constituted a "disclosure

about certain asset-backed securities which saw some pressures, *including subprime mortgage

loans*."  [Prior Opp. at 35 (emphasis added).]  Plaintiff even describes the disclosure as a

"warning" (albeit a "mild" one) that subprime mortgage securities were a source of concern for

the Fund.  And Plaintiff argues that, by the time he received the January 2007 Shareholder

Update, the mass media had already alerted investors like him to the risks of "huge losses" from

subprime mortgage securities.  [SAC ¶ 92.]  It is no surprise, then, that Plaintiff himself

describes the January 2007 Shareholder Update as "the beginning of a 'storm warning.'" [Prior

Opp. at 35.]  But a storm warning is a storm warning; there is no "beginning" or end.  As soon as

the storm warning begins, investors are on the requisite inquiry notice that commences the

running of the statute of limitations.  *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st

Cir. 1987) ("[Claimants] need not . . . have fully discovered the nature and extent of the fraud

before they were on notice that something may have been amiss.  Inquiry notice is triggered by

evidence of the possibility of fraud, not full exposition of the scam itself.").  Plaintiff's decision

to wait until June 2008 to file this lawsuit is legally inexcusable.  *See* 15 U.S.C. ¶ 77m.

## E.  Plaintiff's Claimed Losses Were Not Proximately Caused by the Alleged Misrepresentations or Omissions.

Both Sections 11 and 12 limit a plaintiff's recovery to losses actually caused by the

alleged misrepresentations or omissions.  *See* 15 U.S.C. § 77k(e); 15 U.S.C. § 77l(b).  Thus, the

absence of such loss causation, or "negative causation," is an affirmative defense that may be

raised on a motion to dismiss where established on the face of the pleadings.  *See In re Merrill*

*Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006); *Merrill Lynch*

*Research Reports*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003).  Unlike a typical share of stock

traded on a stock exchange, the price of a mutual fund share is calculated pursuant to a statutory

formula based on its underlying portfolio, and is not affected by the buy-sell decisions of

investors.  Accordingly, even if Defendants had made all of the disclosures sought by Plaintiff,

using exactly the language Plaintiff prefers, the Fund would have owned the same securities,

experienced the same investment performance, and reported the same NAV throughout the

proposed Class Period.  Because the Fund's decrease in NAV was caused by a decline in the

value of the portfolio securities, not by any alleged misrepresentations or omissions, any loss

suffered by proposed Class Members cannot be recovered under Section 11 or 12.  *See In re*

*Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006) ("Plaintiffs explain no mechanism by which a mutual fund share's price could differ from its objective 'value.'"); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588-91 (S.D.N.Y. 2006); *Merrill Lynch Inv. Mgmt.*, 434 F. Supp. 2d at 238-39.[29]

**F.     FMR LLC Is Not a Proper Defendant for Purposes of Section 11.**

Only specific persons may be liable under Section 11: signatories, directors, underwriters, or those who prepared or authorized the allegedly misleading registration statement. *See* 15 U.S.C. § 77k(a). Courts routinely reject claims brought pursuant to Section 11 against persons who do not fall within the categories set forth in Section 11(a). *In re Am. Bank Note Holographics, Inv. Sec. Litig.*, 93 F. Supp. 2d 424, 437 (S.D.N.Y. 2000) (strictly construing categories listed under Section 11(a) and refusing to impute liability to non-signatory parent of issuer, despite claims that parent "functioned" as the issuer); *see also In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 385 (D. Mass. 1987) (dismissing Section 11 claim against accounting firm and COO, where neither was alleged to have prepared or certified prospectus).

Here, Plaintiff does not allege that FMR LLC was a signatory, director, underwriter, or in any way prepared the registration statements of the Fund, as required by Section 11(a). Plaintiff merely asserts that FMR LLC "oversees a wide group of privately held companies in the financial services industry" [SAC ¶ 8], and that the "Registration Statements instruct investors to

---

[29]     *Schwab*'s suggestion that applying the negative causation defense in mutual fund cases would "insulate" or "immunize" mutual funds from liability for prospectus misrepresentations and omissions, *Schwab*, 257 F.R.D. at 547, ignores the extensive regulatory regime to which mutual funds are subject. For example, the SEC could, without alleging or proving loss causation, bring an action under any number of provisions of the Securities Act, the Securities Exchange Act, the Investment Advisers Act, or the Investment Company Act if a fund violated its disclosure obligations. In fact, the SEC has brought such enforcement actions against other mutual fund companies. *See, e.g., In the Matter of State Street Bank & Trust Co.*, Cease and Desist Order, SEC Release No. 9107 (Feb. 4, 2010); Evergreen SEC Order.

contact Fidelity Investments concerning buying and selling shares of the Fund."[30]  [*Id.*]  These allegations do not create liability for FMR LLC under Section 11.

Nor can Plaintiff impute primary Section 11 liability onto FMR LLC as the parent entity of FMR.  Allegations about corporate parentage or management structure do not suffice to invoke Section 11 liability.  *See In re Worldcom, Inc. Sec. Litig.*, 308 F. Supp. 2d 338, 345 (S.D.N.Y. 2004) ("[T]here is no legal basis for an 'enterprise' theory of liability for a Section 11 claim."); *Elscint*, 674 F. Supp. at 385 (allegation that defendant was a "high ranking officer" not sufficient to state a claim under Section 11).

**G.      Defendants Were Not "Control Persons" for Purposes of Section 15 Liability.**

Section 15 imposes liability on any person who controls another person or entity who violates any provision of the Securities Act.  *See* 15 U.S.C. § 77o.  Here, Plaintiff has failed to state a primary violation of the Securities Act, and his Section 15 claim must be dismissed.  *See Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 13 n.12 (1st Cir. 2006).

The control person claims against FMR LLC and the Individual Defendants fail for the additional reason that the Complaint does not specifically allege that these Defendants exercised control.  *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) (denying control person liability in the absence of an allegation demonstrating control).  Plaintiff's bald assertion that FMR LLC and the Individual Defendants had business and personal relationships with the other Defendants [*see* SAC ¶¶ 167-69], are insufficient as a matter of law.  *See Aldridge*, 284 F.3d at 85 (plaintiff must allege facts demonstrating "some indicia of the exercise of control over the entity primarily liable").  Also insufficient are Plaintiff's conclusory assertions, [*see* SAC ¶¶

---

[30]     "Fidelity Investments" is a retail trade name used by several Fidelity subsidiaries.  The prospectus does not invite customers to call FMR LLC for fund information.

166, 168], that these defendants controlled the so-called "primary violators" by dint of their corporate structure and titles.  *See Twombly*, 550 U.S. at 555.

## IV.  CONCLUSION

An investment loss cannot be transformed into a securities claim simply by repeating the buzzwords "subprime" and "Bear Stearns" ad nauseum.  Although Plaintiff is disappointed in hindsight with his investment in the Fidelity Ultra Short Bond Fund, he fails to point to any material misrepresentations or omissions in the Fund Documents.  Further, Plaintiff's Complaint is untimely as investors were on inquiry notice of their purported claims no later than the January 31, 2007 disclosure.  Accordingly, the Complaint must be dismissed in its entirety.

Respectfully submitted,

GOODWIN PROCTER, LLP

/s/ James Dittmar_____
        James S. Dittmar (BBO# 126320)
        David J. Apfel (BBO# 551139)
        Joshua S. Lipshutz (BBO# 675305)
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000
Fax:  617.523.1201
E-Mail:  jdittmar@goodwinprocter.com
        dapfel@goodwinprocter.com
        jlipshutz@goodwinprocter.com

MILBANK, TWEED, HADLEY & McCLOY LLP
        James N. Benedict (*pro hac vice*)
        Sean M. Murphy (*pro hac vice*)
        Andrew W. Robertson (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants Fidelity Management &*
*Research Co., FMR Corp. (n/k/a FMR LLC),*
*Fidelity Brokerage Services LLC, Edward C.*

*Johnson 3d, Abigail P. Johnson, James C. Curvey,
Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas,
Kimberly Monasterio, Christine Reynolds, and
Robert L. Reynolds*

DECHERT LLP
  William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
  Owen C.J. Foster (BBO#670199)
200 Clarendon Street, 27th Floor
Boston, MA  02116
Tel: (617) 728-7100
Fax: (617) 426-6567

*Attorneys for Defendant Fidelity Income Fund*

Dated: May 24, 2010

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 24, 2010.

/s/ James S. Dittmar

**Appendix A**
**Index of Plaintiff's Substantive Allegations By Category**

*Categories:*

1.      Failure to disclose the extent of the Fund's investments in mortgage-related securities

2.      Failure to disclose the Fund's "true exposure" to the subprime mortgage market

3.      Failure to disclose the extent of the Central Fund's investments in mortgage-related securities, including those backed by subprime mortgages

4.      Misrepresentation of the Fund as being managed so as to have the same exposure to interest rate risk as the Lehman Brothers 6-Month Swap Index

5.      Misrepresentation of the Fund's valuation capabilities and methodologies, including failure to disclose reliance on Bear Stearns to price mortgage-related securities

6.      Misrepresentation of the Fund's Net Asset Value ("NAV"), including failure to timely "write down" mortgage-related securities in the portfolio

*Categorization of Plaintiff's Substantive Allegations:*

| SAC Paragraphs Containing Allegations of Misrepresentations and/or Omissions | Corresponding Category/Categories |
|---|---|
| ¶ 43 | 6 |
| ¶ 51 | 1, 2 |
| ¶ 52 | 2 |
| ¶ 53 | 2 |
| ¶ 54 | 1 |
| ¶ 55 | 1 |
| ¶ 56 | 3 |
| ¶ 57 | 3 |
| ¶ 61 | 3 |
| ¶ 62 | 3 |
| ¶ 67 | 5 |
| ¶ 68 | 6 |
| ¶ 69 | 6 |
| ¶ 75 | 6 |
| ¶ 92 | 1, 2 |
| ¶ 98 | 1, 2, 3, 4, 5, 6 |
| ¶ 99 | 2, 3 |
| ¶ 100 | 5 |
| ¶ 101 | 4 |

*Categories:*

1.   Failure to disclose the extent of the Fund's investments in mortgage-related securities

2.   Failure to disclose the Fund's "true exposure" to the subprime mortgage market

3.   Failure to disclose the extent of the Central Fund's investments in mortgage-related securities, including those backed by subprime mortgages

4.   Misrepresentation of the Fund as being managed so as to have the same exposure to interest rate risk as the Lehman Brothers 6-Month Swap Index

5.   Misrepresentation of the Fund's valuation capabilities and methodologies, including failure to disclose reliance on Bear Stearns to price mortgage-related securities

6.   Misrepresentation of the Fund's Net Asset Value ("NAV"), including failure to timely "write down" mortgage-related securities in the portfolio

*Categorization of Plaintiff's Substantive Allegations (continued)*:

| SAC Paragraphs Containing Allegations of Misrepresentations and/or Omissions | Corresponding Category/Categories |
|---|---|
| ¶ 103 | 1, 2, 3, 4, 5, 6 |
| ¶ 104 | 1, 2 |
| ¶ 106 | 4 |
| ¶ 108 | 1, 4, 6 |
| ¶ 110 | 5, 6 |
| ¶ 111 | 6 |
| ¶ 112 | 6 |
| ¶ 114 | 5 |
| ¶ 116 | 5, 6 |
| ¶ 119 | 3 |
| ¶ 121 | 3 |
| ¶ 122 | 3 |
| ¶ 124 | 1, 2 |
| ¶ 125 | 1 |
| ¶ 126 | 1, 2 |
| ¶ 129 | 1, 2 |
| ¶ 130 | 3 |