UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALAN ZAMETKIN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 1:08-cv-10960-MLW |
| Plaintiff, | ) ) ) | CLASS ACTION |
| vs. | ) ) ) | |
| FIDELITY MANAGEMENT & RESEARCH COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ........................................................................1

II.    SUMMARY OF ALLEGATIONS ..................................................................1

III.   APPLICABLE LEGAL STANDARDS ...........................................................4

     A.    Standard of Review on a Motion to Dismiss ............................................4

     B.    Standard Governing Sections 11 and 12(a)(2) of the Securities Act of 1933..........5

IV.   ARGUMENT AND ANALYSIS .....................................................................5

     A.    Plaintiff Has Pled Actionable Claims Under the Securities Laws ..........................5

     B.    The Disclosures in the Fund's Registration Statements, Considered Together and in Context, Were Misleading to Reasonable Investors......................8

     C.    Defendants' Disclosures Regarding the Fund.......................................................10

     D.    Defendants Misrepresented that the Fund's Strategy for Reaching Its Investment Objective Would Be "Consistent with the Preservation of Capital" ...............................................................................................................11

          1.    The Existence of Significant Amounts of Subprime Mortgage Securities in the Fund Rendered the Registration Statements False and Misleading.............................................................................16

          2.    The Fund's Undisclosed Focus on Complex Mortgage-Related Securities, Which Defendants Lacked the Capacity to Evaluate, Rendered the Registration Statements False and Misleading...................21

          3.    Defendants Misrepresented the Fund's Investment in the Internal Fidelity Central Fund ...............................................................25

          4.    Defendants' Statements Regarding the Fund's Reliance on the Swap Index and Use of the Swap Index as Its Benchmark Contributed to the Misleading Nature of the Registration Statements .....................................................................................26

          5.    Defendants Misrepresented the Fund's Valuation Capabilities, Reported False NAVs and Failed to Disclose Bear Stearns' Material Conflict of Interest........................................................28

     E.    Plaintiff's Claims Are Not Time-Barred................................................................33

**Page**

F.      Defendants Have Not Met Their Burden of Demonstrating a "Negative Causation" Affirmative Defense ..........................................................................39

G.      Plaintiff Adequately Alleges Control Person Liability ........................................42

V.      CONCLUSION ...............................................................................................................44

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008).................................................................................7

*Affiliated Ute Citizens of Utah v. U.S.*,
   406 U.S. 128 (1972)...........................................................................................43

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)...............................................................................42

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)....................................................................................4, 9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................4, 9, 27

*Brown v. Credit Suisse First Boston LLC*,
   431 F.3d 36 (1st Cir. 2005)...............................................................................32

*Chao v. Ballista*,
   630 F. Supp. 2d 170 (D. Mass. 2009) .................................................................5

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
   387 F.3d 468 (6th Cir. 2004) ..............................................................................8

*Cooperman v. Individual, Inc.*,
   No. Civ. A. 96-12272-DPW, 1998 WL 953726
   (D. Mass. May 27, 1998)...................................................................................15

*Fraternity Fund LTD v. Beacon Hill Asset Mgmt. LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005)..............................................................41

*Freudenberg v. E*TRADE Fin. Corp.*,
   No. 07 Civ. 8538, 2010 WL 1904314
   (S.D.N.Y. May 11, 2010)....................................................................................6

*Gosselin v. First Trust Advisors L.P.*,
   No. 08 C 5213, 2009 WL 5064295
   (N.D. Ill. Dec. 17, 2009) .......................................................................... *passim*

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)............................................................................................5

**Page**

*In Abrams v. Van Kampen Funds, Inc.*,
    No. 01 C 7538, 2004 WL 1433620
    (N.D. Ill. June 25, 2004) ........................................................................................14, 30, 31

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004)..................................................................................................39

*In re AIG Advisor Group Sec. Litig.*,
    No. 06 CV 1625(JG), 2007 WL 1213395
    (E.D.N.Y. Apr. 25, 2007).......................................................................................................33

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
    No. 95 Civ. 0330 (LMM), 1996 WL 551732
    (S.D.N.Y. Sept. 26, 1996) .....................................................................................................15

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000).....................................................................................43

*In re Brooks Automation Inc. Sec. Litig.*,
    No. 06-11068-RWZ, 2007 WL 4754051
    (D. Mass. Nov. 6, 2007).........................................................................................................42

*In re Cabletron Sys.*,
    311 F.3d 11 (1st Cir. 2002)...............................................................................................18, 42

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009)................................................................................. *passim*

*In re Charles Schwab Corp. Sec. Litig.*,
    No. C 08-01510 WHA, 2010 WL 1463490
    (N.D. Cal. Apr. 8, 2010) ..................................................................................................27, 40

*In re Citigroup Inc. Bond Litig.*,
    No. 08 Civ. 9522 (SHS), 2010 WL 2772439
    (S.D.N.Y. July 12, 2010) .................................................................................................18, 19

*In re Craftmatic Sec. Litig.*,
    890 F.2d 628 (3d Cir. 1989).....................................................................................................6

*In re Donald Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) .......................................................................................................13

*In re Elscint, Ltd. Sec. Litig.*,
    674 F. Supp. 374 (D. Mass. 1987) .........................................................................................43

**Page**

*In re Evergreen Ultra-Short Opportunities Fund Sec. Litig.*,
   No. 08-11064-NMG, 2010 WL 1253114
   (D. Mass. Mar. 31, 2010) ................................................................ *passim*

*In re Global Crossing, Ltd., Sec. Litig.*,
   No. 02 Civ. 910(GEL), 2005 WL 1875445
   (S.D.N.Y. Aug. 5, 2005) .......................................................................43

*In re JP Morgan Chase Sec Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................7, 31

*In re Lehman Brothers Sec. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) ..................................................33

*In re MBIA, Inc. Sec. Litig.*,
   No. 08-CV-264 (KMK), 2010 WL 1253925
   (S.D.N.Y. Mar. 31, 2010) ................................................................ *passim*

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006).........................................41

*In re MoneyGram Int'l, Inc.*,
   626 F. Supp. 2d 947 (D. Minn. 2009)..............................19, 30, 31, 32

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................33

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   No. 03 Civ. 8208 (RO), 2006 WL 1008138
   (S.D.N.Y Apr. 18, 2006)........................................................................41

*In re Morgan Stanley Information Fund Sec. Litig.*,
   592 F. 3d 347 (2d Cir. 2010)..........................................19, 20, 33

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 ..........................................................................................35

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004)...................................................42

*In re RAIT Fin. Trust Sec. Litig.*,
   No. 2:07-cv-03148-LDD, 2008 WL 5378164
   (E.D. Penn. Dec. 22, 2008) ...........................................................6, 8, 30

**Page**

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009).......................................................................20

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006).............................................................41

*In re Stone & Webster Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).............................................................................8, 13

*In re Tyco Int'l, Ltd.*,
    No. MDL 02-1335-B, 02-266-B, 2004 WL 2348315
    (D.N.H. Oct. 14, 2004) ..........................................................................................6

*In re WorldCom, Inc. Sec. Litig.*,
    308 F. Supp. 2d 338 (S.D.N.Y. 2004).....................................................................43

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).....................................................................33

*Kline v. First Western Gov't Sec. Inc.*,
    24 F.3d 480 (3d Cir. 1994).....................................................................................13

*Lalor v. Omtool, Ltd.*,
    No. CIV. 99-469M, 2000 WL 1843247
    (D.N.H. Dec. 14, 2000).........................................................................................33

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990),
    *cert. denied*, 501 U.S. 1249 (1991)......................................................................8, 9

*Merck & Co., Inc. v. Reynolds*,
    130 S. Ct. 1784, 1798 (2010).................................................................34, 35, 37, 41

*Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)......................................................................................7

*Olcott v. Delaware Flood Co.*,
    76 F.3d 1538 (10th Cir. 1996) ...............................................................................33

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996).........................................................................................15

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ...................................................................................6

**Page**

*Panther Partners, Inc. v. Ikanos Communs., Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................20

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  No. 08 Civ. 10841 (JSR), 2010 WL 2175875
  (S.D.N.Y. June 1, 2010)..........................................................................34, 37

*Rodney v. KPMG Peat Warwick*,
  143 F.3d 1140 (8th Cir. 1998) ..............................................................................24

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987).....................................................................................18

*Salois v. Dime Sav. Bank of N.Y., FSB*,
  128 F.3d 20 (1st Cir. 1997)....................................................................................33

*Sanchez v. Pereira-Castillo*,
  590 F.3d 31 (1st Cir. 2009).....................................................................................5

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977)................................................................................................6

*Serabian v. Amoskeag Bank Shares, Inc.*,
  24 F.3d 357 (1st Cir. 1994)....................................................................................29

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992)...................................................................................29

*Shaw v. Digital Equip. Corp.*,
  82 F. 3d 1194 (1st Cir. 1996)..............................................................................5, 15

*Siemers v. Wells Fargo & Co.*,
  No. C 05-04518 WHA, 2007 WL 760750
  (N.D. Cal. Mar. 9, 2007)........................................................................................40

*Tabankin v. Kemper Short-Term Global Income Fund*,
  No. 93 C 5231, 1994 WL 30541
  (N.D. Ill. Feb. 1, 1994)...........................................................................................15

*Va. Bankshares, Inc. v. Sandberg*,
  111 S. Ct. 2749 (1991)...........................................................................................32

*Vachon v. BayBanks, Inc.*,
  780 F. Supp. 79 (D. Mass. 1991) ............................................................................6

Page

*Wilkes v. Heritage Bancorp, Inc.*,
    767 F. Supp. 1166 (D. Mass. 1991) ...........................................................................................6

*Young v. Lepone*,
    305 F.3d 1 (1st Cir. 2002)..............................................................................................34, 35

*Yu v. State Street Corp.*,
    686 F. Supp. 2d 369 (S.D.N.Y. 2010)..............................................................8, 14, 22, 24

*Yu v. State Street Corp.*,
    No. 08 Civ. 8235 (RJH), 08 MDL No. 1945, 2010 WL 2816259
    (S.D.N.Y. July 14, 2010) ........................................................................................ *passim*


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k(a) .........................................................................................................................5
    §77k(a)(2) ..................................................................................................................5, 43
    §77k(e) ........................................................................................................................39
    §77k..............................................................................................................................39
    §77l ..............................................................................................................................39
    §77l(a)(2) ......................................................................................................................5
    §77l(b)..........................................................................................................................39
    §77m .......................................................................................................................33, 34
    §77o..............................................................................................................................42

Federal Rules of Civil Procedure
    Rule 8(a).............................................................................................................. *passim*
    Rule 8(a)(2)....................................................................................................................4
    Rule 9(b) ......................................................................................................................31
    Rule 15(a)......................................................................................................................44

17 C.F.R.
    §230.408(a) ..................................................................................................................19


**SECONDARY AUTHORITIES**

*In the Matter of Evergreen Inv. Mgmt. Co. LLC, et al.*,
    *Cease and Desist Order*, S.E.C. Release No. 60059,
    2009 WL 1585837
    (June 8, 2009)..............................................................................................................30

**Page**

*In the Matter of Piper Capital Management, Inc.*,
S.E.C. Release No. 175, 2000 WL 1759455
(Nov. 30, 2000) ............................................................................................................ *passim*

*In re Piper Capital Management, Inc.*,
*Cease and Desist Order*, S.E.C. Release No. 2163,
2003 WL 22016298
(Aug. 26, 2003) ............................................................................................................ *passim*

Lead Plaintiff Dr. Alan Zametkin ("Plaintiff") hereby submits this memorandum of law in opposition to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint (the "SAC" or "Complaint") dated May 24, 2010 (Docket #69) ("Def. Mem.").

## I.       PRELIMINARY STATEMENT

Defendants' counsel should be credited for their seemingly limitless imagination in twisting Plaintiff's allegations to the point that they are virtually unrecognizable. According to Defendants, investors in the Fidelity Ultra Short Bond Fund (the "Fund") lost a mere 5.4% over a three-year period due to the materialization of "low-probability investment risks" associated with the global credit crisis. Defendants contend that Plaintiff knew he was investing in an aggressive, risky and potentially volatile Fund which was overwhelmingly-weighted toward mortgage and subprime mortgage securities. When these known risks materialized and the Fund lost value, Defendants contend Plaintiff ran to the courthouse in a misguided effort to hold others responsible for his disappointments. As shown below, however, even a cursory review of Plaintiff's SAC and the Fund's Securities and Exchange Commission ("SEC") filings demonstrates that Defendants' musings are pure fantasy. Because Plaintiff has easily satisfied his Rule 8(a) pleading burden of alleging a "plausible" claim for relief, Defendants' motion should be denied in its entirety.

## II.      SUMMARY OF ALLEGATIONS

Plaintiff alleges that Defendants offered shares of the Fund to the public through registration statements and prospectuses (collectively, the "Registration Statements") that were materially false and misleading. ¶¶31-34, 96-130 (all "¶" or "¶¶" references are to the SAC). Specifically, Defendants represented the Fund as being conservatively structured and managed to be low risk with low volatility and "consistent with the preservation of capital," that is, a small step up from a money market fund. ¶¶36, 38-40, 97. This was to be accomplished, in part, by using the exceptionally stable Lehman Brothers 6 Month Swap Index (the "Swap Index") as a guide (and benchmark) in

structuring the Fund and selecting its investments, and by implementing sophisticated securities evaluation techniques.  ¶¶37, 97, 101, 107.

Defendants had, however, secretly abandoned the Fund's conservative investment philosophy to chase higher returns by focusing the vast majority of their efforts on investing in risky subprime and other mortgage-related securities in the midst of the mortgage meltdown. ¶53.  Making matters worse, according to a confidential witness, Defendants were loading the Fund with these risky securities even though they were not capable of evaluating their investment worthiness or pricing these securities under the Fund's stated procedures.  ¶¶28, 65-73.  And the investments were made despite repeated warnings by an internal Fidelity analyst, Lisa Emsbo-Mattingly, beginning in 2003, of an impending subprime mortgage crisis.  ¶¶93-95.  Unfortunately, there was no way for investors to discern from the modest percentages of mortgage securities reported that, in reality, the vast majority of Defendants' efforts were expended acquiring these risky mortgage-related and subprime securities for the Fund.  ¶¶53-55, 73, 125-30.  Nor could Fund investors appreciate the undisclosed and rapidly increasing credit and interest rate risks, or that their conservative investment had morphed into a speculative bet on the real estate and subprime mortgage bubble.  ¶¶104-107.

Unbeknownst to investors, by April 30, 2007, *78% of the Fund's individual holdings consisted of mortgage-related securities and a shocking 22% of its holdings were subprime mortgage securities!* ¶¶51, 53-54, 73.  At this time, when the Fund claimed only 13.3% holdings in "CMOs and Other Mortgage Related Securities," *an incredible 50% of the Fund's value was attributable to mortgage-related holdings*.  ¶¶53-54, 57.

Much of the Fund's overall exposure to subprime and other mortgage-related securities was due to its investment of a quarter of its assets in the internal Fidelity Ultra-Short Central Fund (the "Central Fund").  ¶¶57, 61.  Like the Fund, the Central Fund's composition included an enormous

quantity of mortgage-related and subprime securities that constituted 78% and 28% of its individual holdings, respectively, despite that it was supposed to provide the Fund "the benefits of a fully diversified bond portfolio;" be "consistent with the preservation of capital;" and have "similar risk characteristics" to "cash-like instruments." ¶¶60, 63, 74, 117-18, 120.  Instead of increasing the Fund's diversity and lessening its overall risk, the Fund's outsized investment in the Central Fund materially and surreptitiously increased the Fund's exposure to the faltering mortgage market.  ¶57. It was yet another dangerous wager on real estate and the complex securities created by Wall Street that funded the real estate bubble.

Defendants also reported stable net asset values ("NAVs") for the Fund throughout the majority of the Class Period while the true NAV of the Fund was declining.  ¶¶68-69, 75, 107-08, 111.  Confidential witnesses reveal that Defendants were actually unable to determine fair values for many complex mortgage-related securities or provide oversight in accordance with stated procedures.  ¶¶70-73, 113-16.  Instead, Defendants often blindly depended on unreliable and inflated prices from external pricing services, and Bear Stearns in particular, in spite of its known but undisclosed conflict of interest.  ¶¶65-73, 110.  Defendants' lack of knowledge and other deficiencies related to pricing complex mortgage-related securities caught up with them as they failed to timely write-down the subprime and other mortgage securities as their true prices declined, resulting in inflated NAVs.  ¶75; *see also* ¶¶68-69 (examples of mispriced securities which corroborate the witness accounts).  Ultimately, the Registration Statements misrepresented, among other things: (i) the Fund's objective, characteristics and risks; (ii) the true extent of its exposure to risky subprime and other mortgage-related securities; (iii) its investment evaluation procedures and capabilities; and (iv) the prices of the securities held by the Fund as reflected in its NAV.  ¶¶95-130.

When the risks associated with these misrepresentations and omissions materialized, the Fund's NAV plummeted more than 17%, injuring Plaintiff and other Fund investors. ¶¶132-33. During the twelve months ended July 31, 2008 – alone – the Fund lost more than 12%, while its self-described benchmark index gained almost 5%.[1] ¶136. For 2007, the Fund's performance ranked at the very bottom of its ultra-short bond fund peer-group with 96 funds ranked higher. ¶135. It was not until April 2, 2008 that Defendants first began disclosing the extent of the Fund's exposure to subprime mortgage securities. ¶58. But, by then it was far too late. *See* ¶¶133-34 (depicting dramatic write-downs). Defendants never did quantify the Fund's actual exposure to mortgage-related securities. ¶124. Thereafter, the Fund drastically reduced its mortgage and subprime security holdings and liquidated the Central Fund in order to bring it back in line with its purported investment objectives, strategies and risks. ¶¶138-39, 141.

## III.   APPLICABLE LEGAL STANDARDS

### A.   Standard of Review on a Motion to Dismiss

To plead a claim under Rule 8(a), a plaintiff is only required to provide a "short and plain statement of the claim" containing sufficient factual matter, accepted as true, to state a plausible claim to relief. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). While factual allegations must be sufficient "to raise a right to relief above the speculative level" to "plausible," they need not be "detailed" or "specific." *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Accordingly, a court must "accept as true all the factual

---

[1]   The 12.42% loss was reported by Fidelity itself in its July 31, 2008 Shareholder Report, thereby refuting Defendants' new argument that the Fund only lost 5% over three years according to some required formula. *See* Docket #53-13 (Ex. M to Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss the Amended Complaint  filed 07/17/09) ("Initial Dittmar Decl.") at III.

allegations" and "construe all reasonable inferences in favor of the plaintiff."  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009).  "[A] complaint should only be dismissed at the pleading stage where the allegations are so broad, and the alternative explanations so overwhelming, that the claims no longer appear plausible."  *Chao v. Ballista*, 630 F. Supp. 2d 170, 177 (D. Mass. 2009).

### B.   Standard Governing Sections 11 and 12(a)(2) of the Securities Act of 1933

Section 11 of the Securities Act imposes liability on, *inter alia*, the issuer of a security and every person who signed a registration statement or was named therein as a director or served similar functions, if the registration statement: (1) contained an "untrue statement of a material fact"; (2) "omitted to state a material fact required to be stated"; or (3) omitted a material fact necessary "to make the statements therein not misleading."  15 U.S.C. §77k(a); *Shaw v. Digital Equip. Corp.*, 82 F. 3d 1194, 1204 (1st Cir. 1996).  Section 11 places a "relatively minimal burden" on a plaintiff who purchases a security pursuant to a registration statement to establish a prima facie case by identifying a material misstatement or omission.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  An issuer is therefore subject to "virtually absolute" liability, "even for innocent misstatements."  *Herman & MacLean*, 459 U.S. at 382.  Similarly, Section 12(a)(2) provides liability for any person who offers or sells a security by means of "a prospectus or oral communication . . . [that] includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading."  15 U.S.C. §77l(a)(2).  Scienter is not an element of a Section 11 or 12(a)(2) claim.  *Shaw*, 82 F.3d at 1217.

## IV.   ARGUMENT AND ANALYSIS

### A.   Plaintiff Has Pled Actionable Claims Under the Securities Laws

Defendants contend that Plaintiff's allegations, purportedly concerning the wisdom of management's decisions, business judgments and the Fund's disappointing performance, constitute

inactionable "mismanagement" claims.  Def. Mem. at 14-15, 31-32.  Yet, where a plaintiff alleges

actionable misrepresentations and omissions under the Securities Act, it is inappropriate to dismiss a

case based on pleading "mere mismanagement."  *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 639 (3d

Cir. 1989); *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 WL 5378164, at *7

(E.D. Penn. Dec. 22, 2008).  Recently, in a mutual fund action alleging very similar misconduct

(including inflated NAVs), the trial court held:

> Plaintiffs have alleged more than a displeasure with Defendants' business judgment
> and management of the Funds.  Although the Plaintiffs contend that Defendants used
> poor business judgment, Plaintiffs also contend that Defendants engaged in deception
> through material misrepresentations and omissions to conceal the ramifications of
> Defendants' alleged conduct.

*Gosselin v. First Trust Advisors L.P.*, No. 08 C 5213, 2009 WL 5064295, at *2 (N.D. Ill. Dec. 17,

2009).  As another court held: "it is alleged not that Defendants merely made bad business decisions

or mismanaged the Company, but rather that Defendants misled the public about E*TRADE's

business, operations, and value of its loan portfolio."  *Freudenberg v. E*TRADE Fin. Corp.*, No. 07

Civ. 8538, 2010 WL 1904314, at *19 (S.D.N.Y. May 11, 2010).[2]

Here, as in *First Trust* and *E*TRADE*, Plaintiff's allegations go much further than

management's business judgments.  Plaintiff avers, among other things, that Defendants

misrepresented and failed to disclose the true profile of the Fund and the extent to which it was

---

[2]     *Contrast Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977) (finding no actionable
misrepresentations or omissions); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981)
(complaint failed to allege deception or manipulation elements of a §10(b) claim; thus, there was no
actionable omission); *Vachon v. BayBanks, Inc.*, 780 F. Supp. 79, 82 (D. Mass. 1991) (in §10(b)
case, complaint failed to provide detailed allegations of fraud); *Wilkes v. Heritage Bancorp, Inc.*, 767
F. Supp. 1166, 1171 (D. Mass. 1991) (plaintiffs failed to "state the content of the allegedly false
representation and material omissions"); *see also In re Tyco Int'l, Ltd.*, No. MDL 02-1335-B, 02-
266-B, 2004 WL 2348315, at *3 (D.N.H. Oct. 14, 2004) (discussing the significance of the fact that
no misstatements or omissions were alleged in Santa Fe).

exposed to risky subprime and other mortgage-related securities.  *See* ¶¶36-38, 49-63, 97-108, 124-30.  In addition, Plaintiff alleges that Defendants misstated the evaluation and investment pricing capabilities and methodologies of the Fund (¶¶65-67, 70-75, 110, 113-16), which, in turn, contributed to the misstated Fund NAV.  ¶¶68-69, 111-12.

Nor is this a case based upon 20/20 hindsight in which a plaintiff only alleges an investment failed to "perform as promised."[3]  Def. Mem. at 15; *see In the Matter of Piper Capital Management, Inc.*, S.E.C. Release No. 175, 2000 WL 1759455, at *13 (Nov. 30, 2000) (hereinafter "*Piper Capital I*") (attached as Ex. A to the Declaration of Adam M. Stewart, filed herewith ("Stewart Decl.")) ("Fund losses are not directly at issue here – or anywhere else in this proceeding.  The immediate issue is whether [fund] prospectuses . . . accurately/adequately reflected the Fund's investment strategy, composition. . . .").  Instead, this case involves detailed allegations of present, serious risks due to Defendants' overzealous attempts to improve returns by investing in unsafe securities it did not understand at the same time Fidelity was representing to investors that the Fund was conservative, investments were carefully vetted, there were proper procedures in place to ensure accurate valuation and the Fund's NAVs had remained stable during the initial mortgage market turbulence.  ¶¶31, 36-37, 72-74, 96-130.  Indeed, the Fund's "significant exposure to the very risky and highly volatile subprime mortgage market," at the time of filing the Registration Statements,

---

[3]       This case is distinguishable from *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008), where defendants made incorrect predictions, but there were no allegations to suggest that those predictions were unreasonable. Defendants also quote *In re JP Morgan Chase Sec Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) out of context, making it appear that Defendants had to have been able to predict the full extent of the subprime crisis to be liable for their misrepresentations. See Def. Mem. at 15. *See also Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) ("[A] court must be cautious . . . [i]n cutting off the case on the pleadings by citing hindsight [because] the court is essentially making a prediction that the discovery process will yield only evidence that requires the benefit of hindsight bias to seem adequate [to support the allegations].").

"was contrary to the Fund's positioning, stated objectives and purported investment strategies."[4]

¶51; *see also* ¶¶76-94 (detailing numerous indications of crescendoing risks and contemporaneous losses). *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 496 (6th Cir. 2004) (rejecting "hindsight" argument where evidence was "present of serious risks of adverse consequences" and plaintiffs alleged crescendoing problems at the company during years leading up to serious, adverse financial event); *RAIT*, 2008 WL 5378164, at *5 (allegations that plaintiff misrepresented processes related to credit underwriting and monitoring "at the time of filing" the registration statement were not "fraud by hindsight").

Because Plaintiff has alleged specific, contemporaneous misstatements and omissions, Defendants' mismanagement and "hindsight" arguments must be rejected.

### B.     The Disclosures in the Fund's Registration Statements, Considered Together and in Context, Were Misleading to Reasonable Investors

The central inquiry in determining whether a registration statement is materially misleading is "whether defendant's representations, taken together and in context, would have [misled] a reasonable investor" about the nature of the investment.[5] *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249 (1991) (emphasis added). Plaintiff here goes well beyond the Rule 8(a) pleading requirements by demonstrating that not only

---

[4]     On similar facts and class period, Judge Gorton found that investments in risky subprime and other mortgage-related securities during the same time period were inconsistent with the fund's purportedly conservative investment strategies. *In re Evergreen Ultra-Short Opportunities Fund Sec. Litig.*, No. 08-11064-NMG, 2010 WL 1253114, at *1, *5 (D. Mass. Mar. 31, 2010); *contrast Yu v. State Street Corp.*, 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010) (hereinafter, "*State Street I*") (finding that claims pled with hindsight only related to the investment rating allegations, where registration statements clearly delineated the fund's definition and use of the ratings).

[5]     Because Defendants are required to disclose information to investors such that the "totality of information" is not false or misleading, their attempts to isolate portions of allegations to their benefit must fail. *In re Stone & Webster Inc. Sec. Litig.*, 414 F.3d 187, 208 (1st Cir. 2005).

would a reasonable investor plausibly be misled about the nature of the Fund, but that a sophisticated and widely followed mutual fund analyst – Morningstar – was misled.  ¶¶39-41.

In two separate reports, Morningstar, a leading provider of mutual fund investment analysis, repeatedly described the Fund as "low risk" and "conservative," and touted its "low volatility," "stability" and "restrained approach" to investing.  *Id.*  On the other hand, it cautioned that, like a money market fund, the trade off for safety/low volatility would be a low rate of return.  *Id.*  The Fund was therefore positioned as playing an "ultra-conservative role in [investors'] portfolios."  ¶39. This positioning was consistent with the perception of ultra-short bond funds in general, which are well-known in the mutual fund industry for having "very low volatility and low risk."  ¶35.  As late as December 2007, Morningstar noted that a 5% loss was a significant decline "for such a conservative fund."  ¶41.  If there were any question as to the purported nature of the Fund, Fidelity itself confirmed that the Fund would appeal to "relatively conservative, income oriented investors." ¶38; *see id.* (directing investors to prospectus "for complete information").

Why did Plaintiff, other investors and Morningstar believe that the Fund would be structured in such a manner to be conservative, low risk and stable?  Because, as discussed below, the disclosures in the Registration Statements, "taken together and in context," reasonably led them to that inaccurate conclusion.  *McMahan & Co.*, 900 F.2d at 579; *see also Piper Capital I*, 2000 WL 1759455, at *24 (Stewart Decl. Ex. A) (that peer fund managers were "mystified" when the fund was not managed in accordance with the familiar meaning attributed to stated strategy undermined defendants' interpretation of the registration statements).  On this basis alone, Plaintiff has demonstrated that his claims are sufficiently "plausible" under Rule 8(a).  *See Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 570 ("we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").

C.      **Defendants' Disclosures Regarding the Fund**

According to the Registration Statements, the overriding and fundamental investment objective of the Fund is that it: "seeks to obtain a high level of current income *consistent with the preservation of capital*" and does so by "investing in U.S. dollar denominated money market and investment-grade debt securities," the Central Fund and repurchase agreements.  ¶¶60, 61, 97.  In addition, the Registration Statements disclosed that:

- "FMR uses [the Lehman Brothers 6 Month Swap Index] that represents the market for the types of securities in which the fund invests as a guide in structuring the fund and selecting its investments."  (The Swap Index is a principal-weighted index of swaps with 6-month maturities that encompasses very low volatility and low risk. ¶37.)

- The Fund is managed "to have a similar overall interest rate risk to the index."

- "FMR analyzes a security's structural features and current price compared to its estimated long term value, any short-term trading opportunities resulting from market inefficiencies, and credit quality of its issuer."[6]

- The Fund invested significant assets in the Central Fund, which is "a diversified pool of short-term assets . . . designed to outperform cash-like instruments with similar risk characteristics."[7]

¶¶36-37, 97, 118, 123.  Defendants systematically reinforced the perception of a low volatility/low risk approach to investing by continuously comparing the Fund's performance to the performance of its benchmark – the exceptionally stable Swap Index.  *See, e.g.*, ¶¶37, 107, 134; Docket #53-8 (Ex. H to Initial Dittmar Decl.) at 6 ("During the past year, Ultra-Short Bond returned 4.23%, while the

---

[6]      In the midst of the credit crisis, Fidelity even reassured investors that mortgage delinquencies would be manageable because, among other things: "At Fidelity, we employ sophisticated techniques that incorporate a full evaluation of the collateral of the loans and a bond's structure . . ." Docket #70-5 (Ex. E to Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss the Second Amended Complaint Filed 5/24/10) ("Def. Ex.") at V.

[7]      The Registration Statements further claim that the Fund invests "at least 80% of the [F]und's assets in investment-grade debt securities (those of medium and high quality) of all types."  ¶97.

Lehman Brothers 6 Month Swap Index returned 4.22%."); *accord* Def. Ex. D at III.  In fact, Fidelity repeatedly referred to the Swap Index as the Fund's "benchmark."  ¶37; Def. Ex. E at VI.

The Fund's reported investment mix also reinforced and was entirely consistent with Defendants' other representations.  According to Defendants, more than 25% of the Fund's assets were invested in the Fidelity Central Fund which, as noted, was diversified and designed to outperform cash-like instruments with similar risk characteristics.  ¶118; *see also* ¶120 (Central Fund investment purportedly allowed the Fund "to obtain the benefits of a ***fully diversified*** bond portfolio regardless of the amount the [F]und invests in debt.").  The Fund also specifically disclosed its overall investment mix.  ¶¶50, 53,-54, 57.  For example, as of July 31, 2007, it claimed to have had invested 15.8% of its assets in corporate bonds, 26% of its assets in CMOs and other mortgage-related securities and another 39.3% of the funds were invested in ABS (which includes not only mortgages, but pools of "loans, receivables, or other assets").  Def. Ex. F at 9; *see also* ¶¶50, 53 (similar percentages reported throughout the Class Period).  By all indications, Defendants were adhering to the Fund's investment philosophy and objectives.

In sum, the Registration Statements presented investors with the false and misleading picture that the Fund was, and would continue to be, structured as a conservative and stable investment with a volatility and risk similar to (but admittedly not necessarily identical to) its benchmark, the Swap Index.  ¶¶36-38, 97, 101, 107.  That is, as Morningstar noted, it was a small step up from a money market fund.  ¶40.

> **D.    Defendants Misrepresented that the Fund's Strategy for Reaching Its Investment Objective Would Be "Consistent with the Preservation of Capital"**

What Fund investors received was drastically different from what Defendants portrayed.  By the beginning of the Class Period, while the Fund may have been "seek[ing] a high level of current income," its structure, investments and actual objective were no longer "consistent with the

preservation of capital."  ¶¶97-98.   Defendants had surreptitiously abandoned this fundamental principle in a misguided effort to chase higher returns, thereby creating a risk to investors that was significantly greater than represented.  ¶¶49-57; *see Piper Capital I*, 2000 WL 1759455, at *32 (Stewart Decl. Ex. A) ("[Fund] management strategies and techniques promoted the 'high level of current income' component of [the fund's] stated investment objective at the expense of the 'consistent with preservation of capital' component, thereby subverting the Fund's overall investment objective."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 543, 562 (N.D. Cal. 2009) (denying motion to dismiss based on allegations that investors in a mutual fund were "unwittingly exposed to significant risks, and as the nation's credit crisis unfolded, those risks led to substantial losses").

First and foremost, the Fund became so concentrated in risky mortgage-related securities, including subprime mortgages, that the overall risk to investors was significantly greater than represented.  ¶49.   According to a confidential witness, Defendants invested in exotic financial instruments, derivatives, CDOs and other subprime mortgage securities without understanding them, content with "evaluat[ing] their investment worthiness as time passed."  ¶¶49-51, 72, 98, 110, 114, 116; *Evergreen*, 2010 WL 1253114, at *1, *5 (finding risky mortgage-related investments at odds with a similar investment strategy).  This is no small matter since the vast majority of the individual securities selected by the Fund, and indirectly held through its large investment in the internal Central Fund, were mortgage-related securities.  ¶¶73-74.  ***By the summer of 2007, 78% of the individual securities held by the Fund (representing 50% of its value) were mortgage-related; 22%***

*of the securities were subprime mortgage*.  ¶¶57, 73.[8]  Not only did this colossal shift in strategy

exponentially increase risk, but it also resulted in a material amount of securities being mispriced

and an artificially inflated Fund NAV.  ¶¶67-69, 73-75, 110-12.  Nevertheless, Defendants failed to

alter the Fund's Registration Statements to correct its description, stated investment objective, warn

of the increasing risks,[9] or to reflect Defendants' diminished capacity to evaluate and price the

underlying investments.  ¶¶98-101, 103-104, 106, 108, 110, 114, 116, 119, 121-22, 124, 130.

Because the Fund was no longer managed or structured to "seek[] to obtain a high level of current

income consistent with the preservation of capital," its Registration Statements were materially false

and misleading.  *Piper Capital I*, 2000 WL 1759455, at *13, *30 (Stewart Decl. Ex. A).

Defendants counter that Plaintiff cannot allege falsity since misrepresentations based upon a

fund's investment objective are inactionable as a matter of law.  Def. Mem. at 11-14.  In so arguing,

however, Defendants disregard that Registration Statements must be evaluated as a whole in

assessing whether they are false or misleading.  *Stone & Webster*, 414 F.3d at 208.  Nevertheless, it

has long been the law that such statements regarding the posture of a fund and its purported

investment strategies are actionable.

In *Piper Capital*, the fund also had a stated investment objective of seeking "a high level of

current income consistent with preservation of capital."  *In re Piper Capital Management, Inc.*, 2003

---

[8]    These securities represented 37% and 10% of the value of the Fund's individual holdings,
respectively.  ¶¶53-54.  However, with the inclusion of its investments in the Central Fund, the value
of the Fund's holdings in mortgage-related securities rose to 50%.  ¶57.

[9]    The Fund's "Principal Investment Risks" were also misleading because they were boilerplate
disclosures that "merely warn[ed] the reader that the investment has risks," yet failed to quantify the
fund-specific risks that increased during the Class Period or to warn of the specific risks of which
Plaintiff complains.  ¶¶102-06; *Kline v. First Western Gov't Sec. Inc.*, 24 F.3d 480, 489 (3d Cir.
1994) (quoting *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)); *Piper
Capital I*, 2000 WL 1759455, at *17 (Stewart Decl. Ex. A).

WL 22016298, *Cease & Desist Order*, at *8 (Aug. 26, 2003) (hereinafter "*Piper Capital II*") (Stewart Decl. Ex. B). Unbeknownst to investors, however, the fund began shifting its investments to CMOs and other complex mortgage securities, to the point where the overwhelming proportion of the fund's net assets were invested in CMOs. *Id*. at *5. The SEC found a §10(b) violation because the fund "materially deviated from [its] . . . stated investment objective," but "failed to make meaningful disclosures concerning the increased risk . . . or the impact of that risk on its conservative investment objective." *Id*. at *7. Other courts have similarly held that false or misleading investment objectives can be actionable. For example, in *State Street I*, although initially dismissing the complaint, the court specifically suggested that a fund objective "to maximize current income . . . to the extent consistent with the preservation of capital and liquidity . . ." concerns the fund's exposure to risk and therefore could be actionable. 686 F. Supp. 2d at 375. *In Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2004 WL 1433620 (N.D. Ill. June 25, 2004), the court also noted that an investment objective of "preservation of capital" could give rise to a claim if it was established that "defendants invested in riskier loans than had been represented." *Id*. at *9.

More recently, a District of Massachusetts court rejected the defendants' characterization of a fund's objectives as "general and indefinite." *See Evergreen*, 2010 WL 1253114, at *4. The Court found the strikingly similar fund objectives, such as "[t]he Fund seeks to provide income consistent with preservation of capital and low principal fluctuation," to constitute "key guidelines that established the Trust's investment strategy and laid down the basic ground rules it would follow." *Id*. The court further found that the meaning of the objectives was clarified by more specific statements regarding the fund's objectives and purported structure, as is true in this case. *Id*.[10] It

---

[10] Defendants misconstrue Judge Gorton's characterization of the funds' objectives. See Def. Mem. at 12. While the court did find that the additional statements surrounding the objectives

held that the distinct claims made by the defendants regarding the Fund's objectives, investment strategies and rules under which it would operate were likely "of upmost importance to potential investors." *Id.* at *5; *see also Schwab*, 257 F.R.D. at 543-46 (finding similar misrepresentations actionable).   In so finding, the court also rejected the "bespeaks caution" argument made by Defendants here, holding that the objective is not forward-looking and the vague risk disclosures did not expressly warn of the undisclosed risks. *Evergreen*, 2010 WL 1253114, at *5; Def. Mem. at 13-14.[11]

Because Defendants had surreptitiously abandoned the Fund's strategy of meeting its objective in a manner "consistent with the preservation of capital," Plaintiff has plausibly shown that the Registration Statements were false and misleading when considered as a whole.[12]

_____

helped to clarify their meaning, it also recognized that the objectives themselves were "key guidelines," which undermines defendants' faulty interpretation. *See Evergreen*, 2010 WL 1253114, at *4.  Nevertheless, Defendants' insistence that there are no additional misrepresentations to provide context to the objectives simply ignores numerous allegations in the Complaint. *See, e.g.*, ¶¶35-38, 60-61, 97-101.  These allegations distinguish this case from *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994), in which the plaintiffs relied entirely on isolated statements, not reflective of the entire prospectus, they failed to show were false. *Id.* at *4.

[11]     Defendants' warnings here such as Fund strategies might "not work as intended" or that "you could lose money" are hardly specific, unambiguous warnings of the material risk, such that "reasonable minds could not disagree as to whether the mix of information in the [allegedly actionable] document is misleading." *Shaw*, 82 F.3d at 1213-14 (citation and internal quotations omitted).  *Contrast Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-7 (2d Cir. 1996) (prospectus extensively warned of the specific risk which plaintiffs complain materialized); *Cooperman v. Individual, Inc.*, No. Civ. A. 96-12272-DPW, 1998 WL 953726, at *10 (D. Mass. May 27, 1998) (finding immaterial fact that company lost key personnel because that specific risk was fully disclosed).

[12]     *Compare In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, No. 95 Civ. 0330 (LMM), 1996 WL 551732, *4 (S.D.N.Y. Sept. 26, 1996) (Def. Mem. at 12) (fund's objective was "seeks the highest level of current income, consistent *with what the Fund's Adviser considers* to be prudent investment risk") (emphasis added).

1.    **The Existence of Significant Amounts of Subprime Mortgage Securities in the Fund Rendered the Registration Statements False and Misleading**

Even had investors fully appreciated Defendants' inability to evaluate the complex mortgage securities the Fund was rapidly acquiring (which they clearly did not), there was no way for investors to independently assess the exponentially increasing level of risk such securities represented. ¶51. Beginning in 2005, there was a significant increase in U.S. mortgage default rates, particularly for subprime mortgage loans. ¶¶76-78. Fidelity itself was warned of an impending subprime mortgage crisis as early as 2003. ¶¶93-95. The mortgage default trend was widely-reported during 2005 and 2006, and by early 2007, some of the top mortgage lenders with subprime exposure started to reveal growing defaults and enormous losses. ¶¶79-86. By March 2007, when more than twenty-five subprime lenders had declared bankruptcy, there was no question that the subprime mortgage crisis was not an isolated event and would significantly impact all mortgage-related securities. ¶¶88-92. Therefore, the level of subprime securities and mortgage-related securities in a mutual fund such as the Fund was unquestionably a material fact necessary to make the statements made by the Fund not misleading. ¶92. *See In re MBIA, Inc. Sec. Litig.*, No. 08-CV-264 (KMK), 2010 WL 1253925, at *14 (S.D.N.Y. Mar. 31, 2010) (finding exposure to risky mortgage securities material during the mortgage crisis, whatever the quantity).

While Defendants eventually noted there were some subprime securities in the Fund's portfolio, they were downplayed as small "disappointments" that "detracted" from the Fund's +2.54% performance – which was an insignificant ***0.17%*** below its benchmark's performance.[13]

---

[13]    The statement that the Fund "gained 2.54% for the six months ending January 31, 2007," while the Swap Index "returned 2.71%" (Def. Ex. E at III) was itself false and misleading since the Fund was relying on inflated prices for the underlying securities and reporting false NAVs, creating the mistaken impression of adherence to its benchmark and stable returns. ¶¶107-08.

Def. Ex. E at III; *see also* ¶107 (Registration Statements depicted stable Fund NAVs for most of the

Class Period).  In reality, however, by this time the Fund was already saturated with these toxic

securities.  For example, unbeknownst to investors, by April 30, 2007, almost 50% of the Fund's

ABS and 22% of the Fund's overall individual holdings were subprime mortgage securities.  ¶53.

These shocking numbers increase further when factoring in the internal Fidelity Central Fund, in

which the Fund invested 26% of its assets.  ¶61.  As of June 30, 2007, nearly 20% of the Central

Fund's value was derived from these risky subprime mortgage-related securities.  ¶62.[14]  Yet,

Defendants did not disclose the considerable amount of direct and indirect subprime exposure, or

otherwise identify the subprime holdings, until April 2, 2008, when it was far too late.  ¶124.[15]  Nor

did Defendants otherwise update the Fund's descriptions, objectives, strategies or risks to reflect

these ultra-risky and volatile positions.[16]

---

[14]     The Central Fund was a "black box" of investments that Defendants failed to disclose in the Registration Statements.  ¶61.  Fidelity failed to list the Central Fund's holdings in the 2006 and 2007 Annual Reports, with only a vague reference stating that an unaudited list of Central Fund's holdings was "available upon request."  *Id.*  Nevertheless, Fidelity expressly excluded the list of holdings from the 2006 and 2007 Annual Reports by stating that "the Central Fund financial statements . . . are not covered by this Fund's Report of Independent Registered Public Accounting Firm."  *Id.*

[15]     Defendants' post-class period admissions provide insight as to how drastically out-of-line the Fund's holdings were with its purportedly conservative profile.  On September 29, 2008, Fidelity conceded it belatedly "undertook a number of initiatives *in accordance with the principal investment strategies of the fund*" in an attempt to "reduce the fund's overall volatility" and "position the fund based on our view of future market risk."  ¶138.  In order to bring the Fund's profile in line with its stated objectives, Defendants drastically reduced its holdings in ABS, CMOs and Other Mortgage Related Securities from a composite 62.6% to only 10.6%.  ¶139.  Fidelity also liquidated the Fund's entire investment in the Central Fund for the period ending July 31, 2008, in order to bring the Fund back in line with its principal investment strategies.  ¶138.

[16]     Defendants were also well aware of the undisclosed and increasing credit risks directly associated with holding these securities, but failed to appropriately revise the Fund's risk disclosures or otherwise warn investors.  ¶104.  *See Piper Capital II*, 2003 WL 22016298, at *7-*8 (Stewart Decl. Ex. B) (finding a duty to disclose "overall increase in the Fund's risk/volatility profile"

Defendants respond that there "was no SEC or other regulatory requirement that any mutual fund prospectus identify [subprime mortgage] sub-categories of securities." Def. Mem. at 20. Yet, Defendants affirmatively represented the Fund investment philosophy as being one consistent with the preservation of capital. ¶¶36, 97-98. Having later materially deviated from this strategy, Defendants had an absolute duty to speak fully and accurately so as to make their statements not misleading. *In re Cabletron Sys.*, 311 F.3d 11, 36 (1st Cir. 2002); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987). Furthermore, Defendants made the following statements in January 2007:

> [C]ertain ABS, including those backed by subprime mortgage loans . . . came under pressure due to concerns about delinquencies and the growing likelihood of greater defaults . . . I continued to hold onto these securities because I maintained the belief that they are well protected from the concerns plaguing the lowest quality securities. . . . At Fidelity, we employ sophisticated techniques that incorporate a full evaluation of the collateral of the loans and a bond's structure, meaning its credit enhancement. Credit enhancement provides a cushion – often a significant one – against realized losses from the underlying pool of collateral. The result of our analysis is that I primarily emphasized subprime mortgage securities rated AAA or AA by the major bond rating agencies.

This certainly gave rise to a duty to disclose accurate and complete information based on Defendants' incomplete affirmative misstatements. Def. Mem. at 10; Def. Ex. E at V.

In *In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522 (SHS), 2010 WL 2772439 (S.D.N.Y. July 12, 2010), the court found actionable misrepresentations where, as here, defendants eventually disclosed some exposure to subprime-backed CDOs, but "materially misstated and underrepresented the full scope of risk." *Id*. at *19. The court rejected defendants' argument that there was no duty to "specify what exposure they had to CDO securities in particular," stating: "That argument overlooks

_____

because it "constituted a material deviation from the Fund's stated investment objective of high income with preservation of capital").

both the statutory language and well-established case law" requiring disclosure of any "additional material fact necessary to make the statements [already contained] therein not misleading." *Id.* (internal quotes omitted). *See also In re MoneyGram Int'l, Inc.*, 626 F. Supp. 2d 947, 976-77 (D. Minn. 2009) (statements addressing the portfolio's exposure to the subprime market created a duty to "disclose enough information . . . to prevent [statements implying only a small and temporary impairment] from being misleading").

Furthermore, as Defendants concede, the SEC requires mutual fund prospectuses to disclose "the risks to which the fund's particular portfolio as a whole is expected to be subject."[17] Def. Mem. at 21. And Form N-1A §(B)(4) expressly incorporates an SEC regulation echoing the Section 11 and 12(a)(2) standard. *See* 17 C.F.R. §230.408(a) ("Additional Information" provides: "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."). In this case, at times during the Class Period, subprime and other risky mortgage-related securities constituted the vast majority of the Fund's individual securities holdings. ¶73. This was the case during a "tsunami," as Defendants put it, in the mortgage market. Def. Mem. at 6; *see* ¶¶76-94. Thus, the Fund's portfolio as a whole was subject to significant and rapidly increasing risks that were required to be disclosed. *See Piper Capital I*, 2000 WL 1759455, at *14, *29-*30 (Stewart Decl. Ex. A).[18]

---

[17]    Defendants seem to argue that the disclosure of the Fund's exposure to subprime mortgage securities would require an onerous "laundry list disclosure." Def. Mem. at 21. Yet, that is exactly what Defendants belatedly provided to investors on April 2, 2008. ¶55.

[18]    Defendants misstate the holding in *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F. 3d 347 (2d Cir. 2010). The court, relying on an amicus curie brief filed by the SEC, found that the general directions did not create an additional duty to disclose. *Id.* at 361. Furthermore, in discussing the Form N-1A requirements for risk disclosures, the court stated there was a duty to

In their response, Defendants conflate the issues of the riskiness of subprime securities and misrepresentations related to investment-grade securities. See Def. Mem. at 21-23. As explained above, because the Fund's significant investments in subprime mortgage securities and the associated risks were contrary to the Fund's stated objectives, Defendants were required to provide meaningful disclosures regardless of whether the securities were (according to Defendants' motion) rated AAA or AA. *See MBIA,* 2010 WL 1253925, at *14 (rejecting defendants' argument that exposure to risky CDOs backed by residential mortgage-backed securities (RMBS) during the subprime crisis was immaterial even though the RMBS were "high grade"). In any event, such ratings were not meaningful risk indicators for the Fund's portfolio during the subprime crisis. ¶99; *see Piper Capital I*, 2000 WL 1759455, at *22 (Stewart Decl. Ex. A); Def. Ex. E at V. To wit, Defendants themselves told investors in January 2007 that that their "sophisticated techniques," not the ratings themselves, led them to "emphasize[] subprime mortgage securities rated AAA or AA by the major bond agencies." ¶99; Def. Ex. E at V; *cf. In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 530 (S.D.N.Y. 2009) (finding actionable misrepresentation where company represented hedging activity as "risk reducing," yet it actually increased the portfolio's exposure to significant risks).[19]

---

disclose risks specific to that fund. *See id.* at 363-64. Moreover, the court recognized that an actionable omission could also be pled where a disclosure was required to make affirmative misstatements not misleading. *Id.* at 361. Additionally, *Panther Partners, Inc. v. Ikanos Communs., Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) is inapplicable here because the holding relates to a completely different regulation that requires disclosure of "known trends or uncertainties," yet the plaintiff failed to show the defendant knew about the issues at the time of the IPO. *Id.* at 672.

[19]    The misrepresentation that the Fund invests "80% of assets in investment-grade debt securities (those of medium and high quality) . . ." is material and independently actionable because it appears directly below and is "prominently linked" to the investment objective of "preservation of capital." ¶¶97, 99; *Piper Capital I*, 2000 WL 1759455, at *21 (Stewart Decl. Ex. A). Even assuming the Fund was invested in 80% "investment grade" securities as narrowly defined by Defendants, "subprime and mortgage-related securities were not investment grade even though some had investment grade ratings by the rating agencies" and thus presented undisclosed risks

### 2. The Fund's Undisclosed Focus on Complex Mortgage-Related Securities, Which Defendants Lacked the Capacity to Evaluate, Rendered the Registration Statements False and Misleading

Nor could investors appreciate the risks associated with the Fund's overwhelming focus on mortgage-related securities in general.  For one thing, Defendants repeatedly assured them that they had sophisticated procedures in place to evaluate such securities and limit risk.  *See, e.g.*, ¶¶97, 99; Def. Ex. E at V.  They went as far as claiming that they relied on these procedures in lieu of ratings assigned to such securities by outside ratings agencies.  *Id.*  Yet, this was simply not true.  ¶72.  The presence of a material amount of these complex and risky securities presented significant risks since Defendants did not even understand what they were buying for the Fund, and therefore could not properly evaluate the investments.  *See* ¶¶65, 71-73, 75.

Even if investors had appreciated management's limitations, there was no way to fully understand the true extent of the Fund's exposure to these risky securities.  While mortgage-related securities were classified as "Collateralized Mortgage Obligations," they were also included – in undisclosed amounts – in a separate category of "Asset-Backed Securities."  ¶53.  For instance, as of April 30, 2007, investors were told that 13.3% of the Fund was comprised of CMOs, while 28.8% was ABS.  ¶53.  Although Fidelity defined ABS to include "interests in pools of mortgages, loans, receivables, or other assets," (Def. Ex. B at 4), this definition merely shows that "ABS can come in many forms" and does not necessarily include mortgage securities.  *MBIA*, 2010 WL 1253925, at *10.  In reality, however, as of April 30, 2007, 67% of all securities in ABS were mortgage-related

---

incompatible with the Fund's investment objective.  ¶99; *see Piper Capital I*, 2000 WL 1759455, at *22 (Stewart Decl. Ex. A) (even assuming the weighted average life calculations were technically accurate, "it is difficult to understand how the calculations/disclosures would not have been misleading" where they did not reflect the heightened risk present due to the fund's inadequately disclosed holdings in risky mortgage-related securities).

and almost half (*i.e.*, 49%) of the value of ABS was derived from mortgage-related securities.  ¶54.

Excluding the Fund's investment in the Central Fund, ***a mind-boggling 78% of the Fund's overall***

***holdings were mortgage-related securities*** and more than a third of its value (*i.e.*, 37%) was derived

from these risky investments.  *Id.*  ***Including the Central Fund, half of the Fund's entire value was***

***derived from mortgage-related securities!***  ¶57; *see also* ¶62 (nearly half the value of the Central

Fund was also derived from mortgage-related securities).  Although there were indications that ABS

contained some mortgage-related securities, there was no way for investors to discern the Fund's

true, inflated exposure.

The court's recent opinion *State Street*, granting the plaintiff's motion for reconsideration, is

instructive.  *In Yu v. State Street Corp.*, No. 08 Civ. 8235 (RJH), 08 MDL No. 1945, 2010 WL

2816259 (S.D.N.Y. July 14, 2010) (Holwell, J.) (Stewart Decl. Ex. C) (hereinafter, "*State Street II*"),

the court accepted for filing the plaintiff's amended complaint, finding that allegations, some of

which that are similar to those made here, were not futile.  *Id.* at *4.[20]  Judge Holwell ruled on

analogous allegations that the mutual fund's annual report stated that "mortgage-backed securities"

represented only 13.8% of the Fund, and there were indications such that a reasonable investor

would have known that some mortgage-related (as opposed to "mortgage-backed") securities were

contained within ABS.  *Id.* at *3.  Because plaintiff alleged, as here, that mortgage-related securities

---

[20]      Plaintiff here filed the SAC to address some of the deficiencies initially identified by the Yu court.  *See* Assented-To Motion for Leave to File Second Amended Complaint, and Agreed-Upon Proposed Briefing Schedule on Motion to Dismiss (Docket #65) at 2; *State Street I*, 686 F. Supp. 2d 369 (S.D.N.Y. 2010) (dismissing complaint); *State Street II*, 2010 WL 2862159 (Stewart Decl. Ex. C) (granting reconsideration and finding that plaintiff pleaded a plausible case of misrepresentation or omission).

actually constituted the majority of the securities held by the Fund, the court found that the plaintiff

had pleaded a plausible case that the categories were materially misleading.  *Id.*; ¶54.[21]  It held:

> It remains true that any reasonable investor should have known that some mortgage-related securities were counted in other categories.  But as plaintiff persuasively argues, "there is a world of difference between a Fund listing 14% [Mortgage-Backed securities] with 'some' additional mortgage securities categorized as [Asset-Backed securities], and a fund consisting of nearly 90% [mortgage-related securities]."  If the allegations are true, the Fund may have amounted to an undiversified investment in the mortgage sector, and the narrow disclosure of the percentage of "mortgage-backed" investments arguably misled investors about that fact.  Thus, the PSAC states a plausible claim that the percentage tables mis-categorized securities and were materially misleading.

*State Street II*, 2010 WL 2816259, at *3 (citations omitted).[22]

_____

[21]     Since CMO securities were mortgage-related and ABS included some mortgage-related securities, the sum of the two would presumably provide the maximum amount of such securities. However, given the Fund's conservative strategies, and the ongoing disturbances in the subprime market, investors had every reason to believe ABS consisted of a conservative mix of possible investments.  *See, e.g.*, ¶38.  *See also Piper Capital I*, 2000 WL 1759455, at *10 (noting that although the fund was initially comprised almost exclusively of "ordinary mortgage-backed securities," "the relative safety" of the investments was "reflected in the Fund's stated investment objective").

[22]     The court implicitly rejected the argument that a listing of individual securities somehow cured this misrepresentation.  *See* Def. Mem. at 17-19 (relying on original *State Street I* opinion); *see also Piper Capital I*, 2000 WL 1759455, at *9, *30 (Stewart Decl. Ex. A) (finding defendants materially misrepresented the fund's holdings despite the comprehensive list of fund securities in the registration statements).  Furthermore, the case here is even more compelling because Defendants held additional mortgage-related investments outside of the CMO and ABS categories that were wholly inconsistent with the Fund's positioning, stated objectives and purported investment strategies, and which further exposed the Fund to the risks of the mortgage and subprime markets. ¶55.  For example, Defendants entered into a credit default swap with Morgan Stanley, Inc. whereby the Fund would pay to Morgan Stanley the par value of the underlying bonds upon default of Ameriquest Mortgage Securities, Inc. ¶55.  It was not until April 2, 2008, that Defendants disclosed that this and similar investments were actually mortgage-related subprime securities.  *Id.*; *see also MBIA*, 2010 WL 1253952, at *10 (finding the categories "Multi-Sector CDOs [collateralized debt obligations] with RMBS [residential mortgage-backed securities]" and "other CDOs" materially misleading because the "other CDOs" category also contained RMBS).

As in *State Street II*, it is clear that the Complaint here adequately alleges that the Fund's investment categorizations misled reasonable investors. *See State Street II*, 2010 WL 2816259, at *3 (finding three significant distinctions in plaintiff's second amended complaint that establish false and misleading statements related to the categorization of mortgage-related securities). First, as in *State Street II*, Plaintiff added allegations to the SAC concerning the percentage of the portfolio that the mortgage-related securities as a whole actually represented. ¶¶54, 57. Second, Plaintiff does not allege that a reasonable investor would necessarily believe that there were no mortgage-related holdings in ABS. *Cf. State Street I*, 686 F. Supp. 2d at 379. Plaintiff alleges instead that Defendants' misleading disclosures made it so investors could not appreciate the scope and associated risk of these holdings. ¶54.[23] Finally, Plaintiff has averred facts showing the misleading categories "would have impacted a reasonable investor's decision making at the time." *See, e.g.*, ¶¶54-57, 124-30. As in *State Street II*, Plaintiff alleges Defendants obscured and failed to disclose the Fund's actual mortgage-related holdings. ¶¶124-130; *State Street II*, 2010 WL 2816259, at *3.

Given the unprecedented reliance upon the mortgage-related securities Defendants did not fully understand – in the midst the of the mortgage meltdown – disclosure of the amount of such securities was necessary to make the statements made not materially misleading. *Rodney v. KPMG Peat Warwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) (holding failure to alert the reader to the level of

---

[23]    *See Piper Capital I*, 2000 WL 1759455, at *11, *29-*30 (Stewart Decl. Ex. A) (disclosing that CMOs comprised part of the fund's portfolio was not sufficient considering that the fund had concentrated investments in CMOs that were essential to the fund's performance; failure to disclose the proportion of the fund's CMO investment constituted a "highly unreasonable departure from standards of ordinary care").

risk constituted a material omission); *MBIA*, 2010 WL 1253925, at *14 (finding failure to accurately

disclose quantity of RMBS in the portfolio during the mortgage crisis a material omission).[24]

### 3.   Defendants Misrepresented the Fund's Investment in the Internal Fidelity Central Fund

Also contributing in large part to the misleading nature of the Registration Statements, were

the disclosures relating the Fidelity Central Fund.  The Central Fund was critical to the Fund's

conservative investment strategy since 25%+ of its total assets were invested in this internal

investment vehicle.  ¶¶57, 61.  In fact, the Registration Statements specifically state that the Fund

would seek to meet its objectives through investment in the Central Fund.  ¶97.  In the context of the

Fund's overall conservative strategy, this major investment made perfect sense.  According to the

Registration Statements, the Central Fund was "a diversified internal pool of short-term assets

designed to outperform cash-like instruments with similar risk characteristics."  ¶¶117-18; Def. Ex.

E at IV.  Like the Fund itself, the Central Fund's objective was "to obtain a high level of current

income," utilizing strategies which were "consistent with preservation of capital."  ¶120.

With 78% of its holdings concentrated in mortgage-related securities (and 22% toxic

subprime mortgage securities), the Fund's investment in the Central Fund clearly did not enable it

"to obtain the benefits of a fully diversified bond portfolio."  ¶¶117-19, 120, 122-23.  And contrary

to Defendants' implication, this information was not disclosed to investors.  Instead, the risky

---

[24]     Mr. Dudley's comment that he would "likely concentrate on . . . mortgage- and asset-backed securities" would not have notified a reasonable investor that the Fund contained excessive quantities of risky mortgage-related and subprime securities that were not carefully vetted to be "consistent with the preservation of capital."  *See, e.g.*, ¶36; *MBIA*, 2010 WL 1253925, at *10-*11. Nor did the Registration Statements conspicuously identify mortgage-related securities as one of the Fund's "Principal Security Types," as Defendants contend.  *See* Def. Mem. at 17; Def. Ex. A at 8 (identifying "Debt securities" as a "Principal Security Type" and listing "mortgage and other asset-backed securities" as one of many sub-types that fall within that category).

mortgage and subprime securities rendered the Fund's stated overall objectives, strategies and risks false and misleading and further rendered these specific statements regarding the Central Fund's diversification and associated risks untrue. ¶¶119, 121-23. The Central Fund was really another undisclosed, risky bet on the mortgage and subprime mortgage sector. *See State Street II*, 2010 WL 2816259, at *3.

4. **Defendants' Statements Regarding the Fund's Reliance on the Swap Index and Use of the Swap Index as Its Benchmark Contributed to the Misleading Nature of the Registration Statements**

Defendants' statements regarding the Swap Index "represent[ing] the market for the types of securities in which the [F]und invests" and that it uses the exceptionally stable Swap Index as "a guide in structuring the fund and selecting its investments" misleadingly reinforced the false premise that the Fund was a conservative and stable investment. ¶¶107-08.[25] In fact, the structure of the Fund and its investments were nothing like that of the Swap Index. ¶101.

Defendants respond that the use of the Swap Index was expressly limited to comparison of interest rate risk, and "not overall risk, volatility or performance." Def. Mem. at 25. Yet, Defendants continuously and affirmatively used the conservative and low volatility Swap Index as the Fund's benchmark and compared their performances. *See, e.g.*, ¶134 (Fund's own Annual

---

[25]     Plaintiff also alleges the Fund did not – as represented – have a similar interest rate risk to the Swap Index because the Fund "was subject to a rising interest rate risk that would increase the risk of default on mortgage-related securities." ¶101. While Defendants dispute the meaning of "interest rate risk" (Def. Mem. at 27), the distinction is not determinative here because Plaintiff also avers there were "significant undisclosed credit risks" that caused losses when default rates increased. ¶104. Moreover, the fact that the prevailing interest rates were declining while the Fund's NAV declined is consistent with Plaintiff's allegation that Defendants *belatedly* wrote down the Fund's NAV. *See* Def. Mem. at 27. Plaintiff alleges the Fund incurred losses prior to the summer of 2007, yet Fidelity only began to start writing down the value of the securities in the Fund at that time. ¶75. Thus, Defendants' argument based on interest rate risks versus credit risks and timing does nothing to undermine Plaintiff's well-plead allegations.

- 26 -

Report filed with the SEC on September 29, 2008 includes a chart depicting the performance of the Fund relative to the performance of the Swap Index); Def. Ex. A at 4-5; Def. Ex. D at III; Def. Ex. E at III. Revealingly, Defendants called the Swap Index a "relevant benchmark" and "appropriate" for comparison. ¶37; Def. Ex. E at VI. Thus, Defendants "invited" the comparison between the Swap Index and the Fund's performances. *Evergreen*, 2010 WL 1253114, at *6. Nor can Defendants demonstrate that a reasonable investor would interpret the language in the Registration Statements in the narrow and restrictive manner urged by Defendants, particularly given their other disclosures.[26] *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2010 WL 1463490, at *3 (N.D. Cal. Apr. 8, 2010) (finding defendants' interpretation "extreme" on their motion for summary judgment where it was, as in this case, "directly at odds with the otherwise clear-cut representations" made by the fund).

As in *Piper Capital II* (Stewart Decl. Ex. B), Defendants' use of this misleading and unrepresentative benchmark itself is false and misleading. *Id*. at *7. Far from providing an "appropriate comparison," the Fund was "structured differently from, and was much riskier and more volatile than" the Swap Index. ¶101. *See also Schwab*, 257 F.R.D. at 543 (denying motion to dismiss where plaintiffs alleged the fund's profile was not comparable to its purported benchmark); *Evergreen*, 2010 WL 1253114, at *6 (holding that statements comparing the fund to other indices

---

[26] The plain language of the Registration Statements, cited by Defendants, supports Plaintiff's interpretation. The first two sentences analyzed by Defendants are more specific than the third, and identify three uses or purposes for the Swap Index: (1) as a guide in structuring the Fund; (2) as a guide in "selecting its investments"; and (3) for managing interest rate risk. *See* ¶37. The third sentence broadly states that the Fund uses the Lehman Brother 6 Month Swap Index in "managing the fund's investments" – not interest rate risk only – which logically encompasses all three of the prior, specific purposes mentioned. *Id*. Nevertheless, even if the language is ambiguous, Plaintiff's interpretation sits comfortably within the realm of plausibility and thus, the conflict must be resolved in the Plaintiff's favor at this stage of the proceedings. *Twombly*, 550 U.S. at 593.

were actionable misrepresentations where plaintiffs alleged that the fund was "far more susceptible to unanticipated changes in interest rates" and "far riskier than the Lehman indices"). This misrepresentation was material, as the Fund's performance declined precipitously by 12.49% for the year ended July 31, 2008, while the Swap Index gained 4.62%. ¶136. Clearly, if the Fund had been structured at all similarly to the Swap Index, their performances would not have diverged to such an alarming extent. *See* ¶134 (chart showing precipitous losses the Fund suffered while the Swap Index steadily climbed).

> **5.      Defendants Misrepresented the Fund's Valuation Capabilities, Reported False NAVs and Failed to Disclose Bear Stearns' Material Conflict of Interest**

Plaintiff's allegations in this case clearly demonstrate that Fidelity was unable to accurately price complex, risky mortgage-related securities, in accordance with the procedures set forth in the Registration Statements.  ¶¶65-75, 113-16.  Nevertheless, Defendants failed to disclose these material deficiencies and the resulting false, inflated NAVs they reported, thereby misleading investors and causing them to purchase Fund shares at artificially inflated prices.  ¶¶114-16. Defendants attempt to dissect and confuse Plaintiff's well-plead allegations with inconsequential arguments to obfuscate the glaring reality that investors would have viewed a false and inflated NAV as a "significant alteration of the total mix of available information." *Piper Capital I*, 2000 WL 1759455, at *43 (Stewart Decl. Ex. A).

The Registration Statements set forth a straightforward procedure in which the Fund's assets are valued using a pricing service or market quotations ***unless*** prices are either "not readily available" or "do[] not accurately reflect the fair value for a security. . . ." ¶115.  In such a case, Defendants reassured investors they would do a "fair value" determination in "good faith," which

was subjected to multiple levels of oversight. ¶¶70-71, 113, 115.[27]   However, this procedure was not

implemented.  ¶¶114, 116.   A confidential witness revealed that Fidelity's internal team was

understaffed and no one at the Company knew "the analytics and the pricing that goes behind pricing

out each bond."  ¶¶28, 70-72.  Because many of the securities held by the Fund did not trade

frequently or have readily available prices, Defendants were unable to determine fair value for those

securities, as prescribed.  ¶¶65, 72-73, 115.

Where there were available pricing service or market quotations, Defendants did not and

indeed could not assess "whether risky mortgage-related securities accurately reflected fair value,

value these securities in 'good faith,'" or provide oversight, as their stated procedures demanded.

¶¶114, 116.[28]  This was particularly problematic since the vast majority of Fund securities were

mortgage or subprime mortgage-related.  ¶¶73-74.   And, as described below, the third-party

valuations for these particular types of securities were often overstated by conflicted services, such

as the Bear Stearns "Pricing Direct" website.  ¶¶65-75.  Accordingly, Defendants' failure to

accurately represent the valuation procedure as implemented constitutes an actionable

---

[27]     Fidelity employees provided a Fair Valuation Report to the Fair Value Committee for review.
¶¶71-72. Then, at the highest level of oversight, the Fair Value Oversight Committee was tasked
with "establish[ing] policies concerning procedures and controls regarding the valuation of fund
investments . . . and provid[ing] oversight regarding the investment policies relating to, and Fidelity
funds' investment in, non-traditional securities . . . [and] review[ing] actions taken by FMR's Fair
Value Committee."  ¶113.

[28]     Defendants' attempt to insulate the Fair Value Oversight Committee from a basic
requirement of competence with regard to ensuring fair valuations, the very purpose of the
Committee, must fail.  See Def. Mem. at 31, n.21.  It is misleading to represent that the valuation of
securities is being overseen by "experienced" executives who are actually incapable of providing
oversight and that a committee titled "Fair Value Oversight Committee" cannot determine fair value
or oversee the fair value determinations of others.  See Serabian v. Amoskeag Bank Shares, Inc., 24
F.3d 357, 365 (1st Cir. 1994) ("When defendants 'affirmatively characterize[] management practices
as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.''") (citing Shapiro v.
UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992)).

misrepresentation.  *In the Matter of Evergreen Inv. Mgmt. Co. LLC, et al.*, *Cease and Desist Order*, SEC Release No. 60059, 2009 WL 1585837, at ¶10 (June 8, 2009) (Stewart Decl. Ex. D) (hereinafter "*Evergreen C&D*").[29]

As a result of the foregoing, Defendants incorporated inflated security prices into the NAV calculation and repeatedly reported false NAVs, *i.e.*, made additional actionable misrepresentations, during the Class Period.  ¶¶43, 110-11, 116; *see Evergreen C&D*, at ¶¶1-2, 10-14 (Stewart Decl. Ex. D) (finding undisclosed failure to timely write down mortgage-backed securities is actionable under the securities laws).  It was not until the summer of 2007 that Defendants finally began to ratchet down the NAV to reflect the appropriate prices of the Fund's mortgage-related holdings, but the NAV remained inflated until the end of the Class Period.  ¶75; *see also* ¶¶131-33 (Fund's NAV plummeted from $10.04 to $8.30, or 17%, with the majority of the decline occurring after the summer of 2007).  *See Abrams*, 2002 WL 1160171, at *3, *10 (finding actionable misrepresentations where fund artificially maintained a stable NAV by failing to follow its own valuation procedure and then wrote-down the value of its holdings when the fund gradually changed its valuation methodology).

Plaintiff provides two specific examples of securities among numerous misvalued Fund holdings that were inflated by more than 6% and 8%, respectively.  ¶¶68-69.  Considered in

---

[29]    *See also Abrams*, 2002 WL 1160171, at *3, *10 (finding actionable misrepresentations where defendants misstated the extent to which market quotations would be utilized in valuing the funds and defendants did not follow their stated valuation policy); *RAIT*, 2008 WL 5378164, at *5 (finding material misrepresentations where plaintiffs alleged that represented credit underwriting and monitoring processes "were not designed to minimize investment risk as stated" and supporting the allegation by pointing to the failing market and declining financials of certain issuers); *MoneyGram*, 626 F. Supp. 2d at 975  (determining that defendants had a duty to provide more detailed information regarding the portfolio's exposure to subprime and Alt-A collateral based on the "external market indicators alleged in the complaint" and defendants' internal problems valuing the securities, among other allegations).

conjunction with detailed factual allegations regarding Fidelity's inability to provide fair values for the mortgage-related securities that comprised the majority of the Fund's holdings (¶¶65-75), Plaintiff more than adequately alleges Defendants misrepresented the Fund's NAV in violation of the Securities Act. *See MoneyGram*, 626 F. Supp. 2d at 978 (denying motion to dismiss where a company failed to disclose it was unable to reliably price securities requiring internal pricing and the quantitative effect of disagreements with third party pricers); *see also Abrams*, 2002 WL 1160171, at *4, *10.

Defendants counter that Plaintiff should be required to list each and every mispriced security in the Fund's portfolio in order to establish that the pricing disparities are material. Def. Mem. at 32-34. But this is not even required for a plaintiff subject to Fed. R. Civ. P. 9(b)'s stringent pleading requirements and would be drastically out of line with Rule 8(a)'s "plausibility" requirement. *First Trust*, 2009 WL 5064285, at *4; *see also State Street II*, 2010 WL 2816259, at 8 n.4 (Stewart Decl. Ex. C) (plaintiff need only allege "some facts to close the loop between the market turmoil and the accuracy of the Fund's valuations."). Moreover, this simplistic analysis ignores the additional, corroborating allegations of mispricing by a former Fidelity pricing analyst. ¶¶28, 70-72.[30]

Defendants further attempt to simultaneously argue two irreconcilable contentions: that the NAV is calculated based on a mathematical formula, and thus could not be inflated or inaccurate;

_____

[30]     Defendants' calculations ignore that materiality is not just quantitative, but qualitative. Def. Mem. at 33; *see Piper Capital II*, 2003 WL 22016298, at *16 (Stewart Decl. Ex. B) (rejecting defendants' attempt to translate the materiality concept "into a numerical formula" because a "reasonable investor" would want to know that the Fund was mispricing some securities and the NAV was inflated). The comparison to *JP Morgan Chase* is also inapposite because it is also based on Defendants' irrelevant calculations. *See* Def. Mem. at 34. Moreover, Schwab is inapplicable to this case because the allegations of mispriced assets related to an audit opinion and there were no additional, corroborating allegations of mispricing by confidential witnesses. *Id.* at 561. Finally, the complaint in *State Street II* also lacked witness allegations of mispricing and did not include examples of any resulting mispriced securities. *Id.* at 8 n.4 (Stewart Decl. Ex. C).

and that the "fair value" process is only an "estimate," implying that an NAV may be reported as an

expansive range of values for which Defendants may not be held accountable. *See* Def. Mem. at 35.

Significantly, however, the SEC has already rejected this argument in the *Piper Capital I* and *II*

actions. *See Piper Capital II*, 2003 WL 22016298, at *16; *see also Piper Capital I*, at *45 (Stewart

Decl. Ex. A) (finding prices of securities vary over a "limited range" and rejecting defendants'

contention that they may not be held liable for inflating the NAV).[31]

Also contributing to the inflated NAVs, according to the confidential witness, was Fidelity's

excessive dependence on Bear Stearns to provide prices for certain mortgage securities through its

"Pricing Direct" website, which Fidelity was unable to verify by comparing the data with other

pricing sources.  ¶66.  This blind reliance was especially problematic because Bear Stearns had

incentive to provide, and did provide, inflated values in order to "sustain a strong and lucrative

market for its investment banking and hedge fund business."   ¶67; ¶68 (providing example of

mispriced "***Bear Stearns*** Asset Backed Securities Trust: Series 2004-B01" security); *see also*

¶¶44-48 (explaining in detail Bear Stearns' conflict of interest in issuing and pricing the same

securities in a market it was primarily responsible for creating and sustaining).  Defendants' failure

to disclose their unprecedented reliance on inflated quotes by Bear Stearns and Bear Stearns' conflict

of interest constitute material omissions that were required to be disclosed to make Defendants' false

recitation of their valuation procedure not misleading. *MoneyGram*, 626 F. Supp. 2d at 975 (failure

---

[31]     *Piper Capital I* makes clear that the prices of securities are neither beliefs nor opinions, as
Defendants insist. *Id.* at *44-*45 (Stewart Decl. Ex. A); *see* Def. Mem. at 33, n. 23.  Nevertheless,
not even the cases Defendants cite support their defective characterization.  *See Brown v. Credit
Suisse First Boston LLC*, 431 F.3d 36, 47 (1st Cir. 2005) (§10(b) case in which defendant analyst
could not be held liable for reports, which relate to analyst's personal opinions and beliefs, without a
showing of subjective falsity); *Va. Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2759 (1991)
(statement to shareholders that the price for shares in a merger context was "fair" considered an
opinion).

to disclose "specifics about how and from whom it obtained 'quoted market prices,' or the number of securities requiring management pricing," where defendants represented that management valued investments that were not readily marketable, was materially misleading).[32]

### E. Plaintiff's Claims Are Not Time-Barred

Actions for violations of Sections 11 or 12 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. §77m. "[A]ny determination of when the statute of limitations began to run is most appropriately made in the context of summary judgment." *Lalor v. Omtool, Ltd.*, No. CIV. 99-469M, 2000 WL 1843247, at *6 (D.N.H. Dec. 14, 2000) (citing *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996)); *Schwab*, 257 F.R.D. at 557. A statute of limitation question may be resolved through a motion to dismiss only where the complaint demonstrates that the plaintiff failed to timely assert its cause of action. *See Salois v. Dime Sav.*

---

[32]     Disclosure was required even though revealing the name of a pricing vendor is not specifically contemplated by regulation because it would have warned investors of the risk that Defendants' stated procedures, even if they were followed, would result in an inflated NAV. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506 (S.D.N.Y. 2009) (where a defendant represents procedural protections that are supposed to guard against conflicts of interest, the failure to disclose a material conflict of interest present despite such purported procedure is an actionable omission); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004) (finding nondisclosure of a conflict of interest an actionable omission, "even where no regulation expressly compels the disclosure of such conflicts"). Notably, courts have rejected Defendants' call for a presumption that the public knows securities dealers are conflicted, (Def. Mem. at 30), thereby absolutely relieving them of a duty to disclose such material information, where, as here, "reasonable minds could differ on the importance of information about the conflict of interest alleged by plaintiffs." *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625(JG), 2007 WL 1213395, at *8 (E.D.N.Y. Apr. 25, 2007). This case is distinguishable from cases cited by Defendants in which the specific conflicts of interest are widely and publicly known. *See In re Lehman Brothers Sec. and ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (reasonable investors would have known about rating agencies' conflict of interest because specific concerns had been publicly expressed for years); *Morgan Stanley*, 592 F.3d at 366 (risks associated with securities research are common knowledge).

*Bank of N.Y.*, *FSB*, 128 F.3d 20, 26 (1st Cir. 1997); *Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 08 Civ. 10841 (JSR), 2010 WL 2175875, at *2 (S.D.N.Y. June 1, 2010) (requiring "uncontroverted evidence that clearly demonstrates when the plaintiff should have discovered the fraudulent conduct").

The Supreme Court's recent decision in *Merck & Co., Inc. v. Reynolds* clarified that "inquiry notice" or "storm warnings" – disclosure of facts that would lead a reasonably diligent plaintiff to investigate further – do not commence the statute of limitations period. 130 S. Ct. 1784, 1798 (2010). Instead, the Court held that the statute of limitations does not begin to run until "discovery" of all facts that "constitute the violation," "irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.*; *see also id*. at 1797 ("Nothing in the text suggests that the limitations period can sometimes begin before 'discovery' can take place."); *contra* Def. Mem. at 36 (erroneously contending that "knowledge of the facts underlying [Plaintiff's] claims shall be imputed to him as of the date the duty to inquire arose" if he fails to investigate initial storm warnings).[33]

Defendants here do not contend that Plaintiff should have discovered all of the facts constituting a violation more than a year prior to filing suit. *Merck*, 130 S. Ct. at 1798. They instead base their argument on Fidelity's January 31, 2007 "Shareholder Update," which they claim constitutes a "storm warning" and the point in time Plaintiff should have begun investigating. Def. Mem. at 37; *Young*, 305 F.3d at 9 (limitations period begins at discovery, not at the time of initial

---

[33]     Although the Court ruled on the statute of limitations standard for §10(b) Act cases, the Court found that §10(b) implicitly echoed the language found in the statute of limitations applicable to Securities Act cases, *i.e.*, that "discovery" encompasses "the facts a plaintiff actually knew" and the "facts a reasonably diligent plaintiff would have known." *Id*. at 1795-96; 15 U.S.C. §77m. Moreover, the fact that the First Circuit applies *Young v. Lepone*, 305 F.3d 1 (1st Cir. 2002), a §10(b) case now explicitly overruled by *Merck*, in §§11 and 12(a)(2) statute of limitations determinations, supports that *Merck* is equally applicable to Securities Act cases.

storm warnings).  Notably, Defendants do not even say when they believe Plaintiff should have actually ***discovered*** all of the facts constituting the various violations of the Securities Act.  *Merck*, 130 S. Ct. at 1798; *see also Young*, 305 F.3d at 9 ("a reasonably diligent investigation . . . may consume as little as a few days or as much as a few years to get to the bottom of the matter").

Even if the Shareholder Update constitutes some type of a "storm warning" – which it does not – Defendants do not and cannot argue that it put Plaintiff on notice of Defendants' misstatements and omissions and the other elements of his claims.  *See Merck*, 130 S. Ct. at 1978 (noting that the usefulness of "inquiry notice" and "storm warnings" is extremely limited, and they *do not* start the running of the limitations period).  Fidelity's January 31, 2007 "Shareholder Update," which states that the Fund "heavily emphasized non-government bonds" and that these so-called spread sectors included, but were not limited to, some ABS and MBS.  *See* Def. Mem. at 37-38; Def. Ex. E at III-IV.  According to the Shareholder Update, these ABS and MBS "non-governmental bonds" were also held indirectly through the Central Fund.  *Id.*  Contrary to Defendants' implication, the document did not state that the Fund emphasized MBS or subprime investments, or that the Central Fund even held any subprime investments.  *Compare* Def. Mem. at 37-38 (selectively quoting and isolating portions of update) to Def. Ex. E at III-IV (Shareholder Update).  With respect to disappointments, "certain ABS" backed by subprime loans were said to have "detracted from fund performance," resulting in a +2.54% six-month return, compared to the slightly greater +2.71% experienced by its benchmark index.  Def. Ex. E at III-IV, VI.

These disclosures, however, hardly suggest to investors the presence of any particular "untrue statement or the omission," much less a "probability" of such statements.  *See* Def. Mem. at 37 (citing *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 n.5, 1327 (3d Cir. 2002)).  Nothing in the Shareholder Update gives any indication that the Fund was being managed in a way that was not

"consistent with the preservation of capital," as Plaintiff alleges was the actual case.  In fact, the document reiterated that the Fund remained structured in such a manner.  *See* Def. Ex. E at V.  And, despite the presence of some undisclosed amount of subprime ABS, the Fund only underperformed its benchmark index by 0.17%.  *See* Def. Ex. E at III, VI; *see also* ¶¶107, 132-133 (alleging stable NAVs until July 2007).  Thus, investors had every reason to believe the Fund remained conservatively structured, as represented, and like its benchmark and peers, it was appropriately protected against subprime and mortgage-related risks.  *See, e.g.*, ¶¶134-36 (comparing Fund performance).  So too, investors also had every reason to believe that the Swap Index remained an appropriate benchmark.  *See, e.g.*, ¶¶101, 107-08; Def. Ex. E at VI (describing Swap Index as Fund's "benchmark").

The Shareholder Update even went a step further, falsely reassuring investors that Fidelity undertook certain "sophisticated" measures to ensure that any subprime mortgage investments would not expose the Fund to increased risks.  Def. Ex. E. at V ("At Fidelity, we employ sophisticated techniques that incorporate a full evaluation of the collateral of the loans and a bond's structure, meaning its credit enhancement.  Credit enhancement provides a cushion – often a significant one – against realized losses from the underlying pool of collateral").  *See First Trust*, 2009 WL 5064295, at *8 (denying limitations defense whether "Defendants deceptively tried to differentiate [the] Funds' portfolio from the 'trouble' in sub-prime mortgages.").  The update also gave investors comfort that they were not exposed to increasing credit risks which the Fund stated it would avoid by remaining "conservatively positioned."  Def. Ex. E. at IV-V; ¶104 (Defendants failed to disclose the "increasing credit risks" associated with the undisclosed "concentration in mortgage-related and subprime mortgage securities").

The Fund's solid performance, which at that time tracked the performance of its peers and benchmark, gave investors additional reason to believe that a small amount of subprime mortgage securities in the portfolio was a minor issue and that the Fund was adhering to its stated objectives, policies and structure. *See* Def. Ex. E at VI. Notably, had Defendants properly priced the Fund's mortgage holdings under its stated procedures, the Fund's NAV would have dropped at this time. It did not. *See* ¶75 (Fund did not obtain expertise to properly price mortgage securities until, at the earliest, the summer of 2007, at which time it began to lower the NAV); *see also* ¶¶98, 103, 108, 110-12, 116, 131. Indeed, actual loss is an element of Plaintiff's claims that could not have been known until the NAV declined. *See Merck*, 130 S. Ct. at 1978; *First Trust*, 2009 WL 5064295, at *8 (storm warning not present until NAV suffered a significant decline).

The true and shocking extent of its subprime exposure was not known until the Fund belatedly disclosed this information in mid-2008.[34] *See* ¶¶52, 55, 58, 124, 126, 129. The Fund never disclosed the true extent of its exposure to other mortgage-related securities, something that the update in no way hinted may have been misstated. ¶124. Defendants simply are wrong that a statement that the Fund "emphasized non-governmental bonds," which included ABS and MBS, would be considered by an investor to be inconsistent with its representations that, for example, it

---

[34] Defendants argue that Plaintiff "conten[ds] that investors knew *nothing* about the Fund holding subprime mortgage securities prior to the [Update.]" Def. Mem. at 38. Plaintiff actually alleges: "Even though the Fund disclosed that it held CMOs and mortgage-related securities, it failed to disclose the *full extent* of these holdings, and, critically, failed to disclose the Fund's *true exposure* to the risky subprime mortgage market." ¶51 (emphasis added). Further, the contemporaneous press reports Plaintiff alleges in support of his claims cannot be said to provide notice of Defendants' misrepresentations. Each quoted article deals with the rising incidents of default among subprime borrowers as a whole, but in no way reveals the Fund's true and shocking exposure to the subprime crisis. ¶¶79-91, 97; *see Merrill Lynch*, 2010 WL 2175875, at *2 (defendants' purported news report "storm warnings" regarding MBS raise questions of fact that cannot be resolved on a motion to dismiss).

held 29.3% ABS and 15.7% mortgage-related securities.  ¶125; Def. Mem. at 38; Def. Ex. E at

III-IV; ¶54 (excluding the Central Fund, by April 30, 2007, 78% of the Fund's holdings were

mortgage-related, representing 37% of its value).  Because Defendants' disclosures in the

Shareholder Update not only failed to reveal their false and misleading statements, but further

obscured the true risk, holdings and value of the Fund, a reasonably diligent plaintiff could not have

discovered the essential facts by that date.

The Shareholder Update also provides no warning that the Fund's significant investment in

the Central Fund was really another risky bet on real estate.  ¶¶56-57, 61-63.  Instead, Defendants

reiterated in the update that the Central Fund was "a ***diversified*** pool of short-term assets designed to

outperform cash-like instruments with similar risk characteristics."  Def. Ex. E at IV (emphasis

added); ¶¶117-23.  This was yet another misrepresentation.  *Id*.  Moreover, the update did not

suggest that Defendants lacked the expertise and tools to understand and evaluate the mortgage

securities they were purchasing, which represented the vast majority of the holdings in the Fund.

¶¶65-75, 97, 100, 113-16.  Again, the update itself is false and misleading since it hypes its

(nonexistent) sophisticated evaluation techniques.  Def. Ex. E at V (touting Fidelity's evaluation

techniques); ¶¶73-75 (Fund did not obtain expertise to properly evaluate and price mortgage

securities until, at the earliest, the summer of 2007). Defendants further concede that the update

provided no warning that they failed to follow their announced valuation techniques, often utilized

conflicted valuation services and overstated the Fund's NAV.  Def. Mem. at 38 n.27.

The first time a reasonable investor could possibly have been apprised of any of the various

misrepresentations was on July 31, 2007.   On that date, Defendants faulted the Fund's

underperformance to its "***sizeable*** exposure to subprime mortgages."  *See* Docket #53-13 (Ex. L to

Initial Dittmar Decl.) at III (emphasis added).  Even then, the Fund had not yet experienced a loss

and misrepresentations such as Defendants' valuation and security evaluation deficiencies, the inflated NAVs, the true make up of the Central Fund and similar matters remained fully hidden from investors. *See id.* (reporting +3.09% Fund gain for 12 months ended July 31, 2007). Accordingly, Plaintiff's claims were timely filed on June 5, 2008.[35]

### F.   Defendants Have Not Met Their Burden of Demonstrating a "Negative Causation" Affirmative Defense

Loss causation is not an element of Section 11 and 12(a)(2) claims. 15 U.S.C. §§77k; 77l. Rather, Defendants may assert a "negative causation" defense that Plaintiff's damages were not caused by the material misstatements and omissions. *See* 15 U.S.C. §77k(e); 15 U.S.C. §77l(b). Several circuit courts have held that affirmative defenses, like negative causation, cannot be established on the pleadings. *See, e.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint"); *see also First Trust*, 2009 WL 5064295, at *7 (deferring defendants' negative causation argument until a later stage in the litigation).

Even if the Court considers the defense at this juncture, Defendants' arguments still fail since Plaintiff alleges two accepted theories of causation. First, Plaintiff alleges losses caused by the materialization of the undisclosed risks associated with the Fund's significant holdings of subprime and other mortgage-related securities, many of which they did not fully understand. In rejecting the

---

[35]   Defendants suggest that the Shareholder Update warned that the Fund would experience future losses due to the repricing of "riskier types of bonds." Def. Mem. at 38; Def. Ex. E at V. Instead, the update falsely indicated that the Fund would avoid these risky bonds and continue to maintain a conservative position. Def. Ex. E at V.

very same attacks on the plaintiffs' theory of causation made by Defendants here, the court in Schwab held:

> Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions. Defendants would immunize a scheme that purported to invest in low-risk government bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions. ***Loss causation, however, is not limited to the common "corrective disclosure-price drop" scenario***.
>
> As courts in other circuits have explained, ***a plaintiff may establish loss causation by alleging "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered"; that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security***.

257 F.R.D. at 547 (emphasis added) (citations omitted). *See Evergreen*, 2010 WL 1253114, at *6-*7 (adopting Schwab rationale); *Schwab*, No. 08-CV-01510, 2010 WL 1463490, at *6 (on summary judgment holding "if a mutual fund holds itself out as investing no more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a single industry . . . The materialization of the concealed risk causes the loss.").

Similarly, in this case Plaintiff alleges that the Registration Statements contained materially false and misleading statements concerning, *inter alia*: (i) that the Fund's investment strategy would be "consistent with the preservation of capital"; (ii) the extent of the Fund's true exposure to subprime and other mortgage-related securities; (iii) the valuation capabilities and methodologies of the Fund; and (iv) the composition of the Central Fund. ¶¶96-130. As in *Schwab* and *Evergreen*, Plaintiff's injuries were caused by a materialization of the undisclosed risks associated with the foregoing. *See, e.g.*, ¶¶131, 138; *see also Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 760750, at *14 (N.D. Cal. Mar. 9, 2007) (it is unnecessary to show a drop in NAV after

the truth is revealed to establish loss causation in a mutual fund case). *See also, Merck*, 130 S. Ct. at

1793-94 (recognizing that a loss can occur long before discovery of the fraud).[36]

Second, Plaintiff also alleges a more traditional theory of loss causation as it relates to the

mis-valuation and inflation of the Fund's NAV. Plaintiff alleges that the NAV itself reported during

the Class Period was artificially inflated because of the failure of Defendants to properly price the

underlying assets of the Fund and timely write down mortgage-related securities. *See, e.g.*, ¶110

(alleging statements were materially inaccurate because the "Fund's risky mortgage-related

securities had already declined but the Fund's NAV did not properly reflect the decline in value");

*see also* ¶¶75, 111-12. Had Defendants accurately priced the mortgage-backed securities, the Fund's

reported NAV throughout the Class Period would have been substantially lower and Plaintiff would

have paid less for his shares. *See id.* Instead, when Defendants belatedly wrote down the mortgage-

related securities from their inflated to their true prices, Plaintiff suffered damages as the Fund's

NAV declined. *See Fraternity Fund LTD v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385,

396 (S.D.N.Y. 2005) (finding loss causation allegations sufficient where, as here, "the Complaint

justifies an inference that the NAVs were [materially] overstated").

For these reasons, Defendants have failed to establish their affirmative defense of "negative

causation."

---

[36]   This case stands in stark contrast to *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, where plaintiffs failed to allege a "materialization of risk" theory of loss causation or, in the alternative, explain how the misrepresentations caused the mutual fund's NAV to be overstated. No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *9 (S.D.N.Y Apr. 18, 2006). Further, the *Schwab* court, on practically identical facts to this case, explicitly rejected the Morgan Stanley approach advocated by Defendants. *Schwab*, 257 F.R.D. at 546. Similarly, *In re Salomon Smith Barney Mut. Fund Fees Litig.* and *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.* are easily distinguished because plaintiffs failed to even allege that they lost money on their purchases of mutual fund shares, which is not the case here. 441 F. Supp. 2d 579, 591 (S.D.N.Y. 2006); 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006).

## G.    Plaintiff Adequately Alleges Control Person Liability

Section 15 of the Securities Act provides investors with a remedy against persons or entities that exercise control over primary violators of Sections 11 or 12(a)(2). 15 U.S.C. §77o.  A plaintiff claiming violations of Section 15 must only allege a primary violation of the Securities Act and control over the primary violator.  *In re Brooks Automation Inc. Sec. Litig.*, No. 06-11068-RWZ, 2007 WL 4754051, at *13 (D. Mass. Nov. 6, 2007).  To allege control, a plaintiff must show that "the alleged controlling person . . . not only [has] the general power to control the company, but must also actually exercise control over the company."  *Evergreen*, 2010 WL 1253114, at *9 (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002)). However, control is usually a question of fact inappropriate for resolution at the pleading stage.  *Cabletron*, 311 F.3d at 42; *Evergreen*, 2010 WL 1253114, at *9.

Here, Plaintiff's allegations demonstrate that the Individual Defendants and FMR Corp. controlled primary violators of the Securities Act.[37]  Plaintiff alleges that each Individual Defendant served as trustee or officer of the Fund and that each signed the Registration Statements which contain the alleged misrepresentations.  ¶¶11-19, 22-26. Other courts considering what facts demonstrate "control" for purposes of pleading violations of Section 15 have found such allegations to be sufficient to state a claim.  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (finding that individual defendants who served as officers of the company and signed its registration statement could be liable as "control persons").  *See also Evergreen*, 2010 WL 1253114, at *9; *Schwab*, 257 F.R.D. at 550.  Likewise, Plaintiff's allegations against FMR Corp. are

---

[37]    Plaintiff also alleges Defendant Fidelity Management & Research Company ("FMR") violated Section 15.  ¶165.  Defendants do not challenge the sufficiency of the allegations against Defendant FMR beyond the general statement that "Plaintiff has failed to state a primary violation of the Securities Act[.]." Def. Mem. at 42.

sufficient to state a claim for violations of Section 15.  Plaintiff alleges FMR Corp. is the parent

company of Defendant FMR and that FMR Corp. oversees Defendant FMR.  *See* §IV(A-D), supra

(alleging FMR violated §§11 and 12(a)(2)); ¶¶8, 168.  Further, investors were directed to contact

FMR Corp. if they were interested in "buying or selling shares of the Fund," and several signatories

to the Registration Statements also serve as directors of FMR Corp.  ¶¶8, 11, 14-16, 19.  Far from

"bald" assertions, these allegations of day-to-day involvement in the marketing and sale of the Fund,

taken together with close corporate relationship between FMR Corp. and FMR, are sufficient to

create a reasonable inference that FMR Corp. controlled a primary violator of the Securities Act,

which is all that is required at this stage of the proceeding.  *In re Global Crossing, Ltd., Sec. Litig.*,

No. 02 Civ. 910(GEL), 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (control allegations

sufficient where plaintiff alleged primary violator was wholly-owned subsidiary, companies had

"interchangeable" directors and the parent company was involved in the day-to-day operations of the

subsidiary).[38]

---

[38]     These allegations against FMR Corp. also support liability under §11 despite Defendants'
arguments to the contrary.  *See* Def. Mem. at 41-42. First, Defendants' constrictive interpretation of
§11 conflicts with both the plain language of the statute and its intent to be construed "flexibly
to effectuate its remedial purpose."  *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 151
(1972).  Pursuant to §11(a)(2), liability attaches to "every person who was a director of (or person
performing similar functions) or partner in, the issuer at the time of the filing of the part of the
registration statement. . . ."  15 U.S.C. §77k(a)(2) (emphasis added).  Second, Defendants' case
authority is distinguishable.  *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d
424, 437 (S.D.N.Y. 2000) (addressing whether a corporation, whose name was absent from the
registration statement functioned as the "issuer"); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374,
384-85 (D. Mass. 1987) (addressing subsections of §11(a) relating to accountants and individuals);
*In re WorldCom Inc. Sec. Litig.*, 308 F. Supp. 2d 338, 342, 345 (S.D.N.Y. 2004) (addressing the fifth
subsection of §11(a) relating to underwriters and "indirect" participation).  Third, the lack of
precedent for alleging a §11 claim against an entity such as FMR Corp. should not foreclose
consideration that FMR Corp. was a "partner in" the issuer at the time of the filing of the registration
statement.  *See* ¶8 (FMR Corp. was alleged to be a direct participant by being named in the
Registration Statements as the point of contact for investors); ¶168 (FMR Corp. is alleged to have
had a series of direct business relationships with FMR and its directors and officers).

## V.   CONCLUSION

For the above-stated reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss the SAC.  In the event the Court grants Defendants' motion in whole or part, Plaintiff requests he be allowed 21 days to bring a motion for leave to amend under Rule 15(a), if appropriate.

DATED:  August 5, 2010                  SHAPIRO HABER & URMY LLP


                                        _____
                                               /s/ Adam M. Stewart

                                        THOMAS G. SHAPIRO (BBO # 454680)
                                        ADAM M. STEWART (BBO # 661090)
                                        53 State Street
                                        Boston, MA  02109
                                        Telephone:  617/439-3939
                                        617/439-0134 (fax)
                                        tshapiro@shulaw.com
                                        astewart@shulaw.com

                                        *Liaison Counsel*

                                        ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        EVAN J. KAUFMAN
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        ekaufman@rgrdlaw.com

                                        DYER & BERENS LLP
                                        ROBERT J. DYER
                                        JEFFREY A. BERENS
                                        303 East 17th Avenue, Suite 300
                                        Denver, CO  80203
                                        Telephone:  303/861-1764
                                        303/395-0393 (fax)
                                        bob@dyerberens.com
                                        jeff@dyerberens.com

                                        *Co-Lead Counsel for Plaintiffs*

- 44 -

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mfistel@holzerlaw.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 5, 2010.

*/s/ Adam M. Stewart*
ADAM M. STEWART