# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| ALAN ZAMETKIN, on Behalf of Himself and ) | |
| All Others Similarly Situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:08-CV-10960-MLW |
| ) | |
| FIDELITY MANAGEMENT & RESEARCH ) | |
| COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

GOODWIN PROCTER LLP
    James S. Dittmar (BBO# 126320)
    David J. Apfel (BBO# 551139)
    Joshua S. Lipshutz (BBO# 675305)
53 State Street
Boston, Massachusetts 02109

*Attorneys for Defendants Fidelity Management
& Research Co., FMR Corp. (n/k/a FMR LLC),
Fidelity Brokerage Services LLC, Edward C.
Johnson 3d, Abigail P. Johnson, James C.
Curvey, Timothy Hayes, Joseph B. Hollis,
Stephen P. Jonas, Kimberly Monasterio,
Christine Reynolds, and Robert L. Reynolds*

DECHERT LLP
    William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036
    Owen C.J. Foster (BBO# 670199)
200 Clarendon Street, 27th Floor
Boston, Massachusetts 02116

*Attorneys for Defendant Fidelity Income Fund*

MILBANK, TWEED, HADLEY
& McCLOY LLP
    James N. Benedict (*pro hac vice*)
    Sean M. Murphy (*pro hac vice*)
    Andrew W. Robertson (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I. PRELIMINARY STATEMENT .................................................................................1

II. ARGUMENT .........................................................................................................3

     A.     The Fund Documents Disclosed the Fund's Substantial Investments in
           Mortgage-Related Securities.................................................................................3

     B.     The Fund Was In Compliance With Its Stated Investment Policies and
           Risk Profile Throughout the Putative Class Period. ...........................................6

           1.     Plaintiff's Labeling of the Fund as "Conservative" Is Irrelevant. .............. 6

           2.     Plaintiff Does Not Claim that the Fund's Investment Policies Were
                 Violated........................................................................................................ 10

           3.     The Fund's Investment Objective Is Not Actionable. ................................ 13

           4.     Divergence Between the Performance of a Fund and Its
                 Benchmark Does Not Render Use of the Benchmark Misleading. .......... 14

     C.     Plaintiff's Numerous Claims About the Fund Managers' Skills and
           Capabilities Are Not Actionable Under the Securities Laws................................15

     D.     Plaintiff Does Not Plausibly Allege a Materially Inflated NAV. ..........................16

     E.     Plaintiff's Claims Are Time-Barred Because Plaintiff Should Have
           Discovered His Claims No Later Than the January 2007 Shareholder
           Update...................................................................................................................17

           1.     Disclosures Throughout the Class Period Informed Plaintiff of His
                 Claims. ........................................................................................................ 17

           2.     *Merck* Does Not Alter the Conclusion That This Case Is Untimely......... 19

III. CONCLUSION........................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538,
    2004 WL 1433620 (N.D. Ill. June 25, 2004) ...........................................................................14

*Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, No. 03 Civ. 0971 (RCC),
    2004 U.S. Dist. LEXIS 261 (S.D.N.Y. Jan. 9, 2004) ...............................................................6

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ................................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................................16

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993) ....................................................................................................19

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
    129 F.3d 222 (1st Cir. 1997) ....................................................................................................19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .....................................................................................................16

*Halberstein Inv. Ltd. v. Lehman Bros. Inc.*, No. 04-25517,
    2006 U.S. Dist. LEXIS 9722 (S.D. Fla. Jan. 10, 2006) ..........................................................10

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998) .....................................................................................................14

*In re Bank of Boston Corp. Secs. Litig.*,
    762 F. Supp. 1525 (D. Mass 1991) ............................................................................................6

*In re Charles Schwab Corp. Secs. Litig.*, No. C 08-01510 (WHA),
    2010 WL 1261705 (N.D. Cal. Mar. 30, 2010) ..................................................................11, 13

*In re Craftmatic Secs. Litig.*,
    890 F.2d 628 (3d Cir. 1989) .....................................................................................................16

*In re Donald J. Trump Casino Secs. Litig.*,
    793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993) ....................................10, 11

*In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*, No. 08-11064-NMG,
    2010 WL 1253114 (D. Mass. Mar. 31, 2010) ...................................................................11, 13

*In re Stone & Webster Inc. Sec. Litig.*,
 414 F.3d 187 (1st Cir. 2005)...................................................................13

*In re Union Carbide Class Action Secs. Litig.*,
 648 F. Supp. 1322 (S.D.N.Y. 1986).........................................................6

*Klamberg v. Roth*,
 473 F. Supp. 544 (S.D.N.Y. 1979)..........................................................10

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
 659 F. Supp. 2d 532 (S.D.N.Y. 2009)................................................16, 19

*Lowinger v. Pzena Inv. Mgmt., Inc.*,
 341 Fed. Appx. 717 (2d Cir. 2009)........................................................6, 7

*Merck & Co. v. Reynolds*,
 130 S. Ct. 1784 (2010)......................................................................19, 20

*Miller v. Lazard, Ltd.*,
 473 F. Supp. 2d 571 (S.D.N.Y. 2007)........................................................9

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
 98 F.3d 2 (2d Cir. 1996)......................................................................1, 7

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd in part and vacated in part*, 347 Fed.
 Appx. 617 (2d Cir. 2009).........................................................................7

*Rubke v. Capitol Bancorp Ltd.*,
 551 F.3d 1156 (9th Cir. 2009) ................................................................18

*Santa Fe Indus., Inc. v. Green*,
 430 U.S. 462 (1977)........................................................................15, 16

*S.E.C. v. Steadman*,
 967 F.2d 636 (D.C. Cir. 1992) ................................................................16

*Sewell v. D'Allessandro & Woodyard, Inc.*, No. 2:07-cv-343-FtM-29SPC,
 2010 WL 2872053 (M.D. Fla. July 20, 2010) .........................................20

*Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231,
 1994 WL 30541 (N.D. Ill. Feb, 1, 1994) ...................................7, 18, 19

*Volk v. D.A. Davidson & Co.*,
 816 F.2d 1406 (9th Cir. 1987) ...............................................................19

*Yu v. State Street Corp.*,
 686 F. Supp. 2d 369 (S.D.N.Y. 2010), *vacated by* 2010 WL 2816259
 (S.D.N.Y. July 14, 2010) ...................................................................................12, 13

STATUTES

17 C.F.R. 229.1101(c)(1) (Reg AB, Item 1101(c)(1))......................................................5

17 C.F.R. 230.482(d) .....................................................................................................14

17 C.F.R. 270.2a-4 .........................................................................................................17

58 F.R. 19050-01, 1993 WL 107086 (April 16, 1993) ..................................................14

Sec. Act Rel. No. 33-9117, 75 Fed. Reg. 23328 .............................................................5

15 U.S.C. § 77m.............................................................................................................20

15 U.S.C. § 78c(a)(41) (Secondary Mortgage Market Enhancement Act of 1984) .......5

15 U.S.C. § 80a-2(a)(41)(B) ..........................................................................................17

OTHER AUTHORITIES

Final Rule, *Registration Form Used By Open-End Management Investment Companies,*
 Release No. IC-23064, 1998 WL 107729, at *20 (Mar. 13, 1998) ........................10

*In re Evergreen Inv. Mgmt. Co.*, Cease and Desist Order, SEC Release No. 60059,
 2009 WL 1585837 (June 8, 2009) ..........................................................................13

*In re Piper Capital Mgmt., Inc.*, SEC Release No. 175,
 2000 WL 1759455 (Nov. 30, 2000), *aff'd*, SEC Release No. 2163,
 2003 WL 22016298 (Aug. 26, 2003) ..................................................................12, 13

*In re State Street Bank & Trust Co.*, Cease and Desist Order, SEC Release No. 9107,
 2010 WL 421154 (Feb. 4, 2010) .............................................................................13

Notice of Proposed Rulemaking, *Registration Form Used By Open-End Management
 Investment Companies,* Release No. IC-22528, 1997 WL 87357 (Feb. 27, 1997).................10

SEC Form N-1A (*available at* http://www.sec.gov/about/forms/formn-1a/pdf).................6, 13, 14

The Charles Schwab Corp., Quarterly Report (Form 10-Q) (June 30, 2010), *available at*
 http://www.sec.gov/Archives/edgar/data/316709/000119312510178096/d10q.htm .............13

# I. **PRELIMINARY STATEMENT**

In his Opposition Memorandum ("Opp."), Plaintiff explains his central claim as follows: "Defendants represented the Fund as being ***conservatively*** structured . . . . Defendants had, however, ***secretly abandoned*** the Fund's conservative investment philosophy to chase higher returns by . . . investing in ***risky subprime and other mortgage-related securities***. . . . ***Unbeknownst*** to investors, by April 30, 2007, 78% of the fund's individual holdings consisted of mortgage-related securities and a shocking 22% of its holdings were subprime mortgage securities!"  [Opp. at 1-2 (emphasis altered).]  Each component of this argument is belied by the very Fund Documents upon which the Second Amended Complaint ("SAC") relies.

First, there was nothing "secret" about the Fund's investments in mortgage-related securities.  The Fund's Annual Reports and Shareholder Updates repeatedly told investors that the Fund was "emphasizing" mortgage-related securities, which were listed in the Prospectus as one of the Fund's "principal security types."  They also contained pie charts depicting the Fund's asset mix, and lists identifying every single security in the portfolio.  No reasonable investor could have glanced at the Fund Documents and not been aware that the Fund was heavily invested in mortgage-related securities.  In fact, Plaintiff's purportedly "shocking" statistics are calculated using the Fund's own public disclosures.  This is precisely the context in which a securities law complaint should be dismissed.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 3 (2d Cir. 1996) (dismissal appropriate where allegations are "contradicted by the prospectuses on their face").  *See infra*, Argument § A.

Second, Plaintiff's failure to identify any undisclosed facts is not rescued by his argument that the Fund's investment strategy ran counter to the Fund's purportedly "conservative" appearance.  The Prospectus set forth a detailed set of investment strategies, the risks of which

were fully disclosed, including the very risks which eventually led to a decline in the Fund's value.  No reasonable investor could have read the disclosures in the Prospectus and believed the Fund was not assuming the risks Plaintiff now identifies.  The only plausible way anyone could have perceived the Fund as "conservative" was if he decided that the Fund's disclosed risks were unlikely to materialize because, as was commonly believed prior to mid-2007, investment grade mortgage-related securities were unlikely to experience massive defaults and illiquidity.  That is, one might have perceived as remote the risk that the entire mortgage, housing and credit markets would experience a once-in-a-lifetime systemic failure.  But an investor's incorrect judgment that certain risks were remote cannot give rise to a claim *where those risks were fully disclosed*. An issuer's failure to predict is not a failure to disclose.  *See infra*, Argument § B.1.

Third, the Fund never "abandoned" its stated investment policies.  To the contrary, the Fund's investment portfolio at all times conformed to the detailed investment policies outlined in the Prospectus.  Plaintiff does not plausibly allege otherwise.  Hindsight disagreement with the Fund's disclosed methods for carrying out its investment policies is not a disclosure violation. *See infra*, Argument §§ B.2–4.

Plaintiff also argues that Defendants did a poor job selecting, evaluating and pricing the Fund's investments, and that Defendants were "not qualified" to determine fair values for the mortgage-related investments underlying the Fund's NAV.  [Opp. at 28-33; SAC, ¶¶ 70-75, 114-16].  But these are classic mismanagement claims which are not cognizable under the securities laws.  *See infra*, Argument §§ C, D.

Finally, even if the extent of the Fund's investments in mortgage-related securities did not conform to the Fund's purported "conservative" investment strategy, the scope of those investments was disclosed well over one year before this suit was filed.  Plaintiff's claims are,

therefore, time-barred.  *See infra*, Argument § E.

## II.  ARGUMENT

### A.  The Fund Documents Disclosed the Fund's Substantial Investments in Mortgage-Related Securities.

The SAC is premised upon Plaintiff's alleged "shock" at the Fund's "secret" investments

in mortgage-related securities.  However, no investor reading the Fund Documents could

possibly have been surprised by these investments.  To begin with, the Prospectus listed

"mortgage and other asset-backed securities" as one of the Fund's "Principal Security Types."

[Ex. A (Sept. 29, 2005 Prospectus) at 8.][1]

The Fund's Annual Reports and Shareholder Updates also repeatedly informed investors

of the Fund's heavy emphasis on mortgage-related securities.  For example:

- "I kept the fund *tilted heavily* toward non-government bonds . . ..  I held these securities—namely asset-backed bonds and *mortgage securities*—directly and indirectly through the Fidelity Ultra-Short Central Fund . . . ."  [Ex. H (July 31, 2005 Annual Report) at 6.]

- "My stake in asset-backed securities (ABS), which are bonds secured by pools of assets such as *home equity*, car loan and credit card payments, *was the fund's largest sector weighting* throughout the year.  *I emphasized higher-quality home equity ABS* . . . ."  [Ex. I (July 31, 2005 Shareholder Update) at IV; Ex. J (Jan. 31, 2006 Shareholder Update) at IV.]

- "Another area that helped was *mortgage securities*, where I *emphasized* agency-issued collateralized mortgage obligations." [Ex. I (July 31, 2005 Shareholder Update) at IV.]

- "To the benefit of the fund's performance, I maintained an *out-of-index stake in mortgage securities*, where I focused on agency-issued collateralized mortgage obligations."  [Ex. J (Jan. 31, 2006 Shareholder Update) at IV.]

- "At the same time, I'll likely *emphasize* more attractively priced sectors

---

[1]   Exhibits A through G ("Ex." or "Exhibit") referenced in this Reply Memorandum are attached to the Declaration of James S. Dittmar in Support of Defendants' Motion to Dismiss the Second Amended Complaint filed on May 24, 2010.  Exhibits H and onward are attached to the Declaration of James S. Dittmar in Support of Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Second Amended Complaint, filed herewith.

specifically the ***mortgage- and asset-backed*** areas . . ..” [Ex. J (Jan. 31, 2006 Shareholder Update) at V.]

- “Also to the fund’s benefit was advantageous sector positioning led by a ***heavy emphasis*** on non-government bonds, including structured products such as asset-backed securities, ***collateralized mortgage obligations and commercial mortgage-backed securities***.” [Ex. C (July 31, 2006 Annual Report) at 6.]

- “I’ll likely ***concentrate*** on more attractively priced sectors specifically ***mortgage- and asset-backed securities*** which I feel offer a combination of attractive valuations, high quality and yield advantage over Treasuries.”  [Ex. D (July 31, 2006 Shareholder Update) at IV-V.]

- “I ***heavily emphasized*** non-government bonds.  These ‘spread sectors’—including structured products such as asset-backed securities (ABS) and ***mortgage-backed securities*** (MBS)—continued to benefit from the fact that they offered higher yield . . .” [Ex. E (Jan. 31, 2007 Shareholder Update) at III-IV.]

- “As for disappointments, certain ABS, including those backed by ***subprime mortgage loans***—meaning loans to borrowers with poor credit records—detracted from fund performance.” [Ex. E (Jan. 31, 2007 Shareholder Update) at IV.]

- “Andy Dudley on securities backed by ***subprime mortgages***” was the heading for a highlighted box of text in the Fund’s January 2007 Shareholder Update.  [Ex. E (Jan. 31, 2007 Shareholder Update) at V.]

(Emphases added.)

In addition to these plain-English disclosures, the Fund provided detailed quantitative disclosures.  First, each Annual Report contained pie charts displaying the Fund’s asset allocation by security type.  This breakdown, which included the Fund’s pro rata portion of the Central Fund, showed investors the exact percentage of the Fund’s portfolio that fell into various asset categories, including “Asset-Backed Securities” and “CMOs and Other Mortgage Related Securities.”  [Ex. D (July 31, 2006 Annual Report) at 9.]  The definition of “Asset-Backed Securities” explicitly included interests in pools of mortgages, [Ex. B (Sept. 29, 2005 SAI) at 4], and Plaintiff concedes that investors were aware that mortgage-related securities were included in both the “CMOs” and “Asset-Backed Securities” categories, [Opp. at 21].  Moreover, it was entirely appropriate for some mortgage-related securities to be listed under “Asset Backed

Securities" and others under "CMOs and Other Mortgage-Related Securities" because these are technical terms defined by federal regulations, and certain mortgage-based securities fit into one category and not the other.[2]  Regardless, the Fund's Annual Reports illustrated, in graphical format, that the sum of the CMO and ABS categories *exceeded 55%* of the value of the overall Fund's portfolio during each and every year of the putative Class Period.

Second, to the extent an investor wanted more detail on the ABS category, he need only have looked at the Annual Reports' lists of investments, where, in 2006, for example, 136 of the 344 bonds listed in the ABS category (41%) contained the words "mortgage," "home," "real estate," or "residential." [Ex. C (July 31, 2006 Annual Report) at 10-42.]

Additionally, Plaintiff's own allegations belie the supposedly "secret" extent of the Fund's investments in mortgage-related securities.  Over and over, Plaintiff recounts the "mind-boggling" percentage of the Fund that was invested in mortgage-related securities as of April 30, 2007.  [*See, e.g.*, Opp. at 2, 12-13, 21-22.]  Plaintiff's statistics, however, come directly from the Fund's April 30, 2007 public filing.  [*See* Ex. K (April 30, 2007 Form N-Q) at 42-73.]  Filings from prior periods reveal substantially the same level of mortgage-related securities.  For example, the January 31, 2007 Semi-Annual Report shows that mortgage-related securities comprised nearly three-quarters of the Fund's individual holdings and over half of the ABS category.  [Ex. L (Jan. 31, 2007 Semi-Annual Report).]

---

[2]  The parties' submissions use the term "mortgage-related securities" in a colloquial manner to include all securities "related" to or backed by mortgages.  But for regulatory purposes, "mortgage related securities" is a term of art defined under the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA"), 15 U.S.C. § 78c(a)(41), to include only those securities meeting certain designated criteria.  Not all securities backed by mortgages meet the SMMEA "mortgage related securities" criteria.  Accordingly, the Fund Documents were consistent with federal law when they listed certain mortgage backed securities in the category of "CMOs and Other Mortgage Related Securities," and others in the "Asset-Backed Securities" category, the latter being a category that was expressly defined in the Fund Documents (and under federal law—*see* 17 C.F.R. § 229.1101(c)(1) (Reg AB, Item 1101(c)(1)); Sec. Act Rel. No. 33-9117, 75 Fed. Reg. 23328, 23333)—as an umbrella category for "interests in pools of mortgages, loans, receivables, or other assets." [Ex. B (Sept. 29, 2005 SAI) at 4.]

**B.      The Fund Was In Compliance With Its Stated Investment Policies and Risk Profile Throughout the Putative Class Period.**

**1.      Plaintiff's Labeling of the Fund as "Conservative" Is Irrelevant.**

Plaintiff argues that the Fund's disclosures "taken together" created a "perception" that the Fund had a "conservative investment philosophy."  [Opp. at 1-2, 8-10.]  But Plaintiff's claimed impression of the Fund's disclosed investment strategies as "conservative" cannot survive a motion to dismiss if it is contradicted by the actual disclosures.  *See, e.g., Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 Fed. Appx. 717, 719 (2d Cir. 2009).[3]  Here, no reasonable investor could have read the Prospectus and believed the Fund was not subject to material risks.

In accordance with SEC regulations, the Prospectus identified the types of securities in which the Fund would invest and the specific investment policies the Fund would follow.  *See* SEC Form N-1A (*available at* http://www.sec.gov/about/forms/formn-1a/pdf).  These disclosures—including disclosures on the Prospectus's first page of text—make clear that the Fund's investment policies exposed the Fund to meaningful risk:

- The Fund would normally invest "at least 80%" in "investment-grade debt securities (those of *medium* and high quality)," [Ex. A (Sept. 29, 2005 Prospectus) at 3 (emphasis added)], signifying that up to 20% of the Fund could be invested in junk bonds and that even investment-grade securities would not necessarily be high quality.

- The July 2006 Annual Report disclosed that 16.9% of the Fund's investments were in BBB-rated securities, the lowest level of investment grade.  [Ex. C (July 31, 2006 Annual Report) at 9.]

---

[3]   In *Lowinger*, the court affirmed dismissal of '33 Act claims that disclosures created an inaccurate "image" because those disclosures could have left no reasonable investor with misimpressions about the fund.  *Id.  See also Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, No. 03 Civ. 0971 (RCC), 2004 U.S. Dist. LEXIS 261, at *14 (S.D.N.Y. Jan. 9, 2004) ("Piper Jaffray's statement is literally accurate and remains so in both its context and presentation.  As such, it is improbable, if not impossible, that this statement would mislead investors.") (internal quotations and citation omitted); *In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. 1525, 1538 (D. Mass 1991) (holding that an alleged "impression" that the fund documents painted a "general conservative picture" is "not sufficient to constitute the basis of a securities action under Section 11 or Section 12(2)"); *In re Union Carbide Class Action Secs. Litig.*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) ("[P]laintiffs have chosen to assert vaguely that a false and misleading impression was created.  The Court finds such a pleading to be insufficient.") (citation omitted).

- The Fund will invest "more than 25% . . . in the financial services industries," [Ex. A (Sept. 29, 2005 Prospectus) at 3], signifying that the Fund would face concentrated exposure to a single segment of the market.

- The Fund "is considered non-diversified," meaning that "FMR may invest a significant percentage of the fund's assets in a single issuer." [*Id.* at 3, 7.]

- "To earn additional income for the fund, FMR may use a trading strategy that involves selling (or buying) mortgage securities and simultaneously agreeing to purchase (or sell) mortgage securities on a later date at a set price. This trading strategy may increase interest rate exposure" and create other risks. [*Id.*]

- The Fund may buy and sell futures contracts and swaps. [*Id.*]

The risks of these policies were also spelled out in detail, including the very risks that materialized in 2007-08. *See Olkey*, 98 F.3d at **5-6 (dismissing '33 Act claims where the prospectuses disclosed "the possibility of precisely the scenario that occurred").[4] Far from being "boilerplate," as Plaintiff argues, [Opp. at 13 n.9], these risks are stated prominently and tailored to the Fund's specific investment policies.[5] Indeed, the very "mortgage market events" that Plaintiff claims caused the Fund's losses, [SAC, ¶¶ 90, 92], were the materialization of risks disclosed in the Prospectus:

- Regarding the risk of increasing default rates, [SAC, ¶ 90(c), (d)], the Shareholder Updates informed investors that "[b]ond funds contain . . . the risk of issuer default," and the SAI warned that "[p]ayment of interest and repayment of principal [on ABS] may be largely dependent upon the cash flows generated by the assets backing the securities." [Ex. E (Jan. 31, 2007 Shareholder Update) at II; Ex. B (Sept. 29, 2005 SAI) at 4.]

- Regarding the risk of financial difficulties for mortgage originators, [SAC, ¶ 90(e)], the SAI cautioned that "[a]sset-backed security values may also be

---

[4]   *See also Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 30541, at *5 (N.D. Ill. Feb, 1, 1994) (holding that securities claims must be dismissed where the disclosures "list specific risks . . . and the plaintiffs' loss result[ed] from those very risks"); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 671 (S.D.N.Y. 2008), *aff'd in part and vacated in part*, 347 Fed. Appx. 617 (2d Cir. 2009) (dismissing '33 Act claims where the disclosure "clearly identifies the risk later realized"); *id.* at 672 ("[T]he precise disclosure of a risk later realized cannot adequately form the basis for a securities claim.").

[5]   *See Olkey*, 98 F.3d at 5 ("The plaintiffs seek to have all of the cautionary language disregarded as boilerplate, but it is too prominent and specific to be disregarded. The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed."); *id.* at 8 ("The plaintiffs conveniently dismiss as boilerplate anything in the prospectuses that undermines their argument.").

affected by other factors including . . . the creditworthiness of . . . the originator of the loans or receivables . . . ."  [Ex. B (Sept. 29, 2005 SAI) at 4.]

Furthermore, as risks associated with the Fund's investments in mortgage-related securities either threatened to come or actually came to fruition, they were not ignored.  In fact, the impact on the Fund of what Plaintiff terms "mortgage market events" was disclosed.  For instance, the January 31, 2006 Shareholder Update explained that "[a] strong housing market [had] allowed investors to bid up the prices of many types of mortgage securities," but "[a] notable housing market slowdown would likely cause a divergence in the performance of various mortgage types, particularly those that are credit sensitive."  [Ex. J (Jan. 31, 2006 Shareholder Update) at V.]  And the January 2007 Update reported that "[a] slowing housing market precipitated rising delinquencies for [subprime mortgages], which, in turn, caused declining valuations for the bonds backed by this type of collateral," [Ex. E (Jan. 31, 2007 Shareholder Update) at V], and that subprime mortgage-related ABS had come "under pressure" and "detracted from fund performance" "due to concerns about delinquencies and the growing likelihood of greater defaults," [*id.* at IV].

Plaintiff also claims that the Fund was perceived as having a "low volatility" approach.  [Opp. at 10.]  However, that perception, too, is directly refuted by the Prospectus, which states:

- The Fund is subject to prepayment risk, which "can cause ***greater price volatility*** if interest rates change."

- The Fund "may invest a significant percentage of the fund's assets in a single issuer," and the value of individual securities "can be ***more volatile than the market as a whole***."

- The Fund invests in foreign securities which can be "***more volatile*** than U.S. investments."

[Ex. A (Sept. 29, 2005 Prospectus) at 3, 8 (emphasis added).]

Plaintiff selectively points to certain lower risk aspects of the Fund's disclosed

investment strategy, such as the Fund's ability to invest in cash-like instruments.  [Opp. at 10.]

But any fund with strategic policies that cover a spectrum of risk will contain some disclosures

that appear more conservative and some that appear less conservative.  Plaintiff cannot cherry-

pick certain disclosures and ignore warnings of other risks; "[i]n assessing whether statements

provided in the prospectus are materially misleading, the prospectus must be read as a whole, not

selectively or in a piecemeal fashion."  *Miller v. Lazard, Ltd*., 473 F. Supp. 2d 571, 579

(S.D.N.Y. 2007).

      In the face of the Fund's extensive disclosures, the only plausible way a reasonable

investor could have had the "perception" [Opp. at 10] that the Fund was "conservative" was if he

believed there was a low probability that the disclosed risks would materialize.  But that is not a

disclosure issue—that is a matter of prediction, and as a matter of law, there is no duty to predict

the likelihood that disclosed risks will materialize.  Although Plaintiff speculates that

Morningstar was "misled" into believing the Fund was "conservative," [Opp. at 9],

Morningstar's view comported with the widespread pre-credit crisis view of investment

professionals that the risk of massive defaults in investment grade mortgage-related securities

was remote.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (pleading facts that are "merely

consistent" with a theory "stops short of the line between possibility and plausibility") (internal

quotation marks omitted).  It is important to remember that even as late as April 2007, the

International Monetary Fund was reporting that "even under scenarios of nationwide house price

declines that are historically unprecedented, most investors with exposure to subprime mortgages

through securitized structures will not face losses."  [Ex. M (Int'l Monetary Fund, *Global

Financial Stability Report*, April 2007) at 7.]  Similarly, in March 2007, Federal Reserve

Chairman Ben Bernanke opined that "the impact on the broader economy and financial markets

-9-

of the problems in the subprime market seems likely to be contained." [Ex. N (Testimony of

Ben S. Bernanke before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007)).]  It

may have been reasonable for an investor—or an expert—to have believed that the risks

disclosed here were unlikely to materialize, but that does not impeach the disclosures.

"The disclosure requirements of section 11 and 10(b) do not anticipate a duty by

management to draw inferences for investors.  Again, the object of the securities fraud laws is

disclosure, not business judgment.  Business judgment, including inferences drawn from fully-

disclosed information, rightly remains the province of individual investors."  *In re Donald J.

Trump Casino Secs. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir.

1993).[6]  Where, as here, risks are accurately disclosed, an investor who incorrectly assesses

whether those risks will materialize is not entitled to relief.[7]

### 2.    Plaintiff Does Not Claim that the Fund's Investment Policies Were Violated.

Plaintiff does not claim that the Fund's investment policies were violated.  He does not,

for example, contend that any of the Fund's holdings fell outside the scope of proper

investments, defined by the Prospectus as "debt securities . . . of all types" including "mortgage

and other asset-backed securities."  [Ex. A (Sept. 29, 2005 Prospectus) at 3, 8.]  Plaintiff also

does not dispute that the Fund invested at least 80% of its assets in securities rated investment-

---

[6]    *See also Halberstein Inv. Ltd. v. Lehman Bros.  Inc.*, No. 04-25517, 2006 U.S. Dist. LEXIS 9722, at *23 (S.D. Fla. Jan. 10, 2006) (where risk of an event was disclosed, defendants were under no duty to disclose the likelihood of that risk occurring); *Klamberg v. Roth*, 473 F. Supp. 544, 551-52 (S.D.N.Y. 1979) ("once the facts are disclosed, a failure to articulate adverse inferences from or pejorative descriptions of those facts is not materially deceptive").

[7]    Notably, the SEC considered and rejected a rule requiring funds to quantify the risks believed to be associated with investments in a fund's portfolio.  *See* Notice of Proposed Rulemaking, *Registration Form Used By Open-End Management Investment Companies,* Release No. IC-22528, 1997 WL 87357 (Feb. 27, 1997); *see also* Final Rule, *Registration Form Used By Open-End Management Investment Companies,* Release No. IC-23064, 1998 WL 107729, at *20 (Mar. 13, 1998) ("The Commission did not propose to require a fund to disclose information designed to quantify its expected risk levels….").

grade.[8]  Nor does Plaintiff dispute that the Fund portfolio's dollar-weighted average maturity—

an important risk indicator—was no greater than two years, as the Prospectus disclosed.  [*Id.*][9]

Indeed, the lack of alleged deviation from the Fund's specific investment policies

distinguishes this case from the other mutual fund cases on which Plaintiff relies:

- In *In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*, No. 08-11064-
NMG, 2010 WL 1253114 (D. Mass. Mar. 31, 2010), the Fund Documents stated that the
fund "intended to maintain an average portfolio duration of one year or less" and "that it
would not invest more than 15% of its net assets in illiquid securities."  *Id.* at *4.
Plaintiff in that case specifically alleged, however, that "the Fund's average portfolio
duration exceeded one year," and that "the Fund invested a much greater portion [than
15%] of its assets in illiquid private placement securities."  *Id.* at *1, 5.

- In *In re Charles Schwab Corp. Secs. Litig.*, No. C 08-01510 (WHA), 2010 WL
1261705 (N.D. Cal. Mar. 30, 2010), "the fund's stated concentration policy was to
diversify, *i.e.*, not to concentrate more than 25 percent of the fund in uninsured mortgage-
backed securities or in any other industry."  *Id.* at *2.  In fact, however, "the fund
managers reversed field and repudiated the 25-percent limitation," claiming the unilateral
right to invest up to 100 percent of the fund in mortgage-backed securities.  *Id.* at **2-3.

---

[8]   Plaintiff argues that "such ratings were not meaningful risk indicators for the Fund's portfolio during the
subprime crisis."  [Opp. at 20 & n.19.]  But the Fund expressly defined "investment grade" by reference to these
ratings, [Ex. B (Sept. 29, 2005 SAI) at 8], thereby disclosing to all investors exactly what its references to
"investment grade" meant.  Plaintiff's current argument is pure 20-20 hindsight.

[9]   Plaintiff continues to refer to the Central Fund as a "black box," [Opp. at 17 n.14], and argues that the Fund
misrepresented the contents of the Central Fund, [Opp. at 25-26].  But the contents of the Central Fund are only
relevant to the extent they impact the makeup of the Fund's investments.  Here, the full extent to which the
Fund's investments in the Central Fund affected the quality diversification and asset allocation of the Fund was
fully disclosed in the pie charts in the Fund's Annual Reports.  In fact, the pie charts explicitly noted that they
were "based on the combined investments of the fund and its pro-rata share of the investment of Fidelity's
fixed-income central fund."  [Ex. D (July 31, 2006 Annual Report) at 9.].  Furthermore, the Central Fund, like
any other Fidelity mutual fund, publicly filed its full holdings twice a year.  A list of all Central Fund
investments was available in the fund's annual and semi-annual reports on the SEC website and at fidelity.com.

- In *In re Piper Capital Mgmt., Inc.*, SEC Release No. 175, 2000 WL 1759455 (Nov. 30, 2000) ("*Piper I*"), *aff'd*, SEC Release No. 2163, 2003 WL 22016298 (Aug. 26, 2003) ("*Piper II*"), the SEC Enforcement Division alleged that Piper Jaffray "had inflated overall Fund portfolio duration to more than three times the figure disclosed to investors." *Id.* at *8.  In determining whether the allegations were sustainable, the SEC conducted an extensive analysis of the fund's specifically quantifiable characteristics.  *Id.* at **14-29.

- In *Yu v. State Street Corp.*, 686 F. Supp. 2d 369, 376-77 (S.D.N.Y. 2010) ("*State Street I*"), *vacated by* 2010 WL 2816259 (S.D.N.Y. July 14, 2010) ("*State Street II*"), the court reconsidered its earlier decision dismissing plaintiff's allegations only after the complaint was amended to allege "that the stated percentage of mortgage-backed securities was *actually false*, because many securities that fit the prospectuses' definition of the term were in fact counted in other categories."  *State Street II*, 2010 WL 2816259 at *3.  That is, State Street's definition of asset-backed securities, unlike the definition here, "did not explicitly identify mortgage bonds."  *State Street I*, 686 F. Supp. 2d at 378.  Thus, investors in that case, unlike the investors here, would not have known to look for mortgage-related securities in the asset-backed category.  Furthermore, there is no suggestion in *State Street I* or *II* that the State Street disclosure documents contained anything resembling the extensive narrative disclosures highlighting *this* Fund's exposure to mortgage-related securities.  *See supra*, Argument § A.[10]

---

[10] Defendants believe Judge Holwell's first decision, *State Street I*, dismissing the allegations against State Street, was correct as a matter of law.  Even Judge Holwell's second opinion expresses skepticism about the materiality of the alleged omissions, though he defers that issue until the summary judgment stage.  *See State Street II*, 2010 WL 2816259, at *3 (describing the merit and logic of plaintiff's argument as "far from obvious").  Nonetheless, for the reasons described above, Plaintiff's allegations and the Fund Documents at issue in this case are sufficiently different from those in *State Street II* to require a different result here.

These distinctions matter.  The SEC, for instance, has taken action with respect to all four firms whose disclosure deficiencies Plaintiff attempts to rely upon.[11]

### 3.    The Fund's Investment Objective Is Not Actionable.

Unable to claim that the Fund violated its investment policies, Plaintiff turns instead to the Fund's "investment objective," arguing that the Fund's investments were not "consistent with the preservation of capital."[12]  [Opp. at 11-15.]  But an investment objective merely sets forth the goals a fund "seeks" to achieve.  *See* Form N-1A, Item 2.  The investment objective itself is not an actionable "disclosure" where, as here, the Fund follows its stated investment *policies* describing how the Fund intends to achieve the objective.  [*See* Def. Mem., Argument § A and cases cited therein.]  As the SEC explained in *Piper I*, "[w]hether [a fund] materially deviated from the 'consistent with preservation of capital' component of its stated investment objective turns on . . . analyses of the portfolio's more subtle characteristics (*e.g.,* duration, convexity, average life, diversification, leverage), and the manner in which any material changes in those characteristics were disclosed."  2000 WL 1759455, at *14.  Here, all of those "more subtle characteristics" were disclosed and the Fund complied with the disclosures.

The cases on which Plaintiff relies—*Piper*, *Evergreen*, and *Schwab*—involve allegations of specific violations of concrete investment policies, not simply a subjective belief that the funds' investments were inconsistent with their goals.  [*See* Opp. at 13-15.]  By contrast, claims

---

[11]   *See, e.g., In re Evergreen Inv. Mgmt. Co*., Cease and Desist Order, SEC Release No. 60059, 2009 WL 1585837 (June 8, 2009); *Piper I*; *Piper II*; The Charles Schwab Corporation, Quarterly Report (Form 10-Q) at 10-11 (June 30, 2010), *available at* http://www.sec.gov/Archives/edgar/data/316709/000119312510178096/d10q.htm; *cf. In re State Street Bank & Trust Co.*, Cease and Desist Order, SEC Release No. 9107, 2010 WL 421154 (Feb. 4, 2010) (SEC claimed respondents improperly defined and misreported mortgage and asset-backed securities in unregistered funds, akin to the registered fund allegations in *State Street II*).

[12]   Plaintiff's myopic focus on these six words in the Prospectus directly contradicts Plaintiff's repeated reminder to this Court that "Registration Statements must be evaluated as a whole in assessing whether they are false or misleading."  [Opp. at 13 (citing *In re Stone & Webster Inc. Sec. Litig.*, 414 F.3d 187, 208 (1st Cir. 2005); *see also* Opp. at 8, 9.]  It is Plaintiff, not Defendants, who disregards this admonition.

like Plaintiff's that are based primarily on the investment objective must be dismissed because "having a goal does not necessarily mean that it will be achieved." *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2004 WL 1433620, at *9 (N.D. Ill. June 25, 2004).

    **4.**     <u>**Divergence Between the Performance of a Fund and Its Benchmark Does Not Render Use of the Benchmark Misleading**</u>.

Plaintiff contends that the Fund's use of the Swap Index as a performance *benchmark* was misleading because the Fund's performance diverged from the performance of that Index. [Opp. at 26-28.] Of course, use of a "market" index as a performance benchmark, as required by SEC regulations, *see* 58 F.R. 19050-01, 1993 WL 107086 (April 12, 1993) (adopting release), is not a representation of similar performance. Rather, a benchmark serves as a yardstick against which the relative success of a fund can be measured. As the SEC explained in adopting the benchmark requirement, "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market." 58 F.R. at 19054. *See, e.g., Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (fund's use of a chart comparing fund to an index could not have been viewed by any reasonable investor as a representation of similar risks). When a fund underperforms its benchmark, such underperformance may reflect on the fund's managers, but it does not mean there was misrepresentation.[13] If Plaintiff had wanted a fund with performance tracking an index, he could have purchased an index fund.

---

[13]    Although the Fund under-performed the Swap Index over the putative Class Period, Plaintiff misstates the Fund's performance by relying solely on NAV change, a measure that is incomplete as a matter of law. [*See, e.g.*, Opp. at 4 ("[T]he Fund's NAV plummeted more than 17%.").] In measuring performance, the SEC mandates the use of total return, which includes the effects of dividends. 17 C.F.R. 230.482(d); Form N-1A, Items 4(b)(2), 26(b). As Defendants explained in their Initial Memorandum, the Fund's total return, inclusive of dividends, over the 3-year Class Period chosen by Plaintiff was negative 5.4%. [Def. Mem. at 6.] The -12.42% total return figure to which Plaintiff points, [Opp. at 4 n.1], was the Fund's reported total return over the 12 months ended July 31, 2008.

C. **Plaintiff's Numerous Claims About the Fund Managers' Skills and Capabilities Are Not Actionable Under the Securities Laws.**

Despite Plaintiff's repeated assurances to the contrary, [*see, e.g.*, Opp. at 5-8], his Opposition Memorandum is riddled with arguments [*see, e.g., id.* at 28-33] that show that his valuation and pricing claims are nothing more than mismanagement allegations, which are not cognizable under the securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

First, Plaintiff criticizes Defendants' financial sophistication. He complains, for example, about "Defendants' overzealous attempts to improve returns by investing in unsafe securities *it did not understand.*" [Opp. at 7; *see also* Opp. at 21 ("Defendants did not even *understand* what they were buying for the Fund").] Next, Plaintiff criticizes Defendants' performance of their pricing responsibilities. Plaintiff acknowledges that Defendants *tried* to price the Fund's holdings. [*See, e.g.,* SAC, ¶ 28 (noting that CW1 "worked as a Pricing Analyst" during the Class Period and, in that capacity, "analyzed . . . price accuracy"); *see also id.* ¶ 70 (conceding that "Fidelity attempted to determine the 'fair value' for securities" held by the Fund).] But Plaintiff believes Defendants did *a bad job*, disparaging "Defendants' lack of knowledge and other *deficiencies* related to pricing complex mortgage-related securities." [Opp. at 3; *see also* Opp. at 28 ("Fidelity was unable to *accurately* price complex, risky mortgage-related securities").] Plaintiff also alleges that Fidelity's internal pricing team was "understaffed." [SAC, ¶ 71.] Similarly, he alleges that the members of the Fund's Valuation Committee were "not qualified," [*id.* ¶ 71 (internal quotations omitted)], and that "there definitely probably should have been a little more knowledge as to how these things are priced out," [*id.* ¶ 72 (internal quotations omitted)]. Finally, Plaintiff criticizes the pricing decisions themselves, contending that "Defendants mis-valued, overstated, and/or failed to timely write-down" the price of the Fund's mortgage securities holdings. [*Id.* ¶ 68; *see also, e.g., id.* ¶¶ 65, 75, 114 (pricing not "adequate,"

"accurate," or "proper").]

These criticisms are classic mismanagement allegations and cannot serve as the basis for a disclosure claim. *See Santa Fe*, 430 U.S. at 479.  Nor can Plaintiff "bootstrap" his mismanagement claims into disclosure claims by arguing, as he does here, [Opp. at 28], that the Fund "failed to disclose" the alleged mismanagement. *See In re Craftmatic Secs. Litig.*, 890 F.2d 628, 638-39 (3d Cir. 1989).

**D.     Plaintiff Does Not Plausibly Allege a Materially Inflated NAV.**

Plaintiff has not plausibly alleged that the NAV was materially inflated.  Pointing to two allegedly mispriced securities that inflated the NAV by a combined one hundredth of one penny, [*see* SAC, ¶ 68-69], "'does not even come close' to the 5% threshold that serves as an appropriate 'starting place'" for measuring materiality. *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 540-41 (S.D.N.Y. 2009) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009)); *S.E.C. v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992) (stating that, where the price of a mutual fund share is concerned, "[w]e cannot imagine that a reasonable investor would think the difference between $99.54 and $99.53 a share important").

Plaintiff complains that he should not be "required to list each and every mispriced security in the Fund's portfolio in order to establish that the pricing disparities are material." [Opp. at 31.]  But Defendants assert no such requirement.  To survive a motion to dismiss, however, Plaintiff is required to list enough mispriced securities to plausibly suggest a material mispricing of the Fund's NAV. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Pointing to two purportedly mispriced securities out of the hundreds in the Fund's portfolio, and asking the Court to assume that there must be more, falls far short. *See Landmen*, 659 F. Supp. 2d at 547 (holding that "the conclusory allegation that the real estate market was in the 'midst of the

-16-

freefall' . . . lack[s] any factual connection to the real estate investments *actually in the Company's portfolio*.") (emphasis added).

Plaintiff concedes that the Fund's NAV began declining in "the summer of 2007," [Opp. at 30], at exactly the same time the market for mortgage-backed securities as a whole began its precipitous decline.  [*See* Ex. O (Alan Greenspan, *The Roots of the Mortgage Crisis*, WALL ST. J., Dec. 12, 2007, at A19) ("On August 9, 2007 and the days immediately following, financial markets in much of the world seized up.  Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt . . . .").]  Thus, it appears Plaintiff's true argument is that, prior to the summer of 2007, mortgage-related securities were overvalued by the market *as a whole*.  But the Fund's NAV was required to reflect the *market value* of the Fund's underlying investments, 15 U.S.C. § 80a-2(a)(41)(B); 17 C.F.R. 270.2a-4, not some "inherent value."

**E.      Plaintiff's Claims Are Time-Barred Because Plaintiff Should Have Discovered His Claims No Later Than the January 2007 Shareholder Update.**

**1.      Disclosures Throughout the Class Period Informed Plaintiff of His Claims.**

As described above, the Fund's disclosures throughout the Class Period put Plaintiff on notice of the misstatements he alleges.  The Fund Documents informed investors that the Fund was heavily invested in mortgage-related securities.  *See supra*, Argument § A.  Indeed, ***Plaintiff's own calculation*** of the extent of the Fund's investments in mortgage-related securities was derived directly from the Fund's April 2007 public filing, [*see* Opp. at 2, 12-13, 21-22], demonstrating that the Fund's disclosures were sufficient to put investors on notice of the Fund's portfolio composition.  The same calculation could have been performed using the Fund's prior public filings with similar results.  [*See, e.g.*, Ex. L (Jan. 31, 2007 Semi-Annual Report).]

In addition to the Fund's earlier disclosures, the January 2007 Shareholder Update explicitly informed investors that subprime securities comprised enough of the Fund's portfolio

to be responsible for the most recent quarter's disappointing performance.  [Ex. E (Jan. 31, 2007 Shareholder Update) at iv ("As for disappointments, certain ABS, including those backed by subprime mortgage loans . . . detracted from fund performance.").]  That Update further told investors that the Fund would continue to invest in subprime securities.  [*Id.* ("I continued to hold onto these securities . . . .").]  There can be no question that Plaintiff knew or should have known, no later than the January 2007 Shareholder Update, that the Fund was heavily invested in mortgage-related securities, including subprime securities.

Plaintiff retorts that, even after the January 2007 Shareholder Update, "investors had every reason to believe the Fund remained conservatively structured" because "the Fund only underperformed its benchmark index by 0.17%" in the prior period.  [Opp. at 36.]  But Plaintiff confuses risk with return.  A risky investment may experience periods of positive returns, relative stability or decline.  Indeed, *really* risky investments sometimes earn *really* high returns.  No reasonable investor relies on past return as a measure of present risk.

Plaintiff also contends that even if investors had been aware of the extent of the Fund's investments in mortgage-related securities, "there was no way for investors to independently assess the exponentially increasing level of risk such securities represented."  [Opp. at 16.]  But there is no duty to characterize fully-disclosed risks with "alarming adjectives," *see Tabankin*, 1994 WL 30541, at *5; *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("This allegation merely squabbles about the adverbs . . . .").  Moreover, it is Plaintiff who asserts that the allegedly undisclosed risks of mortgage-related securities were in fact known to investors by March 2007:  "[B]y early 2007, some of the top mortgage lenders with subprime exposure started to reveal growing defaults and enormous losses"; "***By March 2007 . . . there was no question that the subprime mortgage crisis . . . would significantly impact all***

*mortgage-related securities*." [Opp. at 16 (emphasis added).] Plaintiff cannot have it both ways—investors are presumed to be aware of widely known macro-economic conditions. *Landmen Partners*, 659 F. Supp. 2d at 545.

Taking Plaintiff at his word that, by March 2007, it was publicly known that the subprime mortgage crisis "would significantly impact all mortgage-related securities," and combining that with the Fund's repeated prior disclosures of its extensive holdings in mortgage-related securities, Plaintiff has pleaded himself out of court. Adding the January 2007 Shareholder Update highlighting the Fund's investments in subprime securities makes it even more clear. Plaintiff was not entitled to sit on his hands for more than a year to see how his investment panned out. *See Tabankin*, 1994 WL 30541, at *7 ("Faced with numerous warnings of an investment's potential risk, the investor cannot simply wait to see if those risks materialize before filing suit.") (citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163 (4th Cir. 1993)); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir. 1987).

## 2. *Merck* Does Not Alter the Conclusion That This Case Is Untimely.

Plaintiff erroneously contends that the Supreme Court's recent decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), saves his Complaint. [Opp. at 34-35]. But *Merck* does not help Plaintiff at all. *Merck* addressed whether the statute of limitations begins to run when a plaintiff should have begun to *investigate* his claim or upon actual *discovery* of a claim. 130 S. Ct. at 1798. In cases like this, where documents put investors on notice of the alleged misrepresentation *and* no further investigation is required, *Merck* is inapplicable. *See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 225 (1st Cir. 1997) ("We need not decide whether the statute of limitations begins to run on the date the storm warnings appear or the later date on which an inquiring investor would through reasonable diligence have discovered the fraud. The time between the two dates in most cases is not likely

-19-

to be long enough to affect the outcome.") (citations omitted).

Further, cases under the '33 Act (like this one) are likely to come out differently than Section 10(b) cases (like *Merck)* because "[t]he elements of 10(b) claims, which include *scienter*, are likely more difficult to discover than the elements of claims under [Sections 11 or 12(a)(2)], which do not."  *Merck*, 130 S. Ct. at 1801 (Scalia, J., concurring in part and in the judgment); *see also id.* ("Determining when the plaintiff should have uncovered an untrue assertion in a registration statement or prospectus is much simpler than assessing when a plaintiff should have learned that the defendant deliberately misled him . . . .").  Indeed, the only case that has so far applied *Merck* directly to a '33 Act claim has noted this important distinction.  *See Sewell v. D'Allessandro & Woodyard, Inc.*, No. 2:07-cv-343-FtM-29SPC, 2010 WL 2872053, at *2 (M.D. Fla. July 20, 2010).  That court dismissed the Section 12(a)(2) claim as untimely, but did *not* dismiss the Section 10(b) claims on statute of limitations grounds.  *Id.*

The Fund's disclosures—culminating in the January 2007 Shareholder Update—told investors everything they needed to know, without the need for any further investigation.[14] *Merck* does not alter this conclusion.

## III. <u>CONCLUSION</u>

This is a disclosure case in which everything material was indisputably disclosed.  Even after Plaintiff concedes he was aware of the risks that ultimately materialized, he waited more than a year to file suit.  On the basis of the Fund's explicit disclosures and the applicable statute of limitations, and for all the other reasons set forth above and in Defendants' principal memorandum, this case should be dismissed in its entirety.

---

[14]   Plaintiff now contends that the statute of limitations did not begin to run until the NAV began declining.  [Opp. at 37.]  But discovery of "loss" is not required under the '33 Act.  15 U.S.C. § 77m.

Dated: September 7, 2010

Respectfully submitted,

GOODWIN PROCTER, LLP

/s/ James Dittmar_____
      James S. Dittmar (BBO# 126320)
      David J. Apfel (BBO# 551139)
      Joshua S. Lipshutz (BBO# 675305)
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000
Fax:  617.523.1231
E-Mail:  jdittmar@goodwinprocter.com
      dapfel@goodwinprocter.com
      jlipshutz@goodwinprocter.com

MILBANK, TWEED, HADLEY & McCLOY LLP
      James N. Benedict (*pro hac vice*)
      Sean M. Murphy (*pro hac vice*)
      Andrew W. Robertson (*pro hac vice*)
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants Fidelity Management &*
*Research Co., FMR Corp. (n/k/a FMR LLC),*
*Fidelity Brokerage Services LLC, Edward C.*
*Johnson 3d, Abigail P. Johnson, James C. Curvey,*
*Timothy Hayes, Joseph B. Hollis, Stephen P. Jonas,*
*Kimberly Monasterio, Christine Reynolds, and*
*Robert L. Reynolds*

DECHERT LLP
      William K. Dodds (BBO# 126720)
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
      Owen C.J. Foster (BBO#670199)
200 Clarendon Street, 27th Floor
Boston, MA  02116
Tel: (617) 728-7100
Fax: (617) 426-6567

*Attorneys for Defendant Fidelity Income Fund*

-21-

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 7, 2010.

s/ James Dittmar_____