1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                           No. 1:08-cv-10960-MLW

4

5    ALAN ZAMETKIN, on behalf of himself and all others
     similarly situated,
6              Plaintiffs

7
     vs.
8

9
     FIDELITY MANAGEMENT & RESEARCH COMPANY, et al,
10             Defendants

11

12                      * * * * * * * * *

13

14                    For Hearing Before:
                   Chief Judge Mark L. Wolf
15

16                      Motion Session

17
                    United States District Court
18                  District of Massachusetts (Boston)
                    One Courthouse Way
19                  Boston, Massachusetts 02210
                    Monday, November 15, 2010
20

21                      * * * * * * * *

22
                  REPORTER: RICHARD H. ROMANOW, RPR
23                    Official Court Reporter
                   United States District Court
24        One Courthouse Way, Room 5200, Boston, MA 02210
                    bulldog@richromanow.com
25

```
 1                    A P P E A R A N C E S

 2
    JEFFREY A. BERENS, ESQ.
 3      Dyer & Berens, LLP
        682 Grant Street
 4      Denver, Colorado 80203
        (303) 861-1764
 5      Email: Jeff@dyerberens.com
    and
 6   ADAM M. STEWART, ESQ.
        Shapiro Haber & Urmy, LLP
 7      53 State Street
        Boston, Massachusetts 02108
 8      (617) 439-3939
        Email: Astewart@shulaw.com
 9   and
    EVAN J. KAUFMAN, ESQ.
10      Robbins, Geller, Rudman & Dowd, LLP
        58 South Service Road, Suite 200
11      Melville, New York 11747
        (631) 367-7100
12      Email: Ekaufman@rgdlaw.com
        For plaintiff class
13

14   JAMES S. DITTMAR, ESQ.
     DAVID J. APFEL, ESQ.
15   JOSHUA S. LIPSHUTZ, ESQ.
        Goodwin Procter, LLP
16      Exchange Place
        Boston, Massachusetts 02109
17      (617) 570-1944
        Email: Jdittmar@goodwinprocter.com
18   and
    SEAN M. MURPHY, ESQ.
19      Milbank, Tweed, Hadley & McCloy, LLP
        One Chase Manhattan Plaza
20      New York, New York 10005-1413
        (212) 530-5688
21      Email: Smurphy@milbank.com
    and
22   WILLIAM K. DODDS, ESQ.
        Dechert, LLP
23      1095 Avenue of the Americas
        New York, New York 10036-6797
24      (212) 698-3500
        Email: William.dodds@dechert.com
25      For Fidelity defendants
```

```
 1                 P R O C E E D I N G S
 2            (Begins, 3:00 p.m.)
 3            THE CLERK:  Civil Action 08-10960, Alan
 4    Zametkin, et al versus Fidelity Investments, et al.  The
 5    Court is in session.  You may be seated.
 6            THE COURT:  Good afternoon.  Would counsel
 7    please identify themselves for the Court and for the
 8    record, starting with the plaintiffs -- the plaintiff.
 9            MR. BERENS:  Your Honor, I'm Jeffrey Berens,
10    from Dyer & Berens, on behalf of Dr. Alan Zametkin.
11            MR. KAUFMAN:  Good afternoon, your Honor.
12    Evan Kaufman with Robbins, Geller, Rudman & Dowd, for
13    the plaintiff.
14            MR. STEWART:  And Adam Stewart of Shapiro,
15    Haber & Urmy for the plaintiff.
16            MR. DITTMAR:  James Dittmar, your Honor, for
17    the Fidelity defendants.
18            MR. APFEL:  Good afternoon, your Honor.  David
19    Apfel also for the Fidelity defendants.
20            MR. LIPSHUTZ:  Good afternoon, your Honor.
21    Joshua Lipshutz, also for the Fidelity defendants, from
22    Goodwin Procter.
23            MR. MURPHY:  Sean Murphy, Milbank, Tweed,
24    Hadley & McCloy, for the Fidelity defendants.
25            MR. DODDS:  And William Dodds for the Fidelity
```

1    Income Fund.

2              THE COURT:  Okay.  We're here in connection

3    with these defendants' motion to dismiss the second

4    amended complaint.  I'd like to see if I've got the

5    framework right.  I believe the original complaint was

6    filed on June 5, 2008 and that's the relevant date for

7    analysis concerning the defendants' statute of

8    limitations argument.  The second amended complaint was

9    filed April 8th, 2010 and it's that which is the focus

10   of the motion to dismiss.

11        Am I right so far?

12              MR. DITTMAR:  Correct, your Honor.

13              THE COURT:  All right.  Then it's my

14   understanding that the usual Rule 12(b)(6) standard for

15   deciding a motion to dismiss applies and I have to

16   determine whether the complaint alleges sufficient facts

17   to state a plausible claim, as that term has been

18   described in *Twombly* and *Igbal*.  I believe I can

19   consider the second amended complaint as documents that

20   are undisputedly authentic or essential to the

21   plaintiff's claims and which are referenced in the

22   complaint.  And that, for the purposes of this matter,

23   would include the registration statement, as the parties

24   call them, and certain newspaper articles referred to in

25   the complaint.  Am I right on that?

 1          MR. DITTMAR:  I think, your Honor, plus the

 2     prospectuses, the annual and semiannual reports, and the

 3     shareholder updates, which go out with the annual and

 4     semiannual reports to all shareholders.  All of those

 5     documents are, in one variant or addition or another,

 6     exhibits to one or the other of my two affidavits.  And

 7     there aren't that many.

 8          THE COURT:  Okay.

 9          MR. KAUFMAN:  And it's fine with us, your

10     Honor.

11          THE COURT:  All right.  Then, as I understand

12     it, the plaintiff's claims are under Sections 11, 12 and

13     15 of the Securities Act of 1933.  The 1933 Act creates

14     liability for any false or misleading statement or

15     omission that is material.  Fraud is not an element of a

16     1933 Act claim.  The plaintiff need not prove scienter.

17     And therefore it's the ordinary pleading standard of

18     Rule 8 that applies rather than the heightened pleading

19     standard for fraud under 9(b).

20          Am I right about that?

21          MR. KAUFMAN:  We agree with it, your Honor,

22     yes.

23          MR. DITTMAR:  Yes.

24          THE COURT:  All right.  And then there's a

25     one-year statute of limitations provided in 15 United

1   States Code Section 77(m).  As I understand it, it

2   expires one year after the discovery of the untrue

3   statement or omission or after such discovery should

4   have been made by the exercise of reasonable diligence.

5   And if I interpret that -- and this may be less black

6   letter law, but I read the Supreme Court's 2010 decision

7   in *Merck* as essentially importing a second part of that

8   standard into a 10(b)(5) claim and then interpreting it

9   and saying that when somebody's on inquiry notice to

10  begin investigating, it is not necessarily the same date

11  on which he should have known that something whatever

12  was at issue.  But before the *Merck* part, my description

13  of the one-year statute of limitations, is it right up

14  to that point, do you think?

15          MR. DITTMAR:  Up to that point, your Honor,

16  yes, but I'd like to be heard on -- begging the next

17  step.

18          THE COURT:  All right.  That's fine.  I

19  understood that was disputed.  But in any event, I'm

20  telling you what my present, sort of tentative view of

21  the implications of *Merck* are.

22      Then -- and I really -- and I'm sure you're all

23  prepared and I want to hear your arguments the way you

24  want to make it, but it will help me again to see if

25  I've got a feel for this starting out -- a proper feel

1    for this starting out.  I'm interested in knowing what

2    the plaintiff regards as his best argument, in other

3    words, what is the strongest case that there's a false

4    statement or, as I interpret it at the moment, an

5    omission.  I think I know what the answer to that is,

6    but I guess I would like to hear how you articulate it.

7              MR. KAUFMAN:  Well, your Honor, we believe

8    that we have -- there are several strong arguments.  It

9    would be difficult to just take one.  However, we think

10   the -- just the -- our overriding allegations that

11   defendants represented that the Fidelity Ultra bond fund

12   was structured in a way, um, with a focus of

13   preservation of capital, was materially misleading, and

14   was untrue.  The Fidelity fund did not disclose that it

15   had such an overwhelming percentage of its securities

16   invested in mortgage-related securities and especially

17   subprime, risky mortgage securities.

18        An important investment in the fund was the fund's

19   investment in the internally managed mutual fund, the

20   Fidelity central fund, which Fidelity represented to

21   investors to -- to comprise of "the diversified internal

22   pool of short-term assets designed to outperform cash-

23   like instruments with similar risk characteristics."

24   The central fund was heavily invested in subprime

25   securities and about 78 percent of the securities in the

```
1    central fund were investment and mortgage-related
2    securities and about 28 --
3              THE COURT:  In the central fund or in the
4    Ultra Short bond fund if you count the investment in the
5    central fund?
6              MR. KAUFMAN:  It was actually both.  When
7    the -- for purposes of the number of holdings in both
8    funds, approximately 78 percent as of April of 2000, um
9    -- it was April of 2007, about 78 percent of the
10   holdings in the -- the Ultra Short fund were mortgage
11   related as well as the holdings in the central fund were
12   mortgage related.
13        What's -- we allege in the complaint that not only
14   were the securities themselves risky, not only were
15   mortgage-related securities risky, not only were
16   subprime securities risky, but the fact that there was
17   -- that the fund put all of its eggs in one basket
18   rendered the fund itself extremely risky, plus, um,
19   based upon information provided by a former employee of
20   Fidelity who had reason to know the information,
21   Fidelity was loading up on these mortgage-related
22   securities even though they did not fully understand
23   securities, could not evaluate the investment-worthiness
24   of the securities, and Fidelity was unable to adequately
25   price the securities or even determine if the prices
```

1   provided to Fidelity from a pricing service was fair.

2   And as a result, Fidelity --

3              THE COURT:  I'm sorry.  Go ahead.

4              MR. KAUFMAN:  As a result, Fidelity was unable

5   to follow its stated valuation methodologies of

6   determining whether those prices were fair or not,

7   because they weren't capable of doing that.

8              THE COURT:  Now, you just gave me some

9   statistics as of April 30, 2007, correct?

10             MR. KAUFMAN:  Yes.

11             THE COURT:  And you derived those from public

12  filings that Fidelity had made as of April of 2007?

13             MR. KAUFMAN:  No, your Honor.  Well there's --

14  I describe two percentages.  One is the percentage of

15  mortgage-related investments.  In order to determine

16  that percentage, what we did was we took the investments

17  that were -- annual investments that were disclosed by

18  Fidelity and then we performed an extensive amount of

19  research internally on computer systems that we have

20  access to that are very expensive that an ordinary

21  investor wouldn't have access to and cull through those

22  investments, look behind the investments, and

23  determined, you know, which were mortgage related out of

24  the entire portfolio.  Um, we were not able to discern

25  that information from Fidelity's representations

```
 1    themselves.  We had to do a significant amount of
 2    investigation on that.
 3         With respect to the subprime, um, Fidelity didn't
 4    provide any disclosures, um, that would enable us to
 5    determine what was subprime and was not subprime and
 6    what we did for that was we looked at disclosure that
 7    Fidelity made in the second half of 2008 which -- which
 8    they hadn't made prior to that point and in which they
 9    identified which of the securities were subprime.  So in
10    March of 2008, Fidelity finally included footnotes which
11    would -- which identified the subprime securities and
12    they were able to determine subprime securities from
13    earlier periods.  Um, that information was not provided
14    to investors at the time they made their investments.
15              THE COURT:  And, in fact, let me just -- part
16    of what I distill from the complaint and your argument
17    -- let's see to what extent this is accurate and to what
18    extent perhaps incomplete, because you've amplified what
19    I understood was your primary argument in a helpful
20    way.  I thought that a central allegation is that as of
21    April 30, 2007 it was disclosed that 13.3 percent of the
22    holdings of the fund were collateralized mortgage
23    obligations, or CMOs.  It was not disclosed that 48
24    percent of the asset-backed securities, or ABSs, were
25    subprime mortgage securities and that 67 percent were
```

```
 1    mortgage related.  Those securities, held directly by
 2    the fund, were 37 percent of the fund's value, which I
 3    think you argued alone was a disproportionate amount or
 4    lack of adequate diversity.  But then 78 percent -- um,
 5    78 percent of the securities in which there were
 6    investments were mortgage related without counting the
 7    central fund, and with the central fund, 50 percent of
 8    the value was in mortgage-related securities.  Is
 9    that -- did I get that right or --
10              MR. KAUFMAN:  Yes, your Honor.  Um, your
11    Honor, um -- I believe so.  As of April 30th, 2007, um,
12    Fidelity disclosed to investors that 28.8 percent of the
13    fund's direct holdings were asset-backed securities and
14    13.3 percent were CMOs, collateralized mortgage
15    obligations, and other mortgage-related securities.
16    Thus, we allege that the defendants gave the impression
17    and all indications were that the fund held 13.3 percent
18    of mortgage-related securities and then some additional
19    mortgage-related securities under asset-backed
20    securities.  And we allege that that was misleading in
21    and of itself.
22              THE COURT:  It was misleading because?
23              MR. KAUFMAN:  Because it was really that
24    Fidelity invested in 13.3 percent in mortgage-related
25    securities and then 50 percent of the ABS were mortgage-
```

```
 1   related securities.
 2             THE COURT:  And in the disclosure documents,
 3   as I've called them, the public documents revealed or
 4   disclosed that some of the ABS investments would be
 5   mortgage related, but your complaint is about the
 6   degree?
 7             MR. KAUFMAN:  Exactly, your Honor, it's the
 8   degree.  We are not alleging that investors didn't know
 9   that ABS included mortgage-related securities, but
10   rather that investors didn't know that such a
11   significant portion were invested in mortgage-related
12   securities.
13             THE COURT:  And what information, you know,
14   that you've given me on this did you develop in
15   connection with filing the complaint or after the
16   original complaint and not get from the documents that
17   existed as of about April of 2007?
18             MR. KAUFMAN:  The percentage of securities
19   that were mortgage related, um, we had to perform our
20   own investigation for that.  That information was not
21   disclosed.  We performed very tedious extensive research
22   to formulate those allegations.
23             THE COURT:  I think the defendants argue that
24   if you just look at the listing of the securities that
25   were in the -- well, I may be confused about this, but
```

1  the listing of the securities that were in the central

2  fund, a very high percentage of them said "mortgage" or

3  "home" or "residence" in the title of the security.  So

4  you would have known that -- or a reasonable investor

5  would have known that.

6        MR. KAUFMAN:  Well, some did indicate that

7  they were mortgage related, but many did not.  And we

8  provided some examples of those, um, in the complaint.

9  And an important thing to also understand is the -- is

10  the impact that the central fund had on the overall fund

11  itself.  About 25 percent of the Ultra Short bond fund's

12  investments were invested in the central fund.  Um,

13  defendants, however, did not disclose any of the

14  investments in the central fund during the second half

15  of the class period.

16        The beginning of the class period, there were

17  disclosures about the individual holdings in the central

18  fund, but in 2007 and 2008, um, those individual

19  holdings were taken out.  The only thing that was

20  disclosed in the registration statements and in all

21  documents that are incorporated into the registration

22  statements were the fact that the fund invested in the

23  central fund.  And the financials for the fund were not

24  audited in connection with the holdings in the central

25  fund.

1          THE COURT:  So you had to do some independent

2     investigation to get that and to see the percentage in

3     2007 and in 2008 of the overall investment that was in

4     mortgage-related securities and subprime mortgage

5     securities?

6          MR. KAUFMAN:  Yeah, an investor would have to

7     look well outside the documents that are provided to

8     them by Fidelity even if they knew to do that.  Um, but

9     based upon Fidelity's representations, there were no

10    indications that they should have done that because that

11    fund was supposed to be structured as a -- you know, in

12    cash -- in investments similar to cash investments.

13         THE COURT:  But didn't Andrew Dudley, in what

14    is Exhibit C in one of these -- maybe Exhibit E to

15    Mr. Dittmar's affidavit, um, in his "fund talk," which I

16    think was in 2000 and -- was this in 2007?  Yeah, the

17    January 31, 2007 shareholder update -- talk about how he

18    "heavily emphasized nongovernment bonds including

19    structured products such as asset-based securities and

20    mortgage-backed securities" and he "held structure in

21    other securities not only directly but also indirectly

22    through the Fidelity Ultra Short central fund."  I was

23    reading from Page 3 and 4.

24         MR. KAUFMAN:  3 and 4?

25         THE COURT:  Yeah.  I was reading mainly from

1    the top of Page 4.

2              MR. KAUFMAN:  Yeah, I see where you're

3    reading, your Honor.

4         Um, well, first, if you look at the statements,

5    Fidelity disclosed that they heavily emphasized

6    nongovernment bonds which could include a whole variety

7    of different types of investments.

8              THE COURT:  Well, like what?

9              MR. KAUFMAN:  Um, like in corporate bonds it

10   could be credit card receivables.  It could be student

11   loans.  I mean, there are, um, vehicle loans.  Um, there

12   are all different types of securities that could be

13   included within nongovernment bonds.  And --

14             THE COURT:  All right.  And then if you go on

15   to Page 5, he says, on the left:  "I'm content to remain

16   somewhat conservatively positioned by focusing on

17   attractively priced sectors such as mortgages and asset-

18   backed securities as long as I believe they offer the

19   better combination of attractive valuations, quality and

20   compelling yield advantage over treasurer securities."

21             MR. KAUFMAN:  Um, well, there are a few things

22   about that statement.  Um, first, is that, once again,

23   Fidelity is telling investors that the portfolio is

24   conservative where such a heavy -- where such a large

25   investment in one sector, in the mortgage sector is not

1    -- is not a conservative investment.

2        Plus, Fidelity is representing that these

3    securities are accurately priced, but based upon the

4    allegations in the complaint, Fidelity was incapable of

5    determining whether these securities were accurately

6    priced because they weren't capable of evaluating the

7    investment-worthiness of these securities and were not

8    able to determine whether the prices they received were

9    fair.

10        THE COURT:  And then to the right of what I

11   was just reading -- "on securities backed by subprime

12   mortgages," it says:  "Over the past five years,

13   subprime mortgages have become a more significant

14   component of the securitized bond market.  During the

15   final months of the period there was a steady stream of

16   news about troubles in this marketplace.  A slowing

17   housing market precipitated rising delinquencies for

18   these loans which in turn caused declining valuations

19   for the bonds backed by this type of collateral."  It

20   goes on to say, "At Fidelity we employ sophisticated

21   techniques that incorporate a full evaluation of the

22   collateral."  And, "As a result of their analysis, they

23   primarily emphasize subprime mortgage securities rated

24   Triple A or Double A by major bond-rating agencies."

25        Why is that specific discussion of subprime

1    mortgages, in your view, sort of inadequate to make the

2    necessary disclosures?

3         MR. KAUFMAN:  Well, it reveals that the fund

4    was invested in subprime securities, however, it did not

5    reveal, um, first of all, the significant risk that

6    investors were exposed to as a result of such large

7    holdings in subprime securities and it did not disclose

8    the level or extent of the investment in subprime

9    securities.  And when you look at the entire document

10   together -- if you look on the next page, it actually

11   lists the performance of that fund.  Even with the

12   investments in the subprime sector, the fund resulted in

13   a very small variance from the benchmark index for that

14   category which would leave a reasonable investor to

15   believe that even if the fund invested in mortgage-

16   related securities, it was a very, very small investment

17   and it did not have an impact on the performance of the

18   fund.  But as we know, um, when -- when the defendants

19   eventually reduced the NAV, the investors suffered

20   significant losses as a result of much larger

21   investments in subprime securities than was disclosed at

22   least in this January 2007 report.

23        THE COURT:  Well, this is helpful to me at the

24   outset.  And then --

25        MR. KAUFMAN:  Well, your Honor, could I add

1    one more point about what we just read?

2         Going back to Page 5, um, Fidelity is again

3    issuing an untrue statement by stating that "Fidelity

4    employs sophisticated techniques that incorporate a full

5    evaluation of the collateral of the loans and of bond

6    structure, meaning credit enhancement."  That statement

7    is misleading based upon the information provided, once

8    again, by a confidential witness who said that Fidelity,

9    at this point in time, didn't even have a group that was

10   competent to employ sophisticated techniques or fully

11   evaluate the collateral of the loans.

12              THE COURT:  All right.  And ultimately this

13   cooperating witness, if the case survives the motion to

14   dismiss, will be subject to discovery by the defendants

15   in a securities case?  I mean, you're relying on

16   somebody.  I guess I'm trying to -- if we were at

17   summary judgment I would have to base the decision --

18   and we're not, but base the decision on admissible

19   evidence.  Do you anticipate this person is going to

20   testify in this case?

21              MR. KAUFMAN:  Um, what I can tell you today is

22   that I'm very comfortable with this person who provided

23   us the information and up until now that person, um,

24   whether -- you know, what will happen in the course of

25   litigation, I'm not sure.  I know there's case law for

```
 1    different ways.  But, yes, I believe my understanding of
 2    the case law in the circuit is that we will, um, provide
 3    the identity of that person.
 4              THE COURT:  Yes.  Exactly.  All right.  And my
 5    last thing or preliminary question is, um, there are two
 6    *Yu*, Y-U, *vs. State Street Corporation* decisions,
 7    although I have it in the Federal Supplement version, I
 8    think it's the February 25, 2010 decision, the
 9    defendants discuss it, quite a bit, in the memorandum in
10    support of the motion to dismiss, but then there was an
11    amended complaint that wasn't dismissed.  Is it -- do
12    you have this case in mind?
13              MR. KAUFMAN:  Um, yes, your Honor.
14              THE COURT:  And this case, you say, is
15    analogous to the present case?
16              MR. KAUFMAN:  This case is very analogous to
17    the present case, your Honor.  In the *State Street* case,
18    the amended complaint was dismissed, then the
19    plaintiffs filed -- your Honor, the same counsel that
20    represents the plaintiff, State Street, actually is
21    representing the plaintiffs here as well.
22              THE COURT:  What a coincidence.
23              (Laughter.)
24              MR. KAUFMAN:  And the theories are very, very
25    similar and there are very, very similar allegations.
```

```
 1    Um, that State Street did not adequately disclose the
 2    fund's investments in mortgage related and in subprime
 3    mortgage securities.  Um, the initial amended complaint
 4    was dismissed, um, we filed a motion for
 5    reconsideration, and added some additional allegations
 6    detailing actual percentages of the fund's holdings in
 7    mortgage related and in subprime securities, and the
 8    court reversed and granted our motion for
 9    reconsideration.  And when we amended the complaint
10    here, um, we amended it in a similar way by
11    supplementing our allegations by adding specific
12    percentages that the Fidelity Ultra Short bond fund held
13    in mortgage related and in subprime securities.
14              THE COURT:  I may need to read this more
15    closely, but what I'm calling *Yu II*, the second of the
16    New Jersey State Street decisions, um, a discussion was
17    about largely the mortgage-related securities and was
18    there a distinction between mortgage-related securities
19    and mortgage-backed securities that made a difference?
20              MR. KAUFMAN:  There was a distinction,
21    however, where the similarities really are, in these two
22    cases, if I could read to you a quote from the opinion
23    in which the Court stated:  "But as plaintiff" --
24              THE COURT:  On what page?
25              MR. KAUFMAN:  It's on page --
```

1           THE COURT:  3?

2           MR. KAUFMAN:  It's on Page 3 at the top right

3    or Page 4 of 5 on the pdf, towards the middle of that

4    paragraph on the right.

5           THE COURT:  Well, I don't think we have

6    necessarily the same version.  But go ahead.  It would

7    start "It remains true"?  But go ahead.  What do you

8    want me to read?

9           MR. KAUFMAN:  It's on Star 3.

10          THE COURT:  Right.

11          MR. KAUFMAN:  Towards the end and right below

12   the footnote.  "But as plaintiff persuasively argues,

13   there's a world of difference between a fund listing 14

14   percent mortgage-backed securities with some additional

15   mortgage securities, characterized as asset-backed

16   securities, and a fund consisting of nearly 90 percent

17   mortgage-related securities."  It's very similar to our

18   allegations here where Fidelity disclosed that a little

19   more than 13 percent were mortgage related and about 70

20   percent of the securities in asset-backed are mortgage-

21   related securities.

22          THE COURT:  Okay.  All right.  That -- okay.

23   Why don't I turn to Mr. Dittmar.  That both confirms,

24   clarifies and amplifies my understanding.

25          And I have read a number of cases, but I read the

1    *Yu vs. State Street Corporation* cases to try to get a

2    sense of whether they were rightly reasoned,

3    particularly this second one, and if it was rightly

4    reasoned, whether there were distinctions in this case

5    that make a difference.  At some point you should

6    address that.  It doesn't have to be immediately.  But I

7    have -- I have kind of zeroed in on that.  And in part

8    because you like -- if I read it right, you like the

9    first one.  So I wonder about the second one.

10                   MR. DITTMAR:  Are you speaking to me?

11                   THE COURT:  Yes.

12                   MR. DITTMAR:  Oh, I thought you were speaking

13   to my brother and then, with the substance of that

14   question, I had a different perspective.

15        I think there's a critical distinction between *Yu*

16   *II* and our case.  In *Yu I*, the Court -- and I don't

17   actually have the cite for this.  I'm reading from my

18   notes, so excuse the informality.  But in *Yu I*, the

19   Court observed that there was no allegation that, um,

20   securities that fit the precise and technical definition

21   of mortgage-backed securities have been included in

22   other categories than the category of mortgage-backed

23   securities resulting in, let's call it, a distorted or

24   artificial understatement of the extent of holdings of

25   mortgage-backed securities.

1          It was precisely on that score that the complaint

2     was amended to -- between *Yu I* and *Yu II,* such that

3     there was an allegation in *Yu II* that securities that

4     fit the fund's definition of "mortgage-backed

5     securities" were classified not in the mortgage-backed

6     securities classification, but in one or more other

7     classification resulting in a distortion.  We do not

8     have that here.

9          And the 16 or 14 to, um, approximately 90 or 87

10    percent was used, I think, by the Court, um, for a

11    materiality gauge having confronted a misrepresentation

12    of the extent of mortgage-backed securities and we have

13    no misrepresentation of the extent of securities in any

14    classification in the allegations of the complaint

15    here.  What plaintiffs claim is "We didn't get" or "The

16    fund's documents didn't tell enough information or

17    didn't give precise numbers as to the number of

18    securities or the percent of the number of securities of

19    the total number of securities or the percentage of

20    total assets or data of that sort," to which, of course,

21    your Honor has seen from our papers our response is, "We

22    didn't give you precise quantitative measurements, but

23    we showed it was an awful lot."

24         And with the leave of the Court, I had expected

25    originally to go first.  I had prepared a brief

1    presentation which I was going to use a Power Point --

2              THE COURT:  That's fine.  I want to give you a

3    chance to do that.  But let me -- well, we're going to

4    go to where you planned to start, eventually.

5              (Laughter.)

6              THE COURT:  But I really want to understand

7    this because -- because what I'm calling *Yu II*, the July

8    14, 2010 decision, the judge -- I can read it to you.  I

9    don't know if you have a copy.

10             MR. DITTMAR:  I do, your Honor.

11             THE COURT:  I'm on -- this is the Westlaw

12   version.  I'm on the second page in the upper right-hand

13   corner.  This is Page 2.  It says:  "Plaintiff's real

14   claim seems to be one of omission because defendants

15   disclose that a certain type of mortgage-related

16   security represented a small percentage of the

17   portfolio."  11 percent in 2006.  13.8 in 2007.  "It's

18   misleading not to disclose that mortgage-related

19   securities as a whole represented a larger percentage of

20   the portfolio."  And then -- so I thought it was

21   treating it as an omission case, but --

22             MR. DITTMAR:  But, your Honor, if you were to

23   look across the page to the top left column of the third

24   page, um, where the Court, um, indicates what has

25   changed from the first complaint, which was -- which it

```
 1   dismissed to the second complaint, which it let stand,
 2   he says:  "The proposed amendments appear to cure these
 3   pleading deficiencies.  First, plaintiff now alleges
 4   that the stated percentage of mortgage-backed securities
 5   was actually false."
 6            THE COURT:  Well, hold on just a second.  I
 7   just want to find it.
 8            MR. DITTMAR:  I'm sorry.  Do you see where I
 9   am?
10            THE COURT:  No.
11            MR. DITTMAR:  I think we're on the same --
12   well, maybe -- I realize I have Thompson Roiters and I'm
13   not sure what -- it's headnote -- it's the paragraph
14   with Headnote 3.
15            THE COURT:  I have a number of headnotes.
16            MR. DITTMAR:  Would you like me to --
17            THE COURT:  Oh, here, no, I have 3.  "The
18   proposed amendment appears to cure these pleading
19   deficiencies.  First, plaintiff now alleges that the
20   stated percentage of mortgage-backed securities" -- I
21   see, "is actually false because many securities that fit
22   the prospectus's definition of the term were, in fact,
23   counted in other categories."
24            MR. DITTMAR:  They were hidden away basically
25   is what he is saying.
```

1          THE COURT:  Okay.  So here it's your

2     contention that there's no comparable false statement,

3     um --

4          MR. DITTMAR:  Your Honor, if I may?

5          THE COURT:  Go ahead.

6          MR. DITTMAR:  I think it's really quite

7     simple.  In *Yu*, the classification of asset-backed

8     securities doesn't, by definition, include mortgage-

9     backed securities.  In the Fidelity Ultra Short bond

10    fund case, it's just the opposite.  It's just the

11    opposite.

12         THE COURT:  That's -- okay.

13         MR. DITTMAR:  And, in fact, if we go back to

14    the focus of the earlier discussion where we went

15    through the holdings and what information there is on

16    the holdings, there are several ways in which the fund

17    documents that have been submitted to you show holdings

18    of mortgage-related securities.

19         First, there's presentation of information as to

20    the fund as a whole.  Second, there is the category of

21    asset-backed securities which those fund documents

22    explicitly say include interests in pools of residential

23    mortgages.  And third, we have the Fidelity Ultra Short

24    central fund, an internal registered investment company

25    that is available for investment by various other

 1   investment companies that have external investors and

 2   that fund is shown to hold mortgage-related securities.

 3          And for each of these three categories, your

 4   Honor, the fund documents, often through the vehicle of

 5   the words of the portfolio manager talking about

 6   investment management and fund performance, in plain

 7   English language say "mortgage-backed securities" or

 8   "mortgage-related securities" are included in the fund,

 9   in the asset-backed class, and in the central fund.

10          In addition, in plain and simple language, the

11   portfolio manager says "and I invest heavily in

12   mortgage-related securities for the fund and through --

13   and indirectly through the central fund."

14               THE COURT:  Where is that?  In the document I

15   was reading from earlier?  Exhibit E?

16               MR. DITTMAR:  Yeah, if you'd like to have my

17   show and tell --

18               THE COURT:  Okay, then go ahead.

19               MR. DITTMAR:  Mr. Apfel here is my

20   audio/visual or, as he says, "the AV guy."

21               THE COURT:  Mr. Apfel is capable of

22   considerably more than that.

23               (Laughter.)

24               MR. DITTMAR:  Oh, I know.  We recognize that.

25          But also, your Honor, as for -- for each of these

1    categories, the fund as a whole, the asset-backed class,

2    and the central fund --

3              THE COURT:  Well, let's -- here.  Let's go to

4    where you intended to start.

5              MR. DITTMAR:  Okay.  Okay.  Let's just stay

6    right here.  Why don't we go to --

7              THE COURT:  Do you have a hard set of these?

8              MR. DITTMAR:  Yeah, I was planning to hand

9    them up at the end so that --

10             THE COURT:  Well, why don't you hand them up

11   now.  I may want to write on them.

12             MR. DITTMAR:  Okay.

13             THE COURT:  Because I may decide this matter

14   today.

15             MR. DITTMAR:  Would you like one for your

16   clerk?

17             THE COURT:  Yes, I would.

18             (Hands up.)

19             THE COURT:  Here, I'll make these collectively

20   Exhibit A and if you have a third clean copy, we'll give

21   it to the clerk.  Otherwise we'll keep one clean copy.

22   But go ahead.

23             MR. DITTMAR:  I'm handing up a third clean

24   copy.

25             THE COURT:  I thought you might have one.

1          (Hands up.)

2          MR. DITTMAR:  Your Honor, I had intended, um

3     -- and depending upon your Honor's inclination, I will

4     either carry through with it or truncate it, but I had

5     intended to proffer to you today four particular points

6     or four arguments resting, to a large extent, on the

7     briefing for many of the peripheral and subsidiary and

8     tangential points.  Of course, any questions that the

9     Court has, I'll be happy to answer.

10          But I'd like to turn to the first two of them and

11     on the screen right now is the listing of all four.  The

12     first one is that there is, in the fund documents, the

13     documents that you summarized when you were doing your

14     -- if you will, your orientation session for us, in the

15     fund documents there is full disclosure of the fund's

16     investment in mortgage-related securities, including

17     subprime.  And second, there's no misrepresentation of

18     the fund's investment strategies or risks.  I'd like to

19     turn now to the first of these, which is the disclosure

20     of the fund's substantial investment in mortgage-related

21     securities.

22          That investment is reported in fund documents

23     repeatedly, repeatedly, and in different ways or

24     different formats.  First of all, there is, what I was

25     calling a few minutes ago, a plain textual description

 1    such as is on the screen right now.

 2         If I could make the screen work.  There's an

 3    on/off button.  I couldn't find it.

 4              (Adjusts.)

 5              MR. DITTMAR:  And you see here in these two

 6    shareholder updates, in 2005, 2006, the portfolio

 7    manager says that his stake in asset-backed securities,

 8    which are bonds secured by frozen assets such as home

 9    equity was the fund's largest sector rating.  I

10    emphasized "higher quality home equity ABS."  And in the

11    next slide in the deck, there's a very similar simple

12    plain English declaration, "I kept the fund tilted

13    heavily toward asset-backed bonds and mortgage

14    securities."

15         So this is pretty clear plain language.  It's not,

16    um -- it's not complicated.  It's in the annual report.

17    It's in the early pages of the annual report.  It's not

18    buried somewhere.  It's in the account the portfolio

19    manager is giving of his management or his stewardship

20    of the fund.

21              THE COURT:  Would this statement, "I held

22    these securities, namely asset-backed bonds and mortgage

23    securities" arguably plausibly communicate that the

24    asset-backed bonds were completely distinct from

25    mortgage securities?

```
 1            MR. DITTMAR:  No.  Could we take a look at
 2    Slide 9.
 3            (On screen.)
 4            MR. DITTMAR:  Um, in the statement of
 5    additional information, which is part of the
 6    registration statement, there's a definition of that
 7    classification of asset-backed securities.  "Asset-
 8    backed securities represent interests in pools of
 9    mortgages, loans, receivables, and other assets."
10        And so the ABS category -- it includes more.  I
11    recognize that.  I'm not saying that they are
12    congruent.  But the classification of asset-backed
13    securities includes -- includes, as a subset, mortgage-
14    backed securities.
15            THE COURT:  Well, let me -- the plaintiffs
16    will address this, too.  You do securities litigation
17    all the time.  I do it rarely.  I have to decide -- I
18    have to decide essentially whether disclosures of
19    material information would have been adequate for a
20    reasonable investor, I think?
21            MR. DITTMAR:  Right.
22            THE COURT:  And does the law say that a
23    reasonable investor is presumed to know everything
24    that's in the published documents?  I mean, how do I --
25    or is that an evidentiary issue, what does the
```

1    reasonable investor know?

2          MR. DITTMAR:  No, I think that's a matter of

3    law, your Honor.  Let me answer a little -- well, the

4    registration statement for a mutual fund is highly

5    regulated by the SEC.  The SEC has a regulation in the

6    form of forms or, you know, "Fill in the blank," "You

7    have to say this.  You have to say that."  There -- the

8    scheme is to have a shorter, simpler, document, which is

9    the prospectus, and then a longer and more detailed

10   document, the statement of additional information.  Both

11   of those, however, have sections with types of

12   information prescribed by the SEC.  That totality,

13   putting those two things together, are what is designed

14   -- with the SEC's judgment of what ought to go where, is

15   designed to provide full and complete and adequate

16   information for an investor.  They are designed to

17   address exactly the question you're asking, which is

18   "What does an investor need to know?  What is an

19   investor expected to know?"

20        If the SEC calls for such and such information and

21   for it to be located in a particular part in the form --

22   the forms have different parts, then that is legally

23   sufficient.  It's supposed to -- it's supposed to

24   address the informational need that the investor has and

25   also provide the legal protection of compliance with

1    disclosure obligations from the standpoint of the issuer

2    of the --

3            THE COURT:  Are there cases that say this?

4            MR. DITTMAR:  Well, we haven't researched

5    those to present them to you, but I'd would be happy

6    to --

7            THE COURT:  I mean, to a certain extent it

8    makes sense.  In other words, if your argument is "We

9    made the disclosures required by the law as interpreted

10   by the SEC, how can that be inadequate?"  Um, unless

11   it's false or misleading in a material way.  Okay.  So

12   it's your position essentially that I would look at the

13   document and, in effect, assume that a reasonable

14   investor knows the information that's in the document?

15           MR. DITTMAR:  Um, yes.  I want to go a step

16   further.  I want to go a step further.  Because the --

17   we're focusing right now on this question of would a

18   reasonable investor understand that the category, ABS,

19   includes mortgage-related securities?  And I've pointed

20   you to some language in the statement of additional

21   information that says exactly that.

22       Um, the fund itself, twice a year, at the end of

23   its fiscal year and at the end of the 6-month fiscal

24   period, the half year or the mid year, um, publishes an

25   annual or a semiannual report, as the case may be, um,

1     and that report, among other things, has a listing of

2     every single security that is in the fund's portfolio as

3     of the last day of the fiscal period.  That report goes

4     to every shareholder.

5          Um, now, that report breaks the individual

6     asset -- the individual investment asset into

7     categories.  One of those categories for this fund is

8     asset-backed securities.  And if we could have, I

9     believe, it's 13.

10               (On screen.)

11          MR. DITTMAR:  No, maybe not.  It's 7.  I'm in

12     a different place in my notes.

13          Um, and that is a slide that depicts, in

14     abbreviated fashion, what the July 31, 2006 annual

15     report says, um, for the two categories of portfolio

16     securities that are listed there, asset-backed

17     securities and collateralized mortgage obligations.

18     Between the two of them, 25 out of the total 33 pages

19     listing the investment portfolio holdings of the fund as

20     of the fiscal year end, are clearly mortgage-related

21     paper.

22               THE COURT:  But that's one of the things I was

23     trying to get at is, as a matter of law, does one

24     presume that a reasonable investor will get that

25     document and read these 33 pages and see this

1    information or is it not necessary, as long as you put

2    it out there, does it discharge your obligation?

3            MR. DITTMAR:  I think to answer that question,

4    your Honor, is that if you put it out there, it

5    discharges your obligation of the disclosure if it's a

6    suitable disclosure.  Otherwise -- otherwise willful

7    ignorance gives rise to legal rights that informed

8    investors don't have.

9            THE COURT:  Well, I guess what I'm wrestling

10   with is when you have some text like Mr. Dudley's

11   statement in 2007, you know, it synthesizes it, it says

12   -- it says what it says.  And perhaps -- and perhaps

13   it's reasonable to expect investors to read that kind of

14   narrative on it.  I wonder whether it's -- whether the

15   usual investor, who hopefully is part of the reasonable

16   investor, really goes through all that supporting

17   documentation.  But go ahead.

18           MR. DITTMAR:  Well, I pointed out two things,

19   the textual language that says "mortgage related or an

20   asset backed," I've shown you essentially a portrayal of

21   what's in the annual report showing that the asset-

22   backed category has scores, in fact hundreds of

23   securities that are mortgage-related home-equity related

24   securities and then, um, finally there is, in the annual

25   report, a graphic presentation that shows now this time

1    not a count of securities, a number of securities, but

2    dollar value, how much of the dollar value of the

3    portfolio of this fund is represented by mortgage-

4    related securities.  And we have categories that are

5    shown here, corporate bonds, et cetera, including asset-

6    backed securities and CMOs and other mortgage-related

7    securities.

8              THE COURT:  Well, let me ask you this.  It

9    goes back to you.  It goes back to the *State Street II*

10   case.  This says, "CMOs and other mortgage-related

11   securities in 2006, July 31, represented 23.1 percent of

12   the value of the fund."  Did I read that right?

13             MR. DITTMAR:  You read that right.

14             THE COURT:  All right.  These asset-backed

15   securities, it says, represent 39 percent of the fund.

16             MR. DITTMAR:  Correct.

17             THE COURT:  Are some of those asset-backed

18   securities mortgage-related securities?

19             MR. DITTMAR:  They are.

20             THE COURT:  So why doesn't that make this

21   analogous to you?

22             MR. DITTMAR:  Because, your Honor, two

23   reasons.  One, the language we looked at a few minutes

24   ago in these fund documents says that the category

25   asset-backed securities shall include interests in

```
 1    mortgage pools, shall include mortgage-related
 2    securities.  Precisely the problem with *Yu,* that that
 3    was not stated, just the opposite was done.  There were
 4    securities that fit the precise definition that were
 5    excluded from the definitional category in *Yu.*
 6            THE COURT:  But something -- something --
 7    okay, you finish and then I'll go.
 8            MR. DITTMAR:  We've been here before.  I don't
 9    --
10            THE COURT:  Well, we've been here before over
11    the last 25 years.
12            MR. DITTMAR:  That's what I mean.
13            THE COURT:  But I'm getting mellow in my old
14    age.  But go ahead.
15            (Laughter.)
16            MR. DITTMAR:  Well, I am, too.  I'm learning
17    to pick it up sooner.
18            THE COURT:  Well, pretty soon we're going to
19    be -- well, I'm not going to say it.  We'll just be
20    sitting here in silence waiting for each other for a
21    change.  Go ahead.  I'll give you a chance.  Otherwise
22    I'm going to step in.
23            MR. DITTMAR:  That's why I want to kind of get
24    my word in.
25        There are two reasons.  One is the definitional,
```

1      the express definitional, "Here it is said that asset-

2      backed includes mortgage securities," the language we

3      were just looking at, and the second is what we were

4      just looking at, you can go through the listing of

5      securities in the annual report and in the semiannual

6      report and that listing has a goal section called "asset

7      backed securities" and you cast your eye down them --

8      and we were just looking at that a moment ago, and you

9      see one after another after another after another

10     security identified as mortgage trusts, home equity

11     loans, and so forth.  Clearly mortgage-related

12     securities.

13             THE COURT:  Okay.  Now, am I correct that in

14     the law relating to securities it's possible for

15     something to be accurate but nevertheless misleading and

16     indeed materially misleading as a general proposition?

17             MR. DITTMAR:  Yes, that is the case.  But, you

18     know, your Honor, if I may?  It's a very good point.

19             THE COURT:  Thank you.

20             MR. DITTMAR:  I'll wait.  I'll wait.

21             THE COURT:  So -- well, why is it implausible

22     that it would be found, by a finder of fact, a jury,

23     that this is materially misleading because, in a simple

24     way, the graph or the chart says there's 23 percent

25     mortgage-related securities and it doesn't signal

1    somebody to look at the original prospectus that defines

2    asset-backed securities as including mortgages or direct

3    them to look -- to look at the long list of things that

4    are described elsewhere?

5              MR. DITTMAR:  Well, I'll say two things, maybe

6    three.  One, to document another principle, it's a

7    companion to the one you just referenced, which is that

8    something can be literally accurate but misleading.  Um,

9    and another principle of construction that is throughout

10   the federal securities laws is that you look at the

11   disclosures of the document as a whole.  And looking at

12   the disclosures of the fund documents relating to this

13   particular question, we have the specific definitional

14   English language definitional provision, we have

15   statements by the portfolio manager that he invests in

16   mortgage-related securities through asset-backed, um,

17   and we also have the listing that comes out with every

18   annual and semiannual report.  And I think under those

19   circumstances, as a matter of law and hence something

20   that your Honor can decide on a motion to dismiss, a

21   reasonable investor cannot be found to be ignorant of

22   those other provisions in the document.

23        And I'd like to add one further thing, which is to

24   observe that the principle that your Honor has cited,

25   that a provision can be literally true, but connote to

1    an investor something different than the literal truth
2    and hence be misleading, tends to occur -- tends to
3    occur in contexts where the literal truth is squirrelled
4    away in some dark corner of the massive document and
5    it's there to be pointed to by the author of the
6    document saying, "Well, but I disclosed."
7         What we're talking about -- the disclosures we're
8    talking about are front and center disclosures.  They're
9    easily grasped, they're in parts of documents that --
10   many of them are in parts of documents that are not all
11   that large or where much of the document is dealing
12   with -- as in the annual report, is dealing with the
13   very point I'm making that so many of the investment
14   securities are, um, mortgage related.  Those securities
15   that fall under the classification of ABS or asset-
16   backed securities, as well as 100 percent of the
17   securities that are under the CMOs and other mortgage
18   related.
19        And I would like to just tell you one final
20   thing.  There's a technical -- there also is a technical
21   reason why that we have briefed, and it's in a footnote,
22   and I'm sort of commended to you and your law clerks,
23   there is a -- there are technical definitions of "asset-
24   backed securities" and "mortgage-backed securities" and
25   "mortgage-related securities," and they aren't quite the

1    same, and not in the sense that they aren't interests in

2    pools of mortgages, it's rather in features of the

3    investment structure such as does the income pass

4    through to the ultimate beneficiary or does the income

5    stop at the investment pool level and cumulate in the

6    investment pool level.

7         So this is -- this -- I'm making that point so

8    that your Honor understands that the use of the two

9    different categories is not in there as a snare for the

10   unwary to get tripped up, but it has a logic basis in

11   some technicalities of federal law.

12        Now, um, your Honor has already taken a look at

13   the next piece, the next module, if you will, on the

14   point that I've been making, that the fund documents

15   disclosed a substantial investment in MRS, in mortgage-

16   related securities, including subprime, and that's the

17   January 31, 2007 shareholder update which contains the

18   portfolio manager's account which --

19             THE COURT:  Well, actually, I think -- I think

20   we've skipped or have quickly passed a couple.  You have

21   one that says -- if you go back probably to 2,

22   "Plaintiff's allegations."  "It was not until April 2,

23   2008 that defendants belatedly disclosed the actual

24   extent of the fund's subprime exposure."  Right?

25             MR. DITTMAR:  Right.

1          THE COURT:  And then the next one you showed

2     me was a January 31, 2007 shareholder update and that

3     includes Mr. Dudley's statement.

4          MR. DITTMAR:  Right.

5          THE COURT:  So are you showing me something in

6     here that shows the extent of the subprime exposure?

7          MR. DITTMAR:  Um, there is nothing in here,

8     your Honor, that shows a quantitative measurement of the

9     subprime exposure.

10          THE COURT:  What was the subprime exposure?

11     When did it come out, in April of 2007?

12          MR. DITTMAR:  No, this came out shortly after

13     the end of January.

14          THE COURT:  Okay.  So let's say it was in

15     February or March.  What was the subprime exposure then?

16          MR. DITTMAR:  I don't know what it was

17     precisely.  As I stand here I have forgotten that

18     number, your Honor.

19          THE COURT:  Okay.  Go ahead.

20          MR. DITTMAR:  But what the statement shows is

21     that the subprime investments that this fund have were

22     sufficient enough to have a negative impact on fund

23     performance.  As he puts it on page, um, 4, I think it's

24     4, Roman Numeral IV, of the document, and it's really

25     the fourth of four, the first four text pages, um -- I'm

1   sorry, it's the second of those four text pages.  He

2   indicates that investment in subprime was a

3   disappointment and that it detracted from fund

4   performance, which means the investment was of a

5   sufficient scale to impact the overall performance of

6   the entire fund.

7              THE COURT:  It goes on, the highlighted part

8   you have here, to say "Even higher quality subprime

9   securities, which are my area of emphasis, couldn't

10  escape investor concerns over rising delinquencies."

11             MR. DITTMAR:  That's right.

12             THE COURT:  I believe it's the plaintiff's

13  argument, and that's why I wanted to hear it at the

14  outset, that Mr. Dudley wasn't investing in higher

15  qualities of subprime securities and, in fact, he wasn't

16  competent to assess the quality at all or the quality of

17  advice he was getting from outside agencies.  Why --

18             MR. DITTMAR:  Well, I did not quite hear it

19  that way, your Honor, but if that is what plaintiff is

20  asserting, it's an assertion in purely conclusory terms

21  without any kind of fact to make that assertion

22  plausible.

23             THE COURT:  Well, they say they have a

24  cooperating witness who is going to testify.

25             MR. DITTMAR:  But --

```
 1            THE COURT:  Let me finish.

 2            MR. DITTMAR:  Yes.

 3            THE COURT:  Or I'll revert to form.  You're

 4     going to rejuvenate me.

 5         They say they have a cooperating witness whom I

 6     infer has admissible evidence, somebody who presumably

 7     works at Fidelity and saw Mr. Dudley in action, um, who

 8     will say that Mr. Dudley didn't understand these things,

 9     that he had no way of evaluating these things himself or

10     of evaluating the quality and advice he was getting from

11     Bear Stearns, I think it was.  It seems to me that's a

12     factual assertion with a purported witness who will

13     testify to it and this could be -- and for this motion

14     to dismiss stage, um, a false statement that plausibly

15     could be proved because Mr. Dudley is here saying, in

16     effect, you know, "You may have been reading about the

17     problems in the subprime market and they hit us, too,

18     but I've got higher quality subprime mortgages."

19            MR. DITTMAR:  Um, first, I think a careful

20     reading of the complaint doesn't show quite that

21     allegation.  I don't think that there are facts -- facts

22     sufficient to make that claim plausible as opposed to

23     purely conclusory assertions that Fidelity didn't know

24     how to manage or value these securities.

25            THE COURT:  Okay, it's Mr. Kaufman, right?
```

1          MR. KAUFMAN:  Yes, your Honor.

2          THE COURT:  All right.  Where is the -- did I

3     understand your argument right, that you're claiming

4     that Mr. Dudley, on behalf of Fidelity, was saying that

5     he was acquiring higher quality subprime securities but

6     he wasn't competent to evaluate them or evaluate the

7     advice he was getting?

8          MR. KAUFMAN:  Yes, your Honor, that is one of

9     our arguments.

10          THE COURT:  And where is it in the complaint?

11          MR. KAUFMAN:  (Searches.)  I'm just turning to

12     the page.  If you look at Paragraph 65 in the complaint,

13     it says -- there's a heading "Valuable labels accurately

14     priced in risky mortgage-related securities."

15          THE COURT:  Just a second.  Page 18?

16          MR. KAUFMAN:  I mean that entire section

17     describes our factual allegations.  In Paragraph 65,

18     according to CW-1, "During the class period, Fidelity

19     was not able to value the CPOs and other risky mortgage-

20     related securities."

21          If you look at Paragraph 73.  (Turns.)  "We allege

22     that the fund purchased and held significant amounts of

23     risky mortgage-related securities, including subprime

24     mortgage securities, even though the fund investment

25     advisor or manager did not fully understand these

1    securities or know how to adequately evaluate those

2    securities or understand how to properly evaluate them

3    for the purpose of setting the fund NAV."

4            THE COURT:  The net asset value?

5            MR. KAUFMAN:  Yes.

6        And then if you look at Paragraph 75, according to

7    CW-1, "It was not until the summer of 2007, at the

8    earliest, that Fidelity finally even put together a

9    meaningful complex securities group that was even

10   capable of understanding the CPOs and other complex

11   risky mortgage-related securities."  That's when they

12   first formed a group that was even able to understand

13   securities.

14           (Pause.)

15           THE COURT:  Well --

16           MR. DITTMAR:  Can I be heard?

17           THE COURT:  Yes.  So what's insufficient about

18   those allegations?

19           MR. DITTMAR:  Those allegations, your Honor,

20   if you read them carefully, relate exclusively to

21   valuation.  Valuation of portfolio securities is an

22   entirely separate function than management of a

23   portfolio of securities.  Different people.  Different

24   process.  Different function.  And I dare say, a fair

25   reading of this complaint, it's a different claim in

```
 1    this complaint.
 2         It's a claim -- there's a separate claim that
 3    says -- that for some reason the registration statement
 4    and prospectus are misleading because Fidelity couldn't
 5    value the securities that it held and because the net
 6    asset value per share, which is sort of a per share
 7    value of the entire -- of the entire mutual fund, could
 8    not be --
 9              THE COURT:  But if you keep -- I think
10    usually -- do you want to point to another?
11              MR. KAUFMAN:  Yeah, I just wanted to point out
12    another paragraph.
13              THE COURT:  Which one is that?
14              MR. KAUFMAN:  Um, Paragraph 72 towards the top
15    of Page 21.  Um, CW-1 also stated that Fidelity acquired
16    these securities before they were fully understood at
17    Fidelity and that Fidelity, quote, "figured they would
18    evaluate their investment-worthiness as time passed."
19    While the witness does provide information and that that
20    supports our allegations that Bally was unable to value
21    the securities or even confirm that the values they
22    received from Bear Stearns were accurate or fair, um,
23    here CW-1 also provided information that Fidelity did
24    not fully understand the securities.
25              THE COURT:  And I think -- if I understood
```

```
 1    sort of the opening statement, although this may go to
 2    whether this is an objective or a fact, Fidelity is
 3    characterizing this as a conservative investment
 4    vehicle, one that is aimed at preserving capital, but
 5    getting you a higher yield than you would get under
 6    treasury bonds or something.  And so --
 7              MR. DITTMAR:  Fidelity is not adopting, in its
 8    registration statement and prospectus, the nomenclature
 9    "conservative."  That's not in the registration
10    statement of the --
11              THE COURT:  Does Mr. Dudley use that term?
12              MR. DITTMAR:  He may.  I don't remember
13    everything that he said, whether he said at some point
14    he's done something that's more conservative or less
15    conservative.  But that's just an opinion, your Honor.
16    What the 33 Act says, an opinion or an objective --
17              THE COURT:  Well, I understand that opinions
18    are generally not actions.
19              MR. DITTMAR:  Yes, and I would say that in
20    this case -- in precisely this case with the kinds of
21    issues that this case has, what might be actionable is
22    the disclosures about investment strategies, the
23    practical investment strategies that are being used, and
24    whether you then say, um, in this market that set of
25    strategies is conservative or not conservative is a
```

1    matter of opinion.

2              THE COURT:  Well, let's do it this way.  And

3    I, of course, haven't reached these conclusions, the

4    questions are just occurring to me, and I'm sure I'll

5    put the questions to Mr. Kaufman, again too.  But the

6    false statement of net asset value would be actionable

7    under the 1933 Act, wouldn't it?  It's material?  If

8    there was one.

9              MR. DITTMAR:  I'm not sure that it would be

10   actionable under the 33 Act, because net --

11             THE COURT:  Because the net asset value of

12   your shares is $1 and the true net asset value of the

13   shares at the time the statement was referring to was 2

14   cents, that wouldn't be a false statement?

15             MR. DITTMAR:  The price per share is not a

16   registration statement or prospectus term.  There may be

17   other provisions of federal law that would be

18   extrapolated if you were selling some, you know, some

19   artificially-inflated priced share.  But I think we got

20   -- and if I may try to get us back?

21             THE COURT:  Go ahead.

22             MR. DITTMAR:  I think we were talking about

23   whether this complaint, um -- whether this complaint

24   alleges, um, mismanagement by Mr. Dudley and/or the

25   portfolio --

1          THE COURT:  I think it's generally accepted

2     that I have to look at -- that mismanagement alone is

3     not actionable under the 1933 --

4          MR. DITTMAR:  Exactly.  Exactly.  So to the

5     extent to which the allegations that were just read to

6     you are mismanagement allegations, which they seem to me

7     to be, they're not actionable under the --

8          THE COURT:  Well, maybe I have to read the

9     cases.  What case would say that's mismanagement?  If

10    you're making a statement that I'm buying high quality

11    -- well, let's say it was expressed.  I'm an expert with

12    regard to mortgage-related securities, including

13    subprime mortgages.  I'm buying high-quality mortgages

14    and I misrepresented my experience, my expertise, I made

15    it all up.  That wouldn't be actionable?

16          MR. DITTMAR:  Well, if there -- if expertise

17    is portrayed fairly, directly or indirectly, I'm not

18    going to be -- I'm not going to quivel with you, in the

19    registration statement or prospectus and that expertise

20    were not, in fact, possessed, that competence was not,

21    in fact, possessed, then I think that would be

22    actionable.  But that's -- but, your Honor, what I am

23    saying here is that there are no facts, sufficient facts

24    to get us into the plausible claim department.

25          THE COURT:  Let's go a little further.  I

1    don't know that it's on your slide, but Mr. Dudley --

2    "Andrew Dudley had securities backed by subprime

3    mortgages."  You'd say --

4              MR. DITTMAR:  This is the same January 31st of

5    '07?

6              THE COURT:  Right, it's in the same paragraph

7    you've got up on the screen.  You just don't have the

8    whole paragraph.  It says:  "At Fidelity we employ

9    sophisticated techniques that incorporate a full

10   evaluation of the collateral of loans and of bond

11   structure, meaning its credit enhancement."

12             MR. DITTMAR:  Right.

13             THE COURT:  They allege, in the paragraphs

14   Mr. Kaufman pointed out, that they have a witness who

15   will provide admissible evidence that Fidelity didn't

16   have any such thing in January of 2007.  It wasn't until

17   that summer that they put together a group to try to

18   understand these commodities.

19             MR. DITTMAR:  Well, two things.  I don't

20   think, in fairness -- in a fair reading, that the

21   complaint alleges facts sufficient to make that a

22   plausible claim and it's conclusory assertions and

23   simply tagging onto a conclusory assertion the source of

24   a, quote, "confidential witness," closed quote, to give

25   it a certain mysterious aura, doesn't make a conclusory

1    assertion insufficient to support a plausible claim out

2    of that deficiency.

3         This complaint, on the score that we're now

4    talking about, to the extent the complaint is not simply

5    complaining about mismanagement, which is not actionable

6    under the 33 Act, it is asserting mere conclusions and

7    not sufficient facts to support a plausible claim.  That

8    is my point, your Honor.

9         And just to tie all the loose ends together.  When

10   we went off looking at valuation, my brother was arguing

11   that the allegations of inability to value or a

12   misvaluation of the security support the claim of

13   inability to manage and I'm simply pointing out that the

14   valuation is an entirely different thing than managing a

15   portfolio, it's done differently, by different people,

16   and with different processes.  And, as I said once

17   before, the allegations regarding valuation, or improper

18   valuation, or inability to value, are presented in this

19   complaint as a different ground of claim, different from

20   the, quote, "mismanagement" claim.

21              THE COURT:  Okay.

22              MR. DITTMAR:  Could I also just direct you to

23   the very last sentence of this box on Andy Dudley on

24   securities backed by subprime --

25              THE COURT:  Where he says he buys Triple A or

```
 1    Double A rated bonds?
 2              MR. DITTMAR:  Yeah, that's right.  And
 3    plaintiffs have nowhere, nowhere challenged -- nowhere
 4    said that that is misleading other than -- other than,
 5    if I may, that they have said, "Well, Triple A wasn't
 6    really Triple A", which --
 7              THE COURT:  Well, I don't think that's what
 8    they say, they say they didn't have the -- these are all
 9    allegations I have to accept as true and I have to draw
10    reasonable inferences from their specific allegations.
11    They're alleging that Mr. Dudley and the people who work
12    with him, um, weren't able to evaluate the quality of
13    the advice they were getting from Bear Stearns and
14    others.  That they had some independent duty not just to
15    buy something with a label or buy something that
16    another -- you know, that another firm had endorsed, but
17    to --
18              MR. DITTMAR:  I don't think, your Honor -- I
19    don't think, your Honor, that the Bear Stearns's role
20    was as an advisor.  The Bear Stearns' role was as a
21    market-participating broker dealer, in fact, it was the
22    leading one for subprime paper, um, who provided
23    valuation information, market information on value of
24    subprime mortgage-backed securities.  It wasn't --
25    Bear Stearns wasn't rendering advice to Fidelity as an
```

1    investment advisor to assist it in performing investment

2    advice.  That's one thing.

3         The second thing, if I may?  The reference that,

4    in the sentence that I've pointed you to at the end of

5    this little boxed insert, that's referring to the

6    purchasing or the -- the "emphasis" is the word he uses

7    for subprime purchases, um, on Triple A or Double A

8    ratings by the nature of bond services.  Now, that's

9    standard in Forbes, for example.  That has -- those

10   services, those bond-rating services, those credit-

11   rating services, have for decades been the authoritative

12   setters of the credit quality of debt instruments, of

13   debt securities, and that's all he's saying here.  He's

14   saying, you know --

15             THE COURT:  It doesn't look to me like it's

16   all he's saying that I go buy Double A and Triple A

17   bonds.  He says:  "At Fidelity we employ sophisticated

18   techniques that incorporate a full evaluation of the

19   collateral of the loans and of bond structure, meaning

20   its credit enhancement.  Credit enhancement provides a

21   cushion, often a significant one, against realized

22   losses from the underlying pool of collateral.  The

23   result of our analysis of these securities is that I

24   primarily emphasize subprime mortgage securities rated

25   Triple A or Double A by the major bond-rating

 1    agencies."

 2         If he didn't employ a sophisticated technique that

 3    led him to buy those bonds as opposed to some other

 4    security, that would be a false statement, I think, of

 5    fact.

 6              MR. DITTMAR:  That would be a false statement,

 7    although I'd suggest, your Honor, that the critical

 8    piece of information from a fact standpoint in a

 9    disclosure document associated with, um, the offering of

10    an investment is the end result, which is the purchase

11    of sub -- the emphasis in purchasing subprime on Double

12    and Triple A.  Triple A, of course, is the highest rated

13    credit rating that debt securities can get and Double As

14    are the next highest.

15              THE COURT:  Okay.

16              MR. DITTMAR:  And that's -- and I was not

17    neglecting the earlier part, I was focusing on what the

18    credit agencies, the rating agencies are doing, which is

19    providing ratings that he then uses in his decisions to

20    purchase and hold securities.

21         Um, the page that is in front of you and the

22    previous page, the ones -- the pages from the January

23    31, '07, the shareholder update, um, they're in that

24    deck primarily to demonstrate that the investors, um, in

25    this fund were apprised of the fact -- the fact of

```
 1   investment in subprime -- though they have claimed in
 2   their complaint that they didn't understand that the
 3   fund was investing in subprime, and even though risks
 4   associated with that particular, um, type of investment
 5   where he points out in January, the end of January of
 6   2007, the steady stream of news about troubles in this
 7   marketplace, a slowing housing market, rising
 8   delinquencies and declining valuations, this is a pretty
 9   robust disclosure that this fund is investing in
10   subprime mortgage-related securities.
11              THE COURT:  I know.  And you stopped with the
12   sentence that's causing me concern.  You don't have it
13   on your sheet.  "At Fidelity we employ sophisticated
14   techniques and incorporate," et cetera.
15        Okay.  I think we need to move from this.
16              MR. DITTMAR:  Okay.  I'd like to spend a
17   couple of minutes on disclosure of risks.
18              THE COURT:  Okay.
19              MR. DITTMAR:  But I think that -- I've had
20   your Honor's attention for quite a while.
21              THE COURT:  Go ahead.  When I get the sense
22   you're wasting my time, I'll tell you.
23              MR. DITTMAR:  Okay.  Could you do it quietly?
24        Maybe we'll go on then to Slide 15.
25              (Changes overhead slide.)
```

1            MR. DITTMAR:  Your Honor, um, this is a page

2       from the September 29th, 2005 prospectus.

3            THE COURT:  Okay, and this is under the

4       argument summary that "There's no alleged

5       misrepresentation of the fund's investment strategies or

6       risks"?

7            MR. DITTMAR:  That's exactly right, your

8       Honor.  That packet that you have holds together as a

9       coherent whole.

10           The first -- this page, um, which is the, um, at

11      the very, very beginning of the text of that prospectus,

12      it's -- it's, in fact, the first text page after your

13      table of contents and the title page.  It contains the

14      investment objective, the principal investment

15      strategies and the principal investment risks.

16           THE COURT:  Hold on just one second.

17           (Pause.)

18           MR. DITTMAR:  Your Honor --

19           THE COURT:  Okay.  Go ahead.

20           MR. DITTMAR:  I have three pages of call-outs

21      with yellow highlighting from literally the same page.

22           THE COURT:  Go ahead.

23           MR. DITTMAR:  The first is the investment

24      objective, which is a "high-level of current income

25      consistent with preservation of capital," which

 1     plaintiff, um, spends a great deal of energy focusing

 2     on, but this investment objective cannot be the basis of

 3     a claim of a violation of the 33 Act.  There's really no

 4     plausible basis to say that this was not, in fact, the

 5     objective of the fund, notwithstanding that plaintiff

 6     says that the fund has secretly abandoned that

 7     objective.  There are no facts to support that.  It's

 8     not plausible.  The argument is that the fund invested

 9     in a kind of security that, um, makes this statement

10     untrue because this security is of such high risk, but

11     that's not to say that this objective is not, in fact,

12     and has not always been the objective of the fund.

13          In fact, there are several cases that the parties

14     cite to your Honor including Judge Gorton's decision, um

15     --

16               THE COURT:  Is that *Evergreen*?

17               MR. DITTMAR:  In *Evergreen*, exactly, where he

18     says "Objectives like preservation of capital or

19     characterizations of investment strategy as conservative

20     don't" -- they aren't the making of misrepresentation

21     claims under the 33 Act, what you need is you need

22     concrete, specific investment strategies or policies.

23     Those are facts.  Those can be misrepresented or fairly

24     represented.  Um, and we, in fact, or Fidelity, in fact,

25     does list the principal investment strategies, if we go

1  to the next slide, which is 16.

2            (Next slide.)

3            MR. DITTMAR:  The column there from Page 3 of

4  the prospectus, right under the section called

5  "Investment objective," has a listing of principal

6  investment strategies.  We've culled out four of them.

7  There are about seven or eight.  These are probably the

8  most germane to the fund in the circumstances in the

9  market that occurred in 2007 and 2008.

10           THE COURT:  When it says "Investing more than

11  25 percent of total assets of the financial services

12  industry of mortgage-backed securities, investments in

13  the financial services industry"?

14           MR. DITTMAR:  Yes.  Yes.  Because these, um,

15  mortgage securities are put together by firms in the

16  financial services business.  And the investment

17  strategy of the firm are, um -- are strategies that

18  have, if you will, conservative dimensions and they also

19  reflect that there are meaningful risks taken by this

20  fund.  Um, the ones that we highlighted, "normally

21  investing at least 80 percent of assets in investment

22  grade" --

23           THE COURT:  I mean, why would a reasonable

24  investor understand that an investment in mortgage-

25  backed securities with an investment in the financial

1    services industry, as opposed to buying stock in Goldman

2    Sachs, for example?

3            MR. DITTMAR:  Well, you'd have to, um, among

4    other things, also have to look at the listing of

5    investment securities that are in the fund's portfolio,

6    which every new investor gets with the previous annual

7    report and that's with, um -- because it's part of the

8    prospectus and registration statement that you get every

9    six months.  And you can look through -- it doesn't take

10   a genius, it doesn't take rocket science, it just takes

11   some attentiveness to --

12           THE COURT:  But my point here is that, you

13   know, somebody might read the summary -- well, that

14   sentence communicates to me that some of these

15   investors, you know -- I only glance at the business

16   pages.  There's nothing I can do about them, except

17   decide these cases, which I know are very important to

18   everyone involved.

19       But it says, "Oh, they're investing in the

20   financial services industry" and I read that, you know,

21   Goldman Sachs is doing great, that Citibank is doing

22   great.  That -- maybe I'm an unreasonable investor.  But

23   it communicates to me that you're investing in banks,

24   you're investing in firms like Goldman Sachs.  Not that

25   you're investing in people's -- packages of people's

1    home mortgages.

2              MR. DITTMAR:  Those are financial services.

3    Those are the products of financial services.

4              THE COURT:  All right.

5              MR. DITTMAR:  I mean, if you look at the list

6    of securities --

7              THE COURT:  All right.  When Mr. Kaufman gets

8    up, he'll tell me whether that's one of their arguments

9    or not.  Go ahead.

10             MR. DITTMAR:  Um, my point is that there is a

11   series of disclosed concrete specific investment

12   strategies and there's been no challenge to these

13   investment strategies as being falsely presented.  And

14   similarly, if we turn to the last portion of that boxed

15   section, "Principal investment risks," we have

16   disclosure of investment risks, economic downturns and

17   the significant effect on issuers in the financial

18   sector, a particular type of security could be more

19   volatile than the market as a whole, which is the case,

20   um, and the ultimate admonition that you can lose money

21   investing in this fund.  So that this fund, this fund's

22   prospectus, um, presents the principal investment

23   strategies, the principal investment risks.  As

24   *Evergreen* points out, that's where the substance to

25   characterizations or opinions, conservative or not

 1    conservative and the like, that's where real substance

 2    and that's where legal standards can be applied.

 3         And I'd like to make a point, your Honor, about

 4    the body of cases in the last year or so and a couple

 5    going back to the earlier part of the first decade of

 6    this century when collateralized mortgage obligations

 7    were introduced.  There's a series of cases that are on

 8    your screen right now that have involved, um, risk

 9    disclosures and both parties have cited in the briefing

10    to these cases and it's quite interesting that every

11    single one of these cases that has resulted in either

12    SEC enforcement action, which is reflected in the

13    particular case that it's referenced or court decisions

14    permitting litigation, private litigation to proceed,

15    every single one of them has involved a violation, a

16    systematic violation of a concrete specific investment

17    strategy.  And these are strategies just like the kind

18    of strategies that we were looking at a minute ago for

19    the Fidelity Ultra Short fund, duration, maturity,

20    liquidity, concentration, things of that sort, and each

21    of these instances involve SEC action.

22         To turn to the Fidelity Ultra Short fund, there

23    are no allegations that any of the specified investment

24    strategies have been systematically violated and there's

25    no SEC action.

1        Um, I think we've touched upon the NAV.

2            THE COURT:  Hold on a second.  Go ahead.  So

3    here's -- the next section you're arguing is that

4    there's no plausible allegation that the funds NAV was

5    inflated, right?

6            MR. DITTMAR:  Right.  And I'd like to make

7    three points there.  One is that, as one of the cases,

8    and it's slipping my mind right now, which one it is,

9    your Honor, makes the point that -- um, NAV can be

10   challenged as false only when procedures that are

11   represented are not followed.  And here we get to --

12           THE COURT:  You know, that's exactly where we

13   were.  I mean, this is coming into -- at the moment, and

14   I haven't heard again from Mr. Kaufman, but, you know,

15   this sounds like it has a good shot of surviving.

16           MR. DITTMAR:  Absolutely.  Absolutely.  My

17   point -- I completely admit and I don't plan to -- I

18   didn't plan to dilate on this and take much time.  But

19   my point is to please take a look at the complaint.  Are

20   there allegations of fact that sufficiently support a

21   plausible claim?  But I also want to address, um, two

22   other points.

23           THE COURT:  But why is it -- and maybe we're

24   repeating ourselves, but when they say "We have a

25   confidential witness who will testify," and this is the

1   inference in, say, Paragraph 65, that Fidelity is not

2   able to value these correctly, that it didn't have -- it

3   didn't have -- "It didn't employ a sophisticated

4   technique to incorporate a full evaluation of the

5   collateral of those loans."

6           MR. DITTMAR:  With all respect, your Honor --

7           THE COURT:  Everything is with all respect.  I

8   understand.  You're always respectful.  Go ahead.

9           MR. DITTMAR:  Except when I talk when you're

10  talking and then I recognize that --

11          THE COURT:  It's not disrespectful.  It's just

12  passion.  Go ahead.

13          MR. DITTMAR:  Thank you.  With all due

14  respect, I do not believe that that allegation, in

15  Paragraph 65, can fairly be considered an allegation of

16  sufficient fact to support a plausible claim.  It is

17  surely conclusory.  Conclusory.  Purely conclusory.  And

18  I would suggest that what reinforces that objection, on

19  my part, to your treating that as sufficient to get over

20  some Rule 8 bar is that Fidelity is -- you can take

21  judicial notice.  It's one of the largest investment

22  management firms of the world.  The idea that simply

23  saying "They don't know what they're doing," period,

24  with no more detail than that, is not adequate to

25  support a plausible claim.  To dress that up with a kind

1    of impenetrable cloak and dagger with --

2              THE COURT:  Okay, we're at the motion to

3    dismiss.  I understand that *Twombly* and *Igbal* have

4    raised the bar somewhat, but the question is are you

5    going to get discovery?  We're not at summary judgment.

6    We're not at trial.  I --

7              MR. DITTMAR:  Exactly.  But, your Honor, and

8    maybe I'm a supplicant now, but that's exactly the

9    question.

10             THE COURT:  Is it implausible to me that

11   people at Fidelity didn't understand these instruments?

12   "No."  Is it implausible that nobody understood Enron in

13   real-time except for a handful of people, one of whom I

14   know?  "No."  There needs to be something.  You know,

15   you're right, if it was just alleged that they didn't

16   know it, but -- and I'll hear from Mr. Kaufman.  But the

17   fact that Fidelity is big or Citibank is big or AIG is

18   big is not -- doesn't make any of this implausible in

19   the context of, you know, what's occurred in the world

20   in the last couple of years.

21             MR. DITTMAR:  Well, there's nothing -- there's

22   nothing that allows the defendant, *Roy, Conley, Gibson,*

23   to know what is false and you have to have something

24   more than the assertion, "That's false."  Well --

25             THE COURT:  What do you think would be

1  minimally sufficient that's absent?

2           MR. DITTMAR:  I'm not -- that's an unfair

3  question because I don't want to write a road map for

4  opposing counsel.

5           THE COURT:  No, this is not a game.  You're

6  trying to persuade me.

7           MR. DITTMAR:  How about this?  Let me turn the

8  question around.  "During the class period, Fidelity did

9  not have an internal" --

10          THE COURT:  No, you're going to go too fast

11  for the Court Reporter.

12          MR. DITTMAR:  Okay.  "During the class period,

13  Fidelity did not have an internal team who was capable

14  of sufficiently evaluating, understanding and valuing

15  CPOs."  That's language that you looked at before.  CW-1

16  acknowledged that, quote:  "There definitely" --

17          THE COURT:  What paragraph are you reading?

18          MR. DITTMAR:  I'm reading from Paragraph 72 on

19  Page 20 at the bottom.

20     "There definitely, probably, should have been a

21  little more knowledge as to how these things are priced

22  out."  That is going to support advancing this case to

23  discovery with all of the burdens?  And, as your Honor

24  knows, the burdens in this kind of litigation are all on

25  one side.

```
1            THE COURT:  Well, actually, if any of these
2     would get tried and not settled, the burdens would be on
3     two sides because the plaintiffs' lawyers would be
4     running the risk that they're not going to get paid.
5            MR. DITTMAR:  But the fact of the matter is --
6     the fact of the matter is that the burden falls on one
7     side.  And I would say this, your Honor.  I do want to
8     make one or two quick substantive points and then I
9     think I may be done.
10          Um, to the extent your Honor, in parsing through
11    this complaint, finds that, um, as by your likes you
12    find it troubling to think that you can dismiss the
13    case, and by my likes, you know, I'm saying, "It's all
14    conclusion, there is no fact here, it's not enough to be
15    plausible," I would suggest that you think about limited
16    focused discovery, not just setting this juggernaut
17    going.  I don't want you to do that because I want you
18    to dismiss the complaint.  But I'd like to ask you to
19    put that in the back of your head.
20          Now, on this -- going back to this question of NAV
21    falsely inflated?  Um, the only facts that they point to
22    -- if we could have Slide 21.  Slide 21 is on your
23    screen right now.
24              (On screen.)
25            MR. DITTMAR:  The only fact allegations that
```

1   relate to an inflated NAV, which is based upon an

2   inflation of the pricing of portfolio securities, which

3   is the subject we've been talking about, is based -- is

4   confined to the allegation that two -- two out of the

5   hundreds of secure -- hundreds and hundreds of

6   securities that were held directly by the fund or

7   indirectly through the fund's investment in that

8   so-called central fund, one of them a Bear Stearns trust

9   held directly by the fund, is alleged to have been

10  overpriced or overvalued by $12,000 and one, Ace

11  Securities Corp., in the central fund overpriced by

12  $167,000, but together this is it, two out of hundreds

13  and hundreds of securities.  And what's -- so that's the

14  incidence.  And what's the impact, the financial

15  impact?  1/100th of a penny?  It has no impact.  It

16  doesn't come close, by decimal points, to having an

17  impact on the net asset value of this fund.  That's

18  what -- and they say, "Oh, well, these are examples."

19  With all due respect to my brother, your Honor, I don't

20  think "trust-me claims" are appropriate.

21       On its face the pleading is immaterial.  That, you

22  know, is a subject you normally don't take up at a

23  motion to dismiss phase.  But that, I think, on its

24  face, as a matter of law, it's immaterial.

25            THE COURT:  Okay.

 1          MR. DITTMAR:  Okay.  I appreciate your

 2     indulgence, your Honor.

 3          THE COURT:  It's not indulgence.  The stakes

 4     are high for everybody.

 5          It's 5 minutes of 5:00.  We've been going for two

 6     hours.  I'm going to give the stenographer a 10-minute

 7     break and then I'm going to hear from Mr. Kaufman.  I

 8     want to make sure I understand your argument.

 9          And you don't want to be too emboldened by my

10     questions to Mr. Dittmar because it does look to me like

11     there was a lot of information disclosed.  But I want to

12     go -- you know, think about the standard, you know, what

13     are the specific facts, why is this plausible, what

14     cases are particularly helpful to you?  Maybe you'll get

15     an answer today.  Maybe you won't.  We'll come back at 5

16     minutes after 5:00.  The Court is in recess.

17               (Recess, 5:00 p.m.)

18               (Resumed, 5:10 p.m.)

19          THE COURT:  Okay.  Mr. Kaufman.

20          MR. KAUFMAN:  Your Honor, we just listened to

21     a lot of different arguments, um, many of which I

22     addressed in my opening argument, many of which I

23     addressed in the papers.  I'd like to, um, just

24     summarize some of them for you, which I believe are

25     before this court right now.

```
 1        The focus of this motion is whether the case
 2   should be permitted to go forward into discovery and a
 3   standard has been set forth here today in our papers,
 4   um, whether it's plausible that reasonable investors,
 5   that ordinary investors were misled about the value of
 6   this short bond fund.  And based upon the
 7   representations that we've seen, um, yes, a reasonable
 8   investor could have been misled by, um, the defendants'
 9   statements.
10        When you look just at the objective of the fund,
11   the fund was to be structured consistent with the
12   preservation of capital.  Was the fund's large subprime
13   mortgage investments consistent with the preservation of
14   capital?  No.
15        The fund represented that the Fidelity central
16   fund was to enhance --
17             THE COURT:  Hold on just one second.
18             (Pause.)
19             THE COURT:  As I recall, *Evergreen* dealt
20   somewhat with this issue of objectives?
21             MR. KAUFMAN:  Um, yes, *Evergreen* had similar
22   language about the objective being the preservation of
23   capital as well as some other opinions including the
24   *Charles Schwab* opinion.
25             THE COURT:  In the *Charles Schwab* opinion --
```

1    do you have that?

2                (Pause.)

3                MR. KAUFMAN:  As well as in the *Piper Capital*

4    *I* that we cited.

5                THE COURT:  Okay.  Why don't you go ahead.

6                MR. KAUFMAN:  Which also, um -- it's on Page

7    12 of our brief.  And they also used the "consistent

8    preservation of capital" part of the objective.

9         In all of those cases they use the objective of

10   the consistent preservation of capital and in each of

11   those cases the fund invested in a large quantity of

12   mortgage-related securities or a quantity of subprime

13   securities and each of those cases, um, proceeded into

14   discovery.

15        The fund represented that not only was the fund

16   going to invest in conservative securities that were

17   consistent with the preservation of capital, but the

18   fund would invest in the Fidelity central fund, which

19   would enhance the stability of the fund, and we have

20   represented that the Fidelity central fund was going to

21   focus on a diversified portfolio of cash-like

22   instruments.  However, the central fund also voted on a

23   huge quantity of mortgage-related securities and

24   subprime mortgage securities.  So that statement was

25   untrue and misleading.

1          THE COURT:  Where was that statement that the

2   central fund would be diversified, because it was

3   some -- where is the statement?

4          MR. KAUFMAN:  I'm looking for it, your Honor.

5          THE COURT:  Oh, Paragraph 117 to 118 of the

6   complaint.  But where is it in the document?

7          MR. KAUFMAN:  (Looks.)

8          THE COURT:  Well, maybe one of your colleagues

9   can find it.

10          MR. KAUFMAN:  Okay, I've actually identified

11   it, your Honor.

12          THE COURT:  Okay.  Where is it?

13          MR. KAUFMAN:  In the fund's July 31st, 2007

14   annual report.

15          THE COURT:  And where is that in the

16   affidavit?

17          MR. KAUFMAN:  (Searches.)  I believe it's

18   Exhibit F.

19          THE COURT:  To what?  To Mr. Dittmar's?

20          MR. KAUFMAN:  To Defendants' exhibits.  It was

21   actually not included in the exhibit that they --

22          THE COURT:  I'm sorry.  This is -- in the July

23   31, 2007 annual report?

24          MR. KAUFMAN:  Yes.  We quote from it in

25   Paragraph 118 of the complaint.  However, that page is

1    not included in the exhibits that defendants submitted.

2              THE COURT:  All right.  Go ahead.

3              MR. KAUFMAN:  Although that document is

4    submitted, just excerpts are submitted.

5              THE COURT:  All right.  Go ahead.

6              MR. KAUFMAN:  It's a, quote:  "Diversified

7    pool of short-term assets," and it goes on to say

8    "designed to outperform cash-like instruments with

9    similar risks characteristics."

10        The central fund was not a diversified pool of

11   short-term assets.  It's actually very, very focused on

12   the mortgage sector and subprime mortgages.  And these

13   securities are not cash-like instruments with similar

14   risk characteristic to cash.  They're much riskier.

15             (Pause.)

16             MR. KAUFMAN:  What would have been more

17   accurate, your Honor --

18             THE COURT:  In one of the -- you see, there

19   are other places, though, the September 29th prospectus,

20   which I think is Exhibit A, and the Clerk is finding it,

21   which states that "The fund is not considered" -- "is

22   considered nondiversified"?

23             MR. KAUFMAN:  Which page are you on, your

24   Honor?

25             THE COURT:  3.

1          MR. KAUFMAN:  (Searches.)  Oh, your Honor,

2     that refers to the ability for the fund to invest more

3     than a certain percentage in an individual issuer, but

4     does not refer to the ability to invest in any sector.

5          THE COURT:  Okay.  Go ahead.

6          MR. KAUFMAN:  What would be more accurate

7     would be if Fidelity changed the name of the fund to

8     "the Fidelity mortgage-related or subprime debt fund,"

9     that would have been a little more accurate to inform

10    investors of what they actually were buying and what

11    they held, because an investor looking at the

12    prospectus, at the reports, looking at the charts, does

13    not come away with the understanding that they're really

14    investing in the subprime mortgage market and the

15    mortgage market.

16         There are -- as I mentioned, there are several

17    cases that are analogous to our case here, obviously

18    *Evergreen*, of *Schwab*, and *State Street,* which we talked

19    about earlier.  And one point that I want to go back to

20    on *State Street* is that the issue in *State Street* was

21    not that State Street did not disclose that asset-backed

22    securities could include mortgage-related securities

23    because the judge in that case, um, viewed it, you know,

24    as likely that investors would know that a certain

25    number of securities were, in fact, mortgage related,

```
 1    but investors were not aware of the extent and the size
 2    of those holdings.
 3          A couple more points, your Honor.  Um, with
 4    respect to the fund disclosure about investments in
 5    subprime securities, even when they disclose the
 6    investments in mortgage securities with subprime
 7    securities, as your Honor pointed out, those words were
 8    also joined with other statements about the -- the
 9    fund's ability to evaluate those securities.  And --
10                THE COURT:  Go ahead.
11                MR. KAUFMAN:  Which were misleading
12    statements.
13                THE COURT:  Because right now I've essentially
14    honed in on that.  It's part of the reason I asked you
15    for your strongest argument because my general sense is,
16    you know, if there's one claim that's actionable, you
17    can talk later about whether it affects the scope of
18    discovery.  But, you know, looking at this as a whole,
19    particularly Mr. Dudley's statements about January of
20    2007, as I understand it, by that time, according to
21    your complaint, there are articles out there reporting
22    problems in the subprime market and the mortgage-related
23    market generally, correct?
24                MR. KAUFMAN:  Yes, your Honor.  And --
25                (Pause.)
```

1          MR. KAUFMAN:  Well, plus, at that time,

2    internally, um, at least one senior Fidelity research

3    person was expressing strong views about an impending

4    problem in the --

5          THE COURT:  But in terms of what an investor,

6    a potential investor in this Fidelity fund would know,

7    that that person might be reading the financial media

8    and seeing there are problems with the mortgage-related

9    investments and with subprime-related investments, and

10   he would know that the Ultra Short bond fund had some

11   investments in this area and you say would not

12   appreciate the full scope, although the defendant would

13   say they didn't hide anything, and that if you look at

14   the names of the securities you could see that they're

15   real estate related.

16         But in any event, you know, Andy Dudley is

17   specifically talking about securities backed by subprime

18   mortgages and he's noting that there was a steady stream

19   of news about troubles in the marketplace, um, causing a

20   decline in valuation.  But it seems to me he's going on

21   with this -- and I want to know if you think this is

22   right, that he's making a factual statement.  He's

23   saying there may be problems out there generally and

24   we're being impacted by them, but "That doesn't suggest

25   you should get out of our fund or out of this market

1     generally because at Fidelity 'We employ a

2     sophisticated'" -- "We employ sophisticated techniques

3     that incorporate a full evaluation of collateral of the

4     loans and the bond structure, meaning its credit

5     enhancement.  And the result of our analysis,"

6     Fidelity's analysis, "of these securities is that I

7     primarily emphasize subprime mortgage securities rated

8     Triple A or Double A by the major bond-rating

9     agencies."

10          But it seems to -- but this can be interpreted

11    that, reasonably, as saying "While there are problems

12    out there generally, we have a sophisticated way at

13    Fidelity of evaluating bonds and finding the good ones,"

14    and you have somebody who's told you, "No, they didn't,

15    they didn't put together a group on these until months

16    later and they didn't know what they were doing.  They

17    were just doing what everybody else was doing."  So

18    that's a factual statement.  And if there wasn't a --

19    and it could be material to somebody deciding whether

20    they want to continue having the investments in

21    mortgage-related securities.  And they might say, "I

22    wouldn't trust myself to pick some, but Fidelity's big,

23    they've got a great reputation, they have a

24    sophisticated way of dealing with these, and so they'll

25    get me the good ones if I stay and respond."

```
 1              MR. KAUFMAN:  Exactly, your Honor, and the way
 2      that you just described it is better than I could have
 3      ever described it myself.
 4              THE COURT:  Thank you very much.
 5              MR. KAUFMAN:  So I agree with everything you
 6      just said.
 7              THE COURT:  Okay, but that's a factual issue
 8      you say -- and you say that's not implausible that
 9      somebody's going to come in and be able to testify that
10      they didn't have a sophisticated means of evaluating
11      this at the time that statement was made in January of
12      2007.
13              MR. KAUFMAN:  Not only not implausible, it's
14      very plausible, and it's a factual statement.  And
15      Fidelity is holding itself out as having these great
16      sophisticated abilities to value and understand these
17      securities, which is contrary to the allegation in the
18      claims.
19              And we have --
20              THE COURT:  And while -- these allegations --
21      I mean, as Mr. Dittmar mentions, the allegations are
22      under the heading -- "Fidelity was unable to accurately
23      price risky mortgage-related securities."  But I thought
24      in Paragraph 73, you weren't just complaining about the
25      way they priced them after they acquired them, but that
```

 1    they purchased and held significant amounts of risky

 2    mortgage-related securities even though the investment

 3    advisor and the manager did not fully understand the

 4    securities, you know, how to evaluate them or understand

 5    how to properly value them.  In other words, they

 6    couldn't make properly-informed decisions on what they

 7    were buying.  Is that your contention?

 8              MR. KAUFMAN:  Yes, your Honor, it's actually

 9    both.

10              THE COURT:  Okay.  Go ahead.

11              MR. KAUFMAN:  Um, there's one slide that I

12    just wanted to refer to, which is Slide 18, which

13    references the various other cases that are very similar

14    to our case here, in which the plaintiffs have

15    sustained, and then there's a column for SEC action and

16    for Fidelity it says "No."

17        While there may not be -- while there may not be a

18    disclosed SEC action, I would, you know, ask defense

19    counsel today to make a recitation to your Honor that

20    there are no enforcement actions or investigations

21    currently ongoing that have not been publicly disclosed

22    by any regulatory agencies and concerning the Fidelity

23    fund that's at issue here.

24              THE COURT:  Well, I think my obligation is to

25    analyze this independently and not say, "Well, the SEC

1    took action, so there must be proper allegations" or

2    "The SEC didn't take action, so there's no basis for the

3    private suit."  Okay?

4              MR. KAUFMAN:  Okay.  So, your Honor, just to

5    sum up, um, you know, we believe that we have alleged

6    numerous facts which render it more than plausible that

7    Fidelity and the other defendants misrepresented the

8    fund, the capabilities of the fund, and the risk to

9    investors.  Unless you have any additional questions,

10   I'll finish.

11             THE COURT:  I don't think so.  Mr. Dittmar.

12             MR. DITTMAR:  May I just bring a couple of

13   points?

14             THE COURT:  Go ahead.

15             MR. DITTMAR:  Um, first -- and the order may

16   be a little haphazard due to the --

17             THE COURT:  No, just make the points.

18             MR. DITTMAR:  Yeah.  Your Honor, you said that

19   you read this passage where Andy Dudley speaks about

20   subprime as "connoting we have a sophisticated way of

21   finding the good ones," if that's what that meant, and

22   then if, um, plaintiff's complaint fairly alleges that

23   they didn't have the capacity to find the good ones,

24   then there's some falsity or --

25             THE COURT:  Or if they didn't even do the

1    analysis.

2             MR. DITTMAR:  Um, but what he is saying here

3    is not that "We found the good ones," what he's saying

4    is what the analysis did is it drove them to picking

5    subprime securities rated highest by the credit

6    agencies, and Triple A or Double A, which are the two

7    highest credit ratings.  So he's -- the impact of what

8    he's saying is that "We relied on the independent credit

9    agencies who have always been, so to speak, the arbiters

10   of credit quality in debt markets in the United

11   States."  That's what he's saying here.  And there's no

12   suggestion in anywhere in the complaint that that is a

13   false statement and that the end result of the

14   investment management process of picking high credit-

15   rated traunches -- the slices of subprime mortgage-

16   related securities, was not an accurate statement of

17   what was done.

18        I would like to point out -- I hope to clear up

19   what may be a little bit of confusion.  Pricing, which

20   is what drives the NAV, the net asset value of a fund,

21   is entirely different from the investment management

22   process.  The complaint alleges some deficiencies in the

23   capability and procedure for pricing, for pricing

24   securities, not for investment management.  Pricing,

25   however, um, is -- it's fundamentally a management

1    function and to say that Fidelity did a bad job --

2    because they don't say Fidelity didn't have, um --

3    didn't have the mechanism or a mechanism in place for

4    value, they say "Fidelity did a very bad job.  They

5    couldn't do it well."  That's mismanagement.  And it's

6    very clear, the federal law is very clear, that not only

7    is mismanagement not a basis for a federal securities

8    claim, but you can't bootstrap a claim of mismanagement

9    by saying "Your failure to confess your silence about

10   your inability to do your managerial function well is a

11   violation of federal securities law."  So there's sort

12   of a double-barreled bar to this line of attack, no

13   mismanagement and no bootstrapping of mismanagement.

14        And to -- and as an aid to the Court, in looking

15   at the central fund, um, Mr. Kaufman, I think, confused

16   a couple of concepts.  He said that the central fund was

17   represented as being "diversified," which is true, um,

18   "a diversified pool of short-term instruments, debt

19   instruments, designed to outperform cash-like

20   securities."  And there's no allegation that the central

21   fund wasn't diversified.  There's an allegation that

22   there was a lot of mortgage backed or mortgage related

23   securities, but that's not diversification, that's

24   concentration.  Those two words are terms of art in the

25   investment world.

1          The fund itself is -- the concentration is

2     industry wide, like financial services, and we were

3     looking at the over 25 percent in financial services,

4     that meant this fund, the Ultra Short bond fund, was a

5     concentrated fund.  Diversification is when you load up

6     on issues of a single company and the fund is also, um,

7     an undiversified fund -- a nondiversified fund.  Those

8     are disclosures about the fund.

9          So to add anything about the central fund doesn't

10    alter the character of the fund that people are

11    investing in and there was a registration statement and

12    prospectus in that issue here.

13               THE COURT:  All right.  Thank you.  Well, on

14    one hand, I'd like to take this under advisement and

15    write at length about this, but the case has been here

16    for a long time and I'm persuaded that at least one,

17    actually two claims survive the motion to dismiss and I

18    think it's in the interests of the administration of

19    justice as well as the parties and me if I give you my

20    decision and do it orally, and not as thoroughly as I

21    would like to.  But the essence of it is as follows.

22         I'm denying the motion to dismiss except --

23    actually we didn't discuss this.  I think the plaintiffs

24    recognize that Fidelity Investments is not a proper

25    defendant on Count 1, the Section 11 claim.  Is that

1   correct?

2           MR. KAUFMAN:  Um, yes, your Honor.

3           THE COURT:  All right.  Well, Fidelity

4   Investments is dismissed with regard to Count 1, the

5   Section 11 claim, but otherwise the motion to dismiss is

6   denied.

7       The standard, which I went over with the parties

8   at the outset, is important.  Basically the question is

9   whether the complaint alleges sufficient facts to state

10  a plausible claim.  The complaint is governed by Rule 8,

11  not Rule 9, because this is not a fraud case where

12  scienter has to be alleged or proven.  Rule 9 doesn't

13  apply.

14      So under Rule 8, the complaint must include a

15  short and plain statement of the claim showing that the

16  pleader is entitled to relief.  "This pleading standard

17  does not require detailed factual allegations, but it

18  does require more than labels and conclusions and a

19  formulaic recitation of the elements of a cause of

20  action will not do," as the Supreme Court said in **Bell**

21  **Atlantic** and also **Igbal**.  "The Court may disregard bald

22  assertions, unsupportable conclusions, and opprobrious

23  epithets."  "To survive a motion to dismiss, a complaint

24  must contain sufficient factual matter accepted as true

25  to state a claim to relief that is plausible on its

face," as the Supreme Court said in *Igbal*.  "The
plausibility standard is not akin to a probability
requirement, but it asks for more than a sheer
possibility that a defendant has acted unlawfully."
Again that's *Igbal* quoting *Bell Atlantic*.

To zero in on what has come into focus to me as
one actionable alleged misstatement, in Exhibit E to
Mr. Dittmar's affidavit, the January 31, 2007 Fidelity
Ultra Short Bond Fund Shareholder Update, as of January
31, 2007, Andrew Dudley, who manages the fund, is
commenting expressly on securities backed by subprime
mortgages.  He notes that:

"Over the past five years or so subprime mortgages
have become a more significant component of the
securitized bond market.  During the final months of the
period there was a steady stream of news about troubles
in this marketplace.  The slowing housing market
precipitated rising delinquencies for these loans, which
in turn caused declining valuations for the bonds backed
by this type of collateral.

At Fidelity we employ sophisticated techniques
that incorporate a full evaluation of the collateral of
the loans and the bond structure, meaning its credit
enhancement.  Credit enhancement provides a cushion,
often a significant one, against realized losses from

1   the underlying pool of collateral.  A result of our

2   analysis of these securities is that I primarily

3   emphasize subprime mortgage securities rated Triple A or

4   Double A by the major bond rating agencies."

5        This statement could be reasonably interpreted to

6   mean, "I know, Mr. Investor or possible investor, that

7   you've read about problems in the subprime mortgage

8   market and this fund invests in subprime mortgages, but

9   we have our own sophisticated techniques that

10  incorporate the full evaluation of the collaterals of

11  the loans and the bond structure and the result of our

12  analysis, our independent analysis, leads us to purchase

13  particular Triple A or Double A securities."

14       Beginning in Paragraph 65, the second amended

15  complaint relies on a witness, CW-1, who -- drawing

16  reasonable inferences in favor of the plaintiff, it

17  appears to be somebody employed at Fidelity with

18  personal knowledge who will have admissible evidence to

19  support these allegations.  It is alleged, in 65, that:

20  "Even though the fund purchased and held risky mortgage-

21  related securities, including CDOs, Fidelity was unable

22  to adequately or accurately value the securities."

23  According to CW-1:  "During the class period Fidelity

24  was not able to value CDOs and other risky mortgage-

25  related securities and depended on external pricing of

1    these mechanisms."

2         In Paragraph 73 it is alleged that:  "During the

3    class period the fund purchasing held significant

4    amounts of risky mortgage-related securities, including

5    subprime mortgage securities, even though the fund's

6    investment advisor and manager did not fully understand

7    these securities, know how to adequately evaluate such

8    securities, or understand how to properly value them for

9    the purpose of setting the fund's Net Asset Value, NAV."

10        In Paragraph 75 it's alleged, according to CW-1,

11   that:  "It was not until the summer of 2007, at the

12   earliest, that Fidelity finally put together a

13   meaningful complex securities group that was capable of

14   understanding CDOs and other complex, risky mortgage-

15   related securities."

16        So basically there's a factual statement in

17   Mr. Dudley's -- made by Mr. Dudley as of January 31,

18   2007 that:  "Fidelity employs sophisticated techniques

19   that incorporate a full evaluation of the collateral of

20   the loans and the bond structure" and -- and in the

21   complaint a witness who evidently will testify that

22   there was not such a structure or process in place as of

23   January 31, 2007, and that it was not until the summer

24   of 2007, at the earliest, that Fidelity put together a

25   meaningful complex securities group.

1          Now, I understand there are ways that those

2     statements might be reconcilable, but "Is it plausible

3     that Fidelity did not have a sophisticated technique to

4     fully evaluate the collateral," he asked?  And this is

5     not just relying on hindsight, but that it is quite

6     possible that large institutions -- notable

7     institutions, in many respects, did not understand these

8     investments and did not have -- and did not make

9     adequate efforts to understand them.  They might have

10    just gone on following the herd.  And that's essentially

11    what's alleged here.

12          I also generally find that although it doesn't

13    seem that this case is quite as strong on its

14    allegations as *Yu vs. State Street Corporation*, the July

15    14th, 2010 decision reported at 2010 Westlaw 2816259,

16    there are analogies in the allegations.  In that case --

17    and the facts were briefly discussed earlier, but it was

18    alleged that the percentage of mortgage-related

19    securities in the fund was materially greater than

20    communicated to investors or potential investors, and

21    the district court wrote in part:

22          "It remains true that any reasonable investor

23    should have known that some mortgage-related securities

24    were counted in other categories in addition to the

25    designated 'mortgage-related securities' category, but

1    as plaintiff persuasively argues, there's a world of

2    difference between a fund listing 14 percent mortgage-

3    backed securities with some additional mortgage

4    securities categorized as asset-backed securities in a

5    fund consisting of nearly 90 percent mortgage-related

6    securities.  If the allegations are true, the fund may

7    have amounted to an undiversified investment in the

8    mortgage sector and a narrow disclosure of a percentage

9    of mortgaged-backed investments which arguably misled

10    investors about that fact.  Thus, the amended complaint

11    states a plausible claim that the percentage tables did

12    categorize securities and were materially misleading."

13         And Paragraph 117 of the second amended complaint

14    quotes one of the Fidelity documents which describes the

15    Ultra Short central fund as, quote, "A diversified

16    internal pool of short-term assets designed to

17    outperform cash-like instruments with similar risk

18    characteristics in an overweighing of bonds with

19    maturities in the one- to two-year range."

20         The complaint essentially alleges that in April --

21    as of about April 30th, 2007, that 13.3 percent of the

22    holdings of the fund were described to investors as

23    "collateralized mortgage obligations."  It was disclosed

24    that asset-backed securities, also including some

25    mortgages, were not disclosed as mortgage-related

 1    securities.  And it was not disclosed that 48 percent of

 2    the asset-backed securities were subprime mortgages, and

 3    had been securitized, and 67 percent of that were

 4    mortgage related.  It was not allegedly disclosed that

 5    37 percent of the value of the fund was in such

 6    investments.

 7         It is alleged that 78 percent -- I believe this is

 8    correct, that 78 percent of the investments were

 9    mortgage related.  If you don't count the investments of

10    the central fund that Fidelity maintained in the Ultra

11    Short bond fund it invested in, it is alleged that with

12    the central fund, investors had 50 percent of their

13    value in mortgage-related securities and it is plausible

14    that it could be concluded that that was not adequately

15    disclosed.

16         As indicated earlier, a ruling on a motion to

17    dismiss is not a prediction -- it was not a finding of

18    probability and it's not a prediction of how the case

19    will come out.  The defendants have educated me to

20    understand that Fidelity made many disclosures that are

21    relevant to this case.  But at this early stage I don't

22    find that it's proper to dismiss the case based on the

23    present record.

24         That means we're going to have to do some

25    scheduling.  I actually have -- well, it's 10 minutes of

1    6:00.  I have a meeting at 6:00.

2         Can I see your book, Dennis.

3              (Pause.)

4         THE COURT:  There's a joint scheduling

5    statement.  I don't know -- well, let me ask you this.

6    And now you have a ruling.  The next step would

7    inherently be class certification, then discovery, then

8    summary judgment, which could conceivably come out in

9    the defendants' favor.

10        I could give you a little bit of time to look at

11   the schedule you proposed -- and it's now some months

12   ago, to see whether it needs any refinement or to try to

13   come up with a joint proposed schedule or should I meet

14   with you again when I can find time in the next couple

15   of weeks, even if you do agree on the schedule, to see

16   if there's anything practical that might be done to

17   resolve this such as should the schedule include some

18   time to talk about whether you want to settle the case?

19             MR. KAUFMAN:  Your Honor, perhaps we can

20   discuss it among ourselves about the schedule and then

21   we would communicate with your Honor to schedule a

22   follow-up conference.

23             THE COURT:  Mr. Dittmar?

24             MR. DITTMAR:  I wonder if -- I think

25   scheduling a time to come back would be a good idea.  I

1   just want to ask -- I'm not sure if it's indulgence or

2   what, but I'm having elective surgery, a knee

3   replacement this coming Monday.  I know I'm going to be

4   out of commission for perhaps like two weeks.

5            THE COURT:  I have no problem going into

6   December or even later.  My schedule is dense.  Is that

7   what you're suggesting?

8            MR. DITTMAR:  Then perhaps we could get back

9   to you then, because I'm not quite sure today what my --

10           THE COURT:  Okay, here's what I think I'll

11   order you to do, but I don't want this to interfere with

12   your rehabilitation.  It may take longer than you think.

13           MR. DITTMAR:  And I don't want to --

14           THE COURT:  What date do you want to report

15   back to me with a schedule and to let me know whether

16   you want to come in and see me again?  Just tell me the

17   date and within reason I'll give it to you.

18           MR. DITTMAR:  Two weeks.

19           MR. KAUFMAN:  Two weeks is fine, your Honor.

20           THE COURT:  All right.

21           MR. DITTMAR:  Actually let me make it 2 1/2

22   weeks.

23           THE COURT:  Here, how about by December 3rd.

24   And you've got Thanksgiving in there.  So talk about a

25   schedule to proceed, tell me you've talked about

 1     settling the case, and maybe you want to go to

 2     mediation, or maybe it's impossible.  But as far as I

 3     know, and I had to get into this fairly carefully,

 4     unusually carefully, in appointing the lead plaintiff

 5     and the lead counsel, and Mr. Zametkin is an adequate

 6     representative, and so there's probably going to be

 7     class certification, unless there's something I'm

 8     missing.

 9          But -- well, whatever.  You do this all the time.

10     Come up with a reasonable schedule.  Figure out the

11     minimum reasonable time to get the class certification,

12     to get the notice out, and if I certify a class, to do

13     discovery, um, and report by December 3rd.  And in that

14     report you'll tell me whether you just want me to adopt

15     the schedule you jointly agreed on or whether you think

16     it will be constructive for us to get together again and

17     if so what the agenda for that conference should be.

18     Okay?

19          All right.  The Court is in recess.

20               (Ends, 6:00 p.m.)

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4

5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

6     do hereby certify that the foregoing record is a true

7     and accurate transcription of my stenographic notes,

8     before Chief Judge Mark L. Wolf, on Monday, November 15,

9     2010, to the best of my skill and ability.

10

11

12

13

14    /s/ Richard H. Romanow 11-22-10

15    _____
      RICHARD H. ROMANOW   Date

16

17

18

19

20

21

22

23

24

25